UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RITE AID CORPORATION,                           :
30 Hunter Lane                                  :
Camp Hill, Pennsylvania 17011                   :
                                                :    CIVIL ACTION NO.
        and                                     :
                                                :
RITE AID HDQTRS. CORP.                          :    JURY TRIAL DEMANDED
30 Hunter Lane                                  :
Camp Hill, Pennsylvania 17011                   :
                                                :
              Plaintiffs,                       :
                                                :
        v.                                      :
                                                :
ASTRAZENECA PHARMACEUTICALS                     :
L.P.; ASTRAZENECA L.P.; ZENECA, INC.;           :
and ZENECA HOLDINGS, INC.,                      :
                                                :
              Defendants.                       :

_____

**COMPLAINT AND DEMAND FOR JURY TRIAL**

        Plaintiffs, Rite Aid Corporation and Rite Aid Hdqtrs. Corp. (collectively

"Plaintiffs") sue Defendants AstraZeneca Pharmaceuticals L.P., AstraZeneca L.P., Zeneca, Inc.,

and Zeneca Holdings, Inc. under the antitrust laws of the United States, and for their Complaint

allege as follows:

**NATURE OF THE ACTION**

        1.      This is a civil action seeking treble damages and other relief arising out of

Defendants' unlawful monopolization and attempted monopolization of the market for

1

omeprazole and its enantiomers, including the prescription drugs Prilosec, Nexium and any AB-rated generic equivalents of either, by switching the market from Prilosec, which now has generic competition, to a virtually identical drug, Nexium, which does not. Defendants implemented this product switch solely in order to impair generic competition and thereby maintain Defendants' dominant position in the prescription omeprazole market. Defendants' unlawful conduct has deprived Plaintiffs and other purchasers of the benefits of effective generic competition from December 2002 through the present.

## PARTIES

2.      Plaintiffs Rite Aid Corporation and Rite Aid Hdqtrs. Corp. are corporations organized and existing under the laws of the State of Delaware with a principal place of business in Camp Hill, Pennsylvania. Plaintiffs purchase substantial quantities of pharmaceutical products and other goods for resale to the public through approximately 3,350 drugstores owned and operated by Plaintiffs' affiliates. During the relevant period of time, Plaintiffs have purchased Prilosec and Nexium from wholesaler McKesson Corporation ("McKesson"), which purchased the drugs directly from Defendants for resale to Plaintiffs. McKesson has assigned to Plaintiffs the antitrust claims arising from McKesson's purchases of Prilosec and Nexium that was resold to Plaintiffs. Plaintiffs bring this action in their own behalf and as the assignees of the claims of McKesson.

3.      Defendant AstraZeneca Pharmaceuticals L.P. is a Delaware limited partnership with its principal place of business in Wilmington, Delaware. AstraZeneca

Pharmaceuticals L.P. is owned and controlled by AstraZeneca PLC, a public limited liability company domiciled in the United Kingdom.

4.     Defendant AstraZeneca L.P. is a Delaware limited partnership with its principal place of business in Wilmington, Delaware.

5.     Defendant Zeneca, Inc. is a Delaware corporation with its principal place of business in Wilmington, Delaware.

6.     Defendant Zeneca Holdings, Inc. is a Delaware corporation with its principal place of business in Wilmington, Delaware.

7.     The Defendants identified in paragraphs 3 through 6 above will be referred to collectively as "AstraZeneca."

## JURISDICTION AND VENUE

8.     Counts I and II of this Complaint are civil antitrust claims arising under section 2 of the Sherman Act, 15 U.S.C. § 2, and sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.  The Court has subject-matter jurisdiction over those claims pursuant to 28 U.S.C. §§ 1331 and 1337(a).

9.     Venue is proper in this Court pursuant to section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391, because each Defendant is an inhabitant of this District or is found or transacts business here.

**TRADE AND COMMERCE**

10.     The pharmaceutical products at issue in this case are sold in interstate commerce, and the unlawful activities alleged in this Complaint have occurred in, and have had a substantial effect upon, interstate commerce.

**CHARACTERISTICS OF PHARMACEUTICAL MARKETS**

11.     The sale of pharmaceutical products in the United States suffers from a significant market imperfection that can be exploited by manufacturers in order to create or maintain monopoly power with respect to the sale of a particular pharmaceutical composition. Markets function best when the person responsible for paying for a product is also the person who chooses which product to buy.  When the person who chooses the product also pays for it, the price of the product plays an appropriate role in the buyer's choice of product and, correspondingly, the manufacturer of the product has an appropriate incentive to lower its price.

12.     The pharmaceutical industry is characterized by a "disconnect" between the payment obligation and product selection.  State laws prohibit pharmacists from dispensing many pharmaceutical products, including omeprazole, without a prescription from the patient's physician.  This prohibition on dispensing certain drugs without a prescription creates a disconnect between the payment obligation and product selection.  The patient (and in most cases his or her insurer) has the obligation to pay for the product, but the patient's physician chooses which product the patient will buy.

13.     The relative unimportance of price in pharmaceutical markets reduces what economists call the price elasticity of demand -- the extent to which sales go down when

4

price goes up -- which in turn gives brand manufacturers the ability to profitably raise price

substantially above marginal cost.  The ability to profitably raise price above marginal cost is

referred to by economists and antitrust courts as market power or monopoly power.  Thus, one

result of the market imperfections and market structure described above is to allow

manufacturers of branded prescription pharmaceuticals to achieve and maintain monopoly

power.

      14.    Many pharmaceutical manufacturers, including AstraZeneca, exploit this

defect in pharmaceutical markets.  The so-called brand manufacturers (*i.e.*, the manufacturers of

branded, as opposed to generic, pharmaceuticals) employ large forces of sales representatives,

known as "detailers," who visit physicians' offices in an effort to persuade physicians to

prescribe the manufacturer's products.  These detailers do not advise physicians regarding the

cost of the manufacturer's products.  Studies show that physicians typically are not aware of the

relative cost of branded pharmaceutical products and that, even when physicians are aware of

relative cost, they are insensitive to price differences because they do not themselves have the

obligation to pay for the products.  As noted above, the result is that price plays a negligible role

in product selection as between branded prescription pharmaceuticals.

      15.    Manufacturers of generic prescription pharmaceuticals ("generic firms")

market their products in a fundamentally different way.  Rather than exploit the market defect by

marketing their products to doctors, generic firms market their products to pharmacies based

principally on price.  *See* Drug Product Selection, Staff Report to the FTC (Jan. 1979) ["FTC

Staff Rep."] at 49-50; A. Masson and R. Steiner, GENERIC SUBSTITUTION AND PRESCRIPTION

DRUG PRICES: ECONOMIC EFFECTS OF STATE DRUG PRODUCT SELECTION LAWS ["Generic

Substitution"] at 5 (FTC 1985).  They do so not out of altruism, but necessity.  A generic firm

cannot profitably promote a *generic* product to doctors because the firm would have no assurance

that a pharmacist would dispense its generic product rather than another's.  FTC Staff Rep. at 50.

It is thus economically infeasible for generic firms to exploit the price disconnect by promoting

products to doctors, so the firms must try to increase sales by offering low prices to pharmacies.

*See id.*  It would also be socially undesirable for generic firms to exploit the market defect by

detailing to doctors: when two firms market chemically identical drugs to doctors, both firms are

able to exploit the defect and sell their products at supracompetitve prices.

## THE ECONOMIC RATIONALE FOR GENERIC SUBSTITUTION LAWS

16.    Congress sought to ameliorate the price disconnect in pharmaceutical

markets, and restore some normal competitive pressures to those markets, by authorizing the

manufacture and sale of generic pharmaceuticals.  State legislatures continued the same policy by

mandating or permitting generic substitution by pharmacists without physician approval.  When a

pharmacist receives a prescription for a branded pharmaceutical product, and a generic version of

that product is available, state law permits (or in some cases requires) the pharmacist to dispense

the generic product instead of the branded product.  In this way, the importance of price is

reintroduced to the product selection decision at the pharmacy counter.  When generic versions

of a brand-name drug become available, the branded manufacturer loses its ability to exploit the

market imperfection, its monopoly power dissipates, and some normal competitive pressures are

restored.

17.    Today, all 50 states have Drug Product Selection ("DPS") laws that permit or require the pharmacist to dispense a generic drug in lieu of a brand drug whenever possible. These DPS laws are premised on the economic fact that brand companies exploit the market defect by promoting to doctors and that generic firms are unable to do so and therefore promote their products by offering low prices to pharmacies:

> Since physicians are an unlikely force behind a switch to lower-cost brands after the patent period has expired, an erosion of the patent-conferred monopoly must depend on others who have both the power and the incentive to respond to lower prices.    That is the role envisioned for the drug product selection laws: to transfer some of this power to pharmacists. Consumers are the ones most interested in a lower price, and pharmacists must respond to consumer demand because of direct competition with other pharmacies on prescription prices.

Generic Substitution at 7.

18.    DPS laws "shift the choice of [drug product] for most prescriptions from the physician to the pharmacist." *Id.* As the FTC Report put it, "the laws foster price competition by allowing the only principals who have financial incentives to make price comparisons -- the pharmacist and the patient -- to select drug products on the basis of price." FTC Staff Rep. at 7.

## STATE AND FEDERAL PROMOTION OF GENERIC ENTRY

19.    Based on this economic rationale, it became State and national policy to encourage generic substitution for branded drugs.  Working together, the Federal Trade Commission and the Food & Drug Administration in 1979 developed a Model Drug Product Selection Act ("Model Act") for State legislatures to enact. *See* FTC Staff Rep. at  273.  The Model Act permits pharmacists to dispense a generic unless the doctor  specifies that the brand is

7

medically necessary.  The FTC and FDA were "committed to facilitating drug product selection
[*i.e.*, generic substitution]," and believed "that effective drug product selection laws will work to
stimulate price competition in a multi-source prescription drug market." *Id.* at 291.

20.    The FDA also helped promote generic substitution by developing a list of
therapeutically equivalent, generic drugs that could be safely substituted for branded products
(today called the "Orange Book").  The purpose of the FDA's list was to "enhance the ability of
drug purchasers to recognize and take advantage of opportunities for direct savings by drug
selection."  Rules and Regulations, Dept. of Health and Human Services, Food and Drug Admin.,
Therapeutically Equivalent Drugs; Availability of List, 45 F.R. 72582 (Oct. 31, 1980) at 41.  This
list helps make drug products "sufficiently interchangeable so that price can be a major factor in
their selection."  Office of Technology Assessment, Drug Bioequivalents, at 57 (July 1974).

21.    The first generic competitor to enter a market typically does so at a price at
least 30% lower than the price of the equivalent brand-name drug and quickly takes a substantial
amount of market share away from the brand-name manufacturer.  As additional generic
competitors come to market, the price of the generics continues to fall, and their combined
market share continues to grow.  In many cases, generic competitors sell products equivalent to
brand-name prescription drugs for as little as 10% of the price of the brand-name drug, and have
captured as much as 90% of the brand-name drug's pre-generic sales.

22.    The price competition engendered by generic pharmaceuticals benefits all
purchasers of the drug, at all levels of the distribution chain, who are able to buy the same
chemical substance at much lower prices.  Retail pharmacies, such as those owned and operated

by Plaintiffs, substitute generic drugs for brand-name drugs whenever possible.

## FEDERAL REGULATION OF NEW PHARMACEUTICAL PRODUCTS

23.    The federal administrative efforts to encourage generic substitution were ratified by Congress in 1984 with the enactment of the Hatch-Waxman Act.  As noted in detail below, that Act speeded generic entry by easing the FDA approval process.

24.    Under the federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq.*, approval by the Food and Drug Administration ("FDA") is required before a new drug may be sold in interstate commerce.  Premarket approval for a new drug must be sought by filing a new drug application with the FDA, under either section 355(b) or section 355(j) of the Act, demonstrating that the drug is safe and effective for its intended use.

25.    In 1984, Congress amended the Food, Drug and Cosmetic Act by enacting the Drug Price Competition and Patent Term Restoration Act, commonly known as the Hatch-Waxman Act.  The Hatch-Waxman Act simplified the regulatory hurdles for prospective generic drug manufacturers by eliminating the need for generic firms to file lengthy and costly New Drug Applications ("NDAs") in order to obtain FDA approval.  Instead, such firms are permitted to file Abbreviated New Drug Applications ("ANDAs") and to rely on the safety and efficacy data already supplied to the FDA by the brand-name manufacturer.  The Hatch-Waxman Act also added a number of patent-related provisions to the statutory scheme, as described below.  Congress's principal purpose in enacting the Hatch-Waxman Act was "to bring generic drugs onto the market as rapidly as possible." *Mova Pharmaceuticals Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998).

26.     New drugs that are approved for sale by the FDA are sometimes protected by a patent or patents, which provide the patentee with the (conditional) exclusive right to sell that drug in the United States for the duration of the patentee or patents involved, plus any extensions.  Under 21 U.S.C. § 355(b)(1), a patentee seeking FDA approval for a new drug is required to file with the FDA the patent number and expiration date of any patents that claim the drug for which the applicant seeks approval.

27.     An applicant filing an ANDA for a generic version of a brand-name drug must certify to the FDA that one of the following conditions is satisfied: (1) the brand-name manufacturer has not filed patent information with the FDA (a "paragraph I certification"); (2) the patent or patents have expired (a "paragraph II certification"); (3) the patent will expire on a particular future date, and the generic manufacturer does not seek to market its generic product before that date (a "paragraph III certification"); or (4) the patent is invalid and/or will not be infringed by the generic manufacturer's product (a "paragraph IV certification").  21 U.S.C. § 355(j)(2)(A)(vii).

28.     If a generic manufacturer submits a paragraph IV certification stating that a listed patent is invalid or will not be infringed, it must notify the patentee of the filing and explain why the patent is invalid or will not be infringed.  21 U.S.C. § 355(j)(2)(A)(vii)(IV).

29.     The patentee, upon receiving a paragraph IV certification from an ANDA applicant, has 45 days in which to initiate a premarketing patent infringement action against the applicant (a cause of action created by the Hatch-Waxman Act).  If no action is initiated within 45 days, FDA approval of the generic proceeds without regard to patent issues.  If a patent

10

infringement lawsuit is brought within the 45-day window, however, the FDA is automatically barred from granting final approval to the generic applicant until 30 months after the patentee's receipt of the Paragraph IV certification, unless the patent expires or is held invalid or noninfringed first. 21 U.S.C. § 355(j)(5)(B)(iii). This automatic stay of FDA approval is triggered without regard to the merits of the patentee's lawsuit.

      30.     The Hatch-Waxman Act and the federal regulations that implement it do not give the FDA authority to resolve issues of patent law. The FDA is required to accept as true information it obtains from patentees, and to withhold its approval of new generic drugs whenever the patentee presents a litigated dispute (whether genuine or not) regarding the validity or infringement of a patent.

      31.     One result of the statutory and regulatory provisions described above is that brand-name manufacturers have a strong incentive to obtain, list and enforce patents against prospective generic applicants even if the patent is ultimately held to be invalid or not infringed by the generic drug. If a brand-name manufacturer is able to obtain a patent from the Patent and Trademark Office, list the patent in the Orange Book and bring actions under the Hatch-Waxman Act to enforce the patent, the brand-name manufacturer can effectively block the entry of generic competition for up to 30 months. This delay, which is triggered without regard to the merit of the patentee's claim, can be worth hundreds of millions of dollars to the manufacturer of a successful brand-name drug.

      32.     FDA regulations also provide a second means for an unscrupulous brand manufacturer to impair generic competition. Under the Hatch-Waxman Act and State regulatory

regimes, described above, only generic drugs that have been "AB-rated" by the FDA may be automatically dispensed by the pharmacist in lieu of the brand drug. In order to receive an AB-rating, a generic drug must be: (1) therapeutically equivalent to its brand name counterpart, meaning that the generic has the same active ingredient, form, dosage, strength and safety and efficacy profile, and (2) bioequivalent to its brand name counterpart, meaning that the generic is absorbed in the body at approximately the same rate as is the branded drug.

33.     An unscrupulous brand manufacturer that expects to experience generic competition to its original product (Product A) can stop promoting that product and start promoting a virtually identical product instead (Product B). Such a scheme can significantly impair the ability of a generic version of Product A to compete for all sales of the chemical, because most physicians -- in response to the brand manufacturer's detailing efforts -- will stop writing prescriptions for Product A and the approved generic product will not be substitutable for Product B. Thus, the brand manufacturer will effectively protect its sales and profits from generic competition. In order to compete for all sales of the chemical, the generic firm must start over and submit a new ANDA seeking approval to market a generic version of Product B, which will add at least several years to the FDA approval process.

34.     As shown in detail below, Defendants developed and marketed Nexium as part of exactly this kind of generic-impairing scheme. Nexium was not a medical improvement over Prilosec. But because Nexium was a slight chemical variant of the soon-to-be-approved generic versions of Prilosec, those generics could not be AB-rated to Nexium. Defendants knew, based on the economics of the pharmaceutical industry and the AB-rating system, that switching

the market from Prilosec to Nexium would substantially impair competition from generic

Prilosec, and thus allow Defendants to maintain their monopoly. Defendants' unlawfully

exclusionary conduct allowed them to maintain their monopoly by impairing the generic entry

that the Hatch-Waxman Act was designed to foster.

## OMEPRAZOLE AND ESOMEPRAZOLE

35.     Prilosec is one of a class of drugs referred to as "proton pump inhibitors,"

which are used to treat heartburn and related conditions. The active ingredient in Prilosec is

omeprazole. By 1999, sales of Prilosec in the United States had exceeded $4 billion, making it

the top-selling drug in the world.

36.     AstraZeneca owned a patent on omeprazole that was issued by the Patent

and Trademark Office in March 1981 and, after various extensions, expired in October 2001.

Defendants (or their affiliates) obtained and listed in the Orange Book more than a dozen other

patents related to omeprazole. As of October 2001, however, the active pharmaceutical

ingredient in Prilosec was unpatented, leaving Prilosec vulnerable to generic firms that could

attempt to invalidate or "design-around" the other patents.

37.     Omeprazole is a "racemate," a substance consisting of equal parts of two

different physical forms (or isomers) of the same molecule. The two physical forms are mirror

images of one another but are otherwise identical. Each form is referred to as an "enantiomer."

Esomeprazole is the left-handed or "S" (for *sinister*, the Latin word for "left-handed")

enantiomer of omeprazole. Thus, omeprazole consists of equal parts of the right- and left-handed

forms of the molecule, while esomeprazole consists exclusively of the left-handed form.

38.     The FDA approved 20 mg Prilosec capsules in September 1989, 10 mg capsules in October 1995, and 40 mg capsules in January 1998. AstraZeneca began marketing each strength of the drug shortly after receiving FDA approval. From September 1989 until December 2002, AstraZeneca was the only manufacturer of prescription drugs containing omeprazole (or any enantiomer of omeprazole) in the United States.

## DEFENDANTS' EXCLUSIONARY SCHEME
## TO IMPAIR GENERIC COMPETITION

39.     AstraZeneca was acutely aware that its best-selling drug would become potentially vulnerable to generic competition in 2001 and, during the mid-1990's, began devising ways to delay or impair generic competition. AstraZeneca convened a group of marketers, lawyers and scientists and charged them with the job of finding a solution to the impending patent expiration of the company's best-selling drug. The ad-hoc group called itself the "Shark Fin Project," named after the shape that the Prilosec sales chart would trace if Prilosec faced unimpaired generic competition: an inverted V.

40.     The basic scheme devised by the Shark Fin Project was multifaceted. First, before the onset of generic competition, AstraZeneca would seek and obtain FDA approval for a drug containing esomeprazole as its active ingredient, later named Nexium, which, because it used a slightly different form of the molecule, would not be AB-rated to (i.e., subject to substitution by) generic versions of Prilosec. Second, AstraZeneca would engage in an enormously expensive detailing and advertising campaign, using false and misleading claims, to switch existing Prilosec prescriptions to Nexium and thereby protect those prescriptions from generic substitution. Third, AstraZeneca would effectively withdraw branded Prilosec from the

14

market, cause managed care organizations not to cover the costs of generic Prilosec, and thus drive patients to the much higher-priced Nexium. This scheme was approved by AstraZeneca and put into effect beginning in the late 1990's. The scheme required AstraZeneca to incur massive costs to develop and market a new drug, but AstraZeneca accurately predicted that these costs would be far outweighed by the continued monopoly profits that AstraZeneca would enjoy as a result of impairing generic competition.

41.     As set forth in detail below, AstraZeneca's sole motive in launching Nexium and switching prescriptions from Prilosec to Nexium was to interfere with competition from generic Prilosec. Participants in the Shark Fin Project have admitted that, of the dozens of potential actions that they considered to replace the anticipated lost Prilosec sales, launching and switching prescriptions to Nexium was the worst for consumers. Nexium brought no substantial medical benefit to consumers as compared to generic Prilosec. Accordingly, AstraZeneca knew that, *absent the adverse effect on sales of generic Prilosec*, Nexium was a losing business proposition for AstraZeneca -- the costs of research, development, and marketing of Nexium would not be justified by Nexium sales. Absent the adverse effect on sales of generic Prilosec, AstraZeneca's development and marketing of Nexium made no economic sense.

**Defendants' Development of Nexium While Blocking Generic Prilosec**

42.     Anticipating the expiration of Defendants' patent on omeprazole, several generic firms filed ANDAs with the FDA seeking approval to market a generic version of Prilosec upon expiration of the basic omeprazole patent. Each of these applicants submitted a paragraph III certification with respect to that basic patent and paragraph IV certifications with

respect to the other patents that AstraZeneca had listed in the Orange Book, stating that these additional patents were either invalid or would not be infringed by their proposed generic products. Within 45 days of receiving notice of each ANDA filing, AstraZeneca (or an affiliate) sued each generic firm for patent infringement under the Hatch-Waxman Act, thereby triggering a stay of regulatory approval on each firm's ANDA.

43.    These lawsuits were ultimately consolidated in the United States District Court for the Southern District of New York. *In re Omeprazole Patent Litigation*, MDL Docket No. 1291 (S.D.N.Y.) (Jones, J.). After a bench trial in late 2001 and early 2002, the district court ruled that the relevant patents were valid but were not infringed by the proposed generic product developed by one of the generic applicants, Kremers Urban Development Co. ("KudCo"). 222 F. Supp. 2d 423 (S.D.N.Y. 2002). KudCo's ANDA was subsequently approved by the FDA and KudCo entered the market with generic Prilosec in December 2002, shortly after the district court decision. The Federal Circuit affirmed the district court's ruling in December 2003. *In re Omeprazole Patent Litigation*, 84 Fed. App. 76 (Fed. Cir. 2003).

44.    During the delay that resulted from the patent infringement cases filed against generic firms, Defendants put into effect the strategy developed by the Shark Fin Project -- developing a minutely altered form of Prilosec and converting as much of the Prilosec market as possible to that product prior to the commencement of generic competition.

45.    The minutely altered form of Prilosec developed by AstraZeneca was Nexium, which is identical to Prilosec except that Nexium contains esomeprazole rather than omeprazole as its active pharmaceutical ingredient. As explained above, esomeprazole is the

16

left-handed form of the molecule, while omeprazole contains equal parts of the left- and right-

handed forms. The two drugs are otherwise substantially identical. Accordingly, when the FDA

approved Nexium in February 2001, it found that the drug did not contain a new active chemical

entity and refused to reward Nexium with "New Chemical Entity" exclusivity. *See* 21 U.S.C. §

355(c)(3)(D)(ii).

### Defendants' Product Switching Scheme

46.    As compared to omeprazole, esomeprazole offers no therapeutic or other

benefits to consumers. AstraZeneca developed Nexium and brought it to market solely because

of its effectiveness in impairing generic competition.

47.    It is a well known phenomenon in the pharmaceutical industry that doctors

who are in the routine of prescribing Product A will not begin prescribing Product B even if a

generic version of Product B becomes available and is thus much less expensive than Product A.

This is true even if Products A and B are closely related chemical entities and even if Product A

provides no significant medical benefits over Product B. As noted in detail above, doctors are

particularly susceptible to brand manufacturer advertising in the form of "detailing." And as also

noted in detail above, generic firms are economically precluded from employing large detailing

forces.

48.    This phenomenon provides an opportunity for the manufacturer of two

closely related brand-name pharmaceuticals, one of which is vulnerable to generic competition,

to shield that product from the full force of generic competition. For example, assume that in

Year 1 a brand manufacturer makes sales of 100 units of Product B. The brand manufacturer

knows that Product B will face generic competition in Year 3 and that the generics are expected to take 80% of the unit sales, or 80 units. In order to impair that generic competition, the brand manufacturer introduces Product A in Year 1 and directs its detailers to persuade doctors to stop prescribing Product B and instead begin prescribing Product A. Because the same brand manufacturer produces both Product A and Product B, there are no "counter-detailers" to dissuade the doctors from switching from Product B to Product A. In addition, the brand manufacturer can stop providing to doctors free samples of Product B and provide only free samples of Product A. Studies show that providing (or not providing) free samples has a substantial effect on which brand product doctors will prescribe. And, again, there is no countervailing marketing effort with respect to samples because the generic versions of Product B have not yet received FDA marketing approval. Through such a strategy, a brand manufacturer can progress from selling 0 units of Product A and 100 units of Product B in Year 1 to, say, selling 70 units of Product A and 20 units of Product B in Year 3. Thus, instead of having an opportunity to sell 80% of 100 units of Product B, generic firms are limited to having an opportunity to sell 80% of only 20 units of Product B.

49.    This is exactly the generic-impairing strategy on which AstraZeneca's Shark Fin Project was based.

50.    In 2001, AstraZeneca employed approximately 6,600 detailers to promote its products to doctors. It has been reported that the company hired an additional 1,300 individuals just to detail Nexium. Beginning in March 2001, these detailers (along with the ones AstraZeneca already employed) blanketed doctors' offices with literature, samples and

promotional material and began urging all Prilosec prescribers to stop prescribing Prilosec and to start prescribing Nexium instead.

51.     Between March 2001 and the launch of generic omeprazole on or about December 9, 2002, AstraZeneca's sales representatives were aggressively detailing doctors to prescribe Nexium instead of Prilosec based on the claimed superiority of the new drug over the old. AstraZeneca spent approximately $1 billion on detailing and advertising Nexium during the two years after it was introduced.

52.     As part of its detailing effort, AstraZeneca also provided doctors with free samples of Nexium and stopped providing free samples of Prilosec. Doctors typically give free samples of drugs to their patients and simultaneously give the patient a prescription for that drug. By providing samples of Nexium rather than Prilosec, AstraZeneca encouraged physicians to stop prescribing Prilosec and start prescribing Nexium.

53.     Upon the introduction of Nexium, AstraZeneca completely stopped detailing and promoting Prilosec, despite the fact that Prilosec did not yet face generic competition and would not face such competition for another 18 months. AstraZeneca stopped making positive product claims about Prilosec and, instead, began making negative (and false) claims about the effectiveness of Prilosec in treating the conditions for which it is prescribed. AstraZeneca attempted to weaken the competitive position of its own product, Prilosec, in favor of a newer product, Nexium, for the sole reason that doing so would also weaken the competitive position of the anticipated generic versions of Prilosec.

54.     AstraZeneca's strategy was enormously successful in impairing generic

competition for Prilosec. In 2000, before the introduction of Nexium, AstraZeneca had U.S. sales of Prilosec of 29.6 million units. With the introduction of Nexium in March 2001, and with AstraZeneca's determined efforts to switch doctors from Prilosec to Nexium, in 2002 AstraZeneca had U.S. sales of 19.6 million units of Prilosec and 13.4 million units of Nexium. With the introduction of generic omeprazole in December 2002, AstraZeneca continued its market-switching strategy into 2003. In 2003, AstraZeneca continued to switch sales from Prilosec to Nexium, growing Nexium's unit sales from 13.4 million in 2002 to 18.8 million in 2003 (much of the growth at the expense of Prilosec, and the rest as a result of growth in the therapeutic category).

55.    While this product-switching strategy was enormously successful and profitable for AstraZeneca, it was an economic disaster for American consumers. As compared to Prilosec, Nexium provides no significant medical benefits to consumers. Yet, had AstraZeneca not engaged in the product-switching scheme, a minimum of 13.4 million more units of Prilosec would have been available *annually* -- beginning in December 2002 and continuing until the termination of AstraZeneca's Nexium patents in 2014 -- for generic competition. AstraZeneca's product-switching scheme thus has and will cost direct purchasers of prescription omeprazole and esomeprazole more than $11.5 billion in increased prescription costs.

56.    AstraZeneca's product-switching from Prilosec to Nexium was profitable for AstraZeneca only because the strategy had the effect of impairing generic competition to Prilosec. Absent that effect, engaging in the product switch would have made no economic sense

for AstraZeneca. In 2000, AstraZeneca had U.S. sales of 29.6 million units of Prilosec; in 2002, AstraZeneca had U.S. sales of 33 million units of Nexium and Prilosec combined (an 11.4% increase). During this same time period, however, the combined U.S. sales of all proton-pump inhibitors increased from 56.5 million units to 73.9 million units (a 30.8% increase). Thus, sales in the overall therapeutic category increased at nearly three times the rate as that of combined Nexium/Prilosec U.S. sales. Thus, AstraZeneca had *less* U.S. sales of Nexium and Prilosec combined than if AstraZeneca had sold only Prilosec (absent the effect of impairing generic competition). As AstraZeneca knew when it decided to engage in its scheme, the product switching caused AstraZeneca to lose the momentum from its prior Prilosec detailing and advertising efforts and caused some doctors, when asked to switch from Prilosec to Nexium, to instead switch from Prilosec to a non-AstraZeneca proton-pump inhibitor.

57.     In addition to this loss of sales, AstraZeneca also incurred enormous out-of-pocket expenses in order to effect the product switch from Prilosec to Nexium. These enormous expenses, calculated in the billions of dollars, include (but are not limited to) the costs of research and development to produce and obtain FDA approval for Nexium, incremental detailing and marketing expenses, stocking allowances paid to retailers to induce them to carry Nexium, and returned goods allowances paid to wholesalers and other direct purchasers in connection with the return of unused shipments of Prilosec.

58.    AstraZeneca incurred these enormous costs in order to introduce a product that was no better than Prilosec and to make *less* sales of Nexium and Prilosec combined than if AstraZeneca had sold only Prilosec (absent the effect of impairing generic competition). AstraZeneca's product-switching strategy made no economic sense absent its effect of impairing generic competition for Prilosec.

### The Scheme to Mislead Doctors and Patients

59.    To obtain FDA approval for Nexium, AstraZeneca had to test it in clinical trials. Many of the clinical trials used by AstraZeneca to obtain FDA approval of Nexium compared Nexium only with placebos (which is all that is required to obtain FDA approval). But several trials compared Nexium to Prilosec.

60.    AstraZeneca sought FDA approval to market Nexium for three indications: (1) treatment of symptomatic gastroesophageal reflux disease ("GERD"), or common heartburn; (2) treatment of erosive esophagitis; and (3) maintenance of healing of erosive esophagitis. The vast majority of prescriptions for Nexium and other proton-pump inhibitors are written for GERD, or common heartburn. While an estimated 60 million Americans -- more than 40 percent of adults -- experience symptoms of GERD, less than 2 percent suffer from erosive esophagits, a condition that cannot even be diagnosed without the doctor performing an invasive endoscopy.

61.    In an attempt to prove the superiority of Nexium over Prilosec for both common heartburn and erosive esophagitis, AstraZeneca conducted clinical trial No. 172. AstraZeneca scientists concluded that, in order to demonstrate clinical superiority with 95%

accuracy (*i.e.,* actual better results for patients in the real world), it would be necessary for the clinical trial to establish a 10% difference in complete healing rate between Nexium and Prilosec. Clinical trial No. 172 compared the results of the use of each of 40 mg of Nexium and 20 mg of Nexium to the use of 20 mg of Prilosec. The results showed no statistically significant difference between 20 mg Nexium and 20 mg Prilosec in the treatment of heartburn. While there was a slight statistical difference between 40 mg Nexium and 20 mg Prilosec at the four-week mark, that difference disappeared by the eight-week mark. For the treatment of erosive esophagitis, the results showed no statistically significant difference between the use of 20 mg of Nexium and 20 mg of Prilosec. The results showed a small difference (9.7% at 4 weeks and 6.2% at 8 weeks) as between 40 mg of Nexium and 20 mg of Prilosec for the treatment of erosive esophagitis. But the statistical difference did not meet AstraZeneca's own parameters (*i.e.,* a 10% difference) to establish a clinically significant difference.

62.     AstraZeneca performed three additional supportive trials comparing Nexium to Prilosec in the treatment of heartburn: one comparing each of 40 mg and 20 mg of Nexium with 20 mg of Prilosec, another comparing 40 mg of Nexium and 20 mg of Prilosec, and a third comparing 20 mg of Nexium and 20 mg of Prilosec. All three studies failed to show a statistically significant difference as between the use of Nexium and Prilosec to treat heartburn.

63.     With respect to further clinical trials for treatment of erosive esophagitis, AstraZeneca conducted clinical trial No. 173. This clinical trial compared the use of 40 mg of Nexium to the use of 20 mg of Prilosec for the treatment of erosive esophagitis. The results showed no statistically significant difference in outcomes for patients.

64.    AstraZeneca also conducted clinical trial No. 174, which compared the use of 20 mg of Nexium to the use of 20 mg of Prilosec for the treatment of erosive esophagitis.  The results showed no statistically significant difference in outcomes for patients.

65.    AstraZeneca eventually conducted clinical trial No. 222, which again compared the use of 40 mg of Nexium to the use of 20 mg of Prilosec for the treatment of erosive esophagitis.  This time, however, AstraZeneca increased substantially the number of participants in the trial.  Doing so allowed AstraZeneca to reduce from 10% to 5% the difference in complete healing rate between Nexium and Prilosec that would be needed to suggest clinical superiority with 95% accuracy.  This time, the results showed a moderate difference: 12% at four weeks and 9% at eight weeks.

66.    The FDA Medical Officer who reviewed the set of clinical studies concluded that "**superiority** of NEXIUM over omeprazole **was not demonstrated**."  According to the FDA Medical Officer's Review, "a superiority claim of NEXIUM over omeprazole is NOT SUPPORTED by either the comparison of [Nexium 20 mg] vs. [Prilosec 20 mg] or the comparison of [Nexium 40 mg] vs. [Nexium 20 mg]."  Summarizing the complete set of studies, the Review concluded, "There are no studies which demonstrate that [Nexium] is superior to [Prilosec], clinically or even statistically."  The FDA Medical Officer's Review is available on the FDA's web site.

67.    In summarizing the medical review, the reviewer noted in a report dated September 21, 2000 that "the sponsor's conclusion that [Nexium] has been shown to provide a significant clinical advance over omeprazole in the first-line treatment of patients with acid-

related disorders **is not supported by data**." In the reviewer's conclusion, he reiterated that "it is recommended not to allow the sponsor to claim that esomeprazole magnesium has any significant clinical advantage over omeprazole in the first-line treatment of these acid-related disorders because no data in support of such a claim have been submitted."[1]

68. The FDA accepted the reviewer's recommendation and did not permit AstraZeneca to assert that Nexium provides a significant clinical advance over Prilosec. In negotiations between the FDA and AstraZeneca concerning the labeling for Nexium, AstraZeneca agreed that the clinical trials did not support any claim that Nexium is superior to Prilosec. In a meeting on February 6, 2001, AstraZeneca's Vice President specifically informed the FDA that "AstraZeneca is not stating that Nexium is better than omeprazole." AstraZeneca's product Director specifically asserted that AstraZeneca wanted to include the results of the trials in Nexium's product label in order "to make physicians understand that Nexium is not superior to omeprazole." In reliance on these assurances, the FDA approved the Nexium product label and the inclusion of the trial results in the label.

## Defendants' False and Misleading Marketing to Effect the Switch

69. Notwithstanding the FDA's conclusion and its own concession that the clinical data did not support a claim of superiority of Nexium over Prilosec, AstraZeneca launched a massive advertising and detailing campaign designed to persuade doctors and

---

[1] In addition to the medical facts outlined above, the economic facts establish that Nexium is not superior to Prilosec. If Nexium were in fact a superior product to Prilosec, AstraZeneca would have reflected that superiority in the pricing of Nexium. Instead, rather than pricing Nexium at a premium to Prilosec, AstraZeneca introduced Nexium at a *lower* price than Prilosec. Once AstraZeneca had successfully converted the market to Nexium, AstraZeneca raised the price of

consumers that Nexium was a significant improvement over Prilosec. This fraudulent and

misleading campaign was devised by AstraZeneca to impair generic competition to its most

profitable product. AstraZeneca conducted this campaign, despite its enormous cost, in order to

maintain its monopoly position in the market.

       70.    The claims made by AstraZeneca to doctors and consumers were false and

misleading, and were know to be false and misleading, in the following particulars:

       a.   AstraZeneca claimed that Nexium was superior to Prilosec while

          omitting the fact that the FDA did not approve any claim of superiority

          of Nexium over Prilosec;

       b.   AstraZeneca claimed that Nexium was superior to Prilosec while

          omitting the fact that, in order to obtain FDA approval, AstraZeneca

          assured the FDA that "AstraZeneca is not stating that Nexium is better

          than omeprazole";

       c.   AstraZeneca claimed that Nexium was superior to Prilosec while

          omitting the fact that AstraZeneca's own set of studies showed no

          statistically significant difference in healing rates between Nexium and

          Prilosec for the most common indication, *i.e.,* common heartburn;

       d.   AstraZeneca claimed the superiority of Nexium over Prilosec with

          respect to healing erosive esophagitis, but that claim was not supported

          by the set of studies submitted by AstraZeneca to the FDA, (or by any

---

Nexium to approximately the same level as Prilosec.

other set of studies) and, in fact, the studies were included in the product label "to make physicians understand that Nexium is not superior to omeprazole";

e.  AstraZeneca claimed that Nexium was superior to Prilosec, without limiting the claim of superiority to healing of erosive esophagitis;

f.  AstraZeneca made blanket claims of superiority of Nexium over Prilosec with respect to healing erosive esophagitis without limiting the claims to superiority of 40 mg of Nexium as compared to 20 mg of Prilosec, when in fact AstraZeneca had no study showing clinical superiority of 20 mg of Nexium over 20 mg of Prilosec;

g.  AstraZeneca made blanket claims of superiority of Nexium over Prilosec with respect to healing erosive esophagitis without disclosing that most studies did not support that claim and that the one study that could have done so was based solely upon a comparison of 40 mg of Nexium to 20 mg of Prilosec.

71.    This campaign of false and misleading statements to doctors and patients, backed by a billion dollars in marketing outlays, was a material factor in causing the sales switches, described in detail above, from Prilosec to Nexium.

72.    This campaign's disastrous effects on American consumers was noted by, among others, the administrator of the Federal Centers for Medicare & Medicaid Services.  At a physicians convention in 2003, he told attendees that, "You should be embarrassed if you

prescribe Nexium" because it provides no increased medical benefits.  Instead, "The fact is, Nexium is Prilosec. . . .  It is the same drug.  It is a mirror compound."  Contrasting Nexium to truly innovative pharmaceuticals, he concluded that, "Nexium is a game that is being played on the people who pay for drugs."

### Defendants' Withdrawal of Prescription Prilosec from the Market

73.    AstraZeneca was not content merely to switch the market to Nexium and let the manufacturers of generic Prilosec fight for the few Prilosec prescriptions that might continue to be written.  Instead, AstraZeneca effectively withdrew branded Prilosec from the market.

74.    More than 70% of all U.S. consumers have health coverage provided by managed care organizations ("MCOs") that pay for some or all of the costs of prescription pharmaceuticals.  AstraZeneca knew that it is the policy of MCOs covering the vast majority of consumers to discontinue providing coverage for prescription pharmaceuticals when an over-the-counter ("OTC") version of a prescription product becomes available.  Although the costs of OTC medications are thus generally borne by consumers themselves rather than by their insurers, OTC medications nevertheless usually result in overall lower health care costs and are thus usually procompetitive.  AstraZeneca, however, arranged things differently.

75.    On January 27, 2000, AstraZeneca and its OTC marketing partner, Procter & Gamble, jointly applied to the FDA for approval to market Prilosec OTC.  Importantly, they sought approval only for short-term (initially 10 day and later 14 day) use of OTC Prilosec even

though the quantity of active ingredient in OTC Prilosec and prescription Prilosec (for longer-term use) is the same.

76.     On June 20, 2003, the FDA approved the sale of Prilosec OTC.  The FDA awarded AstraZeneca three years of exclusivity in the OTC market because of safety studies performed and submitted by AstraZeneca.  Thus, AstraZeneca was the only manufacturer of OTC omeprazole until June 2006.

77.     AstraZeneca (through its distributor, Procter & Gamble) began selling Prilosec OTC in September 2003, approximately ten months after the launch of generic Prilosec.

78.     As AstraZeneca knew and intended, upon the introduction of Prilosec OTC in September 2003, MCOs covering the vast majority of consumers refused to provide coverage for prescription Prilosec  because of the availability of the OTC version.  As AstraZeneca also knew and intended, the MCOs also stopped providing coverage for *generic* Prilosec.  And as AstraZeneca further knew and intended, the MCOs did so even though OTC Prilosec was recommended for use only for 14 days or less.

79.     AstraZeneca advises patients who begin therapy on OTC Prilosec, but who need longer-term treatment, to consult their physicians to obtain an appropriate prescription.  As a result of AstraZeneca's conduct, however, patients who consult their physicians and their MCOs will learn that there is no coverage for prescription Prilosec, whether brand or generic.  The chemically closest product to OTC Prilosec (other than the non-covered Prilosec) is, of course, Nexium.  Thus, a physician writing a prescription for a patient who has started therapy on OTC Prilosec is likely to write the prescription for Nexium.  Moreover, because most MCOs no

longer cover prescription Prilosec, the physician can confer a financial benefit on the patient by prescribing Nexium rather than advising the patient to continue taking Prilosec OTC or writing a prescription for Prilosec, both of which would have to be paid for out of the patient's own pocket.

80.    Thus, by obtaining FDA approval to market OTC Prilosec, but only for short-term use, AstraZeneca simultaneously:  (1) caused MCOs not to cover branded Prilosec and thus effectively withdrew branded Prilosec from the market; (2) caused MCOs not to cover generic Prilosec; and (3) drove patients who otherwise would have received less-expensive generic Prilosec to receive instead a prescription for much more expensive branded Nexium. AstraZeneca then exacerbated the anticompetitive consequences of this aspect of its scheme by providing a grossly insufficient supply of Prilosec OTC to meet the market demands. Throughout the three-year term of AstraZeneca's OTC market exclusivity, the market was beset with "shortages" of the Prilosec OTC supply.  As the sole manufacturer of Prilosec OTC, AstraZeneca was solely responsible for these artificial shortages.  In fact, the foreseeable effect of these shortages was to drive Prilosec OTC patients to see their physicians and obtain a prescription for Nexium.

81.    The success of this aspect of AstraZeneca's scheme is again seen in the data on unit sales. In 2003, the combined U.S. sales of branded and generic Prilosec were 15.9 million units.  In 2004, after the initiation of AstraZeneca's Prilosec OTC scheme in September 2003, the combined sales of branded and generic prescription Prilosec declined to just 9 million units.  A substantial portion of those lost units is accounted for in increased unit sales of Nexium, which increased from 18.8 million in 2003 to 20.6 million in 2004.

## Relevant Market

82.     The relevant product market is the sale of prescription pharmaceutical products containing the omeprazole/esomeprazole molecule -- *i.e.*, Prilosec, Nexium and any AB-rated generic equivalent of either.  The relevant geographic market is the United States.  A firm that was the only seller of such products in the United States could and would impose a significant, non-transitory price increase without losing sufficient sales to render the price increase unprofitable, as demonstrated by AstraZeneca's ability to profitably charge supracompetitive prices.

83.     From the time it introduced Prilosec until December 2002, AstraZeneca had a 100% share of the relevant market.  Thereafter, and solely because of the exclusionary conduct alleged above, AstraZeneca has maintained a market share of at least 70%.  But for the exclusionary conduct alleged above, AstraZeneca would have been forced to lower its prices to the price charged for generic omeprazole or its market share after December 2002 would have fallen precipitously to less than 20%.

84.     At all relevant times AstraZeneca has maintained an ability to price its omeprazole/esomeprazole prescription products very substantially above its costs of production.  Its prices have exceeded manufacturing costs by approximately 90%.

85.     AstraZeneca's unlawful actions were taken for the purpose of impairing generic competition and allowing it to continue to charge these monopoly prices.

## Effects of Defendants' Unlawful Conduct

86.    Defendants' exclusionary conduct has impaired the sale of generic omeprazole in the United States, and has unlawfully enabled Defendants to sell the omeprazole/esomeprazole molecule at monopolistic, artificially inflated prices. By engaging in such conduct, Defendants have harmed the competitive process and have perpetuated their ability to extract supracompetitive prices from purchasers. But for Defendants' illegal conduct, KudCo and other generic competitors would have been able to compete for all sales of the chemical beginning in December 2002, and Plaintiffs and other purchasers would have benefited from that competition by substituting lower-priced generic omeprazole for all of their purchases of higher-priced Nexium.

87.    There are no procompetitive justifications for Defendants' conduct. The conduct alleged above created no efficiency gains or increases in consumer welfare. On the contrary, Defendants' conduct substantially decreased or eliminated the efficiency gains that would otherwise have occurred through the successful introduction of a less expensive generic version of Prilosec that could be substituted at the pharmacy counter for branded Prilosec -- efficiency gains that Congress and State legislatures intended to bring about when they enacted the Hatch-Waxman Act and State generic substitution laws.

88.    As a result of Defendants' unlawful and exclusionary conduct, Plaintiffs continued to purchase branded omeprazole/esomeprazole from Defendants at monopoly prices rather than generic omeprazole from a generic manufacturer at lower prices. Plaintiffs continue

32

to be overcharged by paying higher prices for the drug than would have prevailed in the absence
of Defendants' unlawful conduct.

## Count I
## Monopolization (15 U.S.C. § 2)

89.     Plaintiffs incorporate by reference the allegations contained in paragraphs
1 through 88 above.

90.     At all relevant times, AstraZeneca has possessed monopoly power in the
relevant market.

91.     During the relevant period, AstraZeneca willfully and unlawfully
maintained its monopoly power by, *inter alia*: (a) introducing Nexium, a drug virtually identical
to and no more effective than Prilosec, solely to prevent generic competitors from competing for
all sales of the omeprazole/esomeprazole molecule; (b) engaging in a massive and deceptive
advertising and promotional campaign to switch patients from Prilosec to Nexium in anticipation
of the entry of generic versions of Prilosec; (c) effectively withdrawing branded Prilosec from the
market, causing MCOs not to cover the cost of generic Prilosec, and artificially constricting the
supply of Prilosec OTC in order to increase sales of Nexium; and (d) engaging in a unified
scheme, including but not limited to the conduct alleged above, to impair generic competition to
Prilosec.

92.     Defendants' actions, individually and collectively, were intended to
suppress rather than to promote competition on the merits, and have had precisely the intended
effect.

93.    Plaintiffs have been injured in their business and property by reason of Defendants' unlawful monopolization.  Plaintiffs' injury consists of paying higher prices for drugs containing omeprazole/esomeprazole than would have been paid in the absence of Defendants' illegal conduct.  Plaintiffs' injury is injury of the type that the antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

94.    Defendants' violations threaten continuing loss and injury to Plaintiffs unless enjoined by this Court.

### Count II
### Attempt to Monopolize (15 U.S.C. § 2)

95.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 94 above.

96.    At all relevant times, AstraZeneca has possessed monopoly power in the relevant market or there has been a dangerous probability of its achieving monopoly power.

97.    During the relevant period, AstraZeneca willfully engaged in exclusionary, anticompetitive conduct designed to impair competition on the merits, including, *inter alia*: (a) introducing Nexium, a drug virtually identical to and no more effective than Prilosec, solely to prevent generic manufacturers from competing for all sales of the omeprazole/esomeprazole molecule; (b) engaging in a massive and deceptive advertising and promotional campaign to switch patients from Prilosec to Nexium in anticipation of the entry of generic versions of Prilosec; (c) effectively withdrawing branded Prilosec from the market, causing MCOs not to cover the cost of generic Prilosec, and artificially constricting the supply of Prilosec OTC in

34

order to increase sales of Nexium; and (d) engaging in a unified scheme, including but not limited to the conduct alleged above, to impair generic competition to Prilosec.

98.     At all relevant times, AstraZeneca has had a specific intent to achieve or maintain a monopoly in the relevant market.

99.     Defendants' actions, individually and collectively, were intended to suppress rather than to promote competition on the merits, and have had precisely the intended effect.

100.    Plaintiffs have been injured in their business and property by reason of Defendants' unlawful attempted monopolization.  Plaintiffs' injury consists of paying higher prices for drugs containing omeprazole/esomeprazole than would have been paid in the absence of Defendants' illegal conduct.  Plaintiffs' injury is injury of the type that the antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

101.    Defendants' violations threaten continuing loss and injury to Plaintiffs unless enjoined by this Court.

WHEREFORE, Plaintiffs pray for judgment against Defendants and for the following relief:

A.      A judgment for three times the damages actually sustained by Plaintiffs, as determined by a jury;

B.      A declaration that Defendants have violated the antitrust laws in the ways described above;

      C.     Permanent injunctive relief which enjoins Defendants from continuing their illegal conduct, and requires them to take affirmative steps to dissipate the effects of their prior violations;

      D.     The costs of this suit, including a reasonable attorneys' fee; and

      E.     Such other and further relief as the Court deems just and proper.

### Jury Demand

Plaintiffs demand a trial by jury of all issues so triable.

Robert D.W. Landon III
KENNY NACHWALTER P.A.
1100 Miami Center
201 South Biscayne Boulevard
Miami, FL 33131
Telephone: (305) 373-1000
Facsimile: (305) 372-1861

*Attorneys for Plaintiffs*

OF COUNSEL:

Steve D. Shadowen
HANGLEY ARONCHICK SEGAL & PUDLIN
30 North Third Street, Suite 700
Harrisburg, PA 17101-1713
Telephone: (717) 364-1030
Telecopy:  (717) 364-1020

Joseph T. Lukens
HANGLEY ARONCHICK SEGAL & PUDLIN
One Logan Square, 27th Floor
Philadelphia, PA 19103-6933
Telephone: (215) 568-6200
Telecopy:  (215) 568-0300

## CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| **I (a) PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| RITE AID CORPORATION and RITE AID HDQTRS. CORP. | ASTRAZENECA PHARMACEUTICALS L.P.; ASTRAZENECA L.P.; ZENECA, INC.; and ZENECA HOLDINGS, INC. |

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Cumberland County
(EXCEPT IN U.S. PLAINTIFF CASES) PA

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
T~~_____~~

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Robert D.W. Landon, III, Esq.
Kenny Nachwalter, P.A.
201 South Biscayne Boulevard, 1100 Miami Center
Miami, FL 33131-4327 Tel. 305-373-1000

CASE NUMBER   1:06CV02089

JUDGE: Rosemary M. Collyer

DECK TYPE: Antitrust

DATE STAMP: 12/08/2006

*JURY ACTION*

### II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

□ 1 U.S. Government
Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

□ 2 U.S. Government
Defendant

□ 4 Diversity
(Indicate Citizenship of Parties
in item III)

### III CITIZENS
FOR PLAINTIFF

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | □ 1 | □ 1 | Incorporated or Principal Place of Business in This State | □ 4 | □ 4 |
| Citizen of Another State | □ 2 | □ 2 | Incorporated and Principal Place of Business in Another State | □ 5 | □ 5 |
| Citizen or Subject of a Foreign Country | □ 3 | □ 3 | Foreign Nation | □ 6 | □ 6 |

### IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ☒ **A.** *Antitrust* | □ **B.** *Personal Injury/ Malpractice* | □ **C.** *Administrative Agency Review* | □ **D.** *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| ☒ 410 Antitrust | □ 310 Airplane<br>□ 315 Airplane Product Liability<br>□ 320 Assault, Libel & Slander<br>□ 330 Federal Employers Liability<br>□ 340 Marine<br>□ 345 Marine Product Liability<br>□ 350 Motor Vehicle<br>□ 355 Motor Vehicle Product Liability<br>□ 360 Other Personal Injury<br>□ 362 Medical Malpractice<br>□ 365 Product Liability<br>□ 368 Asbestos Product Liability | □ 151 Medicare Act<br><br>**Social Security:**<br>□ 861 HIA ((1395ff)<br>□ 862 Black Lung (923)<br>□ 863 DIWC/DIWW (405(g)<br>□ 864 SSID Title XVI<br>□ 865 RSI (405(g)<br><br>**Other Statutes**<br>□ 891 Agricultural Acts<br>□ 892 Economic Stabilization Act<br>□ 893 Environmental Matters<br>□ 894 Energy Allocation Act<br>□ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

### □ E. *General Civil (Other)* OR □ F. *Pro Se General Civil*

| | | | |
|---|---|---|---|
| **Real Property**<br>□ 210 Land Condemnation<br>□ 220 Foreclosure<br>□ 230 Rent, Lease & Ejectment<br>□ 240 Torts to Land<br>□ 245 Tort Product Liability<br>□ 290 All Other Real Property<br><br>**Personal Property**<br>□ 370 Other Fraud<br>□ 371 Truth in Lending<br>□ 380 Other Personal Property Damage<br>□ 385 Property Damage Product Liability | **Bankruptcy**<br>□ 422 Appeal 28 USC 158<br>□ 423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>□ 535 Death Penalty<br>□ 540 Mandamus & Other<br>□ 550 Civil Rights<br>□ 555 Prison Condition<br><br>**Property Rights**<br>□ 820 Copyrights<br>□ 830 Patent<br>□ 840 Trademark<br><br>**Federal Tax Suits**<br>□ 870 Taxes (US plaintiff or defendant<br>□ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty**<br>□ 610 Agriculture<br>□ 620 Other Food &Drug<br>□ 625 Drug Related Seizure of Property 21 USC 881<br>□ 630 Liquor Laws<br>□ 640 RR & Truck<br>□ 650 Airline Regs<br>□ 660 Occupational Safety/Health<br>□ 690 Other<br><br>**Other Statutes**<br>□ 400 State Reapportionment<br>□ 430 Banks & Banking<br>□ 450 Commerce/ICC Rates/etc.<br>□ 460 Deportation | □ 470 Racketeer Influenced & Corrupt Organizations<br>□ 480 Consumer Credit<br>□ 490 Cable/Satellite TV<br>□ 810 Selective Service<br>□ 850 Securities/Commodities/ Exchange<br>□ 875 Customer Challenge 12 USC 3410<br>□ 900 Appeal of fee determination under equal access to Justice<br>□ 950 Constitutionality of State Statutes<br>□ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

④

| □ G. *Habeas Corpus/ 2255*<br>□ 530 Habeas Corpus-General<br>□ 510 Motion/Vacate Sentence | □ H. *Employment Discrimination*<br>□ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | □ I. *FOIA/PRIVACY ACT*<br>□ 895 Freedom of Information Act<br>□ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | □ J. *Student Loan*<br>□ 152 Recovery of Defaulted Student Loans (excluding veterans) |
|---|---|---|---|
| □ K. *Labor/ERISA (non-employment)*<br>□ 710 Fair Labor Standards Act<br>□ 720 Labor/Mgmt. Relations<br>□ 730 Labor/Mgmt. Reporting & Disclosure Act<br>□ 740 Labor Railway Act<br>□ 790 Other Labor Litigation<br>□ 791 Empl. Ret. Inc. Security Act | □ L. *Other Civil Rights (non-employment)*<br>□ 441 Voting (if not Voting Rights Act)<br>□ 443 Housing/Accommodations<br>□ 444 Welfare<br>□ 440 Other Civil Rights<br>□ 445 American w/Disabilities-Employment<br>□ 446 Americans w/Disabilities-Other | □ M. *Contract*<br>□ 110 Insurance<br>□ 120 Marine<br>□ 130 Miller Act<br>□ 140 Negotiable Instrument<br>□ 150 Recovery of Overpayment & Enforcement of Judgment<br>□ 153 Recovery of Overpayment of Veteran's Benefits<br>□ 160 Stockholder's Suits<br>□ 190 Other Contracts<br>□ 195 Contract Product Liability<br>□ 196 Franchise | □ N. *Three-Judge Court*<br>□ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

| □ 1 Original Proceeding | □ 2 Removed from State Court | □ 3 Remanded from Appellate Court | □ 4 Reinstated or Reopened | □ 5 Transferred from another district (specify) | □ Multi district Litigation | □ 7 Appeal to District Judge from Mag. Judge |
|---|---|---|---|---|---|---|

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

15 U.S.C. §2 – Monopolization and attempt to monopolize

**VII. REQUESTED IN COMPLAINT**    CHECK IF THIS IS A CLASS □ ACTION UNDER F.R.C.P. 23    **DEMAND $**    Check YES only if demanded in complaint    **JURY DEMAND:** ⊠ YES    □ NO

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    □ YES    ⊠ NO    If yes, please complete related case form.

DATE **12.8.06**    SIGNATURE OF ATTORNEY OF RECORD *[signature]*

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
### Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.