**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————— X
Walgreen Co., et al.,                                       :
              Plaintiffs,                          :
         v.                                       :     **Civil Case Number:**
AstraZeneca Pharmaceuticals L.P, et al.     :     **1:06-cv-02084-RWR**
             Defendants.                          :
———————————————————————— X
Rite Aid Corporation, et al.                               :
              Plaintiffs,                          :
         v.                                       :     **Civil Case Number:**
AstraZeneca Pharmaceuticals L.P., et. al,   :     **1:06-cv-02089-RWR**
             Defendants.                          :
———————————————————————— X
Louisiana Wholesale Drug Co., Inc.,                        :
              Plaintiff,                           :
         v.                                       :     **Civil Case Number:**
AstraZeneca Pharmaceuticals L.P., et al.,   :     **1:06-cv-02157-RWR**
             Defendants                           :
———————————————————————— X
Burlington Drug Company, Inc., et al.,                     :
              Plaintiffs,                          :
          v.                                       :     **Civil Case Number:**
AstraZeneca Pharmaceuticals L.P., et al.,   :     **1:07-cv-00041-RWR**
             Defendants                           :
———————————————————————— X
Meijer, Inc., et al.,                                      :
              Plaintiffs,                          :
          v.                                       :     **Civil Case Number:**
AstraZeneca Pharmaceuticals L.P., et al.,   :     **1:06-cv-02155-RWR**
             Defendants                           :
———————————————————————— X

**PLAINTIFFS' STATEMENT OF POINTS OF AUTHORITY**
**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Dated:  May 21, 2007

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ....................................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 5

STANDARD OF REVIEW ........................................................................................... 11

ARGUMENT ............................................................................................................ 13

I.     THE PRODUCT REDESIGN SCHEME IS EXCLUSIONARY UNDER THE
      RULE OF REASON .......................................................................................... 13

      A.     The Design Change is Exclusionary Under the Rule of Reason As Applied in
             Microsoft II ......................................................................................... 15

      B.     The Product Redesign Scheme Is Unlawful Under Berkey Photo ....................... 21

           1.     The Price Disconnect Prevents Free Consumer Choice .......................... 22

           2.     AstraZeneca's Head Start Prevented Free Consumer Choice.................. 26

           3.     AstraZeneca's Deceptive Detailing Prevented Free Consumer Choice ... 27

           4.     The Absence of Insurance Prevented Free Consumer Choice.................. 28

II.    THE DESIGN CHANGE IS UNLAWFUL UNDER THE PROFIT
      SACRIFICE TEST........................................................................................... 29

III.   THE FDA'S AUTHORITY TO APPROVE NEW DRUGS DOES NOT EXEMPT
      ASTRAZENECA'S CONDUCT FROM ANTITRUST SCRUTINY ............................. 33

IV.   PLAINTIFFS' ALLEGATIONS OF DECEPTIVE DETAILING AND
      ADVERTISING ARE SUFFICIENTLY PLED................................................. 35

      A.     Even if Rule 9(b) Applies, Plaintiffs' Allegations Satisfy It ................................ 36

      B.     AstraZeneca's Misrepresentations Are Exclusionary Under Section 2................ 38

           1.     AstraZeneca's statements were "clearly false"......................................... 40

2.    The advertising and detailing at issue were not "mere puffery" ............... 41

3.    AstraZeneca made the statements to buyers without knowledge and to doctors without incentive ...................................................................... 41

4.    The statements are not susceptible to neutralization and other offset ...... 42

C.    The Deceptive Detailing and Advertising Campaign Is Not Shielded by FDA Regulations ................................................................................................ 43

CONCLUSION ........................................................................................................................ 45

# TABLE OF AUTHORITIES

## Cases

*Abbott Lab. v. Teva Pharm. USA, Inc.*, 432 F. Supp. 2d 408 (D. Del. 2006) .................... *passim*

*Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139 (4th Cir. 1990) ........ 19

*Anderson v. USAA Cas. Ins. Co.*, 221 F.R.D. 250 (D.D.C. 2004) ................................................ 38

*Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799 (D.C. Cir. 2001) ................................... 1

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) ............................ 13, 30

*AstraZeneca LP v. Tap Pharm. Prod., Inc.*, 444 F. Supp. 2d 278 (D. Del. 2006) ........................ 45

*Avery Denn. Corp. v. Acco Brands*, 2000 WL 986995 (C.D. Cal. Feb. 22, 2000) ....................... 42

*Balaco, Inc. v. Upjohn Co.*, 1992 WL 131150 (E.D. Pa. June 3, 1992) ....................................... 19

*Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) .................... 2, 21, 22, 26

*Billing v. Credit Suisse First Boston, Ltd.*, 426 F.3d 130 (2d Cir. 2005) ..................................... 34

*Biovail Corp. Int'l v. Hoechst Aktien.*, 49 F. Supp. 2d 750 (D.N.J. 1999) ................................... 35

*Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502 (7th Cir. 2007) ................................... 36

*Bridon Am. Corp. v. Mitsui & Co, Inc.*, 1983 WL 1987 (D.D.C. Nov. 7, 1983) ................... 36, 37

*C.R. Bard, Inc. v. M3 Systems, Inc.*, 157 F.3d 1340 (Fed. Cir. 1998) ......................................... 17

*Caldera, Inc. v. Microsoft Corp.*, 72 F. Supp. 2d 1295 (D. Utah 1999) ................................. 17, 39

*Calif. Comp. Prod. v. IBM*, 613 F.2d 727 (9th Cir. 1979) ........................................................... 30

*Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939 (3d Cir. 1993) .......................................................... 41

*Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962) .................. 13, 35

*Covad Comm'n v. Bell Atlantic Corp.*, 398 F.3d 666 (D.C. Cir. 2005) ........................... 19, 31, 32

*Eastman Kodak Co. v. Image Tech. Services, Inc.*, 504 U.S. 451 (1992) .............................. 14, 19

*Eli Lilly & Co. v. American Cyanamid Co.*, 2001 WL 30191 (S.D. Ind. Jan. 8, 2001) ................. 1

*Firestone v. Firestone*, 76 F.3d 1205 (D.C. Cir. 1996)..................................................... 38

*Geneva Pharm. Tech. Corp., Inc. v. Barr Lab. Inc.*, 386 F.3d 485 (2d Cir. 2004)........................ 8

*High v. McLean Fin. Corp.*, 659 F. Supp. 1561 (D.D.C. 1987) ...................................................... 36

*ILC Periph. Leas. Corp. v. IBM*, 458 F. Supp. 423 (N.D. Cal. 1978) ......................................... 30

*In re Buspirone Antitrust Litig.,* 208 F.R.D. 516 (S.D.N.Y. 2002)................................................. 1

*In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618 (E.D. Mich. 2000) ....................... 34, 35

*In re IBM Periph. EDP Devices Antitrust Litig.*, 481 F. Supp. 965 (N.D. Cal. 1979) ................ 17

*In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517 (D.N.J. 2004) ................................................. 19

*In re Relafen Antitrust Litig.*, 218 F.R.D. 337 (D. Mass. 2003) .................................................... 1

*In re Remeron Antitrust Litig.*, 335 F. Supp. 2d 522 (D.N.J. 2004) ............................................ 34

*In re Vitamins Antitrust Litig.*, 2000 WL 1475705 (D.D.C. May 9, 2000) .................................. 37

*In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395 (3d Cir. 2000)..................................... 19, 45

*J.S. McCarthy Co., Inc. v. Brausse Die. & Conv. Equip. Inc.*, 340 F. Supp. 2d 54
    (D. Me. 2004).......................................................................................................................... 38

*Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020 (D.C. Cir.1997) ............. 11, 21

*Ledwick v. AstraZeneca Pharmaceuticals*, Los Angeles County Superior Court of
    California, Case No. BC 324518 ....................................................................................... 38, 44

*Maple Flooring Mfrs. Ass'n v. United States*, 268 U.S. 563 (1925) ............................................ 14

*Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich*, 63 F.3d 1540 (10th Cir. 1995) ..... 25

*[*1] National Ass'n of Pharm. Mfrs. v. Ayerst Labs.*, 850 F.2d 904 (2d Cir. 1988) ........... 37, 39, 45

*Neumann v. Reinforced Earth Co.*, 786 F.2d 424 (D.C. Cir. 1986)....................................... 30, 32

*Nobody in Part. Presents, Inc. v. Clear Channel Comm., Inc.*,
    311 F. Supp. 2d 1048 (D. Colo. 2004)................................................................................... 34

---

[1] As required under the local rules, Plaintiffs have placed an asterisk before the cases upon which they principally rely.

*Northeastern Tel. Co. v. AT & T*, 651 F.2d 76 (2d Cir. 1981)......................................................30

*Park v. Hyatt Corp.*, 436 F. Supp. 2d 60 (D.D.C. 2006) ..............................................................12

*Pennsylvania Employee Benefit Trust Fund v. Zeneca, Inc.*, 2005 WL 2993937
(D. Del. Nov. 8, 2005), *appeal pending* No. 05-05340 (3d Cir.)..............................................44

*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979) ..........................................................................13

*Resp. of Carolina, Inc. v. Leasco Resp., Inc.*, 537 F.2d 1307 (5th Cir. 1976) .............................30

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) ....................................................................................11

*Spirit Airlines, Inc. v. Northwest Air., Inc.*, 431 F.3d 917 (6th Cir. 2005) ..................................31

*Stand Energy Corp. v. Col. Gas Trans. Corp.*, 373 F. Supp. 2d 631 (S.D.W. Va. 2005) ............34

*United States ex. rel. Harris v. Bernad*, 275 F. Supp. 2d 1 (D.D.C. 2003) ..................................38

*United States ex. rel. McCready v. Col./HCA Health. Corp.*, 251 F. Supp. 2d 114
(D.D.C. 2003) ..........................................................................................................................38

*United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377 (1956) ........................................12

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966)..................................................................12

*United States v. Microsoft Corp.*, 1998 WL 614485 (D.D.C. Sept. 14, 1998) .............................15

*United States v. Microsoft Corp.*, 147 F.3d 935 (D.C. Cir. 1998).........................................15, 16

*United States v. Microsoft*, 84 F. Supp. 2d 9 (D.D.C. 1999) .......................................................16

*United States v. Microsoft Corp.*, 87 F. Supp. 2d 30 (D.D.C. 2000)............................................13

\* *United States v. Microsoft*, 253 F.3d 34 (D.C. Cir. 2001) (*en banc*)..................................*passim*

*Verizon Comm's Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398 (2004) ...............14, 30, 33

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003) ...................................................36

*Z-Tel Comm., Inc. v. SBC Comm., Inc.*, 331 F. Supp. 2d 513 (E.D.Tex. 2004) ..........................38

## **Statutes**

21 U.S.C. § 355.................................................................................................................8, 34

The Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417 (1984) .................................................................................................................... 8

Medicare Modernization Act, Pub. L. No. 108-173 § 1112 ........................................... 35

**Rules**

Federal Rule of Civil Procedure 9(b) ................................................................. 4, 36, 38

**Other Authorities**

P. Areeda & H. Hovenkamp, ANTITRUST LAW ¶ 773 (Supp. 2006) ............................... 30

IIA P. Areeda, H. Hovenkamp & J. Solow, ANTITRUST LAW ¶ 411 (2d ed. 2002) .................... 23

III P. Areeda & D. Turner, ANTITRUST LAW, ¶ 738a (1978) ........................................ 40

III P. Areeda & H. Hovenkamp, ANTITRUST LAW ¶ 651a (2d ed. 2002) ..................................... 14

IIIA P. Areeda & H. Hovenkamp, ANTITRUST LAW, ¶ 781e (2d ed. 2002) ........................... 15, 39

R. Bork, THE ANTITRUST PARADOX 144 (1978) ......................................................... 31

Drug Product Selection, Staff Report to the FTC  (Jan. 1979) ................................. 3, 22

"Financial Conflicts of Interest in Physicians' Relationships with the Pharmaceutical Industry," *New England Journal of Medicine*, Vol. 351, No. 18 (Oct. 28, 2004) ...................................... 23

"Health Industry Practices that Create Conflicts of Interest: A Policy Proposal for Academic Medical Centers," *Journal of the American Medical Association*, Vol. 295, No. 4 (Jan. 25, 2006), at 430 .............................................................................. 23

* H. Hovenkamp, et al., IP AND ANTITRUST: AN ANALYSIS OF ANTITRUST PRINCIPLES APPLIED TO INTELLECTUAL PROPERTY LAW, (Supp. 2007) ............................................. 3, 25, 26

July 22, 2003 testimony of Janet Woodcock, M.D., Dir., Center for Drug Evaluation and Research, FDA, before the Senate Special Committee on Aging ........................... 45

A. Masson and R. Steiner, GENERIC SUBSTITUTION AND PRESCRIPTION DRUG PRICES: ECONOMIC EFFECTS OF STATE DRUG PRODUCT SELECTION LAWS (FTC 1985) ................... 7, 22

2 Moore's Federal Practice § 9.03 (3d ed. 2006) ........................................................ 36

J. Ordover & R. Willig, *An Economic Definition of Predation: Pricing and Product Innovation*, 91 YALE L.J. 8, 22 (1981) ............................................................ 31, 32

*Pharmaceutical Price Controls in OECD Countries*, U.S. Dep't of Commerce,

Int'l Trade Admin. (Dec. 2004) ................................................................................. 34

"Prescription Drugs, FDA Oversight of Direct-to-Consumer Advertising Has Limitations,"
U.S.G.A.O., GAO-03-177, October 2002 .............................................................. 45

*Sales Manager is Fired After Comments Hit Web*, Philadelphia Inquirer, Apr. 7, 2007, at E01 . 23

S. Salop, *Exclusionary Conduct, Effect on Consumers and the Flawed Profit-Sacrifice
Standard*, 73 ANTITRUST L.J. 311 (2006) .............................................................. 31

*U.S. Consumer Groups Question Use Of Free Samples by Drug Makers --
Industry Hopes to Hook Doctors, Patients Through Costly Giveaways,*
Wall Street Journal, July 20, 2000, at 24 .................................................................. 23

Plaintiffs[1] submit this opposition to AstraZeneca's motion to dismiss their claims under Section 2 of the Sherman Act alleging that AstraZeneca's product-redesign scheme unlawfully maintained its monopoly power and substantially impaired generic competition.

## INTRODUCTION

Over the last decade, manufacturers of brand-name pharmaceuticals have developed a series of "evergreening" techniques - techniques used to impair competition from generic drugs. These techniques include paying generic manufacturers not to enter, filing sham lawsuits and frivolous "citizen's petitions," making false "Orange Book" listings, and tying up sources of necessary ingredients.[2] This case involves yet another way in which brand manufacturers invest in erecting barriers to generics rather than in improving medicines for consumers.

Faced with imminent generic competition to its blockbuster drug Prilosec, AstraZeneca tweaked the product's design and gave it a different name, Nexium. The redesigned product brought no medical or other benefits of any kind to consumers. But it was enormously profitable for AstraZeneca because it prevented generic Prilosec from being substitutable at the pharmacy counter for the redesigned product, and thus impaired the generics companies' most cost-efficient (and only commercially feasible) means of competing. AstraZeneca's refrain that

---

[1] This memorandum is submitted on behalf of all plaintiffs in these actions: *Walgreen Co. et al. v. AstraZeneca Pharm., et al.*, No. 06-cv-02084; *Rite Aid Corp. et al. v. AstraZeneca Pharm. et al.*, No. 06-cv-02089; *Meijer, Inc. et al. v. AstraZeneca Pharm., et al.*, No. 06-cv-02155; *Louisiana Wholesale Drug Co., Inc. et al. v. AstraZeneca Pharm. et al.*, No. 06-cv-02157; and *Burlington Drug Co., Inc. et al. v. AstraZeneca Pharm.. et al.*, No. 07-cv-00041. For the Court's convenience, as all plaintiffs' Complaint are substantively identical, all citations shall be to the Walgreen First Amended Complaint ("Compl."). Unpublished opinions and selected other materials cited herein are included in Plaintiffs' Appendix (the "Appendix") submitted herewith.

[2] *See Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799 (D.C. Cir. 2001); *In re Relaf. Antitrust Lit..*, 218 F.R.D. 337 (D. Mass. 2003); *In re Buspirone Antitrust Lit..*, 208 F.R.D. 516 (S.D.N.Y. 2002); *Eli Lilly  v. Amer. Cyan. Co.*, 2001 WL 30191 (S.D. Ind. Jan 8, 2001).

redesigning Prilosec offered consumers another choice of product (Def. Br. at 17) rings hollow: the redesign brought *no benefits* to consumers, but had the intended effect of *preventing millions of consumers from choosing* far less expensive generic Prilosec.

In the face of these allegations that the product design change brought no consumer benefits and significantly impaired competition, AstraZeneca urges this Court to adopt a new and unprecedented antitrust rule - that *all* product design changes made by a monopolist are *per se* lawful. AstraZeneca urges that design changes be deemed lawful without inquiry as to whether they resulted in a product improvement, or whether any alleged improvement is outweighed by any anticompetitive consequences.

The D.C. Court of Appeals, in an *en banc* decision, expressly rejected that proposed rule, holding instead that whether product design changes are exclusionary under Section 2 of the Sherman Act is determined under the rule of reason. *See United States v. Microsoft*, 253 F.3d 34, 65-66 (D.C. Cir. 2001) (*en banc*) ("*Microsoft II*"). The Complaints here easily state a *prima facie* case of consumer harm under the rule of reason. By impairing the generic rivals' only effective means of competing, AstraZeneca prevented the generics from making (and preserved for itself) more than 17 million unit sales annually. This results in *a loss to consumers of more than $11.5 billion.* Moreover, any alleged offsetting procompetitive justifications are not properly considered on a motion to dismiss (they are factual issues). And, the Complaints allege there are none - the design change brought no therapeutic or other benefits to consumers.

AstraZeneca's design change is exclusionary even under *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263 (2d Cir. 1979), upon which AstraZeneca relies. That case recognized that design changes can be exclusionary when the market or the monopolist's own conduct prevents "free consumer choice" from selecting the superior product - in this case, the clinically

equivalent but far less expensive drug.  The prescription drug market is very different from other markets because the consumer does not choose which product to buy - a doctor does.  Therefore, "[t]he basic problem is that the forces of competition do not work well in a market where the consumer who pays does not choose, and the physician who chooses does not pay."  Drug Product Selection, Staff Report to the FTC (Jan. 1979) at 2-3. As detailed below, AstraZeneca's design change, and its massive campaign of blanketing doctors' offices with free samples of Nexium and deceptive claims of clinical superiority of Nexium over Prilosec, were intended to exploit this basic problem in the market and substantially impair "free consumer choice."

A recent decision held that the *Microsoft II* rule of reason analysis governs pharmaceutical product design changes because "the nature of the pharmaceutical drug market, as described in Plaintiffs' allegations" - including the fact that doctors, rather than consumers, select which product to purchase - undermines free consumer choice. *Abbott Labs. v. Teva Pharm. USA, Inc.*, 432 F. Supp. 2d 408 (D. Del. 2006).  The leading academic authority on intellectual property and antitrust issues has reached exactly the same conclusion.  H. Hovenkamp, et al., IP AND ANTITRUST: AN ANALYSIS OF ANTITRUST PRINCIPLES APPLIED TO INTELLECTUAL PROPERTY LAW, at § 12.5 at 12-45 - 12-48 (Supp. 2007) ("IP AND ANTITRUST").

Antitrust scrutiny is particularly appropriate here, not only because of the "nature of the pharmaceutical drug market," but also because of AstraZeneca's own conduct that magnified the anticompetitive effect of its product redesign scheme.  It began switching Prilosec prescriptions to Nexium 18 months before generic Prilosec even entered the market.  By the time the generics entered, AstraZeneca had already switched over 10 million unit sales from Prilosec to Nexium, putting these units beyond effective generic competition.  Both before and after generic Prilosec entered, AstraZeneca's army of nearly 8,000 detailers made deceptive and misleading statements

3

to doctors regarding the supposed superiority of Nexium over Prilosec. And its introduction of non-prescription Prilosec ("Prilosec OTC") had the intended effect of causing managed care organizations to stop providing insurance coverage for generic Prilosec - even though generic prescription Prilosec cost less than half of Prilosec OTC and a fraction of prescription Nexium.

Moreover, the Complaints here also allege that AstraZeneca's conduct is exclusionary under the far more forgiving (of the monopolist) "profit sacrifice" test. AstraZeneca's multi-billion dollar investment in its product redesign scheme was profitable to AstraZeneca *solely* because the scheme had the effect of impairing generic competition. AstraZeneca made no new sales or profits from Nexium except those that it made by impairing generic competition. No court has ever held that a product design change that is alleged to fail the profit sacrifice test is nevertheless lawful under Section 2.

AstraZeneca makes a last effort to avoid antitrust scrutiny by invoking the FDA's regulatory authority to approve new drugs. But the FDA approves New Drug Applications based on whether the drug is *safe* and *effective,* not whether it is an improvement or whether its introduction will have anticompetitive consequences. Thus, courts have unanimously rejected the argument that the FDA's limited regulatory authority can preclude antitrust scrutiny.

Finally, Plaintiffs' allegations regarding AstraZeneca's representations to doctors and consumers that Nexium was superior to Prilosec are not subject to Federal Rule of Civil Procedure 9(b) because the representations are not alleged as a stand-alone fraud claim, but as part of an overall anti-competitive product-redesign scheme. Even if Rule 9(b) did apply, the allegations satisfy the Rule by quoting the statements and identifying by, when, and to whom they were made. Nor were the misrepresentations supported by the studies in the FDA-approved Nexium label - those studies showed definitively that Nexium is *not* superior to Prilosec, and

AstraZeneca expressly conceded that fact to the FDA in negotiations over the label's contents.

## STATEMENT OF FACTS

Prilosec is a proton pump inhibitor used to treat heartburn and related conditions. Compl. at ¶ 42. In 1999, Prilosec was the top-selling drug in the world, with U.S. sales of more than $4 billion. *Id.* The patent on the active ingredient in Prilosec was slated to expire in October 2001, leaving Prilosec vulnerable to competition from generic drugs. *Id.* at ¶ 43.

AstraZeneca responded to this imminent threat by making a small change in the chemical composition of Prilosec, and encouraging doctors to prescribe the new composition rather than the old. This design change brought no medical benefits to consumers, but did shield the vast majority of sales from generic substitution. AstraZeneca executives admitted that, of the dozens of plans for replacing the anticipated lost Prilosec sales, this plan was the worst one for consumers. *Id.* at ¶ 47. A former chief executive acknowledged that, based purely on medical merits, Nexium "would not have been developed." *Id.* at ¶ 67. Nexium was developed not for its ability to heal patients, but solely for its ability to impair generic competition. *Id.*

### The Absence of Consumer Benefit

The active ingredient in Prilosec, omeprazole, is a chiral molecule, which means it is an equal-parts mixture of an S-enantiomer and R-enantiomer. (This chemistry is explained in detail in the Complaints. Compl. at ¶¶ 52-54). Omeprazole, whether the mixture or either enantiomer alone, is only a prodrug, *i.e.*, the compound itself is inactive, and the active drug is formed only after it is ingested into the body. The active drug, cyclic sulfenamide, is not a chiral compound, so there is no reason to believe that a dose of one enantiomer of omeprazole would interact with the body's proton pumps any differently than would an equal dose of the mixture. *Id.* at ¶ 54.

AstraZeneca's redesigned drug, Nexium, is simply the S-enantiomer of omeprazole, *i.e.*,

esomeprazole.  And, in fact, numerous studies, including those that AstraZeneca submitted to the

FDA, clearly show that Nexium provides no clinical benefit over an equal dose of Prilosec. *Id.* at

¶ 78. Although AstraZeneca implies otherwise in its brief, *the Complaints repeatedly allege that*

*the product design change brought no benefits of any kind to consumers* - it "created no

efficiency gains or increases in consumer welfare." *Id.* at ¶ 112; *see also, e.g., id.* at ¶ 55

("compared to omeprazole, esomeprazole offers no therapeutic or other benefits to consumers").

### The Nature of Pharmaceutical Markets

AstraZeneca's product redesign scheme worked because of, and was designed to exploit,

the unusual nature of pharmaceutical markets.  Usually, the hallmark of consumer choice is the

selection of a product based on a balancing of quality and price.  Pharmaceutical markets,

however, are characterized by a "price disconnect."  A doctor, rather than a consumer, selects

which product to buy.  This is significant because, as studies have shown, doctors are price-

insensitive, *i.e.,* they select which drugs to prescribe based on factors other than price.  *Id.* at ¶

21.  Thus, price plays a negligible role in product selection as between branded pharmaceuticals.

*Id.* at ¶¶ 20-21.  This has resulted in AstraZeneca obtaining very substantial market power,

including the ability to price its omeprazole/esomeprazole prescription products at more than 10

times its manufacturing costs while making sales in the billions of dollars.  *Id.* at ¶ 109.

Brand companies such as AstraZeneca exploit the price disconnect by heavily promoting

their brand products to doctors, primarily through "detailing," *i.e.,* personal sales calls.  *Id.* at ¶

21.  A generic company, however, cannot profitably promote a *generic* product to doctors

because a pharmacist could easily substitute some other company's generic version of the same

drug.  *Id.* at ¶ 22.   Unable to exploit the price disconnect by detailing doctors, generic companies

increase sales by offering low prices to pharmacies.  *Id.*

When the system works as intended, the availability of a generic alternative puts the price/quality balancing choice back in consumers' hands. This results in much lower prices for prescription drugs. The first generic typically enters at a price at least 30% below that of the brand. *Id.* at ¶ 28. The price discount grows - often to 90% - as more generics enter, and generics rapidly take the vast majority of unit sales. *Id.* This is an unalloyed boon for consumers.

In order to promote this quality/price choice for consumers, all 50 states and the District of Columbia enacted Drug Product Selection ("DPS") laws that permit or require the pharmacist to dispense a generic drug in lieu of a brand drug whenever the consumer consents. *Id.* at ¶ 24. These DPS laws *are premised on the economic fact that brand companies exploit the price disconnect by promoting to doctors and that generic companies are unable to do so, and thus promote their products by offering low prices to pharmacies.* An FTC report concluded:

> Since physicians are an unlikely force behind a switch to lower-cost brands after the patent period has expired, an erosion of the patent-conferred monopoly must depend on others who have both the power and the incentive to respond to lower prices. *That is the role envisioned for the drug product selection laws: to transfer some of this power to pharmacists. Consumers are the ones most interested in a lower price, and pharmacists must respond to consumer demand because of direct competition with other pharmacies on prescription prices.*

*Id.* (quoting A. Masson and R. Steiner, GENERIC SUBSTITUTION AND PRESCRIPTION DRUG PRICES: ECONOMIC EFFECTS OF STATE DRUG PRODUCT SELECTION LAWS at 7 (FTC 1985) ("FTC Generic Subst. Rep.") (emphasis added)); *see also* Compl. at ¶¶ 26-27 (describing other FTC, FDA, and State efforts to promote generic substitution).

DPS laws "shift the choice of [product] for most prescriptions from the physician to the pharmacist." *Id.* at ¶ 25 (quoting FTC Generic Subst. Rep.). The FTC noted, "the laws foster price competition by allowing the only principals who have financial incentives to make price comparisons - the pharmacist and the patient - to select drug products on the basis of price." *Id.*

Under the Hatch-Waxman Act[3] and State regulatory regimes, only generic drugs that have been "AB-rated" by the FDA may be automatically dispensed by the pharmacist in lieu of the brand drug.   In order to receive an AB rating, a generic drug must be: (1) therapeutically equivalent to its brand-name counterpart, meaning that the generic has the same active ingredient, form, dosage, strength and safety and efficacy profile, and (2) bioequivalent to its brand-name counterpart, meaning that the generic is absorbed in the body at approximately the same rate as is the branded drug.  *See id*. at ¶ 39.  The need to obtain FDA approval and an AB rating is a significant barrier to generic entry in the pharmaceutical industry.  *See Geneva Pharm. Tech Corp., Inc. v. Barr Lab. Inc.*, 386 F.3d 485, 499 (2d Cir. 2004).

**The Anti-Competitive Effect of AstraZeneca's Product Design Change**

The price disconnect and the regulatory barriers to entry provided fertile ground for AstraZeneca's product-redesign scheme.  In the pharmaceutical market *the critical determinant* of the success of a generic product is its AB rating, *i.e.,* substitutability at the pharmacy counter. Compl. at ¶ 39.  A medically insignificant redesign of the brand product, such as AstraZeneca engineered here, destroys that substitutability and significantly impairs the rival's only commercially viable means of competing.  *Id.* at ¶ 40. Also, unlike the usual market, a brand drug company's design change automatically invokes a regulatory barrier to entry, with any generic firm unable to compete for all of the relevant sales unless it begins the FDA-approval process anew and face a likely minimum 30-month delay *after* successfully redesigning its own product to match the redesigned brand product.  *Id.* at ¶ 38; 21 U.S.C. § 355(j)(5)(B)(iii).

Thus, as compared to the usual market, the pharmaceutical marketplace increases both the opportunity and incentive for brand companies to redesign their products with an

---

[3] The Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417 (1984), codified at 21 U.S.C. §§ 355, 360cc and 35 U.S.C. §§ 156, 271, 282.

anticompetitive intent and effect. AstraZeneca did exactly that. Nexium provides no medical or other benefits to consumers as compared to Prilosec. Compl. at ¶ 55. But Nexium is *different from* Prilosec, and generic Prilosec thus is not AB rated to Nexium. *Id.* at ¶ 46. By redesigning Prilosec, AstraZeneca prevented generic Prilosec from being AB rated to the redesigned product, impaired generic manufacturers' only viable means of competing for all sales, and thus prevented consumers from making the price/quality choice at the pharmacy counter.

Moreover, AstraZeneca knew that doctors, being price-insensitive, would not switch their patients back to Prilosec - even after generic Prilosec became available - if AstraZeneca could get them to switch from Prilosec to Nexium before the generics entered. *Id.*. at ¶ 56. Therefore, 18 months before the generics entered, AstraZeneca began converting as many Prilosec prescriptions as possible to Nexium. Using its existing army of 6,600 detailers, plus an additional 1,300 new hires, AstraZeneca bombarded doctors' offices with pleas to switch prescriptions from Prilosec to Nexium. *Id.* at ¶ 59. As part of this billion-dollar campaign, AstraZeneca's detailers blanketed doctor's offices with literature, promotional material, and free samples of Nexium. *Id.* at ¶¶ 59-61.

No one was there to dissuade the doctors from switching. Generic manufacturers are economically precluded from detailing, and in any event they were still 18 months away from even having their products approved. *Id.* at ¶¶ 22, 62. And the maker of branded Prilosec - AstraZeneca - was deliberately not singing its praises. Instead, AstraZeneca completely stopped detailing and promoting Prilosec, even though it would not face generic competition for another 18 months. *Id.* at ¶ 62. AstraZeneca even began comparing Prilosec unfavorably to Nexium, in order to weaken demand for the anticipated generic versions of Prilosec. *Id.* Consequently, before generic Prilosec was even approved for marketing, AstraZeneca had succeeded in

reducing annual unit sales of Prilosec from 29.6 million to 19.6 million, while increasing the annual unit sales of Nexium from 0 to 13.4 million. *Id.* at ¶ 63.

AstraZeneca made its product redesign scheme more effective by deceiving doctors and consumers about the relative medical efficacy of Nexium and Prilosec. In an ad campaign directed to consumers, AstraZeneca misrepresented that, as compared to Prilosec, Nexium is more powerful; has more efficacy in healing and symptom control; is more effective as a first-line therapy; is better in stopping heartburn and starting healing; and has been shown to be clinically superior. *Id.* at ¶ 92. AstraZeneca also trained and directed its entire Nexium sales force to make a series of misrepresentations to all doctors on whom they called. These included the false assertions that Nexium demonstrated a significant clinical advantage over Prilosec; has a greater healing and symptom resolution rate for erosive esophagitis patients; is superior in long-term maintenance as well as in initial healing; results in more symptom-free patients; has a lower number of treatment failures; has a greater clinical advantage for more severe patients; and is a better proton pump inhibitor. *Id.* at ¶ 91. All of these statements were false and misleading. *Id.* at ¶ 93. Most doctors to whom these misrepresentations were directed are not specialists who might be familiar with studies showing that in fact Nexium is not superior to Prilosec. *Id.* at ¶ 95. And even specialists were adversely affected by AstraZeneca's deceptive campaign. *Id.*

AstraZeneca also shielded its products from effective generic competition by causing managed care organizations ("MCOs") not to cover the cost of generic Prilosec. AstraZeneca knew it was the policy of MCOs covering the vast majority of consumers to stop covering a prescription pharmaceutical (both the brand and generic versions) when an over-the-counter version of that product becomes available. *Id.* at ¶ 97. AstraZeneca therefore introduced Prilosec OTC in September 2003. *Id.* at ¶ 101. A 30-day supply of Prilosec OTC costs more

than twice the price of generic Prilosec. *Id.* at ¶ 105. But the interests of MCOs and consumers are fundamentally misaligned in this respect - MCOs avoid paying for any omeprazole (whether brand, generic, or OTC) by declining to cover prescription Prilosec on the ground that it is available over-the-counter. *Id.* at ¶ 103. And for those consumers who require a prescription proton pump inhibitor for long-term use (the label for Prilosec OTC indicates it should not be taken for more than 14 days), the MCOs' policy has the perverse effect of causing Nexium, but not the far less expensive generic Prilosec, to be covered by insurance. *Id.* at ¶¶ 98, 102.

**The Consumer Welfare Loss**

The product redesign scheme was profitable for AstraZeneca *solely* because the change had the effect of impairing generic competition. AstraZeneca had fewer U.S. sales of Nexium and Prilosec combined than if it had sold only Prilosec, absent the effect of impairing generic competition. *Id.* at ¶ 65. Nexium made no new sales or profits other than those made by impairing generic competition. *Id.*

But the design change was wildly profitable for AstraZeneca because it was wildly successful in impairing generic competition. The design change and related conduct prevented generic companies from taking 17 million unit sales away from AstraZeneca annually. *Id.* at ¶ 106. This translates into a loss of more than $11.5 billion to consumers. *Id.* at ¶ 64.

### STANDARD OF REVIEW

On a motion to dismiss, "the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 235-36 (1974). Accordingly, a court must accept all the allegations in a plaintiff's Complaint as true and construe them in the light most favorable to the plaintiff. *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan,* 115 F.3d 1020, 1027 (D.C. Cir.1997). "In light of these liberal pleading requirements, a Compl. should not be dismissed for failure to state a claim

unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Park v. Hyatt Corp.*, 436 F. Supp. 2d 60, 64 (D.D.C. 2006).

Plaintiffs must plead two elements to state a claim of monopolization under Section 2 of the Sherman Act: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). In its motion, AstraZeneca does not dispute its monopoly power, which is "the power to control prices or exclude competition." *United States v. E.I. duPont de Nem. & Co.*, 351 U.S. 377, 391 (1956). In fact, it has been able to profitably raise prices substantially above the competitive level. *See* Compl. at ¶¶ 107-109.

Thus, the only issue raised by AstraZeneca's motion is whether Plaintiffs adequately alleged that AstraZeneca willfully maintained its monopoly power by impeding generic competition. Contrary to AstraZeneca's view that Plaintiffs advocate an unprecedented extension of antitrust law (Def. Br. at 19), two vitally important cases have found unlawful monopolization based on product design changes analogous to that alleged here. *See Microsoft II*, 253 F.3d at 65-66 (Microsoft unlawfully maintained monopoly by redesigning its software to impair competition); *Abbott*, 432 F. Supp. 2d at 420-24 (denying motion to dismiss where product design change impaired generic competition). These cases, among many others, flatly refute AstraZeneca's contention that product design changes are *per se* lawful under Section 2.

And, contrary to AstraZeneca's attempt to analyze each aspect of its product- redesign scheme in isolation,[4] its conduct: (a) must be analyzed as a whole within the context of the

---

[4] In particular, AstraZeneca analyzes Plaintiffs' allegation of a misleading detailing and marketing campaign as if it were a separate false-advertising claim; Plaintiffs instead allege that the campaign was one aspect of the overall product redesign scheme. *See* Compl. at ¶ 46.

economic and regulatory context in which it occurs; and (b) can be unlawful even if some of the individual elements of the scheme are not independently unlawful under Section 2. *Cont'l Ore Co. v. Union Carb. & Carb. Corp.*, 370 U.S. 690, 698-99 (1962) (related factual allegations under Section 2 must be considered as a whole, not dismembered and viewed in their separate parts); *United States v. Microsoft Corp.*, 87 F. Supp. 2d 30, 44 (D.D.C. 2000) ("only when the separate categories of conduct are viewed, as they should be, as a single, well-coordinated course of action does the full extent of the violence that Microsoft has done to the competitive process reveal itself"), *aff'd, Microsoft II*, 253 F.2d at 34; *Abbott,* 432 F. Supp. 2d at 428 ("acts as a group [may] have an anticompetitive effect even if the acts taken separately do not").

## ARGUMENT

## I.    THE PRODUCT REDESIGN SCHEME IS EXCLUSIONARY UNDER THE RULE OF REASON

The touchstone for determining whether conduct is exclusionary, and therefore unlawful under Section 2, is the effect of that conduct on consumers.  The Sherman Act is a "consumer welfare prescription."  *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343 (1979).  Thus, conduct is unlawfully exclusionary if it "either does not further competition on the merits or does so in an unnecessarily restrictive way."  *Aspen Skiing Co. v. Aspen High. Skiing Corp.*, 472 U.S. 585, 604 n.32 (1985) (quoting III P. Areeda & D. Turner, Antitrust Law 78 (1978)).  Stated differently, improper exclusion is "exclusion not the result of superior efficiency."  *Id.* at 603.

Applying these principles, the *en banc* Court of Appeals in *Microsoft II* adopted the "rule of reason" approach to Section 2 liability.  This approach, which is similar to the rule of reason analysis in Section 1 cases, proceeds through a series of steps:

> First, to be condemned as exclusionary, a monopolist's act must have an "anticompetitive effect."  That is, it must harm the competitive *process* and thereby harm consumers . . . .

> Second, the plaintiff, on whom the burden of proof of course rests, must demonstrate that the monopolist's conduct indeed has the requisite anticompetitive effect . . . .
>
> Third, if a plaintiff successfully establishes a *prima facie* case under § 2 by demonstrating anticompetitive effect, then the monopolist may proffer a "procompetitive justification" for its conduct. If the monopolist asserts a procompetitive justification . . . then the burden shifts back to the plaintiff to rebut that claim.
>
> Fourth, if the monopolist's procompetitive justification stands unrebutted, then the plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit . . . .

*Microsoft II*, 253 F.3d at 58-59 (citations omitted); *see also* III P. Areeda & H. Hovenkamp, ANTITRUST LAW ¶ 651a, at 72 (2d ed. 2002) (exclusionary conduct is conduct reasonably capable of prolonging monopoly power and does "not benefit consumers at all" or is "unnecessary for the particular consumer benefits" or "produce[s] harm[] disproportionate to the resulting benefits").

There is no place in this analysis for formalistic rules like AstraZeneca's proposal that product design changes be deemed *per se* lawful. Instead, courts focus on economic effects and evaluate the substance of the challenged conduct rather than its form. *See Eastman Kodak Co. v. Image Tech. Services, Inc.*, 504 U.S. 451, 467 (1992) (court must "resolve antitrust claims on a case-by-case basis, focusing on the 'particular facts disclosed by the record'") (quoting *Maple Flooring Mfrs. Ass'n v. United States*, 268 U.S. 563, 579 (1925)). As the Supreme Court explained in that case, "[l]egal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law." *Id*. at 466-67.

The economic effect of conduct can be determined only by a fact-intensive inquiry that is attuned to the "economic context," including the "particular structure and circumstances of the industry at issue." *Verizon Comm's Inc. v. Law Off. of C. V. Trinko*, 540 U.S. 398, 411 (2004). Moreover, otherwise permissible conduct may be exclusionary when practiced by a monopolist.

*United States v. Microsoft Corp*., 1998 WL 614485 at *23 (D.D.C. Sept. 14, 1998). The context

and specific facts here clearly reveal the anticompetitive effect of AstraZeneca's product

redesign scheme.

### A.  The Design Change is Exclusionary Under the Rule of Reason As Applied in Microsoft II

Invoking the truism that innovation is an important part of competition, AstraZeneca asks

the Court to adopt a new antitrust rule that a monopolist's product design changes are *per se*

lawful.  Def. Br. at 20.  AstraZeneca apparently intends that a product redesign be exempt from

antitrust scrutiny even if the design change does not improve the product, and regardless of its

adverse effect on consumer welfare.[5]  The Court of Appeals, however, has expressly rejected a

rule of *per se* legality, and instead subjects a monopolist's design changes to the rule of reason.

AstraZeneca's assertion of *per se* legality is similar to the Court's analysis in *United

States v. Microsoft Corp.,* 147 F.3d 935 (D.C. Cir. 1998) (*Microsoft I*).  There, the Government

asserted that Microsoft violated the terms of a prior consent decree by creating a technological

integration between its operating software and its Internet browser.  The Court declined to weigh

the alleged benefits of the integration against its anticompetitive effects, holding that Microsoft

need only ascribe "facially plausible benefits" to the integration.  *Id.* at 950. The Court held,

---

[5] AstraZeneca supports its proposed new rule by citing to "IIIA P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 781e (2005)" for the proposition that "all product innovation should be lawful, setting aside only the possible case where investment in innovation is used to facilitate predatory pricing." Def. Br. at 20.  The volume of this treatise that AstraZeneca purports to quote does not exist.  A Second Edition of Volume IIIA was published in 2002.  That edition, (a copy of the relevant portion is in the Appendix), states as follows:  "[A]ll product innovation should be lawful *in the absence of bundling*, setting aside only the possible case where investment in innovation is used to facilitate predatory pricing…." (emphasis added). The reference to "bundling" is to "technological tying," *i.e.,* the monopolist's strategic redesign of the product in order to impair competition from complementary products (addressed in ¶ 776 of the treatise).  Thus, AstraZeneca excised from the "quote" the very part relevant here, and, as shown below, the 2007 Hovenkamp IP/Antitrust treatise, not the general antitrust treatise, specifically applies these principles to design changes to pharmaceutical products.  *See infra* at Section I.B.1.

"[t]he question is not whether the integration is a *net* plus but merely whether there is a plausible claim that it brings some advantage." *Id.* The Court was careful to note, however, that this test was required by the terms of the consent decree, not by antitrust law. *See id.* at 950 & n.14. Judge Wald rejected adoption of a "plausible benefit" standard, instead asserting that, "the courts are certainly capable of determining whether a particular integration offers any synergistic benefit at all and whether these benefits are minimal, significant, or great." *Id.* at 959 (Wald, J., concurring in part and dissenting in part).

The *Microsoft I* "plausible benefit" standard - which in any event does not support AstraZeneca's assertion of *per se* legality - is not the antitrust law of this Circuit. The Court of Appeals, *en banc*, later held that conduct unlawful under Section 2 is that "which reduce[s] social welfare," as measured under the rule of reason. *Microsoft II,* 253 F.3d at 58. Importantly, the Court expressly held that the rule of reason determines whether product design changes are exclusionary. *Id.* at 59.

In *Microsoft II*, an opinion issued on appeal after a full trial, the Government asserted that three of Microsoft's design changes were exclusionary under Section 2. Microsoft changed its operating software to exclude its Internet browser from the "add/remove" utility program; designed the operating system to override the user's choice of any rival browser as the "default" browser; and intermingled browsing and other code so that the user's attempt to delete Microsoft's browser would disable the operating system. 253 F.3d at 64-65.[6] The Court of Appeals noted that courts are "properly very skeptical" of claims that design changes have harmed competition. *Id.* at 65. But the Court then expressly rejected the contention, repeated by

---

[6] When Microsoft made these design changes, it did not remove its old product from the market. Consumers therefore had a choice between the old and redesigned products. *See United States v. Microsoft,* 84 F. Supp. 2d 9, 21, 26-27, 56 (D.D.C. 1999).

AstraZeneca here, that such design changes are *per se* lawful. Citing numerous other cases, the Court held that, "[j]udicial deference to product innovation, however, does not mean that a monopolist's product design decisions are per se lawful." *Id.*

Microsoft aggressively urged the Court of Appeals to adopt a more lenient (for the monopolist) standard, arguing, for example, that "design changes that improve a product cannot violate Section 2."[7] The Court rejected that contention, and held that product design changes are subject to a straightforward application of the rule of reason.[8] The Government met its initial burden by proving that all three of the design changes were anticompetitive because they had the effect of reducing the usage share of rival browsers, thereby protecting Microsoft's operating system monopoly. *Id.* at 65-66. The burden then shifted to Microsoft to establish a business justification for the design changes, and "Microsoft proffer[ed] no justification for two of the three challenged actions." *Id.* at 66. Although Microsoft made "some general claims regarding the benefits" of the design changes, it "neither specifie[d] nor substantiate[d] those claims." *Id*. Because the government made out a *prima facia* case of harm to competition, and Microsoft failed to substantiate its alleged procompetitive justifications, those two design changes constituted exclusionary conduct violative of Section 2. *Id.* at 67.

As to the third design change, Microsoft demonstrated "valid technical reasons" for the change - that "it was necessary" to design the product as it had. *Id.* The Government did not rebut the proffered justification, or show that the anticompetitive effect of the design change

---

[7] *See* Microsoft's Reply Brief in *Microsoft II*, (relevant portion included in Appendix).

[8] Other courts have similarly applied the rule of reason to allegations of exclusionary product design changes. *See*, *e.g.*, *C.R. Bard, Inc. v. M3 Systems, Inc.*, 157 F.3d 1340, 1382-83 (Fed. Cir. 1998) (jury entitled to reject proffered procompetitive justifications as pretextual); *Caldera Inc. v. Microsoft Corp.*, 72 F. Supp. 1295, 1313 (D. Utah 1999) (court must consider effects on competitors and consumers and whether product was improved); *In re IBM Periph. EDP Devices Antitrust Litig.*, 481 F. Supp. 965, 1003 (N.D. Cal. 1979) (same).

outweighed its procompetitive benefits, so Microsoft was not liable for the third change. *Id.*

In this case, we are still at the pleading stage, and AstraZeneca has not even alleged (much less proven) any procompetitive justifications for its conduct. Moreover, the market at issue in *Microsoft II* had no significant imperfections impairing free consumer choice and no regulatory barriers to entry. Here, product interchangeability (*i.e.,* the AB rating) is *the critical determinant* of generic rivals' success. The *only* commercially viable means for generic manufacturers to market their products is through generic substitution at the pharmacy counter. Compl. at ¶ 22. A medically insignificant redesign of the brand product that prevents an AB rating, such as AstraZeneca engineered, destroys that substitutability and eliminates the generic rivals' only commercially viable means of competing. And unlike the situation in the usual market, a design change in the pharmaceutical market automatically invokes a *regulatory barrier to entry* - the generic firm must develop a new AB rated version, begin the FDA approval anew, and then face *a likely minimum* additional 30-month delay. Compl. at ¶¶ 39-40; *see also Abbott*, 432 F. Supp. 2d at 415-17. As compared to other markets, the *specific facts* in this *particular market* increase both the opportunity and incentive for the monopolist to redesign products with an anticompetitive purpose and effect. Thus, AstraZeneca's plea for a more lenient standard has even less plausibility than the similar plea rejected in *Microsoft II.*

*Microsoft II* governs this case, and Plaintiffs clearly alleged a *prima facia* case of consumer harm under that analysis. The design change scheme prevented generic competitors' FDA-approved products from being "AB rated" to, and substituted at the pharmacy counter for, the redesigned product. Compl. at ¶ 41. Absent the change, generic Prilosec would have gained at least 85% of the unit sales in the market - over 25 million units a year. *Id.* at ¶ 106. As a result of the design change, however, annual sales of the generic were less than 7.4 million units. *Id.*

This reduction in generic sales has and will cost purchasers of omeprazole/esomeprazole *more than $11.5 billion. Id.* at 64. These increased costs to purchasers are the quintessence of anticompetitive harm. *See Eastman Kodak*, 504 U.S. at 478 (exclusionary conduct resulting in higher prices "is facially anticompetitive and exactly the type of harm that the antitrust laws aim to prevent"); *In re Warfarin Sod. Antitrust Litig.,* 214 F.3d 395, 397, 401 (3d Cir. 2000) (allegation that brand company "disabled [generic's] market penetration" is a "formidable demonstration of an antitrust injury"). Under *Microsoft II*, Plaintiffs' *prima facia* showing of anticompetitive harm shifts the burden to AstraZeneca to establish a procompetitive justification for the design change. *Microsoft II*, 253 F.3d at 59.

But, the law is clear that on a motion to dismiss, the court cannot consider a defendant's proffered justifications. *See Covad Comm'n v. Bell Atl. Corp.*, 398 F.3d 666, 676 (D.C. Cir. 2005) (business justification cannot be resolved on a motion to dismiss). Thus, the rule of reason inquiry (for the moment) is at an end, and AstraZeneca's motion to dismiss must be denied. *Id.*[9]

In any event, the Complaints here make abundantly clear that there are no procompetitive justifications for AstraZeneca's design change. The Complaints allege that the design change brought *no benefits of any kind to consumers* - it "created no efficiency gains or increases in consumer welfare." Compl. at ¶ 112; *id.* at ¶ 55 ("As compared to omeprazole, esomeprazole offers no therapeutic or other benefits to consumers").[10]

---

[9] *See also Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.,* 910 F.2d 139, 145 (4th Cir. 1990) (on motion to dismiss, court must deem pro-competitive justifications to be unproved); *In re K-Dur Antitrust Litig.,* 338 F. Supp. 2d 517, 533 (D.N.J. 2004) (same); *Balaco, Inc. v. Upjohn Co.,* 1992 WL 131150, at *2 (E.D. Pa. 1992) ("a factual determination of the actual competitive effects is not appropriate on a motion to dismiss").

[10] *See also* Compl. at ¶ 41 ("Nexium was not a medical improvement over Prilosec" but was only "a slight chemical variant"); *id.* at ¶ 46 ("AstraZeneca did not care whether Nexium was clinically superior to Prilosec, and in fact knew that it was not"); *id.* at ¶ 47 ("Nexium

(continued...)

The clinical studies comparing 20 mg of Nexium to 20 mg of Prilosec definitively show no superiority of Nexium. *Id*. at ¶ 78. A few studies show a slight clinical advantage for a *double dose* (40 mg) of Nexium versus 20 mg of Prilosec. *Id.* at ¶ 80. However, the Complaints allege that any therapeutic gain for the double dose of Nexium is no more than the gain routinely shown for a double dose of Prilosec, *id.* at ¶ 47; that any gains result solely from the increased dosage, *id.*; and AstraZeneca knew there is such a dose-response relationship for all proton pump inhibitors, *id.* at ¶ 88. Indeed the Nexium label provides that the effective action of esomeprazole "is *dose-related* up to a daily dose of 20 mg to 40 mg." *Id.* at ¶ 89.

AstraZeneca tries to negate these allegations, asserting throughout its brief that Nexium is an "incremental but important improvement[]," Def. Br. at 23, that the "research provide[d] a sound scientific basis for regarding [Nexium] . . . as an improvement," and that omeprazole is "less attractive [than Nexium] to consumers and doctors," *id.* at 20, 24. AstraZeneca also asserts that *Plaintiffs' own Complaints* allege only that Nexium is "not much better than" Prilosec, *id.* at 21, and that Nexium was not a "significant enough improvement[]," *id.* at 24.[11] As shown

_____

(continued...)

brought no medical benefit to consumers as compared to generic Prilosec"); *id.* at ¶ 52 (AstraZeneca introduced Nexium "for the sole reason that doing so would also weaken the competitive position of the anticipated generic versions of Prilosec"); *id.* at ¶ 64 ("as compared to Prilosec, Nexium provides no medical benefits to consumers"); *id.* (Astra-Merck's CEO admitted that "if we had left it to our R&D, Nexium would not have been developed"); *id.* at ¶ 72 ("AstraZeneca knew that Nexium was not clinically superior to Prilosec"); *id.* at ¶ 77 ("studies comparing Nexium to Prilosec did not support a conclusion that Nexium was an improvement over Prilosec even in the healing of EE"); *id.* at ¶ 87 ("studies comparing 20 mg Nexium to 20 mg Prilosec definitively show no superiority of Nexium"); *id.* at ¶ 108(a) ("Nexium is a slight variant of and provides no clinical benefits over Prilosec and its generics").

[11] AstraZeneca quotes the Complaints to the effect that Nexium did not represent a "*significant* clinical advance over omeprazole in the *first line* treatment of patents." Def. Br. at 18, quoting Compl. at ¶86 (AstraZeneca's emphasis). But that allegation was coupled with those shown above alleging Nexium provided *no medical or other benefit* as compared to Prilosec.

above, this characterization is directly rebutted by the Complaints' express allegations.  On a motion to dismiss, AstraZeneca is not entitled to contradict Plaintiffs' allegations or to alter them to its liking.  *Jungquist*, 115 F.3d at 1027.

*Microsoft II* requires application of the rule of reason to AstraZeneca's design change; Plaintiffs have clearly alleged a *prima facie* case of consumer harm; procompetitive justifications cannot be considered on this motion to dismiss; and the Complaints negate any justifications that could be offered.  AstraZeneca's motion should be denied.

### B.  The Product Redesign Scheme Is Unlawful Under *Berkey Photo*

AstraZeneca entirely ignores the dispositive holding in *Microsoft II* and instead invites this Court to apply the analysis articulated by the Second Circuit in *Berkey Photo,* 603 F.2d 263.  *See* Def. Br. at 19.  Even if *Berkey Photo* were applied here, it too would compel the denial of AstraZeneca's motion.

In *Berkey Photo*, the plaintiff-competitor asserted that Kodak unlawfully used its monopoly in film to make sales of cameras and processing services.  603 F.2d at 278.  Kodak designed its new 110 camera so that it could be used only with the new Kodacolor II film, and, for a period of 18 months, Kodak made Kodacolor II film only for the 110 camera.  Plaintiff asserted that, by linking together the 110 camera and the widely advertised Kodacolor II film, Kodak made camera sales at plaintiff's expense, even though plaintiff contended the film was not necessary to produce good 110 photographs.  *Id.* at 286.  The Court rejected that contention, noting that the evidence *at trial* showed that Kodacolor II film was inferior to its predecessor, Kodacolor X, in some respects and superior in others. *Id.*[12]  Whether one or the other was superior was therefore "a matter of individual taste."  *Id.* at 287.  Accordingly, the court held that

---

[12] As in *Microsoft II*, in *Berkey,* the issues were decided after a *trial*, not a motion to dismiss.

the market was able to determine the products' relative superiority "so long as the free choice of consumers is preserved." *Id.; see also id.* ("it is of no importance that a judge or jury may later regard them as inferior, so long as that success was not based on any form of coercion").

Plaintiffs' painstaking allegations here make clear that, in this particular market, the "free choice of consumers" (in *Berkey Photo*'s phrase) cannot defeat AstraZeneca's scheme to overcharge purchasers $11.5 billion for a slight chemical variant of Prilosec.

### 1.  The Price Disconnect Prevents Free Consumer Choice

The Complaints make clear that free consumer choice cannot sort the relative merits of omeprazole and esomeprazole because *consumers do not choose which branded product to purchase.* Unlike the vast majority of markets, the pharmaceutical marketplace is characterized by a "price disconnect." Doctors, not consumers, choose which product will be purchased. Compl. at ¶ 19. Doctors typically are not aware of the relative cost of branded pharmaceuticals and, even when they are, they are nevertheless insensitive to price differences because they do not have to pay for the products. *Id.* at ¶ 21.

Consumers in this market do not make the quality/price comparison between products that is the *sine qua non* of "free consumer choice." As the FTC found, "[t]he basic problem is that the forces of competition do not work well in a market where the consumer who pays does not choose, and the physician who chooses does not pay. Patients have little influence in determining which products they will buy and what prices they must pay for prescriptions." Drug Product Selection, Staff Report to the FTC (Jan. 1979) at 2-3; *see also* FTC Generic Subst. Rep. at 5 ("[T]he institutions of the prescription drug market are markedly different from those in most other product markets. For prescription drugs, it has not been the consumer who has made the choice among brands; it has been the physician"); Compl. at ¶¶ 18-25.

Moreover, doctors' price insensitivity makes them particularly susceptible to "detailing" and free samples from brand companies' sales representatives. *Id.* at ¶ 56. This is an extreme instance of what economists call an "agency problem" - where "one market participant is represented by an agent whose personal incentives diverge from its principal's goals." IIA P. Areeda, H. Hovenkamp, et al., ANTITRUST LAW ¶ 411, at 48 (2d ed. 2002).

The price disconnect in the pharmaceutical industry, and the brand manufacturers' exploitation of it by detailing doctors, creates a notorious agency problem. Brand manufacturers direct 90% of their $21 billion marketing budgets to "detailing" and other marketing to doctors.[13] There is a growing concern that doctors' "professional judgment about the welfare of the patients may be inappropriately influenced by a secondary interest - in this case, the personal gain derived from relationships with pharmaceutical companies."[14]

Doctors who have been "detailed" and have become accustomed to prescribing product A will not begin prescribing product B even if the generic version of product B becomes available and is much less expensive than product A - and even where, as here, product A is simply a

---

[13] "Health Industry Practices That Create Conflicts Of Interest: A Policy Proposal For Academic Medical Centers," *Journ. of the Amer. Med. Ass'n*, Vol. 295, No. 4 (Jan. 25, 2006), at 430 ("JAMA"). Reflective of AstraZeneca's views of detailing doctors are the observations of a now-former sales manager in an internal newsletter: "There is a big bucket of money sitting in every office. Every time you go in, you reach your hand in the bucket and grab a handful." Phila. Inquirer, Apr. 7, 2007, at E1, *Sales Manager Is Fired After Comments Hit Web*.

[14] "Financial Conflicts of Interest in Physicians' Relationships with the Pharmaceutical Industry," *New England Journal of Medicine*, Vol. 351, No. 18 (Oct. 28, 2004), at 1891. "Drug companies also know that samples help build brands and can be directly linked to increased prescriptions for the drugs. The pharmaceutical industry heavily distributes freebies for its newest drugs and usually curtails or eliminates them for products about to go off patent." *U.S. Consumer Groups Question Use Of Free Samples by Drug Makers - Industry Hopes to Hook Doctors, Patients Through Costly Giveaways,* Wall Street Journal at 24, July 20, 2000. Studies show that "even a small gift is a powerful influence on people's behavior. Individuals receiving gifts are often unable to remain objective; they reweigh information and choices in light of the gift." JAMA at 431.

slight chemical variant of product B and provides no medical benefits over product B.  Compl. at ¶ 56.  To suggest in these circumstances (as AstraZeneca does) that free consumer choice will determine whether Nexium is superior to Prilosec is simply to close one's eyes to reality and, more importantly, to the allegations in the Complaints.

Based on the commercial reality of the pharmaceutical marketplace, courts and commentators have concluded that there is no "free consumer choice" in this market.  In *Abbott*, 432 F. Supp. 2d 408, the court denied Abbott's motion to dismiss a Section 2 claim asserting that Abbott's product design changes were exclusionary.  Abbott redesigned its drug, Tricor, from a capsule to a tablet, and slightly reduced the amount of active ingredient.  Plaintiffs there (who are many of the same plaintiffs here) asserted that Abbott changed the formulation "not to improve the product but simply to prevent generic formulations from becoming AB-rated for substitution with Tricor."  *Id.* at 415.  The court in *Abbott* noted that *Berkey Photo* applies only when the relevant products compete "in an open market," and that, "in the absence of free consumer choice, the basis for judicial deference [to design changes] is removed."  *Id.* at 421.

The *Abbott* court held that "the nature of the pharmaceutical drug market, as described in Plaintiffs' allegations, persuades me that the rule of reason approach should apply here."  *Id.* at 422.  Plaintiffs' allegations there included a description of the "price disconnect" described above, including that doctors, not consumers, select which product to buy.  The market cannot determine which product is superior when the brand company is detailing the redesigned product to doctors and is *not* detailing and providing free samples of the original product.  The *Abbott* court also noted that the monopolist had removed the original product from the market. *Id.* at 423.  The principal significance of the removal of the product was that no one was detailing or

providing free samples of it.[15]  Here, AstraZeneca not only stopped detailing and providing free samples of the original product, like the monopolist in *Abbott,* but also instructed its Nexium detailers to compare Prilosec unfavorably to Nexium.  Compl. at ¶ 62.

In theory, of course, generic companies could detail doctors on the virtues of the original product, and try to offset the monopolist's detailing of the redesigned product.  *Abbott,* 432 F. Supp. 2d at 423 (generic firms could "market their own branded versions of the old Tricor formulations").  But detailing by generic companies is *not commercially feasible*.  *See* Compl. at ¶¶ 22, 71.  The *commercially viable* means of selling generic products is through generic substitution in the pharmacy, not detailing to doctors.  *Id*.; *see also Abbott,* 432 F. Supp. 2d at 423.  By changing the product design, the brand company impairs the generic companies' "cost-efficient means of competing in the pharmaceutical drug market" and thus prevents the market from determining which product is superior.  *Id.* at 423; *see also id.* (for conduct to be unlawful, "Competitors need not be barred 'from all means of distribution' if they are barred 'from the cost-efficient ones'" (quoting *Microsoft II*, 253 F.3d at 64)); *Multistate Legal Stud., Inc. v. Harc. Brace Jov.*, 63 F.3d 1540, 1553 n.12 (10th Cir. 1995) (raising rivals' cost can be anticompetitive conduct if the defendant cannot demonstrate a legitimate business justification for it).

The leading IP/Antitrust treatise reaches the same conclusion as the *Abbott* court.  *See* IP

---

[15] The physical removal of the original product would not prevent a doctor from writing a prescription for it, which could then be filled with a generic.  Therefore, the primary significance of the removal of the original product from the market was that the brand manufacturer would no longer detail it or provide free samples.  As AstraZeneca admits, what matters in this market is whether "doctors [have] chosen to prescribe Prilosec instead of Nexium."  Def. Br. at 11.  Of course, merely stopping detailing and providing free samples is not necessarily exclusionary conduct under Section 2.  But whether or not exclusionary, that conduct clearly prevents the free and open competition assumed in *Berkey Photo*.

AND ANTITRUST § 12.5, at 12-45 - 12-48.[16]  Because of "regulatory barriers" and "[t]he nature of the pharmaceutical drug market," a design change can prevent generic manufacturers from "tak[ing] advantage of state generic substitution laws."  *Id.* at 12-46 (quoting *Abbott*, 432 F. Supp. 2d at 422).  Such design changes, which Hovenkamp characterizes as "product-hopping," "seem[ ] clearly to be an effort to game the rather intricate FDA rules to anticompetitive effect." *Id.* at 12-45.  Under the *Microsoft II* test, a pharmaceutical design change will be unlawfully exclusionary if the "product change . . . lacks substantial medical benefits."  *See id.*  Although courts may be reluctant to "delve into the technical details of the product change," it is "an inquiry that must be made in a Section 2 case once market power has been proven."  *Id.* § 12.3e, at 12-26 – 12-27.  That inquiry will eventually be necessary here, but Plaintiffs' allegation that AstraZeneca's design change produced *no* medical benefits is dispositive of the present motion.

## 2.  AstraZeneca's Head Start Prevented Free Consumer Choice

Free consumer choice is impaired here not only by the economic realities of the pharmaceutical marketplace, but also by AstraZeneca's specific conduct.  Eighteen months before the first generic manufacturer received FDA approval, AstraZeneca began its massive effort to convert as many Prilosec prescriptions to Nexium as possible.  Compl. at ¶ 59.  The Court in *Berkey Photo* held that such a "head start" by an entrenched monopolist can interfere with free consumer choice.  603 F.2d at 287 n.39 (no consumer choice if Kodak shifted all its film production from old film to new before other photo finishers could process new film); *id.* at 288 (Kodak arguably interfered with consumer choice by making new film available only for its own camera for 18 months).

The Complaints here allege that AstraZeneca's 18-month head start allowed it to convert

---

[16] A copy of the relevant pages are included in the Appendix.  As noted in the excerpt, one of the authors, Mark Lemley, represented one of the plaintiffs in *Abbott Labs*.

10 million units in annual sales from Prilosec to Nexium before generic Prilosec was even approved for marketing.  Compl. at ¶ 63.  Moreover, once doctors switched from Prilosec to Nexium, the generic manufacturers had no commercially feasible means of getting them to switch back to Prilosec.  *Id.* at ¶ 56.  Thus, "the economic realities of the pharmaceutical marketplace meant that those 10 million units remained beyond effective competition from generic omeprazole."  *Id.* at ¶ 71.

### 3.  AstraZeneca's Deceptive Detailing Prevented Free Consumer Choice

The free consumer choice required to justify deference to product design changes under *Berkey Photo* was also precluded here by AstraZeneca's deceptive detailing and ad campaign. As shown below in Section IV, AstraZeneca reinforced the effectiveness of its product-redesign scheme by training and directing its entire Nexium sales force to falsely assert to doctors that Nexium was superior to Prilosec.  *See* Compl. at ¶ 91. Regardless of whether the deceptive campaign is independently actionable (*see* Section IV), the Complaints allege that *it in fact prevented the market from defeating AstraZeneca's product-redesign scheme*. *See* Compl. at ¶68.

Markets can overcome false and deceptive advertising only to the extent that rivals have the means of countermanding it.  *See National Ass'n of Pharm. Mfrs. v. Ayerst Laboratories*, 850 F.2d 904, 916 (2d Cir. 1988) (one factor to consider in determining whether misleading advertising has anticompetitive effects is whether it is "readily susceptible to neutralization or other offset by rivals").  Here the Complaints allege that no competing manufacturer had the incentive or means to countermand AstraZeneca's deceptive campaign against Prilosec. AstraZeneca, the manufacturer of branded Prilosec, had no incentive to countermand its own deceptive detailing; manufacturers of generic Prilosec had no effective means of countermanding the deceptive detailing.  Consequently, "there were no 'counter-detailers' to provide samples of

generic Prilosec or to negate AstraZeneca's claims of Nexium superiority."  Compl. at ¶ 70.

### 4.  The Absence of Insurance Prevented Free Consumer Choice

Finally, consumers do not have free choice here because AstraZeneca caused MCOs to stop providing reimbursement to consumers for purchases of Prilosec (whether branded or generic).  A free market can hardly be deemed to have chosen Nexium in preference to Prilosec when there is insurance coverage for Nexium but not for the far less expensive generic Prilosec.

MCOs covering the vast majority of consumers stop providing coverage for prescription pharmaceuticals when an OTC version of the product becomes available.  Compl. at ¶ 97.  When AstraZeneca introduced Prilosec OTC in September 2003, 10 months after the launch of generic Prilosec, MCOs stopped providing coverage for generic as well as branded Prilosec. *Id.* at  ¶ 101.

After the introduction of Prilosec OTC, the combined sales of branded and generic prescription Prilosec declined from 15.9 million units in 2003 to less than 8.4 million units in 2005.  *Id.* at ¶ 104.  This occurred despite the fact that *AstraZeneca's price for OTC Prilosec is more than twice the price of generic Prilosec.  Id.* at ¶ 105.

Regardless of whether AstraZeneca's introduction of Prilosec OTC was independently anticompetitive,[17] it clearly resulted in the absence of the open competition between Nexium and generic Prilosec that is contemplated by *Berkey Photo*.  Consumers had insurance coverage for Nexium but not for generic Prilosec.  AstraZeneca's assertion that MCOs had no contractual obligation to AstraZeneca to stop covering generic Prilosec (Def. Br. at 25)  is irrelevant.  Regardless of any contractual obligation, MCOs *in fact* stopped covering generic Prilosec, and that is all that is relevant under *Berkey Photo.*

---

[17] AstraZeneca asserts that Plaintiffs allege that the introduction of Prilosec OTC was itself anticompetitive.  Def. Br. at 24.  The Complaints make no such allegation.

AstraZeneca seems to suggest *Berkey Photo* applies here because *doctors* and *MCOs* have choice. Def. Br. at 25-26. But the Complaints clearly allege that doctors and MCOs are not proxies for consumers. Lacking the obligation to pay for prescription products, doctors are price-insensitive and heavily influenced by detailing. Compl. at ¶ 21. And the interests of MCOs and consumers are misaligned. *Generic Prilosec is half the price of Prilosec OTC* (which has the same active ingredient and efficacy). *Id.* at ¶ 105. But by announcing and enforcing a policy of not covering the prescription version of a product that is available OTC, the MCOs avoid paying for *any* form of omeprazole, whether OTC, generic, or brand. For the consumer, Prilosec OTC costs twice as much as generic Prilosec; for the MCO, Prilosec OTC costs $0.

The further, perverse result of this misalignment of interests is that when a consumer needs a prescription product (Prilosec OTC is indicated for only 14-day usage), the consumer finds that the far more expensive Nexium is covered and the far less expensive generic Prilosec is not. *Id.* at ¶ 103. Far from "sav[ing] money with Nexium" as AstraZeneca cynically asserts (Def. Br. at 13), consumers ultimately pay for the high price of Nexium in the form of higher insurance premiums.

## II.    THE DESIGN CHANGE IS UNLAWFUL UNDER THE PROFIT SACRIFICE TEST

In this Circuit, product design changes are analyzed under the *Microsoft II* rule of reason test, and AstraZeneca's motion should be denied under that standard. But Plaintiffs have stated a claim even under the much more permissive (for the monopolist) "profit sacrifice" test. None of the cases cited by AstraZeneca dismissed a product design case where plaintiffs had alleged that the change failed the profit sacrifice test; many of those cases indicate that such allegations are

sufficient to state a claim under Section 2.[18]

The rule of reason asks whether the benefits of the design change to *consumers* are greater than the losses *to consumers.* The profit sacrifice test asks whether the benefits of the design change *to the monopolist* (*i.e.*, additional sales and profits), absent the effect of maintaining the monopoly, are greater than the *costs to the monopolist.* The profit sacrifice test is, in essence, an economic test for determining that the monopolist's *sole* motive was to impair competition. If a profit-maximizing firm engages in conduct that would not be economically rational (*i.e.*, maximally profitable) absent a reduction in competition, then it can be inferred that the firm was motivated solely by a desire to cause the reduction in competition. *See, e.g.,* P. Areeda & H. Hovenkamp, ANTITRUST LAW ¶ 773 at 367 (Supp. 2006) (a refusal to deal is unlawful if it is "'irrational' in the sense that the defendant sacrificed an opportunity to make a profitable sale only because of the adverse impact the refusal would have on a rival").[19]

---

[18] *See, e.g., Northeastern Tel. Co. v. AT & T*, 651 F.2d 76, 94-95 (2d Cir. 1981) (properly instructed jury could reasonably find that monopolist designed product in order to impede competition); *Calif. Comp. Prod. v. IBM*, 613 F.2d 727, 743-44 (9th Cir. 1979) (IBM was entitled to redesign its products to make them less expensive and more efficient; no proof that redesign failed profit sacrifice test); *Resp. of Carolina, Inc. v. Leasco Resp., Inc.*, 537 F.2d 1307, 1330 (5th Cir. 1976) (technological tying cases are "limited to those instances where the technological factor tying the hardware to the software has been designed for the purpose of tying the products, rather than to achieve some technologically beneficial result"); *ILC Periph. Leas. Corp. v. IBM*, 458 F. Supp. 423, 439-41 (N.D. Cal. 1978) (no liability where "there was no evidence that IBM was sacrificing present profits with the expectation of recouping its losses with subsequent price increases"). In none of these cases did the court attempt to resolve the defendant's liability on a motion to dismiss. The D.C. Circuit has used the profit sacrifice test in certain types of Section 2 cases not involving product design changes. *See Covad Comm's*, 398 F.3d at 675 (refusal to deal); *Neumann v. Reinforced Earth Co.*, 786 F.2d 424, 427 (D.C. Cir. 1986) (sham patent litigation).

[19] *See also Aspen Skiing*, 472 U.S. at 610-11 (the defendant "was willing to sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival"); *Trinko*, 540 U.S. at 408 (evidence in *Aspen Skiing* reflected "a willingness to forsake short-term profits to achieve an anticompetitive end"); *Covad Comm's*, 398 F.3d at 676 (predatory practice "is one in which a firm sacrifices short-term profits in order to drive out of

(continued...)

Professors Ordover and Willig explored the application of the profit sacrifice test to product design changes.  J. Ordover & R. Willig, *An Economic Definition of Predation: Pricing and Product Innovation*, 91 YALE L.J. 8, 22 (1981) ["Ordover"].  They note that even "technological superiority" of the new product does not prevent finding exclusionary conduct:

> [T]he technological superiority of a new system does not preclude a finding of predatory product innovation. . . . Under this standard, a new system is immune from a finding of predation if and only if the value to consumers of the new system relative to the preexisting system is greater than the required development costs.

*Id.* at 49.[20]   The allegations in the Complaints easily withstand a motion to dismiss, even if this Court applied the profit sacrifice test instead of the rule of reason test required by *Microsoft II*.

*First,* "AstraZeneca's sole motive in launching Nexium and switching prescriptions from Prilosec to Nexium was to interfere with competition from generic Prilosec."  Compl. at ¶ 47; s*ee also id*. at ¶ 46 ("AstraZeneca did not care whether Nexium was clinically superior to Prilosec, and in fact knew that it was not"); *id.* at ¶ 117 ("AstraZeneca's unlawful actions were taken for the purpose of impairing generic competition and allowing it to continue to charge . . . monopoly prices").  In the words of Astra-Merck's then-chief executive, "If we had left it to R&D, Nexium

_____

(continued...)

the market or otherwise discipline a competitor").

[20] *See also Spirit Air., Inc. v. Northwest Air., Inc.*, 431 F.3d 917, 953 (6th Cir. 2005) (Moore, J., concurring) (predation claims are based on the theory that "an incumbent seeks to retain monopolist control in the future by ceasing to engage in economically rational behavior in the present in an effort to drive potential rivals from the market"); S. Salop, *Exclusionary Conduct, Effect on Consumers and the Flawed Profit-Sacrifice Standard*, 73 ANTITRUST L.J. 311, 318-19 (2006) (profit-sacrifice test "examines the profitability of the defendant's conduct relative to a hypothetical market outcome" in which it  has no ability to raise prices after the conduct occurs); R. Bork, THE ANTITRUST PARADOX 144 (1978) (test is used to identify business practices that "would not be considered profit-maximizing except for the expectation either that (1) rivals will be driven from the market, leaving the predator with a market share sufficient to command monopoly profits, or (2) rivals will be chastened sufficiently to abandon competitive behavior the predator finds inconvenient or threatening").

would not have been developed. The project was driven by the marketing people." *Id.* at ¶ 67. These allegations establish that AstraZeneca's sole motive was to impair generic competition, not to improve its product. *See Neumann*, 786 F.2d at 427 (predation "involves the deliberate seeking of monopoly power by means other than superior efficiency").

     *Second*, Plaintiffs alleged that the design change was profitable only because it allowed AstraZeneca to maintain its monopoly power by impairing generic competition:

- "AstraZeneca knew that, *absent the adverse effects on sales of generic Prilosec*, Nexium was a losing business proposition for AstraZeneca - the costs of research, development and marketing of Nexium would not be justified by Nexium sales."Compl. at ¶ 47;

- "Absent the adverse effect on sales of generic Prilosec, AstraZeneca's development and marketing of Nexium made no economic sense." *Id.*;

- "AstraZeneca's product-switching from Prilosec to Nexium was profitable for AstraZeneca only because the strategy had the effect of impairing generic competition to Prilosec. Absent that effect, engaging in the product switch would have made no economic sense for AstraZeneca." *Id.* ¶ 65.

     These allegations defeat AstraZeneca's motion. Indeed, merely alleging that the conduct is "predatory" can "suffice[ ] to withstand a motion to dismiss because, in the vernacular of antitrust law, a 'predatory' practice is one in which a firm sacrifices short-term profits in order to drive out of the market or otherwise discipline a competitor." *Covad Comm's*, 398 F.3d at 676.

     *Third*, the Complaints support these claims with specific economic facts. Under the profit sacrifice test, a design change "is immune from a finding of predation if and only if the value to consumers of the [change] relative to the preexisting [product] is greater than the required development costs." Ordover, at 49. In 2000, before Nexium entered, AstraZeneca had U.S. sales of 29.6 million units. Compl. at ¶ 65. In 2002, it had U.S. sales of 33 million units of Prilosec and Nexium combined, an 11.4% increase. *Id.* In that period, however, the number of prescriptions for the relevant conditions increased over 30% (twice that of Prilosec/Nexium). *Id.*

Thus, there is no basis to ascribe *any* consumer value to the design change. Nexium caused AstraZeneca to *lose sales* (except those kept by impairing generic competition). *Id.* at ¶¶ 63, 65.

AstraZeneca incurred massive R&D and marketing costs to switch the market to a product with fewer sales. This strategy was profitable *only* because of its effect of impairing competition from generic Prilosec. AstraZeneca made its R&D and marketing investments not to increase sales by improving a product, but to impair generic Prilosec. This is classic predation.

## III.    THE FDA'S AUTHORITY TO APPROVE NEW DRUGS DOES NOT EXEMPT ASTRAZENECA'S CONDUCT FROM ANTITRUST SCRUTINY

Relying on *Trinko*, AstraZeneca asserts that the Court should dismiss Plaintiffs' claims because the FDA regulates the entry of branded pharmaceuticals. Def. Br. at 21-24. While quoting snippets from *Trinko*, AstraZeneca ignores its context as well as its analysis.

The *Trinko* Court determined whether a particular regulatory regime justified creating an exception to the general rule that a monopolist has no duty to aid competitors. 540 U.S. at 411. Plaintiffs here complain not of a failure to *aid* rivals, but of AstraZeneca's billion-dollar investment made solely to *harm* competitors and competition. Even as to failures to aid competitors, the *Trinko* Court held that the existence of a regulatory scheme counsels against antitrust scrutiny only where the regulations are "designed to deter and remedy anticompetitive harm." *Id.* at 412. In contrast, where there is "nothing built into the regulatory scheme which performs the antitrust function . . . the benefits of antitrust are worth its sometimes considerable disadvantages." *Id.* (citation omitted). Thus, courts applying *Trinko* have held that the existence of a regulatory regime counsels against antitrust scrutiny only when that regime "performs the antitrust function" by deterring and remedying anticompetitive harm. *See, e.g., Billing v. Cred. Suisse First Bost.*, 426 F.3d 130, 172 (2d Cir. 2005); *Stand Energy Corp. v. Col. Gas Trans. Corp.*, 373 F. Supp. 2d 631, 641 (S.D.W. Va. 2005); *Nobody in Part. Presents, Inc. v. Clear*

*Chann. Comm., Inc.*, 311 F. Supp. 2d 1048 (D. Colo. 2004).

The FDA's review process for new drug products examines the product's safety and efficacy (as compared to placebo) for the preferred indication. 21 U.S.C. § 355(a), (b). The FDA has no authority to deny approval based on the competitive effect of a new drug, or whether it is an improvement over existing drugs. *See* 21 U.S.C. § 355(d).[21] Thus, courts routinely entertain antitrust claims against brand manufacturers for thwarting generic competition. *See, e.g., Abbott,* 432 F. Supp. 2d 408; *In re Remeron Antitrust Litig*., 335 F. Supp. 2d 522 (D.N.J. 2004); *In re Cardizem CD Antitrust Litig*., 105 F. Supp. 2d 618, 663-64 (E. D. Mich. 2000).

For example, the defendant in *Remeron* relied on *Trinko* to argue that the Hatch-Waxman Act and FDA's "Orange Book" regulations "should override the Sherman Act, thereby barring Plaintiffs' late listing antitrust claim." *Remeron*, 335 F. Supp. 2d at 530. Rejecting that argument, the court noted that *Trinko* involved "a complete regulatory scheme that grants regulators significant power to enforce rules and to issue penalties." *Id.* In contrast, the regulatory regime for drug approvals contemplates that competition issues will be resolved by the courts, "and not the FDA." *Id.* at 530-31. Accordingly, "[n]o authority has been cited to support the proposition that the antitrust laws have been superseded by the Hatch-Waxman Act or by FDA regulations. *Trinko* does not bar the instant antitrust claims." *Id.* at 531.

Similarly, in *Cardizem*, the court held that the antitrust laws were applicable where Andrx agreed with the brand company to abandon launch of generic Cardizem in return for a

---

[21] The FDA's inability to deny approval based on competition concerns is in stark contrast to the regulatory regimes in other industrialized nations. Many other governments regulate the prices of drugs and place restrictions on the approval of new drugs based on their therapeutic gains over existing products. *See generally Pharmaceutical Price Controls in OECD Countries*, U.S. Dep't of Commerce, Int'l Trade Admin. (Dec. 2004). The FDA has no comparable authority to regulate entry based on competition concerns.

multi-million dollar payment.[22]   Neither the Hatch-Waxman Act nor the FDA drug-approval regulations shielded that conduct from antitrust scrutiny because the conduct "was not mandated by the Hatch-Waxman Act, and was not adequately reviewed by any federal agency."  105 F. Supp. 2d at 663.  The court concluded that "no court has held that the sixteen year old Hatch-Waxman Amendments provide immunity from the antitrust laws or have repealed the Sherman Act, and Defendants have not persuaded this Court that it should be the first to do so."  *Id.; see also Biovail Corp. v. Hoechst Aktien.*, 49 F. Supp. 2d 750, 764-66 (D.N.J. 1999) (fact that FDA found drug safe and effective had no bearing on whether defendants' acts were anticompetitive).

    That Congress left the regulation of pharmaceutical competition to the antitrust laws is confirmed by recent amendments to the Medicare Prescription Drug Improvement and Modernization Act of 2003.  That act mandates that agreements between brand and generic companies settling Hatch-Waxman litigation must be submitted to the *antitrust agencies* for review under the *antitrust laws.  See* Medicare Modernization Act, Pub.L. No. 108-173, § 1112.

## IV.    PLAINTIFFS' ALLEGATIONS OF DECEPTIVE DETAILING AND ADVERTISING ARE SUFFICIENTLY PLED

    Plaintiffs have alleged a multifaceted product-redesign scheme, one aspect of which is AstraZeneca's misrepresentations made to consumers and doctors regarding the alleged superiority of Nexium to Prilosec.  AstraZeneca treats these allegations of misrepresentations as if they were an independent claim of false advertising.  They are not; they are one aspect of the overall product redesign scheme and should be analyzed as such.  *See Continental Ore*, 370 U.S. at 698-99; *Microsoft,* 87 F. Supp. 2d at 44; *Abbott,* 432 F. Supp.2d at 428.  Regardless of whether AstraZeneca's misrepresentations are independently unlawful, they are appropriately

---

[22] Although decided before *Trinko*, the *Cardizem* court applied analysis later endorsed by *Trinko.*

considered together with all of AstraZeneca's conduct in determining whether the overall product-redesign scheme is exclusionary.

Even if the misrepresentations are improperly viewed in isolation as AstraZeneca argues, and not as part of a scheme, the allegations (1) satisfy Rule 9(b); (2) allege exclusionary conduct under Section 2; and (3) are not shielded from antitrust scrutiny by the FDA-approved label.

### A.  Even if Rule 9(b) Applies, Plaintiffs' Allegations Satisfy It

The pleading requirements in Federal Rule of Civil Procedure 9(b) do not apply here because the misrepresentations alleged are just one aspect of a multifaceted, unified scheme to impair generic competition.  Courts have applied Rule 9(b) to antitrust claims only where the alleged fraud is the gravamen of or pervades the *entire* anticompetitive scheme.  *See Borsellino v. Goldman Sachs Group, Inc*., 477 F.3d 502, 507 (7th Cir. 2007) (appellants' "brief is riddled with references to fraud, showing that this theory pervades their entire case"); *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (as  to two defendants, the "entirety of [the] Compaint." was comprised of allegations of a "unified fraudulent course of conduct").

But Plaintiffs' allegations are clearly sufficient even if Rule 9(b) applies.  Rule 9(b) must be read in harmony with Rule 8's requiriment that "pleadings should contain a 'short and plain statement of the claim and or defense' and that each averment should be 'simple concise and direct.'"  *Bridon Am. Corp. v. Mitsui & Co,* 1983 WL 1987 at * 4 (D.D.C. Nov. 7, 1983); *High v. McLean Fin'l Corp.*, 659 F. Supp. 1561, 1566 (D.D.C. 1987); *see also* 2 Moore's Federal Practice § 9.03, at 9-36 (3d ed. 2006).  Moreover, "the general rule requiring specific allegations of time, place and content is 'relaxed somewhat as to matters peculiarly within the adverse party's knowledge' or 'where the issues are complex, or the transactions involved cover a long period of time'." *Bridon Am. Corp.*, 1983 WL 1987 at * 5 (citation omitted); *see also In re*

*Vitamins Antitrust Litig.*, 2000 WL 147505 at * 3 (D.D.C. May 9, 2000).

Plaintiffs have alleged with particularity the misleading statements. During the late 1990s and early 2000s, Plaintiffs allege AstraZeneca trained and directed *its entire Nexium sales force* to assert to *all doctors on whom they called* that, as compared to Prilosec, Nexium:

- "demonstrates a significant clinical advantage;"

- has "significantly greater healing and symptom resolution rates for [Erosive Esophagitis] patients;"

- has a clinical advantage "demonstrated in longer term maintenance therapy, as well as in the initial healing stage;"

- has more symptom-free patients;

- has a lower number of treatment failures;

- "has a greater clinical advantage for more severe patients;"

- is "a better PPI;" and

- is "expected to positively affect other associated outcomes such a patient satisfaction; [quality of life] and productivity."

Compl. at ¶ 91. The Complaints allege that not one of these representations is true - that, as compared to Prilosec, Nexium "offers no therapeutic or other benefits to consumers." *Id.* at ¶ 55; *see also id.* at ¶ 112 (Nexium offers "no efficiency gains or increases in consumer welfare").

In print ads and a direct-to-consumer ad campaign, AstraZeneca asserted that in studies *comparing it with* Prilosec, Nexium:

- had "[p]roven efficacy in short-term healing (4-8 weeks);"

- had "proven symptom control;"

- was an "effective first-line PPI therapy;" and

- will "Stop the heartburn - Start the HEALING."

*Id.* at ¶ 92. Because the ads said that they were based on studies comparing Nexium to Prilosec,

reasonable readers would believe they meant Nexium had *better* short-term healing and symptom control than Prilosec; was a *better* first-line therapy than Prilosec; and stopped heartburn and started healing *faster* than Prilosec.  *Id.*  Each assertion is false.  *See id.* at ¶¶ 55, 112.

These detailed allegations have provided Defendants with ample notice of the basis for Plaintiffs' claim that Defendants engaged in a campaign of distortions and misdirections.  The allegations include quotations as to what was said, identify the context in which it was said (detailing and print ads), and state to whom it was said (consumers and the doctors on whom the Nexium sales force called).[23]  No more is required.  *United States ex rel. McCready v. Col./HCA Health. Corp.*, 251 F. Supp. 2d 114, 116 (D.D.C. 2003); *United States of America, ex. rel. Harris v. Bernad*, 275 F. Supp. 2d 1, 7-8 (D.D.C. 2003).

## B.  AstraZeneca's Misrepresentations Are Exclusionary Under Section 2

A monopolist's misrepresentations as to the quality or attributes of its (or a competitor's) product clearly can be exclusionary under Section 2.  *See, e.g., Microsoft II*, 253 F.3d at 77 (finding Section 2 liability because misrepresentations achieve advantage based on neither "the superiority of the [monopolist's product] [n]or . . . the acumen of its makers"); *Z-Tel Comm., Inc. v. SBC Comm., Inc.*, 331 F. Supp. 2d 513, 530 (E.D. Tex. 2004) ("advertising that creates barriers to entry may constitute exclusionary conduct"); *Caldera, Inc. v. Microsoft Corp.*, 72 F.

---

[23] Even if *arguendo*, Rule 9(b) applies and the Complaints were found not to satisfy the rule, dismissal with prejudice without permitting discovery is not appropriate.  *See J.S. McCarthy, Co. Inc. v. Brausse Die. & Conv. Equip., Inc.,* 340 F. Supp. 2d 54 (D. Me. 2004) (denying motion to dismiss, allowing discovery on time, place, and content of alleged fraud); *see also Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) ("leave to amend is 'almost always' allowed to cure deficiencies in pleading fraud"); *Anderson v. USAA Cas. Ins. Co.*, 221 F.R.D. 250, 253 (D.D.C. 2004) (where complaint does not satisfy Rule 9(b), "the court should freely grant leave to amend").  Indeed, a court has already refused to dismiss a claim involving AstraZeneca's fraudulent promotion of Nexium.  *See Ledwick v. AstraZeneca Pharm.*, L.A. County Superior Court of California, case no. BC 324518 (copy in the Appendix).  If the Court determines the Complaints are deficient in this regard, Plaintiffs request that they be permitted discovery on the relevant issues and to amend the Complaints.

Supp. 2d 1295, 1319 (D. Utah 1999) (deceptive communications "viewed in context with other alleged anticompetitive behavior may give rise to a § 2 violation").

AstraZeneca nevertheless argues that the Court should *presume* its campaign of distortions had a *de minimis* effect on competition, and cannot be exclusionary as a matter of law.  Def. Br. at 31.  This argument is undermined by the very authorities that it cites.

In *Ayerst Laboratories*, 850 F.2d at 916 (Def. Br. at 31), an association of generic companies claimed that the brand company violated Section 2 by sending a letter to pharmacists that was "false and misleading because it effectively told pharmacists that [the brand drug] was therapeutically superior to [the generic drug], and that [the generic drug] should not be dispensed for any indications."  Although the Court discussed the *de minimis* presumption, it *reversed the grant of the motion to dismiss*, explaining, plaintiff "should be allowed to go forward with the discovery process to substantiate its claim that the Letter was clearly false, clearly material, and clearly likely to induce reasonable reliance."  *Id.*  The Court further explained that "the several factors we have noted above cannot be adequately evaluated until the discovery process has moved forward to a greater extent than it has thus far."  *Id.* at 917.

Likewise, the treatise on which AstraZeneca relies (Def. Br. at 32), states, "misrepresentations and organized deception by a dominant firm may have § 2 implications when used against a nascent firm just as it is entering the market.  Such a firm has no established customer base and typically lacks the resources to answer the dominant firm's deception effectively."  IIIA P. Areeda & H. Hovenkamp, ANTITRUST LAW, ¶ 782b (2d ed. 2002); s*ee Z-Tel Comm.*, 331 F. Supp. 2d at 531-32 (denying motion to dismiss in situation  described in treatise).

For well over a decade, AstraZeneca was the only marketer of prescription drugs containing omeprazole (or any enantiomer of omeprazole) in the United States.  It was not until

December 2002 that the first generic Prilosec entered the market. By that time, however, defendants were well on their way to effecting their product redesign scheme by switching the market from Prilosec to Nexium. This is a textbook case of a dominant firm engaging in organized deception just as a new firm is entering the market. Indeed, unlike the usual situation addressed by Hovenkamp, here the nascent rivals, who are economically precluded from detailing, had no effective means of combating AstraZeneca's campaign, even after they entered. Compl. at ¶ 71. The presumption of a *de minimis* effect simply does not apply here.

Even if the *de minimis* presumption were applicable, Plaintiffs clearly overcome it under the six-factor test invoked by AstraZeneca.[24] AstraZeneca concedes the allegations satisfy two of the four criteria, and AstraZeneca's assertions regarding the other four are wrong.

### 1.  AstraZeneca's statements were "clearly false"

Plaintiffs identified a series of statements made to doctors and consumers regarding an alleged superiority of Nexium over Prilosec. AstraZeneca asserts that "plaintiffs never dispute the truth" of those statements. Def. Br. at 33. But Plaintiffs *have* disputed their truth by alleging Nexium is *not* superior to Prilosec *in any respect. See, e.g.,* Compl. at ¶¶ 55, 112.

Nor can AstraZeneca avoid this conclusion by asserting that its statements were merely "true but misleading." *See* Def. Br. at 33. AstraZeneca asserted "X" (*e.g.,* that Nexium has "significantly greater healing and symptom resolution rates for EE patients," Compl. at ¶ at 91); Plaintiffs assert "not X" (*e.g.*, studies definitively show no such advantages for Nexium, *id.* at ¶ 78, and Nexium "offers no therapeutic or other benefits to consumers," *id.* at ¶ 55).

---

[24] The six-factor test, first set forth by Professors Areeda and Turner, queries whether the representations were "(i) clearly false, (ii) clearly material, (iii) clearly likely to induce reasonable reliance, (iv) made to buyers without knowledge of the subject matter, (v) continued for prolonged periods of time, and (vi) not readily susceptible of neutralization or offset by rivals." III P. Areeda & D. Turner, ANTITRUST LAW, ¶738a, at 278-79 (1978).

### 2.    The advertising and detailing at issue were not "mere puffery"

For similar reasons, AstraZeneca's misrepresentations cannot be passed off as "mere puffery." *See* Def. Br. at 34.  The very cases relied on by AstraZeneca, for example *Castrol Inc. v. Pennzoil Co.,* 987 F.2d 939, 946 (3d Cir. 1993), hold that advertisements are not "mere puffery" where, as here, "the claim is both specific and measurable by comparative research," or "seeks to substantiate its claims of superiority by reference to testing."

As shown above, AstraZeneca touted Nexium as an improvement over Prilosec, asserting, for example, that it has "significantly greater healing and symptom resolution rates for EE patients;" that the clinical advantage "is demonstrated in longer term maintenance therapy, as well as in the initial healing stage;" that it has a lower number of treatment failures; and has "a greater clinical advantage for more severe patients."  Compl. at ¶ 91.  AstraZeneca *specifically cited alleged comparative studies with Prilosec* and falsely asserted that they showed Nexium was more powerful, had better efficacy in healing, better symptom control, and was more effective as a first-line therapy.  *Id.* at ¶ 92.  The studies negate each of those claims.  *Id.* at ¶ 78.  These are the kind of "specific and measurable" claims, verifiable (indeed, already disproven) by "comparative research," which the courts have held do not constitute "mere puffery."

### 3.    AstraZeneca made the statements to buyers without knowledge and to doctors without incentive

The *de minimis* test asks whether the misrepresentations were made to a *buyer* without knowledge of the subject matter.  The idea is that a buyer with such knowledge will have the incentive and ability to overcome the defendant's false representations. Plaintiffs clearly satisfy these criteria to the extent that AstraZeneca made misrepresentations to consumers.  Consumers are the buyers of the pharmaceutical products, and they lack the specialized medical knowledge necessary to overcome the misrepresentations.

41

To the extent that AstraZeneca made misrepresentations to doctors and MCOs, they are *not the buyer* of the products and thus lack the incentive and/or ability to overcome the misrepresentations. As shown above, doctors do not pay for pharmaceuticals and thus are not price sensitive. And the MCOs' interests here were not aligned with those of consumers. *See supra* Section I.B.4. Here the actual buyer, the consumer, lacks sufficient knowledge to defeat the misrepresentations, and doctors and MCOs are not the buyer and therefore lack the incentive (or, in the case of MCOs, the incentive and/or ability) to defeat the misrepresentations.

This reality is highlighted by AstraZeneca's massive campaign to promote the use of Nexium over Prilosec, amassing a sales force of nearly 8,000 and spending approximately $1 billion on detailing and advertising in the first two years on the market. This conduct would have been irrational if AstraZeneca thought that the effect on doctors and MCOs would be *de minimis*. As one court succinctly stated, "This Court agrees with [plaintiff's] inference that if the buyers were knowledgeable, then [defendant] would not make these presentations to them." *Avery Denn. Corp. v. Acco Brands*, 2000 WL 986995 (C.D. Cal. 2000) (issue of fact precluded summary judgment as to whether plaintiff had "overcome the de minimis presumption to establish that [defendant's] sales campaign is anticompetitive conduct").[25]

### 4. The statements are not susceptible to neutralization and other offset

Nor were the misrepresentations neutralized by detailers "from the makers of the other PPIs that treat the same conditions (Prevacid, Protonix and Aciphex)." Def. Br. at 36. The misrepresentations were designed to switch the market *from Prilosec* to Nexium, thereby impairing generic competition. Compl. at ¶ 90. AstraZeneca produced both Prilosec and Nexium,

---

[25] Focusing on statements of one individual (described in the Complaint) AstraZeneca argues *all* doctors knew the truth - that Nexium was *no* improvement over Prilosec. Def. Br. at 36. But Plaintiffs allege most doctors who prescribe Nexium are general practitioners unfamiliar with the studies, and even many specialists were misled. Compl. at ¶ 95.

so there were no "counter-detailers" to dissuade doctors from switching from Prilosec to Nexium. There is no basis (on a motion to dismiss) to credit the fanciful suggestion that other PPI manufacturers had an incentive to, or did, counter AstraZeneca's detailing *against Prilosec*.

### C. The Deceptive Detailing and Advertising Campaign Is Not Shielded by FDA Regulations

Citing 21 C.F.R. § 314.125(b)(6), AstraZeneca asserts that the FDA ensures that labels are not false or misleading. Def. Br. at 38. But Plaintiffs do not claim that the Nexium *label* was false and misleading. The label includes the test results which Defendants told the FDA showed Nexium is not superior to Prilosec. Compl. at ¶ 78. Rather, Plaintiffs claim AstraZeneca's *representations to consumers and doctors* were false and misleading and contrary to its promise to the FDA that it would not claim that Nexium was superior to Prilosec. *Id.* at ¶¶ 91-93, 89.

AstraZeneca makes a vague assertion that its representations were in some undefined way "supported by FDA-approved labels." Def. Br. at 38. But the studies definitively show no superiority of Nexium. Compl. at ¶ 78. The FDA Medical Officer who reviewed the entire set of clinical studies submitted to the FDA regarding Nexium specifically concluded that "[t]here are no studies which demonstrate that [Nexium] is superior to [Prilosec], clinically or even statistically." *Id*. at ¶ 85. Moreover, AstraZeneca's Vice President specifically informed the FDA at a meeting on February 6, 2001, that "AstraZeneca is not stating that Nexium is better than omeprazole." *Id*. at ¶ 89. Indeed, AstraZeneca asked the FDA to include the studies in the label in order "to make physicians understand that Nexium is not superior to omeprazole." *Id.* AstraZeneca's claims of superiority are therefore not "supported by" the label.[26] *See id.* at ¶ 93.

---

[26] AstraZeneca cites a case dismissing a claim against it under a state consumer protection law - not the Sherman Act. *Penn. Empl. Benefit Trust Fund v. Zeneca, Inc.* No. 05-075-SLR, 2005 WL 2993937 (D. Del. Nov. 8, 2005) *appeal pending* No. 05-05340 (3d Cir.). That court did not have before it the allegation that AstraZeneca expressly told the FDA it was

(continued...)

Ultimately, AstraZeneca retreats to limited evidence in some of the studies (contradicted by other studies) that a *double dose* of Nexium (40 mg) may have some clinical advantage as compared to a single dose (20 mg) of Prilosec. *See* Def. Br. at 39. Even assuming that all of the studies as a whole could be read to support that conclusion (the Complaints allege they cannot be), the label still would not support AstraZeneca's representations of superiority. AstraZeneca asserted that *Nexium* is superior to *Prilosec*. It did not limit its representations to a claim that *40 mg* Nexium is superior to *20 mg* Prilosec. Nor did AstraZeneca's representations disclose that the multiple studies comparing 20 mg Nexium to 20 mg Prilosec showed no superiority for Nexium. *See* Compl. at ¶ 78. The blanket assertions that Nexium *as such* is superior to Prilosec *as such* are clearly not "supported by" the label. *See id.* at ¶ 93.

It is true, as AstraZeneca notes, that the FDA has authority to disapprove manufacturers' written marketing materials. *See* Def. Br. at 22. But the FDA is not the comprehensive marketing "watchdog" that AstraZeneca pretends. Given the significant growth of drug advertising and the strain on FDA resources, the FDA is ill-equipped to police all manufacturers' DTC advertising let alone to police the daily activities of tens of thousands of detailers. According to a GAO report, in 2002, only five FDA staff members review DTC advertisements. "Prescription Drugs, FDA Oversight of Direct-to-Consumer Advertising Has Limitations," at 17

_____

(continued...)

including the studies in the label to demonstrate that Nexium is, in fact, no better than Prilosec. *See* Compl. at ¶ 89. Defendants focus heavily on that opinion, yet ignore the California Superior Court decision, which held that its claims of superiority of Nexium over Prilosec may be challenged as deceptive advertising, despite the FDA approval of the label, because "the court cannot fathom[] how Nexium's labeling affirmatively supports defendants' claim that Nexium is superior to Prilosec." *Ledwick v. AstraZeneca* L.A. Super. Ct, BC 324518 , at 10,.

Also unpersuasive is the citation to *Requirements on Content and Format of Labeling for Human Prescription Drug and Biological Products*, 71 Fed. Reg. 3922 (Jan. 24, 2006); its Preamble notes that FDA labeling decisions should "preempt" contrary or conflicting *state laws concerning the failure to warn* product liability plaintiffs about the medical dangers of a drug.

& n.26, U.S.G.A.O., GAO-03-177, Oct. 2002.  Another handful of reviewers review materials

prepared for doctors.[27]  Additionally, drug companies do not submit their detailing plans, scripts

or other materials used to train their representatives in how to discuss their products with doctors.

In any event, AstraZeneca has little basis to argue that the FDA has the *exclusive*

authority to determine whether its promotional materials are false or misleading.  In *AstraZeneca*

*LP v. Tap Pharm. Prod., Inc.*, 444 F. Supp. 2d 278 (D. Del. 2006), AstraZeneca itself sought a

declaration *from a court* that its 2004-2005 DTC advertising campaign comparing Nexium to

PPIs (other than Prilosec) was not false or misleading.  Having invoked the authority of the

federal courts on that subject, it should not be heard to suggest that the authority does not exist.

AstraZeneca's concession that courts have authority to review pharmaceutical marketing

is consistent with other cases that similarly exercised that authority.  *See Warfarin Sodium*, 214

F.3d at 397 (antitrust standing exists in claim that brand company "orchestrated a campaign

disparaging generic substitutes"); *Ayerst*, 850 F.2d 904 (reversing dismissal of Section 2 claim

based on claim that brand company sent deceptive letters to pharmacists).  That the FDA had

disapproved the misrepresentations in these cases (*see* Def. Br. at 39) is irrelevant.  The courts

did not tie their holdings to that fact, and nothing in the law or logic supports such a limitation.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.

---

[27] July 22, 2003 testimony of Janet Woodcock, M.D., Dir., Center for Drug Evaluation and Research, FDA, before the Senate Special Committee on Aging (In 2003, DDMAC was staffed with about 40 staff members, "20 are primary reviewers and 5 are secondary reviewers (team leaders). The review staff currently has six review groups. Four are Professional Review Groups, each with two review teams, who review materials prepared for health care professionals.") (available at http://www.hhs.gov/asl/testify/t030722b.html).

By: _____/S/_____
Robert D.W. Landon III  (D.C. Bar 441571)
KENNY NACHWALTER P.A.
1100 Miami Center
201 South Biscayne Boulevard
Miami, FL 33131
(305) 373-1000
(202) 372-1861 (fax)

*Attorneys for Walgreen Plaintiffs*

Steve D. Shadowen
Joseph T. Lukens
HANGLEY ARONCHICK SEGAL &
PUDLIN
One Logan Square, 27th Floor
Philadelphia, PA 19103
(215) 568-6200
(215) 568-0300 (fax)

*Attorneys for Rite Aid Plaintiffs*

By: _____/S/_____
David U. Fierst (D.C. Bar 912899)
STEIN, MITCHELL & MEZINES LLP
110 Connecticut Avenue, N.W., Suite 1100
Washington, DC 20036
(202) 737-7777
(202) 296-8312 (fax)

Bruce E. Gerstein
Barry S. Taus
Brett Cebulash
Kevin S. Landau
Archana Tamoshunas
Elena K. Chan
GARWIN GERSTEIN & FISHER LLP
1501 Broadway, Suite 1416
New York, NY 10036
(212) 398-0055
(212) 764-6620 (fax)

J. Gregory Odom
Stuart E. Des Roches
Charles F. Zimmer
ODOM & DES ROCHES, LLP
Suite 2020, Poydras Center
650 Poydras Street
New Orleans, LA 70130
(504) 522-0077
(504) 522-0078 (fax)

Daniel Berger
David F. Sorensen
Eric Cramer
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3010
(215) 857-4671 (fax)

David P. Smith
W. Ross Foote
PERCY, SMITH & FOOTE LLP
720 Murray Street
P.O. Box 1632
Alexandria, LA 71309
(318) 445-4480
(318) 487-1741 (fax)

Brent B. Barriere
PHELPS DUNBAR LLP
Canal Place
365 Canal Street, Suite 2000
New Orleans, LA 70130
(504) 584-9210
(504) 568-9130 (fax)

Adam Moskowitz
Alexander S. Bokor
KOZYAK TROPIN & THROCKMORTON,
P.A.
2525 Ponce de Leon Blvd., 9th Floor
Miami, FL 33131-2335
(305) 372-1800
(305) 372-3508 (fax)

*Attorneys for Louisiana Wholesale Drug Co.,
Inc.; Burlington Drug Company, Inc.; Dik
Drug Company; and King Drug Company of
Florence, Inc. on behalf of themselves and all
others similarly situated*

By: _____ /S/ _____
Linda P. Nussbaum
Robert N. Kaplan
KAPLAN FOX & KILSHEIMER LLP
805 Third Avenue, 22nd Floor
New York, NY 10022
(212) 687-1980
(212) 687-7714 (fax)

Joseph M. Vanek
David Germaine
VANEK, VICKERS & MASINI, P.C.
111 S. Wacker Drive, Suite 4050
Chicago, IL 60606
(312) 224-1500
(312) 224-1510 (fax)

Paul E. Slater
SPERLING & SLATER, P.C.
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
(312) 641-3200
(312( 641-6492 (fax)

*Attorneys for Meijer, Inc. and Meijer
Distribution, on behalf of themselves and all
others similarly situated*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

—————————————————————— X

Walgreen Co., et al.,
    Plaintiffs,       :
            :
    v.        :    **Civil Case Number:**
AstraZeneca Pharmaceuticals L.P, et al.  :    **1:06-cv-02084-RWR**
    Defendants.     :
—————————————————————— X

Rite Aid Corporation, et al.     :
    Plaintiffs,       :
            :
    v.        :    **Civil Case Number:**
AstraZeneca Pharmaceuticals L.P., et. al,  :    **1:06-cv-02089-RWR**
    Defendants.     :
—————————————————————— X

Louisiana Wholesale Drug Co., Inc.,   :
    Plaintiff,       :
            :
    v.        :    **Civil Case Number:**
AstraZeneca Pharmaceuticals L.P., et al.,  :    **1:06-cv-02157-RWR**
    Defendants     :
—————————————————————— X

Burlington Drug Company, Inc., et al.,   :
    Plaintiffs,       :
            :
    v.        :    **Civil Case Number:**
AstraZeneca Pharmaceuticals L.P., et al.,  :    **1:07-cv-00041-RWR**
    Defendants     :
—————————————————————— X

Meijer, Inc., et al.,       :
    Plaintiffs,       :
            :
    v.        :    **Civil Case Number:**
AstraZeneca Pharmaceuticals L.P., et al.,  :    **1:06-cv-02155-RWR**
    Defendants     :
—————————————————————— X

**[PROPOSED] ORDER**

   Upon consideration of the Defendants' Motion to Dismiss, Plaintiffs' opposition(s), Defendants' reply, and oral argument on the matter, it is hereby,

ORDERED that Defendants' Motion to Dismiss is DENIED in its entirety.

SO ORDERED this _____ day of _____, 2007:


_____
Richard W. Roberts
United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 21, 2007, I caused to be electronically filed

Plaintiffs' Statement of Points of Authority in Opposition to Defendants' Motion to Dismiss and

accompanying Appendix with the Clerk of the Court via CM/ECF.  Notice of this filing will be

sent by e-mail to all parties by operation of the court's electronic filing system.  Parties may

access this filing through the court's CM/ECF System.


_____/S/_____
Robert D.W. Landon, III (DC Bar No. 441571)