# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LOUISIANA WHOLESALE DRUG CO.,
INC., on behalf of itself and all others
similarly situated,

                  Plaintiff,

      v.                               CIVIL ACTION NO. 1:06-cv-02157-RWR

ASTRAZENECA PHARMACEUTICALS
L.P.; ASTRAZENECA L.P.; ZENECA,
INC.; and ZENECA HOLDINGS, INC.,

                  Defendants.

----------------------------------------------------------------X

BURLINGTON DRUG COMPANY, INC.,
DIK DRUG COMPANY, and KING DRUG
COMPANY OF FLORENCE, INC., on
behalf of themselves and all others similarly
situated,

                  Plaintiffs,

      v.                               CIVIL ACTION NO. 1:07-cv-00041-RWR

ASTRAZENECA PHARMACEUTICALS
L.P., ASTRAZENECA L.P., ZENECA, INC.,
and ZENECA HOLDINGS, INC.,

                  Defendants

----------------------------------------------------------------X

MEIJER, INC., and MEIJER
DISTRIBUTION, INC., on behalf of
themselves and all others similarly situated,

                  Plaintiffs,

      v.                               CIVIL ACTION NO. 1:06-cv-02155-RWR

ASTRAZENECA PHARMACEUTICALS
L.P., et al.,

                  Defendants

```
-------------------------------------------------------------X
```
WALGREEN CO., et al.,

                 Plaintiffs,

     v.                           CIVIL ACTION NO. 1:06-cv-02084-RWR

ASTRAZENECA PHARMACEUTICALS
L.P., ASTRAZENECA L.P., ZENECA, INC.,
and ZENECA HOLDINGS, INC.,

                 Defendants

```
-------------------------------------------------------------X
```

RITE AID CORPORATION and RITE AID
HDQTRS. CORP.,

                 Plaintiffs,

     v.                           CIVIL ACTION NO. 1: 06-cv-02089-RWR

ASTRAZENECA PHARMACEUTICALS
L.P., et al.,

                 Defendants

---

### DIRECT PURCHASER PLAINTIFFS' MOTION AND MEMORANDUM FOR RULE 16(b) CONFERENCE AND FOR LEAVE TO CONDUCT DISCOVERY

---

       The Direct Purchaser Plaintiffs[1] respectfully request that the Court set a scheduling

conference pursuant to Fed. R. Civ. P. 16(b) to discuss case management issues and to enter a

scheduling order that will govern the litigation and allow for the expeditious commencement of

discovery.  Direct Purchaser Plaintiffs further move this Court for an order allowing them to

immediately obtain certain relevant documents already collected and produced by defendants

---

[1]      Louisiana Wholesale Drug Co., Inc., Burlington Drug Company, Inc., Dik Drug
Company, King Drug Company of Florence, Inc., Meijer, Inc., Meijer Distribution, Inc.,
Walgreen Co., Eckerd Corporation, The Kroger Co., Maxi Drug, Inc. d/b/a Brooks Pharmacy,
American Sales Company, Inc., New Albertson's, Inc., Safeway, Inc., Hy-Vee, Inc., Rite Aid
Corporation and Rite Aid Hdqtrs. Corp., hereinafter collectively referred to as "Direct Purchaser
Plaintiffs."

AstraZeneca Pharmaceuticals, LP and Zeneca, Inc. (collectively "AstraZeneca" or "Defendants") to plaintiffs in California state court actions regarding false advertising allegations involving the drugs Prilosec and Nexium.[2]  The allegations of false advertising in the California Litigation are similar to certain aspects of the anticompetitive scheme alleged herein regarding Prilosec and Nexium, and the documents produced in that case are relevant to those aspects.

The Direct Purchaser Plaintiffs believe that such a status and scheduling conference is appropriate at this time to address the above issues since:

1.  There have been several lawsuits filed on behalf of multiple direct purchaser class and non-class plaintiffs all challenging AstraZeneca's conduct with Prilosec and Nexium and raising similar antitrust monopolization causes of action under Section 2 of the Sherman Act. A Fed. R. Civ. P. 16(b) status conference with the Court would help facilitate the efficient advancement of these cases by formalizing the coordination among the class and non-class cases and consolidating all of the direct purchaser class cases.

2.  The Defendants' position that discovery should be stayed simply because they filed a motion to dismiss should be rejected.  Such a stay is generally disfavored and is not warranted here, especially given the nature of AstraZeneca's motion to dismiss, which seeks to have the Court apply a never-before-adopted standard, instead of the controlling standard established by the D.C. Circuit in *United States v. Microsoft*, 253 F.3d 34, 65-66 (D.C. Cir. 2001) (*en banc*) ("*Microsoft II*"). Defendants have not, and cannot, make the necessary "strong showing" that their motion to dismiss will succeed required to delay Plaintiffs' right to discovery. As a result, it is appropriate for discovery to commence at this time, including the implementation of a formal scheduling order.[3]

---

[2]    *James Weiss, et al. v. AstraZeneca Pharmaceuticals, LP, et al.,* Los Angeles Superior Court Case No. BC 323107, and *Ledwick, et al. v. AstraZeneca Pharmaceuticals, LP, et al.,* Los Angeles Superior Court Case No. BC 324518 (collectively referred to as the "California Litigation").

[3]    The Direct Purchaser Plaintiffs have communicated their proposal for a schedule to the Defendants, along with their position on the issues raised in LCvR 16.3(c).  See correspondence of May 31, 2007, from Des Roches to Treece, attached as Exhibit "A".

3. In any event, access to the California Litigation documents should be granted immediately since those documents (a) are clearly relevant to this case; (b) were contemplated in the California Litigation protective order to be produced in other actions, like the instant one, where overcharges on Nexium are alleged; and (c) can be obtained by the Direct Purchaser Plaintiffs at absolutely no cost or burden to the Defendants.

To date, the Defendants have refused to agree to any discovery going forward until resolution of their motion to dismiss.[4]  Under the circumstances of this case, there is no justification for Defendants' refusal to proceed with discovery or negotiate a scheduling order.

I.     **The Court Should Convene a Rule 16(b) Conference and Allow Discovery to Proceed.**

Five related antitrust actions against AstraZeneca are pending in this Court.  All were filed between December 2006 and January 2007.  Two of the cases – *Walgreen* (06-cv-2084) and *Rite Aid* (06-cv-2089) – are non-class actions.  The other three cases are class actions brought on behalf of direct purchasers of Prilosec and Nexium – *Louisiana Wholesale Drug Co., Inc.* (06-cv-02157); *Burlington Drug Company, Inc., Dik Drug Company, and King Drug Company of Florence, Inc.* (07-cv-00041); and *Meijer, Inc., and Meijer Distribution, Inc.* (06-cv-02155). An unopposed motion to appoint class counsel, consolidate the class cases and establish a class leadership structure is pending in the class cases (Civ. NO. 06-cv-02157, Docket Nos. 13 and 16).

Plaintiffs' and Defendants' counsel are experienced in pharmaceutical antitrust litigation and have litigated with and against one another in the past.  Counsel for Plaintiffs anticipate that the Court will consolidate the class actions as proposed in the pending motion, and coordinate

---

[4]     While the Defendants agree with several of the Direct Purchaser Plaintiffs' positions on LCvR 16.3(c) matters, they have refused to negotiate an applicable schedule.  See Exhibit "B". (Treece letter to Des Roches of June 11, 2007).

the class actions with the *Walgreen* and *Rite Aid* cases.  Discovery can then proceed in a coordinated, non-duplicative manner in all five cases, which will minimize the burden on the Court and the parties.

Plaintiffs believe that a Rule 16(b) conference is appropriate to address these, and other, case management and scheduling issues at the Court's earliest convenience.  Also, Defendants apparently have some issues to raise, although they have not articulated those issues to the Direct Purchaser Plaintiffs.  *See* Exhibit "B".

Under Rule 16, a scheduling order should be entered "as soon as practicable but in any event within 90 days after the appearance of a defendant and within 120 days after the complaint has been served on a defendant."[5]  Defendants were served in the *Walgreen* case on December 27, 2006 and entered an appearance on February 2, 2007.  All complaints were served on Defendants by January 12, 2007. See Stipulation, 06-cv-02157, Docket No. 15, at p. 1.

The Defendants have proposed that discovery in this matter, in every form, be postponed until this Court has resolved the pending motion to dismiss.  While such an arrangement is practical in certain cases, this is not one of them.  As a general concept, courts disfavor staying discovery pending a motion to dismiss. *See Worldcom Technologies, Inc.  v.  Intelnet Int'l,* 2002 U.S. Dist.  LEXIS 15892 at *18-19 (E.D. Pa.  Aug.  22, 2002); *Coca-Cola Bottling Co. v.  Grol*, 1993 U.S. Dist.  LEXIS 3734 at *6, *7 (E.D. Pa.  1993). Stays of discovery are rare exceptions to the liberal discovery rules of Rule 26, and are applied only if "defendant makes a *strong showing* that the plaintiff's claim is without merit."  2-15 Moore's Manual – Federal Practice and

---

[5]    Fed. R. Civ. P. 16(b) ("…The [scheduling] order shall issue as soon as practicable but in any event within 90 days after the appearance of a defendant and within 120 days after the complaint has been served on a defendant. A schedule shall not be modified except upon a showing of good cause and by leave of the district judge or, when authorized by local rule, by a magistrate judge.")

Procedure § 15.02 (*emphasis added*).

This rare exception should not be applied here because Defendants have not made a "strong showing" that Plaintiffs' claims are so clearly meritless that a blanket stay of all discovery is appropriate or warranted. The Defendants' motion to dismiss can succeed only if this Court: (a) accepts Defendants' proposition to apply a standard that has never before been applied; (b) ignores binding precedent from the Circuit Court for the District of Columbia, reasoned analysis from the *Abbott* case, which is a similar "product hopping" case, and from noted antitrust commentator Professor Herbert Hovenkamp; and (c) does not accept as true Plaintiffs' factual allegations, including their detailed allegations that Defendants' purportedly improved Nexium product in fact provided no medical benefits whatsoever over the prior Prilosec product, but was introduced solely to impede competition from less expensive generic versions of Prilosec.[6] *See* Plaintiffs' Statement of Points of Authority In Opposition to Defendants' Motion to Dismiss, 06-cv-02157, Docket No. 42, at pp. 13 – 33. The Defendants' meritless argument is far from the strong showing needed to warrant delay of all discovery until resolution of their motion.

As detailed in the Direct Purchaser Plaintiffs' opposition to the motion to dismiss, the D.C. Circuit has clearly held that a "rule of reason" factual inquiry is required to fully and fairly evaluate the anticompetitive allegations in cases such as this one, where the defendant is alleged to have engaged in exclusionary conduct through product changes. *See United States v. Microsoft*, 253 F.3d 34, 65-66 (D.C. Cir. 2001) (*en banc*) ("*Microsoft II*"). The cases and

---

[6]     *Abbott Lab. v. Teva Pharm. USA, Inc.*, 432 F. Supp. 2d 408 (D. Del. 2006) (In *Abbott* the Honorable Kent Jordan denied the Defendants' motion to dismiss in a case involving product hopping not long before his appointment to the United States Court of Appeals for the Third Circuit); and, H. Hovenkamp, *et al.*, IP and Antitrust: An Analysis of Antitrust Principles Applied to Intellectual Property Law (Supp. 2007), § 12.5, at 12-45 - 12-48.

commentators explain that the touchstone for determining whether conduct is exclusionary, and therefore unlawful under Section 2, is the economic effect of that conduct on consumers.[7]  The economic effect of such conduct can be determined only by a ***fact-intensive inquiry*** that is attuned to the "economic context," including the "particular structure and circumstances of the industry at issue." *Verizon Comm's Inc. v. Law Off. of C. V. Trinko*, 540 U.S. 398, 411 (2004).

This sort of inquiry, obviously, is not well-suited for a motion to dismiss where, as here, the Direct Purchaser Plaintiffs have pled extensive facts supporting their contentions that: (a) the statutory framework and economics of the pharmaceutical industry enable and facilitate Defendants' scheme to exclude generic competition by making medically insignificant changes to its Prilosec product and then promoting that modified product, Nexium, as an improvement over Prilosec, and (b) this "product hopping" had an enormous anticompetitive impact by minimizing the rapid and substantial generic substitution that normally occurs upon generic entry, thereby causing purchasers to overpay for that product by billions of dollars. *See, e.g.*, Plaintiffs' Statement of Points of Authority In Opposition to Defendants' Motion to Dismiss, 06-cv-02157, Docket No. 42, at pp. 1 – 4.

Defendants respond to these allegations in their motion to dismiss with allegedly pro-competitive justifications for their exclusionary conduct, but the "facts" to support such arguments are not in evidence and cannot serve to undermine Plaintiffs' factual allegations at this stage. *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1975 (U.S. May 21, 2007) ("…when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint.") (internal citations and quotation marks omitted).

---

[7]    Exclusionary conduct is conduct reasonably capable of prolonging monopoly power and does "not benefit consumers at all" or is "unnecessary for the particular consumer benefits" or "produce[s] harm[] disproportionate to the resulting benefits." *Microsoft II*, 253 F.3d at 58-59 (internal citations omitted); *see also* III P. Areeda & H. Hovenkamp, Antitrust Law ¶ 651a, at 72 (2d ed. 2002).

In denying a motion to dismiss that raised similar arguments to those raised by Defendants here, the Court in *Abbott* recently held in another "product hopping" antitrust case that the *Microsoft II* rule of reason analysis was the appropriate standard, and thus greater scrutiny through a "rule of reason analysis" was necessary . *Abbott Labs. v. Teva Pharm. USA, Inc.*, 432 F. Supp. 2d 408 (D. Del. 2006). The leading academic authority on intellectual property and antitrust issues reached the same conclusion. H. Hovenkamp, *et al.*, IP and Antitrust: An Analysis of Antitrust Principles Applied to Intellectual Property Law, at § 12.5 at 12-45 - 12-48 (Supp. 2007).[8]

Implementation of a rule of reason analysis – as endorsed by *Microsoft II*, *Abbott*, and Professor Hovenkamp – would preclude granting of the Defendants' motion to dismiss in this case. Defendants, however, argue that their motion to dismiss should be granted based on a *per se* legality argument – i.e., that such "product hopping" is always legal. This standard has not found acceptance within the courts. Thus, Defendants cannot make a "strong showing" that Plaintiffs' claims are without merit and that there are efficiencies to be gained by delaying the discovery anticipated by Rule 26 until resolution of their motion to dismiss.

Direct Purchaser Plaintiffs, therefore, respectfully request that this Honorable Court set a Rule 16(b) Scheduling Conference and allow discovery to commence.

## II.     The Defendants' Reliance on *Twombly* is Misplaced.

In communications with Plaintiffs' counsel, the Defendants have voiced their desire to

---

[8]     Also, the defendants in *Abbott*, as AstraZeneca does here, made the boilerplate request to indefinitely delay discovery until their motion to dismiss was resolved. The *Abbott* Court rejected that request, allowing discovery – including the immediate production of documents produced in prior related matters – before denying the defendant's motion to dismiss. *See Abbott Labs. v. Teva Pharm. USA, Inc.*, D. Del., Civ. No. 02-1512, October 27, 2005 Scheduling Order, attached as Exhibit "D"; and, May 26, 2006 Order Denying Motion to Dismiss, *Abbott Labs. v. Teva Pharm. USA, Inc.*, 432 F. Supp. 2d 408 (D. Del. 2006), attached as Exhibit "C".

assert that the recent *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (U.S. May 21, 2007) ("*Twombly*"), decision suggests that discovery should not proceed until after the validity of the complaint is tested. However, a review of *Twombly* shows that any attempts to rely on this opinion for such a proposition would be misplaced.

As an initial matter, the primary question presented in *Twombly* was limited to a specific type of claim not at issue in this case – i.e., whether unsupported allegations of parallel conduct alone are sufficient to state a conspiracy claim under Section 1 of the Sherman Act. *Id.*, at 1963 ("We granted certiorari to address the proper standard for pleading an antitrust conspiracy [via Section 1] through allegations of parallel conduct…"). There is a set of legal principles unique to pleading and proving such a claim, that do not apply to a Section 2 case regarding a pharmaceutical company's efforts to block generic competition through the use of its monopoly power and "product hopping." Thus, *Twombly* has little, if anything, to do with whether the Direct Purchaser Plaintiffs have technically and adequately alleged an exclusionary "product hopping" Section 2 claim regarding Prilosec/Nexium and whether discovery should be stayed in this case until the Court rules on the Defendants' motion to dismiss. Indeed, at least one other court has already dealt with the overzealous application of *Twombly* by defendants seeking to preclude discovery until the resolution of motions to dismiss and held that *Twombly* did not preclude discovery prior to the resolution of the defendant's motion to dismiss. *See In re Static Random Access Memory (SRAM) Antitrust Litigation*, United States District Court, Northern District of California, MDL-c-07-1819, Transcript of June 1, 2007 Case Management

Conference, attached as Exhibit "E" at p. 7; *see also* June 21, 2007 Supplemental Case

Management Order No. 1, attached as Exhibit "F", at p. 2.[9]

Second, the *Twombly* majority found that there was not a single fact alleged by the

plaintiffs therein to suggest an agreement, other than parallel conduct. *See id.*, at 1964 ("The

inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity

of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational

and competitive business strategy unilaterally prompted by common perceptions of the

market.")  By contrast, Plaintiffs here have alleged numerous detailed facts that support the

existence of a comprehensive "product hopping" scheme that violates Section 2 of the Sherman

Act under *Microsoft II*.  *See, e.g.*, details from the *Walgreen* Amended Complaint (06-cv-02084)

regarding: (1) Defendants' creation of the "Shark Fin Project" to save market share as Prilosec

faced patent expiration, at paras. 45 – 49; (2) the development and implementation of the

"product hopping" scheme, at paras. 50 – 67; (3) Defendants' clinical tests, which failed to

support the superiority of Nexium over Prilosec, at paras. 74 - 85; and (4) Defendants' agreement

with the FDA that Nexium was not superior to Prilosec and that it was not stating that Nexium

was superior, and subsequent promotion of Nexium to doctors and consumers as being superior

to Prilosec; at paras. 85 – 95.  While Defendants will certainly dispute these factual allegations

---

[9]    The *SRAM* Court allowed the Plaintiffs to obtain documents produced in prior
proceedings, including documents the defendants produced to the Department of Justice (at the
request of the DOJ, the court stayed deposition and interrogatory discovery during the pending
grand jury investigation). *Id.*

(as is true in most every antitrust case), even under *Twombly*, the Direct Purchaser Plaintiffs' factual allegations must be taken as true for the purpose of the pending motion to dismiss.[10]

The dispute aired in Defendants' motion to dismiss, and Plaintiffs' responsive papers, is a dispute about the substantive reach of the antitrust laws and the veracity of Plaintiffs' allegations (e.g., that Nexium was not a medical improvement over Prilosec), not a dispute about pleading standards. *Twombly* is a case about pleading a specific type of conspiracy under Section 1. It does not change the facts of this case, the legal standard applicable to the Plaintiffs' claims,[11] or the fact that immediate commencement of discovery *via* a Rule 16(b) Scheduling Order is the most efficient means to advance this case towards resolution.

### III.    The California Litigation Documents Are Relevant And Can Be Produced Without Cost or Burden To Defendants.

The Direct Purchaser Plaintiffs also request that the Court order Defendants to grant the Direct Purchaser Plaintiffs immediate access to documents that have already been compiled, reviewed, and produced by Defendants in state-court litigation in California regarding the Nexium product at issue in this case.

Defendants were sued in November 2004 in the California Litigation for having engaged

---

[10]    *See Erickson v. Pardus*, 127 S. Ct. 2197, 2200, 75 USLW 3643, (U.S. Jun 04, 2007) (This Supreme Court decision rendered after *Twombly*, uses the *Twombly* opinion to make clear that: "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint.") (*internal citations omitted*).

[11]    *See Twombly*, 127 S. Ct. at 1973, n. 14. ("In reaching this conclusion, we do not apply any 'heightened' pleading standard, nor do we seek to broaden the scope of Federal Rule of Civil Procedure 9, which can only be accomplished "'by the process of amending the Federal Rules, and not by judicial interpretation.'" *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 515 (2002) (quoting *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168 (1993)).")

in unfair and deceptive advertising in connection with Nexium.[12]  In part, the plaintiffs in the

California Litigation have alleged that the Defendants engaged in a massive false advertising

campaign in an attempt to persuade patients taking Prilosec (an AstraZeneca product) and their

physicians that the "New Purple Pill", Nexium (also an AstraZeneca product), was better and

more effective than Prilosec in treating heartburn.  With the patent term of AstraZeneca's

blockbuster Prilosec nearing its end, Nexium became the most heavily marketed drug in

America.  Furthermore, at about the same time, the Defendants ceased promoting Prilosec, which

was at one time the most widely prescribed drug in the world.[13]

Direct Purchaser Plaintiffs do not assert state law claims for deceptive advertising, but do

allege certain facts that overlap with those in the California Litigation.  Specifically, Direct

Purchaser Plaintiffs allege that one aspect of the multi-faceted anticompetitive scheme by which

Defendants impeded competition from generic Prilosec was to deceptively assert in advertising

to consumers and marketing presentations to doctors that Nexium was medically/clinically

superior to Prilosec when, in fact, Defendants knew, and specifically represented to the FDA,

that Nexium was not superior. *See, e.g., Louisiana Wholesale Drug, Inc*., Amended Complaint at

¶¶ 71, 92, 93, 118, 123.

---

[12]     *See* Third Amended Complaint from *James Weiss, et al. v. AstraZeneca Pharmaceuticals, LP, et al.* (one of two cases comprising the "California Litigation"), attached hereto as Exhibit "G".

[13]     *Id*. at p. 1.

Discovery in the California Litigation has commenced and the Defendants have produced a number of documents relating to their alleged deceptive practices in promoting Nexium.[14] Given the relevance of these same documents to some of the factual allegations in the Direct Purchaser Plaintiffs' complaints, the Direct Purchaser Plaintiffs requested that the Defendants allow them to obtain a copy of the documents produced in the California Litigation from plaintiffs' class counsel in that case.[15]  Counsel for Defendants objected to this request.[16]  The only justification given for this refusal was Defendants' position that discovery is not appropriate in this case until resolution of its motion to dismiss.[17]  In addition to the arguments presented above regarding discovery generally, it is respectfully suggested that the Defendants' position should be rejected for several other reasons.

---

[14]  Specifically, as demonstrated by a Joint Discovery Statement (attached hereto as Exhibit "H", dated April 28, 2006) and a separate Notice and Report from Status Conference (attached hereto as Exhibit "I", dated May 11, 2006) from the California Litigation, it is clear that Defendants have agreed to produce, and either have already produced or will soon produce, documents relating to Nexium including, among other things: (a) press releases and public company announcements (*see* Exhibit "H" at Exhibit C, therein, at p. 4); (b) promotional materials directed to physicians, consumers, and managed care organizations (*Id*., at pp. 5-8); (c) the Investigational New Drug Application and New Drug Application filed with the FDA relating to Nexium's indication for gastroesophageal reflux disease and for eradication of bacteria in combination with antibiotics, as well as correspondence with the Division of Marketing, Advertising and Communication of the FDA (*Id*., at p. 7); and (d) marketing objectives and themes (Exhibit "I", at p. 1).

[15]  *See* Letter from Des Roches to Treece, dated April 18, 2007, attached as Exhibit "J".

[16]  *See* Letter from Treece to Des Roches, dated April 23, 2007, attached as Exhibit "K".

[17]  *Id*.  Defendants are not in a position to claim that the documents in the California case are irrelevant since the Direct Purchaser Plaintiffs have made allegations that the Defendants engaged in a misleading marketing campaign and Defendants argue in their motion to dismiss that the Court should disregard these allegations due to an alleged failure to plead with sufficient particularity under Fed. R. Civ. P. 9(b).  It is quite telling of Defendants' motivations in denying the Direct Purchaser Plaintiffs access to those documents that they (a) make arguments about a lack of specificity regarding the deceptive marketing allegations, yet (b) refuse to allow the Direct Purchaser Plaintiffs to gain access to documents which may cure the very deficiencies about which Defendants complain.

As an initial matter, the Direct Purchaser Plaintiffs have offered to procure the documents in a manner that would cause the Defendants to incur no costs, expenses, or other burdens. Counsel for the Direct Purchaser Plaintiffs have offered to procure these documents, at their own costs, from plaintiffs' class counsel in the California Litigation. Thus, a defendant's typical rhetorical position – *i.e.*, that it does not want to incur unnecessary costs during the pendency of its motion to dismiss – simply has no application to this situation. Indeed, the Defendants will incur more costs by opposing the Direct Purchaser Plaintiffs' request for access to the California Litigation documents than they would have incurred by simply agreeing.

Additionally, it was specifically anticipated by AstraZeneca and the court in the California Litigation that the documents produced in that case would also be produced in cases such as this one. On November 22, 2005, Judge Victoria G. Chaney signed an Agreed Protective Order Regarding Confidential Information (attached as Exhibit "L") applicable to the California Litigation which provides as follows:

> The parties agree that Discovery Material will be used only for the [California Litigation] including any appeals of this Litigation, ***and for any other action brought by or on behalf of a [sic] an individual or organization that has used, purchased or reimbursed for Nexium, so long as all parties have agreed to be governed by the terms of this Order.***[18]

The Direct Purchaser Plaintiffs clearly are within the class of anticipated recipients of these documents since they are entities that have directly purchased Nexium. Further, Plaintiffs' counsel agreed to be bound by the terms of the California Litigation Protective Order pending entry in this case of a substantially similar Protective Order.[19]

---

[18]    *See* Exhibit "L" at p. 3.

[19]    *See* Letter from Des Roches to Treece, dated April 18, 2007, attached as Exhibit "J".

It is respectfully represented that this is one such circumstance where discrete, focused discovery prior to a formal conference is appropriate.  Indisputably relevant documents can be made available to Direct Purchaser Plaintiffs with no cost or burden to the Defendants.  Granting Plaintiffs access to those documents now will permit Direct Purchaser Plaintiffs to process and analyze these documents, thereby moving this case forward efficiently, during a period when the case may otherwise remain static pending a ruling on Defendants' motion to dismiss.

## IV.     CONCLUSION

For the foregoing reasons, the Direct Purchaser Plaintiffs respectfully request that the Court set a case management and scheduling conference pursuant to Rule 16(b) at the Court's earliest convenience.  The Direct Purchaser Plaintiffs further request discovery procedures commence in this case notwithstanding the Defendants' motion to dismiss and that Plaintiffs be allowed to gain immediate access to the documents produced by Defendants in the California Litigation.

Respectfully submitted,

Dated:  July 10, 2007          By: s/ Robert D.W. Landon, III
      Miami, FL          Robert D.W. Landon, III, Esq.
                                        Scott Eliot Perwin, Esq.
                                        KENNY NACHWALTER, P.A.
                                        201 South Biscayne Boulevard
                                        1100 Miami Center
                                        Miami, FL 33131
                                        Telephone: 305-373-1000
                                        Facsimile: 305-372-1861

                                        Lauren C. Ravkind, Esq.
                                        KENNY NACHWALTER, P.A.
                                        111 Congress Avenue
                                        Suite 1060
                                        Austin, TX 78701

Joseph T. Lukens, Esq.
HANGLEY ARONCHICK SEGAL & PUDLIN
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6933

Steve D. Shadowen, Esq.
Monica L. Rebuck, Esq.
HANGLEY ARONCHICK SEGAL & PUDLIN
30 North Third Street, Suite 700
Harrisburg, PA 17101-1713

David U. Fierst, Esq.
STEIN, MITCHELL & MEZINES LLP
1100 Connecticut Avenue, N.W.
Suite 1100
Washington, D.C. 20036

Bruce E. Gerstein, Esq.
Barry S. Taus, Esq.
Brett Cebulash, Esq.
Kevin S. Landau, Esq.
GARWIN GERSTEIN & FISHER LLP
1501 Broadway
Suite 1416
New York, NY 10036

Daniel Berger, Esq.
David F. Sorensen, Esq.
Eric Cramer, Esq.
BERGER & MONTAGUE
1622 Locust Street
Philadelphia, PA 19103

John G. Odom, Esq.
Stuart E. Des Roches, Esq.
Charles F. Zimmer II, Esq.
ODOM & DES ROCHES, LLP
Suite 2020, Poydras Center
650 Poydras Street
New Orleans, LA 70130

David P. Smith, Esq.
W. Ross Foote, Esq.
PERCY, SMITH & FOOTE L.L.P.
720 Murray Street
P.O. Box 1632
Alexandria, LA 71309

Brent B. Barriere, Esq.
PHELPS DUNBAR LLP
Canal Place
365 Canal Street, Suite 2000
New Orleans, LA 70130

Adam Moskowitz, Esq.
KOZYAK TROPIN & THROCKMORTON, P.A.
2525 Ponce de Leon Blvd., 9th Floor
Miami, Fl 33131-2335

Linda Nussbaum, Esq.
Robert N. Kaplan, Esq.
KAPLAN FOX & KILSHEIMER, LLP
805 Third Avenue, 22nd Floor
New York, NY 10022

## CERTIFICATE OF SERVICE

I hereby certify that I have this 10th day of July, 2007, served a true and correct copy of

the foregoing on below-listed counsel of record in this proceeding, by electronic means, as well

as by United States mail, properly addressed and first class postage prepaid.

s/ Robert D.W. Landon, III
Robert D.W. Landon, III

**Counsel of Record:**

Mark Haddad
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013

John Treece
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603

***Attorneys for Defendants***

David U. Fierst (D.C. Bar 912899)
STEIN, MITCHELL & MEZINES LLP
1100 Connecticut Avenue, N.W.
Suite 1100
Washington, DC 20036

Bruce E. Gerstein, Esq.
Barry S. Taus, Esq.
Brett Cebulash, Esq.
Kevin S. Landau, Esq.
GARWIN GERSTEIN & FISHER LLP
1501 Broadway , Suite 1416
New York, NY 10036

Daniel Berger, Esq.
David F. Sorensen, Esq.
Eric Cramer, Esq.
BERGER & MONTAGUE
1622 Locust Street
Philadelphia, PA 19103

John G. Odom, Esq.
Stuart E. Des Roches, Esq.
Charles F. Zimmer II, Esq.
ODOM & DES ROCHES, LLP
Suite 2020, Poydras Center
650 Poydras Street
New Orleans, LA 70130

David P. Smith, Esq.
W. Ross Foote, Esq.
PERCY, SMITH & FOOTE L.L.P.
720 Murray Street
P.O. Box 1632
Alexandria, LA 71309

Brent B. Barriere, Esq.
PHELPS DUNBAR LLP
Canal Place
365 Canal Street , Suite 2000
New Orleans, LA 70130

Adam Moskowitz, Esq.
KOZYAK TROPIN & THROCKMORTON, P.A.
2525 Ponce de Leon Blvd., 9th Floor
Miami, Fl 33131-2335

Linda Nussbaum, Esq.
Robert N. Kaplan, Esq.
KAPLAN FOX & KILSHEIMER, LLP
805 Third Avenue, 22nd Floor
New York, NY 10022

Robert D.W. Landon, III, Esq.
Scott Eliot Perwin, Esq.
KENNY NACHWALTER, P.A.
201 South Biscayne Boulevard
1100 Miami Center
Miami, FL 33131

Joseph T. Lukens, Esq.
HANGLEY ARONCHICK SEGAL & PUDLIN
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6933

Steve D. Shadowen, Esq.
Monica L. Rebuck, Esq.
HANGLEY ARONCHICK SEGAL & PUDLIN
30 North Third Street
Suite 700
Harrisburg, PA 17101-1713

**Attorneys for Plaintiffs**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**


LOUISIANA WHOLESALE DRUG CO.,
INC., on behalf of itself and all others
similarly situated,
                              Plaintiff,

        v.                                          CIVIL ACTION NO. 1:06-cv-02157-RWR

ASTRAZENECA PHARMACEUTICALS
L.P.; ASTRAZENECA L.P.; ZENECA,
INC.; and ZENECA HOLDINGS, INC.,
                              Defendants.

----------------------------------------------------------------X

BURLINGTON DRUG COMPANY, INC.,
DIK DRUG COMPANY, and KING DRUG
COMPANY OF FLORENCE, INC., on
behalf of themselves and all others similarly
situated,
                              Plaintiffs,

        v.                                          CIVIL ACTION NO. 1:07-cv-00041-RWR

ASTRAZENECA PHARMACEUTICALS
L.P., ASTRAZENECA L.P., ZENECA, INC.,
and ZENECA HOLDINGS, INC.,
                              Defendants
----------------------------------------------------------------X

MEIJER, INC., and MEIJER
DISTRIBUTION, INC., on behalf of
themselves and all others similarly situated,
                              Plaintiffs,

        v.                                          CIVIL ACTION NO. 1:06-cv-02155-RWR

ASTRAZENECA PHARMACEUTICALS
L.P., et al.,
                              Defendants

```
-----------------------------------------------------------------X
```

WALGREEN CO., et al.,
                              Plaintiffs,

        v.                                    CIVIL ACTION NO. 1:06-cv-02084-RWR

ASTRAZENECA PHARMACEUTICALS
L.P., ASTRAZENECA L.P., ZENECA, INC.,
and ZENECA HOLDINGS, INC.,
                              Defendants

```
-----------------------------------------------------------------X
```

RITE AID CORPORATION and RITE AID
HDQTRS. CORP.,
                              Plaintiffs,

        v.                                    CIVIL ACTION NO. 1: 06-cv-02089-RWR

ASTRAZENECA PHARMACEUTICALS
L.P., et al.,
                              Defendants

---

## ORDER

---

    **UPON CONSIDERATION** of the Direct Purchaser Plaintiffs' Motion and

Memorandum for Rule 16(B) Conference and for Leave to Conduct Discovery filed by

Louisiana Wholesale Drug Co., Inc., Burlington Drug Company, Inc., Dik Drug Company, King

Drug Company of Florence, Inc., Meijer, Inc., Meijer Distribution, Inc., Walgreen Co., Eckerd

Corporation, The Kroger Co., Maxi Drug, Inc. d/b/a Brooks Pharmacy, American Sales

Company, Inc., New Albertson's, Inc., Safeway, Inc., Hy-Vee, Inc., Rite Aid Corporation and

Rite Aid HDQTRS. Corp. (collectively, the "Direct Purchaser Plaintiffs"), the grounds stated in

support of the Motion, all opposition thereto, and the entire record herein, it is hereby

**ORDERED** that the Motion is granted.

It is **FURTHER ORDERED** that the Court shall conduct a Rule 16(b) Scheduling Conference on _____, at _____, in room _____ of the United States District Court for the District of Columbia.

It is **FURTHER ORDERED**, that the Direct Purchaser Plaintiffs are granted leave to immediately gain access to documents produced by Astrazeneca Pharmaceuticals L.P., Astrazeneca L.P., Zeneca, Inc., and/or Zeneca Holdings, Inc., produced in the matters captioned *James Weiss, et al. v. AstraZeneca Pharmaceuticals, LP, et al.,* Los Angeles Superior Court Case No. BC 323107, and *Ledwick, et al. v. AstraZeneca Pharmaceuticals, LP, et al.,* Los Angeles Superior Court Case No. BC 324518.

So ordered on this _____ day of _____ , 2007.

_____
Honorable Richard W. Roberts
United States District Judge

Copies To:

Mark Haddad
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013

John Treece
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603

***Attorneys for Defendants***

David U. Fierst (D.C. Bar 912899)
STEIN, MITCHELL & MEZINES LLP
1100 Connecticut Avenue, N.W., Suite 1100
Washington, DC 20036

Bruce E. Gerstein, Esq.
Barry S. Taus, Esq.
Brett Cebulash, Esq.
Kevin S. Landau, Esq.
GARWIN GERSTEIN & FISHER LLP
1501 Broadway, Suite 1416
New York, NY 10036

Daniel Berger, Esq.
David F. Sorensen, Esq.
Eric Cramer, Esq.
BERGER & MONTAGUE
1622 Locust Street
Philadelphia, PA 19103

John G. Odom, Esq.
Stuart E. Des Roches, Esq.
Charles F. Zimmer II, Esq.
ODOM & DES ROCHES, LLP
Suite 2020, Poydras Center
650 Poydras Street
New Orleans, LA 70130

David P. Smith, Esq.
W. Ross Foote, Esq.
PERCY, SMITH & FOOTE L.L.P.
720 Murray Street
P.O. Box 1632
Alexandria, LA 71309

Brent B. Barriere, Esq.
PHELPS DUNBAR LLP
Canal Place
365 Canal Street, Suite 2000
New Orleans, LA 70130

Adam Moskowitz, Esq.
KOZYAK TROPIN & THROCKMORTON, P.A.
2525 Ponce de Leon Blvd., 9th Floor
Miami, Fl 33131-2335

Linda Nussbaum, Esq.
Robert N. Kaplan, Esq.
KAPLAN FOX & KILSHEIMER, LLP
805 Third Avenue, 22nd Floor
New York, NY 10022

Robert D.W. Landon, III, Esq.
Scott Eliot Perwin, Esq.
KENNY NACHWALTER, P.A.
201 South Biscayne Boulevard
1100 Miami Center
Miami, FL 33131

Joseph T. Lukens, Esq.
HANGLEY ARONCHICK SEGAL & PUDLIN
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6933

Steve D. Shadowen, Esq.
Monica L. Rebuck, Esq.
HANGLEY ARONCHICK SEGAL & PUDLIN
30 North Third Street
Suite 700
Harrisburg, PA 17101-1713

***Attorneys for Plaintiffs***

# **<u>Exhibit A</u>**

LAW OFFICES
## ODOM & DES ROCHES, LLP
A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

SUITE 2020, POYDRAS CENTER
650 POYDRAS STREET
NEW ORLEANS, LA 70130
TELEPHONE (504) 522-0077
FAX (504) 522-0078

May 31, 2007

217 WEST MAIN STREET
P.O. BOX 523
HAHIRA, GA 31632
TELEPHONE (229) 794-3412
FAX (229) 794-3544

John W. Treece, Esq.                                    *Via Email*
*Sidley Austin LLP*
One South Dearborn
Chicago, IL 60603

Re: ***Louisiana Wholesale Drug Co., Inc. v. AstraZeneca
Pharmaceuticals, L.P., et al.*; United States District
Court, District of Columbia; Civil Case No. 06-cv-
02157.**

Dear John:

Thank you for your email of May 23, 2007, outlining AstraZeneca's position on
the Rule 16 and 26 issues that we discussed in our initial telephone conference. We
disagree for several reasons with the proposition that it is inappropriate to go forward
with formal Rule 16 and 26 processes at this time.

As you know, there have been several lawsuits filed on behalf of multiple direct
purchaser class and non-class plaintiffs ("Direct Purchaser Plaintiffs") all challenging
AstraZeneca's conduct with Prilosec and Nexium and raising similar antitrust causes of
action. All plaintiff groups have organized their litigation efforts to date and anticipate
closely coordinating the discovery and other aspects of this case on an on-going basis (as
has been done in several Hatch-Waxman antitrust cases). In order to formalize this
coordination and deal with other issues articulated in this letter, a Fed.R.Civ.P. 16(b)
status conference with the Court would help facilitate the efficient litigation of these
cases. As I'm sure you know, these kinds of conferences are routine in multi-party
antitrust cases such as this one.

Second, given the nature of AstraZeneca's motion to dismiss, in which it seeks to
have the Court apply a never-before-adopted standard, the chances of success for
AstraZeneca on its motion are slim. As a result, we believe that it is appropriate for
discovery to commence at this time, including the implementation of a formal scheduling
order.

Third, your reliance on *Twombly* is misplaced and any suggestions of multi-
phased merits discovery is similarly inappropriate. Without belaboring the point here,
*Twombly* is expressly limited to the context of pleading a conspiracy case under a
conscious parallelism theory which is not at issue here. Further, the Plaintiffs in this case
have not, and do not, rely on bare legal conclusions to support their claims, but have pled

LAW OFFICES
ODOM & DES ROCHES, LLP

facts in excruciating detail to support their Section 2 causes of action. You may not agree with Plaintiffs' legal theory, but it is a disagreement about substantive antitrust doctrine and not a disagreement about pleading requirements under Rule 8.

In relation to these claims and allegations, the Direct Purchaser Plaintiffs and their lawyers take their pleading and filing obligations quite seriously and do not believe that we have misstated any facts. To the extent AstraZeneca actually believes, as you have stated, that "plaintiffs' opposition brief makes some serious misstatement of certain facts that appear to be key to their arguments", we ask that you inform us immediately of the facts that you believe we have misstated and the underlying information demonstrating those facts to be false. Otherwise, we believe it is highly inappropriate for AstraZeneca to use contentions of "misstatements" for purposes of attempting to delay or phase full merits discovery.

## LCvR 16.3(c) Matters To Be Discussed

In light of our position that it is appropriate for the 26(f) process to commence immediately and for the Court to schedule a Rule 16(b) scheduling and status conference, please find below the Direct Purchaser Plaintiffs' position on the various issues we are required to discuss under LCvR 16.3(c):[1]

1. This case is not likely to be disposed of by Defendants' motion to dismiss and discovery should commence immediately.
2. It is anticipated that some legal and/or factual issues can be agreed upon after sufficient discovery has taken place. Also, see proposed schedule below.
3. This matter should not be assigned to a Magistrate Judge for all purposes.
4. Plaintiffs are willing to enter into settlement discussions at an appropriate time, but the likelihood of settlement at this time is low.
5. This matter cannot benefit from the Court's ADR procedures at this time.
6. This matter cannot be resolved via motion to dismiss, although the Direct Purchaser Plaintiffs believe they may have grounds for filing summary judgment motions on discreet issues upon completion of discovery. Also, see proposed schedule below.
7. The initial disclosures mandated by Fed.R.Civ.P. 26(a)(1) should go forward. See proposed schedule below.

---

[1] The numbering conforms to that found in LCvR 16.3(c). Also, as I'm sure you recall, several of these positions were disclosed to AstraZeneca on our initial call.

LAW OFFICES
ODOM & DES ROCHES, LLP

| | |
|---|---|
| 8. | See proposed schedule below. |
| 9. | See proposed schedule below. |
| 10. | See proposed schedule below. |
| 11. | Discovery should not be bifurcated or phased. The Direct Purchaser Plaintiffs will be in a better position to comment on the organization of trial after completion of discovery. |
| 12. | See proposed schedule below. |
| 13. | See proposed schedule below. |
| 14. | The Plaintiffs believe that the following items would aid in efficiently moving this matter forward: (a) entry of Case Management Order No. 1, as filed by the Direct Purchaser Class Plaintiffs; (b) formal coordination of all antitrust lawsuits filed against Defendants which are based on substantially similar allegations; and (c) regularly scheduled status conferences to ensure that the matter is proceeding according to the Court-ordered schedule and to resolve outstanding discovery disputes. |

## Proposed Schedule

Below is a schedule proposed by the Direct Purchaser Plaintiffs to govern this case. All dates are stated in terms of the number of months from the time the Court enters the schedule.

| | |
|---|---|
| Exchange of Rule 26(a)(1) disclosures | 1 month |
| Pleading amendments/addition of parties | 8 months |
| Rule 23 briefing, argument, decision | |
|     Opening brief | 7 months |
|     Opposition brief | 9 months |
|     Reply brief | 10 months |
|     Argument/hearing | 11 months |
|     Decision | 12 months |
| Discovery | |
|     Document requests | Immediately |
|     End of first wave of document production for requests served within 1 month | 4 months |
|     First deposition notices | 3 months |
|     Other fact discovery | Immediately |
|     Close of fact discovery | 13 months |

LAW OFFICES
ODOM & DES ROCHES, LLP

| | | |
|---|---|---|
| Experts | | |
| | Opening reports | 16 months |
| | Rebuttal reports | 18 months |
| | Reply reports | 19 months |
| Agreed Protective Order | | 1 month |
| Dispositive motions | | |
| | Opening briefs | 20 months |
| | Opposition briefs | 21 months |
| | Reply briefs | 22 months |
| | Argument/hearing | 23 months |
| | Decisions | 24 months |
| Pretrial Conference | | 26 months |
| Trial | | 28 months |

As concerns discovery, it is apparent that the normal limitations on the number of depositions and interrogatories ought not to apply in light of the number of issues to be addressed in discovery, and that it is likely that a certain number of depositions will need to go forward for longer than 7 hours. We anticipate further discussions on these issues with you, as well as on other related issues such as e-discovery, in the near future.

We look forward to receiving AstraZeneca's (a) position on the LCvR 16.3(c) issues the parties are required to discuss, and (b) either acceptance of the schedule proposed above or a counter-proposal. We request the favor of a reply on or before June 7, 2007.

Thank you for your consideration of these matters.

Best regards,

Stuart E. Des Roches

cc:    Barry S. Taus
       Kevin Landau
       Dan Berger

LAW OFFICES
ODOM & DES ROCHES, LLP


David Sorenson
Ross Foote
David Fierst
Linda Nussbaum
Alex Bokor
Joseph T. Lukens
Lauren Ravkind
Scott E. Perwin
Mark E. Haddad
Alycia A. Degen
Joshua E. Anderson
(all *via* email)

# Exhibit B



SIDLEY AUSTIN LLP
ONE SOUTH DEARBORN
CHICAGO, IL 60603
(312) 853 7000
(312) 853 7036 FAX

jtreece@sidley.com
(312) 853-2937

BEIJING
BRUSSELS
CHICAGO
DALLAS
FRANKFURT
GENEVA
HONG KONG
LONDON

LOS ANGELES
NEW YORK
SAN FRANCISCO
SHANGHAI
SINGAPORE
SYDNEY
TOKYO
WASHINGTON, D.C.

FOUNDED 1866

June 11, 2007

Stuart E. Des Roches, Esq.
Odom & Des Roches, LLP
Suite 2020, Poydras Center
650 Poydras Street
New Orleans, LA 70130

Re:     *Louisiana Wholesale Drug Co., Inc. v. AstraZeneca*
        *Pharmaceuticals, L.P., et al.*; United States District
        Court, District of Columbia; Civil Case No. 06-cv-02157

Dear Stuart:

This letter responds to your letter dated May 31, 2007.

I don't think that either of us is going to convince the other about the appropriateness of proceeding with discovery during the pendency of AstraZeneca's motion to dismiss. But out of caution that my silence be mistaken for acquiescence, let me respond briefly to the points you raise at the start of your letter.

I appreciate that the plaintiffs have coordinated their efforts and want to "formalize this coordination," but that is largely (although not exclusively) a matter among the plaintiffs. Accordingly, I do not see this as particularly relevant to the discovery issue.

It goes without saying that we disagree with your characterization of AstraZeneca's motion and its chances for success. We think that it is the plaintiffs who are urging a "never-before-adopted standard" by suggesting that proliferating consumers' choices by introducing a new drug product that the FDA has found offers not only different but improved treatment opportunities could somehow be anticompetitive. In any event, the motion won't be decided by our letters.

You've misunderstood my reference to *Twombly*. My point is that the case strongly suggests, if it doesn't make it clear, that expensive discovery should not proceed before the viability of the complaint is tested.

The misstatements of fact that I refer to are, for the most part, described in our brief (and/or upcoming reply brief). But making accusations back and forth isn't useful here, and my



Stuart Des Roches
June 11, 2007
Page 2

larger point is simply that if the judge were to incorrectly deny our motion to dismiss, it may be on a ground that is sufficiently narrow that discovery could similarly be narrowly tailored.

That said, we also have some room for agreement. AstraZeneca agrees with your points 2 (although it's vague), 3, 4, and 5,. As for point 7, we believe that initial disclosures would be appropriate, if ever, only after a ruling on AstraZeneca's motion to dismiss. As to your point 14, we generally believe it is premature to address these matters but would do so after a decision on the motion. Also as to Point 14, I believe that on the phone, plaintiffs expressed their willingness to enter into a stipulation regarding the nondiscoverability of draft expert reports and communications between counsel and experts. I propose t put that in the category of "other matters" that should be discussed at the appropriate time.

We also believe that discovery should be bifurcated and/or phased. (And, as noted above, we believe that this approach finds support in *Twombly*.) At a minimum, the issue of class certification should be addressed before other issues; but in addition, I would again state that while we have a confidence in our pending motion to dismiss, if the judge were to deny that motion, we believe it is likely that his ruling would focus the discovery on a few key issues.

In addition, we are not inclined to agree to a discovery schedule at this point for the same reason, *i.e.*, that even if the judge denies the motion to dismiss, we think it is likely that discovery could nonetheless be more focused than is typical in these cases. For this reason, we decline to offer a counter proposal at this time.

Nonetheless, there are some items in the schedule in your letter that we could probably agree to, such as the time to negotiate a protective order (or take disagreements to the court) and the time for amending pleadings or adding parties. Similarly, we would be willing to discuss, early on, the limitations on interrogatories, requests to admit, and depositions in the event discovery moves forward. (I suspect, however, that we are more inclined to the normal limits than plaintiffs are.)

If you would like to take about areas of possible agreement or about the parties' positions generally, please let me know and we can arrange a time.



Stuart Des Roches
June 11, 2007
Page 3


                          Sincerely,


                          John W. Treece

JWT:acw

CH1 3895045v.1

# Exhibit C

**Westlaw.**

432 F.Supp.2d 408                                                                Page 1
432 F.Supp.2d 408, 2006-1 Trade Cases P 75,270
**(Cite as: 432 F.Supp.2d 408)**

**H**

Abbott Laboratories v. Teva Pharmaceuticals
USA, Inc.
D.Del.,2006.

United States District Court,D. Delaware.
ABBOTT LABORATORIES, an Illinois cor-
poration, Fournier Industrie et Santé, a French
corporation, and Laboratoires Fournier S.A., a
French corporation, Plaintiffs,
v.
TEVA PHARMACEUTICALS USA, INC., a
Delaware Corporation, Defendant.
Teva Pharmaceuticals USA, Inc., a Delaware
corporation, Teva Pharmaceutical Industries
Limited, an Israeli corporation, and Novopharm,
Ltd., a Canadian corporation, Counterclaim-
Plaintiffs,
v.
Abbott Laboratories, an Illinois corporation,
Fournier Industrie et Santé, a French corpora-
tion, and Laboratoires Fournier S.A., a French
corporation, Counterclaim-Defendants.
Abbott Laboratories, an Illinois corporation,
Fournier Industrie et Santé, a French corpora-
tion, and Laboratoires Fournier S.A., a French
corporation, Plaintiffs,
v.
Impax Laboratories, Inc., a Delaware corpora-
tion, Defendant.
Impax Laboratories, Inc., a Delaware corpora-
tion, Counterclaim-Plaintiff
v.
Abbott Laboratories, an Illinois corporation,
Fournier Industrie et Santé, a French corpora-
tion, and Laboratoires Fournier S.A., a French
corporation, Counterclaim-Defendants.
In re TriCor Direct Purchaser Antitrust Litiga-
tion
This Document Relates to: all Actions
In re TriCor Indirect Purchaser Antitrust Litiga-
tion
This Document Relates to: all Actions
**Nos. CIV.A. 02-1512-KAJ, CIV.A.
03-120-KAJ, CIV.A. 05-340-KAJ, CIV.A.**

**05-360-KAJ.**

May 26, 2006.

**Background:** Generic drug manufacturers and
direct and indirect purchasers brought action un-
der Sherman Act and state law alleging that
manufacturers of branded drug twice changed
drug's formulation in order to prevent generic
formulations from becoming rated for substitu-
tion with branded drug and pursued patent in-
fringement litigation without probable cause.
Defendants moved to dismiss complaint.

**Holdings:** The District Court, Jordan, J., held
that:

(1) fact that generic manufacturers were able to
sell their own branded versions of old formula-
tions of branded drug did not bar their claims
under § 2 of Sherman Act;

(2) fact issues remained as to whether branded
drug manufacturer had probable cause to bring
patent infringement suits; and

(3) generic manufacturers sufficiently alleged
antitrust injury.

Motion denied.
West Headnotes
**[1] Antitrust and Trade Regulation 29T** 🔑
**620**

29T Antitrust and Trade Regulation
    29TVII Monopolization
        29TVII(A) In General
            29Tk619 Elements in General
                29Tk620 k. In General. Most Cited
Cases
To violate § 2 of Sherman Act, monopolist's
conduct must harm competitive process and
thereby harm consumers, but harm to one or
more competitors will not suffice. Sherman Act,
§ 2, 15 U.S.C.A. § 2.

**[2] Antitrust and Trade Regulation 29T** 🔑

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**641**

29T Antitrust and Trade Regulation
    29TVII Monopolization
        29TVII(C) Market Power; Market Share
            29Tk641 k. In General. Most Cited Cases

**Antitrust and Trade Regulation 29T ☜650**

29T Antitrust and Trade Regulation
    29TVII Monopolization
        29TVII(D) Illegal Restraints or Other Misconduct
            29Tk650 k. In General. Most Cited Cases
Even monopolist may through technological innovation expand its market share, increase consumer brand identification, or create demand for new products, and such actions are perfectly consistent with competitive forces that Sherman Act was intended to foster. Sherman Act, § 2, 15 U.S.C.A. § 2.

**[3] Antitrust and Trade Regulation 29T ☜689**

29T Antitrust and Trade Regulation
    29TVII Monopolization
        29TVII(E) Particular Industries or Businesses
            29Tk689 k. Medical Supplies and Pharmaceuticals. Most Cited Cases
Rule of reason approach was applicable in assessing generic drug manufacturers' claim that manufacturers of branded drug violated § 2 of Sherman Act by changing drug's formulation, even if new formulations had advantages over old formulations, where reformulations, combined with brand drug manufacturers' removal of its old formulations from market, prevented generic formulations from becoming rated for substitution with branded drug. Sherman Act, § 2, 15 U.S.C.A. § 2.

**[4] Antitrust and Trade Regulation 29T ☜650**

29T Antitrust and Trade Regulation

29TVII Monopolization
    29TVII(D) Illegal Restraints or Other Misconduct
        29Tk650 k. In General. Most Cited Cases
To show that conduct has anticompetitive effect, in violation of § 2 of Sherman Act, it is not necessary that all competition be removed from market; test is not total foreclosure, but whether challenged practices bar substantial number of rivals or severely restrict market's ambit. Sherman Act, § 2, 15 U.S.C.A. § 2.

**[5] Antitrust and Trade Regulation 29T ☜689**

29T Antitrust and Trade Regulation
    29TVII Monopolization
        29TVII(E) Particular Industries or Businesses
            29Tk689 k. Medical Supplies and Pharmaceuticals. Most Cited Cases
Fact that generic drug manufacturers were able to sell their own branded versions of old formulations of branded drug did not bar their claims under § 2 of Sherman Act based on branded drug manufacturer's use of allegedly manipulative and unjustifiable formulation changes to prevent generic formulations from becoming rated for substitution with branded drug, where reformulations prevented them from offering generic substitutes for branded drug. Sherman Act, § 2, 15 U.S.C.A. § 2.

**[6] Antitrust and Trade Regulation 29T ☜650**

29T Antitrust and Trade Regulation
    29TVII Monopolization
        29TVII(D) Illegal Restraints or Other Misconduct
            29Tk650 k. In General. Most Cited Cases
While monopolist may compete and is not required to aid its competitors, monopolist is not free to take certain actions that company in competitive or even oligopolistic market may take, because there is no market constraint on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

432 F.Supp.2d 408
432 F.Supp.2d 408, 2006-1 Trade Cases P 75,270
**(Cite as: 432 F.Supp.2d 408)**

monopolist's behavior. Sherman Act, § 1 et seq., 15 U.S.C.A. § 1 et seq.

**[7] Antitrust and Trade Regulation 29T ⟋ 900**

29T Antitrust and Trade Regulation
    29TXI Antitrust Exemptions and Defenses
        29Tk900 k. In General. Most Cited Cases
Drug manufacturer's exercise of its First Amendment rights to obtain reformulations of its branded drug was not immunized from antitrust liability to extent its communications were used as integral part of conduct that violated Sherman Act. U.S.C.A. Const.Amend. 1; Sherman Act, § 1 et seq., 15 U.S.C.A. § 1 et seq.

**[8] Antitrust and Trade Regulation 29T ⟋ 905(3)**

29T Antitrust and Trade Regulation
    29TXI Antitrust Exemptions and Defenses
        29Tk905 Efforts to Influence Government Action
            29Tk905(3) k. Litigation; Sham Litigation. Most Cited Cases
Party that pursues litigation is generally immune from antitrust liability for that conduct, because such petitioning activity is protected by First Amendment, but not if that litigation is sham. U.S.C.A. Const.Amend. 1; Sherman Act, § 1 et seq., 15 U.S.C.A. § 1 et seq.

**[9] Antitrust and Trade Regulation 29T ⟋ 905(3)**

29T Antitrust and Trade Regulation
    29TXI Antitrust Exemptions and Defenses
        29Tk905 Efforts to Influence Government Action
            29Tk905(3) k. Litigation; Sham Litigation. Most Cited Cases
Litigation is sham, and therefore not immune under antitrust laws, if: (1) lawsuit is objectively baseless in sense that no reasonable litigant could realistically expect success on merits, and (2) baseless lawsuit conceals attempt to interfere directly with business relationships of competitor, through use of governmental process, as op-

posed to outcome of that process, as anticompetitive weapon. Sherman Act, § 1 et seq., 15 U.S.C.A. § 1 et seq.

**[10] Antitrust and Trade Regulation 29T ⟋ 905(3)**

29T Antitrust and Trade Regulation
    29TXI Antitrust Exemptions and Defenses
        29Tk905 Efforts to Influence Government Action
            29Tk905(3) k. Litigation; Sham Litigation. Most Cited Cases
Issue of whether branded drug manufacturer had probable cause to bring patent infringement suits against generic drug manufacturers based on abbreviated new drug applications (ANDA) for new formulations for branded drug involved fact question that could not be resolved on motion to dismiss generic drug manufacturer's antitrust claims against branded drug manufacturer. Sherman Act, § 1 et seq., 15 U.S.C.A. § 1 et seq.

**[11] Antitrust and Trade Regulation 29T ⟋ 650**

29T Antitrust and Trade Regulation
    29TVII Monopolization
        29TVII(D) Illegal Restraints or Other Misconduct
            29Tk650 k. In General. Most Cited Cases
When determining antitrust liability based on collection of factual allegations, courts must look to monopolist's conduct taken as a whole rather than considering each aspect in isolation. Sherman Act, § 1 et seq., 15 U.S.C.A. § 1 et seq.

**[12] Antitrust and Trade Regulation 29T ⟋ 905(3)**

29T Antitrust and Trade Regulation
    29TXI Antitrust Exemptions and Defenses
        29Tk905 Efforts to Influence Government Action
            29Tk905(3) k. Litigation; Sham Litigation. Most Cited Cases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

432 F.Supp.2d 408
432 F.Supp.2d 408, 2006-1 Trade Cases P 75,270
**(Cite as: 432 F.Supp.2d 408)**

Plaintiffs may not use litigation conduct to support claim of overall scheme to monopolize if they cannot prove that litigation was sham. Sherman Act, § 1 et seq., 15 U.S.C.A. § 1 et seq.

**[13] Antitrust and Trade Regulation 29T ☞ 963(1)**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and Enforcement
        29TXVII(B) Actions
            29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
                29Tk963 Injury to Business or Property
                    29Tk963(1) k. In General. Most Cited Cases

Antitrust plaintiffs not only must prove antitrust violation, injury, and causation, they also must show that injury they have sustained is antitrust injury, which is to say injury of type that antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. Sherman Act, § 1 et seq., 15 U.S.C.A. § 1 et seq.

**[14] Antitrust and Trade Regulation 29T ☞ 972(5)**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and Enforcement
        29TXVII(B) Actions
            29Tk972 Pleading
                29Tk972(2) Complaint
                    29Tk972(5) k. Injury to Business or Property. Most Cited Cases

Generic drug manufacturers sufficiently alleged antitrust injury to support their claim that branded drug manufacturer violated federal antitrust laws by knowingly enforcing patent procured by fraud, even though adding patent to patent infringement litigation did not result in additional thirty-month stay under Hatch-Waxman Act of Food and Drug Administration's (FDA) approval of generic manufacturers'

abbreviated new drug applications (ANDA), where generic manufacturers alleged overall scheme to monopolize that included fraudulent conduct, and one manufacturer asserted separate fraudulent procurement claim. Sherman Act, § 1 et seq., 15 U.S.C.A. § 1 et seq.; Federal Food, Drug, and Cosmetic Act, § 505(j), 21 U.S.C.A. § 355(j).

**[15] Antitrust and Trade Regulation 29T ☞ 963(1)**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and Enforcement
        29TXVII(B) Actions
            29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
                29Tk963 Injury to Business or Property
                    29Tk963(1) k. In General. Most Cited Cases

Since claim depends on proof of anticompetitive effect of conduct as a whole, question of antitrust injury should also be based on that conduct as a whole. Sherman Act, § 1 et seq., 15 U.S.C.A. § 1 et seq.

**[16] Federal Civil Procedure 170A ☞636**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak633 Certainty, Definiteness and Particularity
                170Ak636 k. Fraud, Mistake and Condition of Mind. Most Cited Cases

Plaintiff cannot sue multiple defendants for fraud merely by alleging fraud with particularity as to one defendant. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[17] Patents 291 ☞313**

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
            291k313 k. Dismissal Before Hearing. Most Cited Cases

Issue of whether branded drug manufacturer knew that patent was obtained by third party's fraud on Patent and Trademark Office (PTO) and still asserted that patent against generic manufacturers involved fact question that could not be resolved on motion to dismiss generic manufacturers' *Walker Process* claims against branded drug manufacturer.

**[18]** Torts 379 ⇒241

379 Torts
   379III Tortious Interference
      379III(B) Business or Contractual Relations
         379III(B)2 Particular Cases
            379k241 k. Business Relations or Economic Advantage, in General. Most Cited Cases

Under Delaware law, generic drug manufacturers asserting claims against branded drug manufacturers for tortious interference with prospective business advantages as result of their unnecessary reformulations and sham patent infringement suits were not required to identify specific relationships that had been disrupted.

**Patents 291 ⇒328(2)**

291 Patents
   291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
      291k328 Patents Enumerated
         291k328(2) k. Original Utility. Most Cited Cases
4,985,726, 6,589,552. Recognized as Not Infringed.

**Patents 291 ⇒328(2)**

291 Patents
   291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
      291k328 Patents Enumerated
         291k328(2) k. Original Utility. Most Cited Cases
6,074,670, 6,277,405, 6,652,881. Cited.

Mary B. Graham, Esq., Morris, Nichols, Arsht

& Tunnell, Wilmington, DE, Of Counsel: William F. Cavanaugh, Jr., Esq., Eugene M. Gelenter, Esq., Chad J. Peterman, Esq., Alexis A. Gander, Esq., Patterson, Belknap, Webb Tyler LLP, New York, NY, Counsel for Abbott Laboratories.

Frederick L. Cottrell, III, Esq., Anne Shea Gaza, Esq., Richards, Layton & Finger, Wilmington, DE, Of Counsel: Steven C. Sunshine, Esq., Maria M. DiMoscato, Cadwalader, Wickersham & Taft LLP, Washington, DC, Matthew P. Hendrickson, Esq., Bradley J. Demuth, Esq., Cadwalader, Wickersham & Taft LLP, New York, NY, Timothy C. Bickham, Esq., Steptoe, Johnson LLP, Washington, DC, Counsel for Fournier Industrie et Santé, and Laboratoires Fournier, S.A.

Josy W. Ingersoll, Esq., John W. Shaw, Esq., Young, Conaway, Stargatt & Taylor, LLP, Wilmington, DE, Of Counsel: David **412** M. Hashmall, P.C., Goodwin Procter LLP, New York, NY, Bruce M. Gagala, Esq., M. Daniel Hefner, Esq., Leydig, Voit & Mayer, Ltd., Chicago, IL, Kenneth A. Cohen, Esq., Elaine Herrmann Blais, Esq., Christopher Holding, Esq., Goodwin Procter LLP, Boston, MA, Counsel for Teva Pharmaceuticals USA, Inc. and Novopharm, Ltd.

Richard K. Herrmann, Esq., Mary B. Matterer, Esq., Morris, James, Hitchens & Williams LLP, Wilmington, DE, Of Counsel: Mark A. Lemley, Esq., Asim M. Bhansali, Esq., Paula L. Blizzard, Esq., Keker and Van Nest LLP, San Francisco, CA, Philip J. McCabe, Esq., Kenyon & Kenyon, San Jose, CA, C. Kyle Musgrove, Esq., Kenyon & Kenyon, Washington, DC, John C. Vetter, Esq., Kenyon & Kenyon, New York, NY, Counsel for Impax Laboratories, Inc.

Jeffrey S. Goddess, Esq., Rosenthal, Monhait Gross & Goddess, P.A., Wilmington, DE, Of Counsel: Bruce E. Gerstein, Esq., Barry S. Taus, Esq., Adam Steinfeld, Esq., Garwin, Gerstein & Fisher, L.L.P., New York, NY, Stuart E. Des Roches, Esq., Odom, & Des Roches, L.L.P., New Orleans, LA, Linda P. Nussbaum, Esq., Cohen, Milstein, Hausfeld & Toll P.L.L.C., New York, NY, David P. Smith, Esq., Percy,

Smith & Foote, Alexandria, LA, Daniel Berger, Esq., David Sorensen, Esq., Berger & Montague, P.C., Philadelphia, PA, Donald L. Bilgore, Esq., Bilgore, Reich, Levine & Kantor, Rochester, NY, Sperling & Slater, Daar & Vanek, P.C., Chicago, IL, Liaison Counsel for Director Purchaser Class.

Elizabeth M. McGeever, Esq., Prickett, Jones, Elliott, P.A., Wilmington, DE, Of Counsel: Richard Alan Amold, Esq., Scott E. Perwin, Esq., Lauren C. Ravkind, Esq., Kenny Nachwalter, P.A., Miami, FL, Steve D. Shadowen, Esq., Hangley Aronchick Segal & Pudlin, Harrisburg, PA, Joseph T. Lukens, Esq., Esq., Hangley Aronchick Segal & Pudlin, Philadelphia, PA, Counsel for CVS and Walgreen.

Jonathan L. Parshall, Esq., Murphy Spadaro & Landon, Wilmington, DE, Counsel for Pacificare Health Systems, Inc.

Pamela S. Tikellis, Esq., Robert J. Kriner, Jr., Esq., A. Zachary Naylor, Esq., Robert R. Davis, Esq., Chimicles & Tikellis LLP, Wilmington, DE, Of Counsel: Bernard Persky, Esq., Christopher J. McDonald, Esq., Kellie C., Safer, Esq., Labaton Scharow & Rudoff LLP, New York, NY, Bryan L. Clobes, Esq., William R. Kane, Esq., Miller Faucher and Cafferty LLP, Philadelphia, PA, Patrick E. Cafferty, Esq., Miller Faucher and Cafferty LLP, Ann Arbor, MI, Marvin A. Miller, Esq., Jennifer W. Sprengel, Esq., Miller Faucher and Cafferty LLP, Chicago, IL, Jeffrey L. Kodroff, Esq., Theodore M. Lieverman, Esq., Simon B. Paris, Esq., Spector, Roseman & Kodroff, P.C., Philadelphia, PA, Thomas M. Sobol, Esq., David S. Nalvin, Esq., Gergory H. Matthews, Esq., Hagens Berman Sobol Shapiro LLP, Cambridge, MA, Steve W. Berman, Esq., Hagens Berman Sobol Shapiro LLP, Seattle, WA, Liaison Counsel for the Indirect Purchasers.

## MEMORANDUM OPINION

JORDAN, District Judge.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TABLE
OF
CON-
TENTS**

 I. INTRO-          .413
    DUC-
    TION.

    .

II. BACK-           .413
    GROUN
    D.

    A.    Generic         .414
          Drugs
          and the
          Operation
          of the
          Hatch-
          Waxman
          Act.

    B.    Defend-         .415
          ants' An-
          ticompet-
          itive
          Conduct.

          1.    The           .415
                Switch
                from
                Capsules
                to Tab-
                lets.

          2.    The           .416
                Switch
                from Ori-
                ginal
                Tablets to
                New
                Tablets.

    C.    Plaintiffs'     .418

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Legal Claims.

.

III.  STAND-ARD OF RE-VIEW.    .419

.

IV.  DISCUS-SION.    .419

    A.  Antitrust Liability for Product Formula-tion Changes.    .420

        1.  The Ap-propriate Standard.    .420

        2.  Plaintiffs' Allega-tions Re-lating to Product Innova-tion.    .423

        3.  Foreclos-ure from the Fen-ofibrate Market.    .423

        4.  Actions Taken to Support the For-mulation Changes.    .423

    B.  Sham Litiga-    .424

Case 1:06-cv-02089-RWR     Document 36-2     Filed 07/10/2007     Page 20 of 50

Page 9

tion.

| | | | |
|---|---|---|---|
| | 1. | Probable Cause for Alleging Infringement. | .425 |
| | 2. | Summary Judgment Opinion. | .426 |
| | 3. | Inequitable Conduct. | .426 |
| C. | Allegations of an Overall Scheme to Monopolize. | | .428 |
| D. | Antitrust Injury. | | .430 |
| | 1. | *Walker Process* Claims. | .430 |
| | 2. | Sham Litigation Claims. | .431 |
| E. | Allegations of Joint Conduct. | | .431 |
| | 1. | Allegations Against Abbott. | .431 |
| | 2. | Allegations Against Fournier. | .433 |

432 F.Supp.2d 408, 2006-1 Trade Cases P 75,270
**(Cite as: 432 F.Supp.2d 408)**

F.     State     .433
       Law
       Claims.

       .

V. CON-          .434
   CLU-
   SION.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## *413 I. INTRODUCTION

These antitrust actions have been brought by various plaintiffs [FN1] (collectively "Plaintiffs") against Abbott Laboratories ("Abbott"), and Fournier Industrie et Santé and Laboratoires Fournier S.A. (collectively "Fournier"). [FN2] Before me is the Defendants Consolidated Motion to Dismiss Plaintiffs' Complaints (C.A. No. 02-1512, Docket Item ["D.I."] 383, C.A. 02-1512, D.I. 429; C.A. 03-120, D.I. 294; C.A. 05-340, D.I. 38; C.A. 05-360, D.I. 39; the "Motion"). Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1337. For the reasons that follow, I will deny the Motion.

> FN1. The actions have been brought by the following: Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries Ltd. (collectively, "Teva") (see C.A. No. 02-1512, Docket Item ["D.I."] 360, Ex. A); Impax Laboratories, Inc. ("Impax") (see C.A. 03-120, D.I. 289); Walgreen Co., Eckerd Corp., The Kroger Co., Maxi Drug, Inc., Albertson's, Inc., Safeway, Inc., and Hy-Vee, Inc. (see C.A. 05-340, D.I. 31); CVS Pharmacy, Inc., Rite Aid Corp., and Rite Aid Hdqtrs. Corp. (see C.A. 05-340, D.I. 30); Pacificare Health Systems, Inc. ("Pacificare") (see C.A. 05-360, D.I. 35; the Putative Class of Direct Purchasers (the "Class of Direct Purchasers") (see C.A. 05-340, D.I. 29); and the Putative Class of Indirect Purchasers (the "Class of Indirect Purchasers") (see C.A. 05-360, D.I. 24). Novopharm, Ltd. ("Novopharm") was joined as a counterclaim-plaintiff in Civil Action No. 02-1512. (C.A. 02-1512, D.I. 426.) The plaintiffs in Civil Action 05-340 will be referred to collectively as the "Direct Purchasers," and those in Civil Action 05-360 will be referred to collectively as the "Indirect

Purchasers."

> FN2. Abbott and Fournier will be referred to collectively as "Defendants."

## II. BACKGROUND [FN3]

> FN3. The following background information is based on Plaintiffs' allegations, which are assumed to be true for the purposes of this Rule 12(b)(6) motion.

According to Plaintiffs, Abbott and Fournier have manipulated the statutory *414 framework that regulates the market for pharmaceutical drugs in order to prevent generic substitutes for the branded drug TriCor® from having a meaningful opportunity to enter the market. (C.A. No. 02-1512, D.I. 360, Ex. A at ¶ 3.) [FN4] As context for those allegations, a description of the approval process for generic pharmaceutical drugs may be helpful.

> FN4. In support of the Motion, Defendants attack Plaintiffs' allegations without always distinguishing the plaintiff making a particular allegation. The several plaintiffs' allegations are similar, and, unless otherwise noted, common allegations will be referenced to Teva's counterclaims (C.A.02-1512, D.I. 360, Ex. A). Also, unless otherwise noted, citations to the record refer to docket items in the case involving Teva, Civil Action 02-1512.

### A. Generic Drugs and the Operation of the Hatch-Waxman Act

Before a pharmaceutical drug is released into the market, it must be approved by the Food and Drug Administration ("FDA"), pursuant to the Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 et seq. (D.I. 360, Ex. A at ¶ 32.) The manufacturer of a new branded drug must submit detailed safety and efficacy data for the drug to the FDA in a New Drug Application ("NDA"). 21

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

U.S.C. § 355(a). The NDA must also list "the patent number and the expiration date of any patent which claims the drug ... or which claims a method of using such drug." 21 U.S.C. § 355(b)(1). After approval, information about the branded drug, including patent information, is published by the FDA in a publication entitled "Approved Drug Products with Therapeutic Equivalence Evaluations," which is generally called the "Orange Book," after the color of its cover. (See D.I. 360, Ex. A at ¶ 35.)

The Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act"), codified at 21 U.S.C. §§ 355, 360cc and 35 U.S.C. §§ 156, 271, 282, provides a framework for the introduction of generic versions of previously approved branded drugs. Under that framework, a generic manufacturer may submit an Abbreviated New Drug Application ("ANDA") to the FDA. 21 U.S.C. § 355(j). (D.I. 360, Ex. A at ¶ 34.) The ANDA process allows the generic manufacturer to incorporate efficacy and safety data submitted to the FDA in the NDA for a branded drug, as long as the generic drug is shown to be bioequivalent to that branded drug. 21 U.S.C. § 355(j)(2)(A). (D.I. 360, Ex. A at ¶ 34.)

The Hatch-Waxman Act also provides a framework for the holders of pharmaceutical patents to enforce their patents against generic competitors. When filing an ANDA, a generic manufacturer must certify whether its generic drug will infringe any patents listed in the Orange Book as being associated with the branded drug. 21 U.S.C. § 355(j)(2)(A)(vii). (D.I. 360, Ex. A at ¶ 36.) For each listed patent, the ANDA applicant must make one of four possible certifications (respectively, the Paragraph I, II, III, and IV Certifications): (I) that no patent information on the branded drug has been submitted to the FDA; (II) that the patent has expired; (III) that the patent will expire on a stated date; or (IV) that the patent is invalid or will not be infringed by the generic drug. 21 U.S.C. § 355(j)(2)(A)(vii)(I)-(IV). A Paragraph I or II Certification poses no barrier to FDA approval,

and one under Paragraph III allows approval after the patent expires. 21 U.S.C. § 355(j)(5)(B)(i)-(ii). A Paragraph IV Certification, however, makes the filing of an ANDA an act of patent infringement. *415 35 U.S.C. § 271(e)(2)(A). Along with a Paragraph IV Certification, the applicant must provide notice to the patent holder of its invalidity or noninfringement position. 21 U.S.C. § 355(j)(2)(B)(i). The patent holder has forty-five days after receiving that notice to file a patent infringement suit. 21 U.S.C. § 355(j)(5)(B)(iii). Significantly, if an infringement suit is filed, FDA approval of the ANDA is stayed until either thirty months have passed or a court rules that the patent is invalid or not infringed. Id. (See D.I. 360, Ex. A at ¶¶ 36-37.)

Pharmacists may dispense the generic equivalent for a branded drug when the branded drug is prescribed by a physician. (Id. at ¶ 77.) Such substitution is allowed, however, only if the generic drug has been "AB-rated" by the FDA, which means not only that the generic drug is bioequivalent to the branded drug, but also that the generic has the same form, dosage, and strength. (Id. at ¶ 78; C.A. 05-340, D.I. 29 at ¶¶ 41, 48, 81; C.A. 05-360, D.I. 24 at ¶¶ 27-28.) Therefore, an approved generic drug that is not AB-rated against a currently available branded drug, because, for example, the drugs have different formulations or dosages, may not be substituted for the branded drug and may only be sold, if at all, as a separately branded, rather than generic, drug. (D.I. 360, Ex. A at ¶ 78.)

B. *Defendants' Anticompetitive Conduct*

Defendants have allegedly manipulated the Hatch-Waxman framework in violation of the antitrust laws, in order to prevent generic substitution for their fenofibrate drug, TriCor. Fenofibrate is used to treat high levels of triglycerides, and also has indications for the treatment of high cholesterol. (Id. at ¶¶ 2, 44, 45.) Plaintiffs allege that Defendants responded to the threat of generic entry into the market by changing the formulation of TriCor, not to im-

prove the product but simply to prevent generic formulations from becoming AB-rated for substitution with TriCor. Defendants changed the TriCor formulation twice: first, TriCor was changed from capsule form to tablet form, and second, it was changed from that initial tablet form to a second tablet form.

### 1. The Switch from Capsules to Tablets

Abbott has licensed from Fournier several patents covering fenofibrate formulations. (*Id.* at ¶ 21.) Abbott and Fournier are alleged to have worked together to procure patents and to market fenofibrate formulations under Abbott's TriCor brand name. In 1998, Abbott received FDA approval of its NDA for TriCor in capsule form. (*Id.* at ¶ 64.) That formulation was listed in the Orange Book, along with U.S. Patent No. 4,985,726 (the " '726 patent" '), which was asserted to cover that formulation. (*Id.*) In December 1999, Novopharm filed an ANDA for 67 mg and 200 mg fenofibrate capsules, along with a Paragraph IV Certification that its formulations did not infringe any valid or enforceable claim of the '726 patent. (*Id.* at ¶ 65.) In May 2000, Impax filed a similar ANDA. (C.A. 03-120, D.I. 289 at ¶ 30.) In response to those ANDA filings, Defendants filed lawsuits (the "Capsule Litigation") in the United States District Court for the Northern District of Illinois against Novopharm and Impax, in April and August 2000 respectively, alleging infringement of the '726 patent. (D.I. 360, Ex. A at ¶ 66; C.A. 03-120, D.I. 289 at ¶ 31.) By that time, Novopharm had been acquired by Teva. FN5 (D.I. 360, Ex. A at ¶ 66.) The lawsuits**416 triggered the thirty-month Hatch-Waxman stay of FDA approval of the generic formulations. (*Id.* at ¶ 66; C.A. 03-120, D.I. 289 at ¶ 31.)

> FN5. Teva does not make clear in its pleading how Novopharm was acquired. However it occurred, because of the acquisition and because Novopharm joins Teva's arguments as to this Motion (D.I. 431), I will refer to Teva and Novopharm collectively as "Teva" throughout

this Memorandum Opinion.

In March 2002, the Northern District of Illinois granted summary judgment for Teva, holding that Teva's fenofibrate formulations did not infringe the '726 patent because, in those formulations, fenofibrate was not comicronized with a solid surfactant, as required by the asserted claims of that patent. *Abbott Labs. v. Novopharm Ltd.,* No. 00-C-2141, 2002 WL 433584 (N.D.Ill. Mar. 20, 2002). The United States Court of Appeals for the Federal Circuit affirmed that judgment for Teva in March 2003. *Abbott Labs. v. Novopharm Ltd.,* 323 F.3d 1324 (Fed.Cir.2003). The District Court then granted summary judgment for Impax, also in March 2003. (C.A. 03-120, D.I. 289 at ¶ 42.) According to the Direct Purchasers, Defendants knew that the accused formulations did not infringe and, therefore, had no probable cause to pursue the litigation against Teva and Impax. (C.A. 05-340, D.I. 29 at ¶¶ 120-23; C.A. 05-340, D.I. 30 at ¶¶ 76-79; C.A. 05-340, D.I. 31 at ¶¶ 80-83.)

While the Capsule Litigation was pending in the Northern District of Illinois, Abbott submitted an NDA for a new fenofibrate formulation: 54 mg and 160 mg tablets. (D.I. 360, Ex. A at ¶ 70.) That NDA was approved in September 2001, while the 30-month stay from the Capsule Litigation was still blocking approval of Teva's and Impax's ANDAs for fenofibrate capsules. (*Id.*) Defendants sought approval of a new indication for their tablet formulation, claiming that fenofibrate also could be used to increase levels of high density lipoprotein (HDL), or "good cholesterol." (*Id.* at ¶ 71.) To support the new indication, Defendants submitted data for the capsule formulation and argued that the new tablet formulation was bioequivalent to the capsule formulation. (*Id.*) According to Plaintiffs, Defendants' submission of the capsule data effectively admitted that the tablet formulation was not an improvement over the previous capsule formulation. (*Id.*)

After the NDA for the tablet formulation was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

approved, Defendants stopped selling TriCor capsules and also bought back the existing supplies of those capsules from pharmacies. (*Id.* at ¶ 70.) In addition, Defendants changed the code for TriCor capsules in the National Drug Data File ("NDDF") to "obsolete." (*Id.*) The NDDF is a private database that provides information about FDA-approved drugs. (C.A. 03-120, D.I. 289 at ¶ 23.) Changing the code to "obsolete" removed the TriCor capsule drug formulation from the NDDF, which prevented pharmacies from filling TriCor prescriptions with a generic capsule formulation. (D.I. 360, Ex. A at ¶¶ 73-74.)

Teva's ANDA for 200 mg capsules was approved on April 9, 2002, after the summary judgment in the Capsule Litigation caused the end of the Hatch-Waxman stay. (*Id.* at ¶ 68.) However, because the TriCor capsule formulation had already been removed from the market, generic substitution was no longer possible. (*Id.* at ¶¶ 77-78.) Teva has marketed fenofibrate capsules under the brand Lofibra®, but those sales have been modest. (*Id.* at ¶ 79.)

### 2. The Switch from Original Tablets to New Tablets

Because the only branded fenofibrate on the market was the TriCor tablet form, **\*417** Teva and Impax each developed generic equivalents for that tablet formulation and submitted ANDAs for 54 mg and 160 mg tablets in June and September 2002, respectively. (D.I. 360, Ex. A at ¶ 83; C.A. 03-120, D.I. 289 at ¶ 48.) With those ANDAs, Teva and Impax again submitted Paragraph IV Certifications stating that their formulations did not infringe any valid or enforceable patent claim listed in the Orange Book with Defendants' tablet formulation. (D.I. 360, Ex. A at ¶ 84; C.A. 03-120, D.I. 289 at ¶ 48.) In response to those ANDA filings, Defendants filed lawsuits in this court against Teva and Impax, in October 2002 and January 2003 respectively, alleging infringement of the '726 patent, of U.S. Patent No. 6,074,670 (the " '670 patent"), and of U.S. Patent No. 6,277,405 (the "

'405 patent"). (D.I. 360, Ex. A at ¶ 47; C.A. 03-120, D.I. 289 at ¶¶ 49-50.) Again, that triggered the thirty-month Hatch-Waxman stay. The current antitrust claims brought by Teva and Impax were set forth as counterclaims in that patent litigation.

Two other related patents were subsequently listed in the Orange Book for TriCor tablets: U.S. Patent No. 6,589,552 (the " '552 patent") in July 2003, and U.S. Patent No. 6,652,881 (the " '881 patent") in December 2003. (D.I. 360, Ex. A at ¶¶ 49, 53; C.A. 03-120, D.I. 289 at ¶¶ 51, 67.) Teva and Impax filed Paragraph IV Certifications as to those two patents, and, in response, Defendants filed successive patent infringement suits against Teva and Impax, first for the '552 patent and then for the '881 patent. (D.I. 360, Ex. A at ¶¶ 50, 51-52, 54-55; C.A. 03-120, D.I. 289 at ¶¶ 51-53, 68-69.) The lawsuits against Teva and Impax for the '726, the '670, the '405, the '552, and the '881 patents will be referred to collectively as the "Tablet Litigation." The '552 suit triggered an additional thirty-month stay, but, pursuant to a change in the statute that prevented successive litigation stays, FN6 the '881 suit did not. (D.I. 360, Ex. A at ¶¶ 52, 55; C.A. 03-120, D.I. 289 at ¶¶ 53, 69.) Thus, the stay based on the first three patents was to expire in March 2005, and, absent an intervening court decision, the additional stay based on the '552 patent was to expire in February 2006. (D.I. 360, Ex. A at ¶ 52.)

> FN6. In 2003, the Hatch-Waxman Act, 21 U.S.C. § 355(j)(5)(b), was amended to limit patentees to one thirty-month stay. *See* Herbert Hovenkamp, Mark D. Janis & Mark A. Lemley, *IP and Antitrust* § 12.4c (2006) ("[L]egislative changes effective in 2004 deal effectively with the problem ... by limiting patentees to a single 30-month stay for any given drug, regardless of the number of patents listed as covering that drug.").

On May 6, 2005, I granted partial summary judgment for Teva and Impax, holding that their

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tablet formulations did not infringe the '552 patent. (D.I. 332; D.I. 360, Ex. A at ¶ 90.) Since that patent was the cause of the Hatch-Waxman stay extending beyond March 2005, Teva's AN-DA was approved on May 13, 2005. Defendants then voluntarily dismissed their remaining infringement claims against Teva and Impax. (D.I. 360, Ex. A at ¶ 92.)

According to all Plaintiffs except for Impax, Defendants pursued the Tablet Litigation without probable cause because they knew that the patents-in-suit were rendered unenforceable by inequitable conduct before the U.S. Patent and Trademark Office ("PTO") and they also knew that the accused formulations did not infringe the patents-in-suit. (*Id.* at ¶¶ 212-26; C.A. 05-340, D.I. 29 at ¶¶ 120-23, 126-46; C.A. 05-340, D.I. 30 at ¶¶ 76-79, 82-102; C.A. 05-340, D.I. 31 at ¶¶ 80-83, 86-88, 92-109; C.A. 05-360, D.I. 24 at ¶¶ 81-85; C.A. 05-360, D.I. 35 at ¶¶ 62-64.) In addition, Teva alleges that the '881 patent *418 was obtained through fraud on the PTO. (D.I. 360, Ex. A at ¶ 222.)

As before, while the Tablet Litigation was pending in this court, Defendants submitted an NDA for a new formulation, this time for tablets with a dosage of 145 mg and 48 mg instead of 160 mg and 54 mg. (*Id.* at ¶ 86.) For the new formulation, Defendants sought a label change stating that the new tablets no longer had to be taken with food (the "no food effect label" or "NFE label"). (*Id.* at ¶ 98.) However, according to Plaintiffs, that formulation was not an actual improvement over the previous tablets but was developed simply to prevent generic substitution. (*Id.*) As they had done with the TriCor capsules, Defendants stopped selling the old TriCor tablets and changed the NDDF code to implement the formulation change to the new tablets. (*Id.* at ¶¶ 87, 90.)

### C. *Plaintiffs' Legal Claims*

Based on the foregoing allegations, Teva makes ten claims (*id.* at ¶¶ 276-368): first, that Defendants have engaged in a conspiracy to monopol-

ize the fenofibrate market, in violation of section 2 of the Sherman Act ("Section 2"), 15 U.S.C. § 2; second, that they have entered into a contract, combination, or conspiracy in restraint of trade, in violation of section 1 of the Sherman Act ("Section 1"), 15 U.S.C. § 1; third, that they have engaged in an overall scheme to monopolize the fenofibrate market, in violation of Section 2; fourth, that they have attempted to monopolize that market, in violation of Section 2; fifth, that they have entered into a contract, conspiracy, or combination to use sham litigation to restrain trade, in violation of Section 1; sixth, that they have engaged in sham litigation, in violation of Section 2; seventh, that they have listed patents in the Orange Book improperly, in violation of Section 2; eighth, that they have committed fraud during the prosecution of the '881 patent, in violation of Section 2; ninth, that Teva is entitled to injunctive relief in the form of a compulsory license of all patents listed in the Orange Book for the new tablet formulation; and, tenth, that Defendants have tortiously interfered with Teva's valid business expectancies concerning the sale of fenofibrate.[FN7] Teva seeks treble damages and injunctive relief. (*Id.* at 95-96.)

> FN7. All of the Sherman Act claims include assertions that Teva is also entitled to relief under Section 4 of the Clayton Act, 15 U.S.C. § 15. (*See* D.I. 360, Ex. A at ¶¶ 286, 295, 305, 313, 323, 334, 343, 355.)

Impax makes seven claims (C.A. 03-120, D.I. 289 at ¶¶ 144-74): first, that Defendants have entered into a conspiracy in restraint of trade, in violation of Section 1; second, that they have monopolized the fenofibrate market, in violation of Section 2; third, that they have attempted to monopolize that market, in violation of Section 2; fourth, that they have conspired to monopolize that market, in violation of Section 2; fifth, that they have engaged in a conspiracy to restrain trade, in violation of a California statute, Cal. Bus. & Prof.Code §§ 16720 et seq.; sixth, that they have engaged in an anticompetitive

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

conspiracy, in violation of another California statute, Cal. Bus. & Prof.Code § 17200; and, seventh, that they have intentionally interfered with Impax's prospective economic advantage from the sale of fenofibrate.[FN8] Impax seeks treble damages and injunctive relief. (*Id.* at 36-37.)

> FN8. As with Teva's claims, all of the Sherman Act claims in Impax's antitrust counterclaims are also asserted to be a basis for relief under Section 4 of the Clayton Act, 15 U.S.C. § 15. (*See* C.A. 03-120, D.I. 289 at ¶¶ 149, 154, 159, 165.)

**\*419** The Direct Purchasers make two claims (C.A. 05-340, D.I. 29 at ¶ ¶ 160-84; C.A. 05-340, D.I. 30 at ¶¶ 115-27; C.A. 05-340, D.I. 31 at ¶¶ 123-36): first, that Defendants have monopolized the fenofibrate market, in violation of Section 2; and second, that they engaged in a contract, combination, or conspiracy to restrain trade, in violation of Section 1. The Direct Purchasers, like Teva and Impax, seek treble damages and injunctive relief. (C.A. 05-340, D.I. 29 at 65; C.A. 05-340, D.I. 30 at 40; C.A. 05-340, D.I. 31 at 41-42.)

The Class of Indirect Purchasers makes five claims (C.A. 05-360, D.I. 24 at ¶¶ 107-25): first, it seeks injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, for Defendants' alleged violations of Section 2; second, it claims that Defendants have violated the antitrust and consumer protection statutes of various states [FN9] and the District of Columbia; third, it claims that Defendants have been unjustly enriched by their unlawful conduct; fourth, it claims that Defendants have violated the Delaware Consumer Fraud Act, 6 Del.Code §§ 2511 et seq.; and fifth, it claims that Defendants have violated the consumer protection acts of every state and of the District of Columbia. The Class of Indirect Purchasers seeks treble damages and injunctive relief. (C.A. 05-360, D.I. 24 at 51.)

> FN9. Those states are Arizona, California, Florida, Iowa, Kansas, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin. (C.A. 05-360, D.I. 24 at ¶ 112.)

Pacificare makes three claims (C.A. 05-360, D.I. 35 at ¶¶ 180-209): first, it seeks injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, for Defendants' alleged violations of Section 2; second, it claims that Defendants have violated the antitrust laws of Arizona, California, and Nevada; and third, it claims that Defendants have violated the consumer fraud statutes of Arizona, California, Colorado, Nevada, Oklahoma, Oregon, Texas, and Washington, and have been unjustly enriched by their conduct. Pacificare seeks damages and injunctive relief. (C.A. 05-360, D.I. 35 at 44.)

### III. STANDARD OF REVIEW

Fed.R.Civ.P. 12(b)(6) requires a court to accept as true all material allegations of the complaint. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir.1998)* (internal citation omitted). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Id.* (internal citation omitted). The moving party has the burden of persuasion. *See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir.1991).*

### IV. DISCUSSION

In support of this Motion, Defendants argue (1) that, taking Plaintiffs' allegations as true, Defendants' conduct in changing the TriCor formulation and implementing those changes in the market does not violate federal antitrust law;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN10 (2) that any **\*420** actions taken in the Capsule and Tablet Litigations are immune under the antitrust laws because Plaintiffs have not adequately pleaded that those lawsuits were a sham; (3) that the overall scheme claims must be dismissed because the individual components of the scheme fail to state a claim; (4) that Plaintiffs have not pleaded antitrust injury for some of the claims; (5) that Plaintiffs have not adequately pleaded Abbott's or Fournier's involvement in portions of the alleged scheme; and (6) that the state law allegations fail to state a claim. Since each argument fails, the Motion to Dismiss will be denied.

> FN10. In their arguments concerning antitrust liability, Defendants do not separately address the claims under different statutory sections, e.g., Section 1 or Section 2 of the Sherman Act. For example, while the cases that Defendants rely on discuss liability under Section 2, Defendants apparently intend their arguments concerning the legality of their conduct to apply equally to the Section 1 claims. (D.I. 384 at 17 ("For all these reasons, Plaintiffs' allegations relating to the introduction of new products and discontinuance of old products, do not state a claim under Section 1 or 2 of the Sherman Act.").) For purposes of this Motion, I will address Defendants' arguments as they have been framed, and I will not separately discuss the different statutory claims.

A. *Antitrust Liability for Product Formulation Changes*

Defendants argue that their conduct in changing the TriCor formulation and implementing the change cannot support an antitrust claim. (D.I. 384 at 8-17.) First, they assert that Plaintiffs have conceded in their complaints that the TriCor formulation changes were improvements, and that any product change that introduces an improvement, however minor, is per se legal under the antitrust laws. (*Id.* at 8.) Thus, according

to Defendants, the antitrust claims based on those formulation changes must be dismissed. Second, Defendants argue that they have not violated the antitrust laws because Teva and Impax have not been completely foreclosed from the fenofibrate market. Third, Defendants argue that they were not required to help their competitors, and so their withdrawal of old TriCor formulations and changes to the NDDF codes do not amount to antitrust violations. Those arguments both fail to state the proper legal standards and mischaracterize Plaintiffs' factual allegations

1. The Appropriate Standard

[1][2] To violate Section 2, a monopolist's conduct "must harm the competitive process and thereby harm consumers. In contrast, harm to one or more competitors will not suffice." *United States v. Microsoft Corp.,* 253 F.3d 34, 58 (D.C.Cir.2001). Thus, conduct must be examined to determine its anticompetitive effect, i.e., the effect on competition itself. *Id.* One of the benefits of competition is the introduction of new, improved products. *See Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 286 (2d Cir.1979) ("The attempt to develop superior products is ... an essential element of lawful competition."); IIIA Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 781a (2d ed.2002) (hereinafter "Areeda") ("[P]roduct superiority is one of the objects of competition ...."). Thus, while improved products may harm the sales of competitors, that harm is an aim and result of appropriate competition. *See* Herbert Hovenkamp, Mark D. Janis & Mark A. Lemley, *IP and Antitrust* § 12.2 (2006) (hereinafter "IP & Antitrust") ("Innovation necessarily disadvantages rivals who do not keep up.").FN11 Even a monopolist may "through technological innovation expand its market share, increase consumer brand identification, or create demand for new products," and such actions are "perfectly consistent with the competitive forces that the Sherman Act was intended to foster." *Foremost Pro Color, Inc. v. Eastman Kodak Co.,* 703 F.2d 534, 546 (9th Cir.1983).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

432 F.Supp.2d 408, 2006-1 Trade Cases P 75,270
**(Cite as: 432 F.Supp.2d 408)**

FN11. I note that one of the authors of IP & Antitrust, Mark A. Lemley, represents Impax in this matter.

**\*421** Because, speaking generally, innovation inflicts a natural and lawful harm on competitors, a court faces a difficult task when trying to distinguish harm that results from anticompetitive conduct from harm that results from innovative competition. "[T]he error costs of punishing technological change are rather high [and] ... [c]ourts should not condemn a product change, therefore, unless they are relatively confident that the conduct in question is anticompetitive." IP & Antitrust § 12.1. If consumers are free to choose among products, then the success of a new product in the marketplace reflects consumer choice, and "antitrust should not intervene when an invention pleases customers." Areeda ¶ 776d. If the new product is not successful, then there will be no significant injury to competitors and no need for antitrust intervention. *Id.* Based on those general principles, the Defendants argue that an antitrust claim premised on the introduction of new products must be supported by evidence that "the innovator knew before introducing the improvement into the market that it was absolutely no better than the prior version, and that the only purpose of the innovation was to eliminate the complementary product of a rival." (D.I. 384 at 10-11 (quoting Areeda ¶ 776d).)

That reasoning was applied in the *Berkey Photo* case, 603 F.2d 263, where the Second Circuit refused to weigh the benefits from Kodak's introduction of a new camera model and film format against the alleged harm from the product introduction, because that weighing had already occurred in the marketplace. 603 F.2d at 286-87. The fact that consumers bought Kodak's new products instead of those of its competitors accurately reflected the value of the new products, "so long as the free choice of consumers [was] preserved." *Id.* at 287. Thus, the Court concluded, the antitrust laws should not intervene. *See id.* ("If a monopolist's products gain acceptance in the market ... it is of no im-

portance that a judge or jury may later regard them as inferior, so long as that success was not based on any form of coercion.").

A major logical underpinning of the Second Circuit's reluctance to inquire into the alleged anticompetitive effect of Kodak's new products was the success of those products in an open market, and the related conclusion that the harm to Kodak's competitors was a matter of consumer choice. *See* Areeda ¶ 781b ("[I]f buyers want it, is an antitrust court entitled to say that buyers should not have it? We doubt that the court has any choice but to accept consumer sovereignty, especially in the absence of any criteria or calculus for deciding otherwise."). Consumers who are free to choose among various products enjoy the presence of competition rather than its absence.

By contrast, when the introduction of a new product by a monopolist prevents consumer choice, greater scrutiny is appropriate. The court in *Berkey Photo* noted that consumers in that case were "not compelled" to purchase the new film, in part because "Kodak did not remove any other films from the market when it introduced the new one." 603 F.2d at 287. Indeed, "the situation [in that case] might be completely different if, upon introduction of the [new] system, Kodak had ceased producing film in the [old] size, thereby compelling camera purchasers to buy [the new] camera." *Id.* at 287 n. 39. In the absence of free consumer choice, the basis for judicial deference is removed.

The D.C. Circuit in the *Microsoft* case, 253 F.3d 34, also recognized that "[a]s a general rule, courts are properly very skeptical about claims that competition has been harmed by a dominant firm's product **\*422** design changes" because such changes are part of competition. 253 F.3d at 65. Nevertheless, that court still concluded that "[j]udicial deference to product innovation ... does not mean that a monopolist's product design decisions are per se lawful." *Id.* In that case, Microsoft's technological integration of its web browser and Windows operating system

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

were subject to antitrust scrutiny, *Id. at 65-67,* and the government was able to show that that integration had an anticompetitive effect, namely that it caused harm "not by making Microsoft's own [web] browser more attractive to consumers but, rather, by discouraging [the distribution of] rival products," *id. at 65.* Once the plaintiff demonstrated that anticompetitive effect, the burden shifted to Microsoft to present a procompetitive justification for its conduct. *Id. at 59, 66-67.* The D.C. Circuit said that, if such a justification were offered, the plaintiff could rebut it or, alternatively, establish antitrust liability by demonstrating that "the anticompetitive harm of the conduct outweighs the procompetitive benefit." *Id. at 59; see also id. at 67.* That balancing approach embodies the familiar "rule of reason" test first articulated by the Supreme Court in *Standard Oil Co. v. United States,* 221 U.S. 1, 61-62, 31 S.Ct. 502, 55 L.Ed. 619 (1911). In the *Microsoft* case, Microsoft presented a procompetitive justification for only a portion of its technological integration, and was liable for the unjustified conduct. *253 F.3d at 66-67.* As to the justified conduct, the government failed to rebut the procompetitive justification or show that it was outweighed by the anticompetitive harm, and so Microsoft was not liable under the Sherman Act. *Id. at 67.*

[3] The nature of the pharmaceutical drug market, as described in Plaintiffs' allegations, persuades me that the rule of reason approach should be applied here as well. The per se standard proposed by Defendants presupposes an open market where the merits of any new product can be tested by unfettered consumer choice. But here, according to Plaintiffs, consumers were not presented with a choice between fenofibrate formulations. Instead, Defendants allegedly prevented such a choice by removing the old formulations from the market while introducing new formulations. Hence, an inquiry into the effect of Defendants' formulation changes, following the rule of reason approach, is justified. *Cf.* IP & Antitrust § 12.5 (inquiry as to product-switching conduct such as

is alleged in this case is justified because that conduct "seems clearly to be an effort to game the rather intricate FDA rules to anticompetitive effect").

Therefore, in this case, an antitrust inquiry into the benefits provided by Defendants' product changes is appropriate. Contrary to Defendants' assertion, Plaintiffs are not required to prove that the new formulations were absolutely no better than the prior version or that the only purpose of the innovation was to eliminate the complementary product of a rival. Rather, as in *Microsoft,* if Plaintiffs show anticompetitive harm from the formulation changes, that harm will be weighed against any benefits presented by Defendants.FN12 *See* 253 F.3d at 59, 66-67.

> FN12. I note the importance of the screening function that is carried out by the need for the antitrust plaintiff to show monopoly power. Only a manufacturer with monopoly power will be subject to the scrutiny under Section 2 discussed here. *See United States v. Dentsply Int'l, Inc.,* 399 F.3d 181, 186 (3d Cir.2005); *Microsoft,* 253 F.3d at 50-51. Defendants do not argue, for purposes of this Motion, that they lack the requisite monopoly power.

***423** 2. Plaintiffs' Allegations Relating to
Product Innovation

In addition to their discussion of the legal standard, Defendants also assert that Plaintiffs have admitted that the new TriCor formulations had significant benefits, namely the new HDL indication for the first tablet formulation and the NFE benefit for the second tablet formulation. According to Defendants, those specific admissions are contrary to Plaintiffs' general allegations that the new formulations were not improvements. (D.I. 384 at 12-13.) Defendants err in two respects. First, as discussed above, Plaintiffs need not prove that the new formulations had absolutely no benefit. Second, the socalled admissions cited by Defendants only state

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that Defendants sought permission from the FDA to include the HDL indication and NFE label changes with the new formulations. Plaintiffs do not concede that those changes accurately reflected actual improvements in the drug. Indeed, they clearly make the opposite contention: that there were no significant medical benefits from the changes. (D.I. 360, Ex. A at ¶¶ 71, 86, 98; C.A. 03-120, D.I. 289 at ¶¶ 33, 59; C.A. 05-340, D.I. 29 at ¶¶ 80, 87-88, 108-09; C.A. 05-340, D.I. 30 at ¶¶ 50, 58-59, 104; C.A. 05-340, D.I. 31 at ¶¶ 51, 62-63, 111; C.A. 05-360, D.I. 24 at ¶¶ 53, 73, 93; C.A. 05-360, D.I. 35 at ¶¶ 47, 70.) Thus, Plaintiffs have made no concessions in this regard that would support dismissal of their claims.

### 3. Foreclosure from the Fenofibrate Market

Defendants next argue that their introduction of new fenofibrate formulations cannot be considered anticompetitive because it has not prevented Teva or Impax from selling fenofibrate. (D.I. 384 at 11-12.) Defendants are correct that, according to Plaintiffs' allegations, Teva and Impax have not been prevented from marketing the formulations that were the subject of their ANDAs, i.e., the old TriCor formulations. If it were true that an antitrust plaintiff had to show that competition were completely foreclosed, then Defendants' argument might have merit. However, that is not the correct legal standard.

[4][5] To show that conduct has an anticompetitive effect, "it is not necessary that all competition be removed from the market. The test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit." *United States v. Dentsply Int'l, Inc.,* 399 F.3d 181, 191 (3d Cir.2005). Competitors need not be barred "from all means of distribution," if they are barred "from the cost-efficient ones." *Microsoft,* 253 F.3d at 64. Here, while Teva and Impax may be able to market their own branded versions of the old TriCor formulations, they cannot provide generic substitutes for the current TriCor formulation, which is alleged to be their

cost-efficient means of competing in the pharmaceutical drug market. That opportunity has allegedly been prevented entirely by Defendants' allegedly manipulative and unjustifiable formulation changes. Such a restriction on competition, if proven, is sufficient to support an antitrust claim in this case.

### 4. Actions Taken to Support the Formulation Changes

Defendants assert (D.I. 384 at 14-17) that the actions they are alleged to have taken in support of the product changes, i.e., withdrawing the old formulations from the market and changing the NDDF codes, fail to support an antitrust claim because, according to Defendants, even a monopolist has "no general duty to aid competitors." (*Id.* at 14 (citing **\*424**_Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP,_ 540 U.S. 398, 411, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004)).) Thus, while Defendants actions may have made it more difficult for Teva and Impax to compete, because those actions blocked generic substitution for TriCor, Defendants argue that they are not required to help Teva and Impax by allowing them to "free-ride on the TriCor brand." (D.I. 384 at 14-17.)

[6] As discussed above, *supra* Section IV.A.1, while a monopolist may compete and is not required to aid its competitors, *see, e.g., Microsoft,* 253 F.3d at 58, "a monopolist is not free to take certain actions that a company in a competitive (or even oligopolistic) market may take, because there is no market constraint on a monopolist's behavior." *LePage's Inc. v. 3M,* 324 F.3d 141, 151-52 (3d Cir.2003) (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 601-04, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985)). Contrary to Defendants' assertion (D.I. 384 at 15), Plaintiffs allege harm to competition rather than simply harm to Teva and Impax. By removing the old products from the market and changing the NDDF code, Defendants allegedly suppressed competition by blocking the introduction of generic fenofibrate. The Court in *Berkey Photo* noted that such con-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

duct, which results in consumer coercion, is potentially anticompetitive. *See* 603 F.2d at 287 & n. 39 (finding no liability but stating that "the situation might be completely different" if the defendant stopped producing old products or removed them from the market). Thus, the allegations of product removal and NDDF code changes, like the allegations related to the product changes themselves, support Plaintiffs' antitrust claims.FN13

> FN13. Defendants also argue (D.I. 384 at 25-26) that Teva's claim that patents were wrongfully listed in the Orange Book (D.I. 360, Ex. A at ¶¶ 183-205, 335-43) must be dismissed. Teva has agreed to drop that claim. (D.I. 404 at 48 n. 16.)

[7] As to the allegations regarding NDDF code changes, Defendants also assert that the changes were commercial speech protected under the First Amendment. (D.I. 384 at 16.) Even if the First Amendment applies, simply raising it as a talisman, as Defendants have done, is insufficient to provide immunity from antitrust scrutiny. The Supreme Court has addressed the issue of First Amendment protection from antitrust liability, stating that "First Amendment rights are not immunized from regulation when they are used as an integral part of conduct which violates a valid statute." *Cal. Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 514, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). Here, the changes in the NDDF code are alleged to be part of the Defendants' anticompetitive scheme, and those changes are an appropriate part of the circumstances to be considered in this case when evaluating Defendants' allegedly unlawful actions.

### B. *Sham Litigation*

[8] Plaintiffs allege that Defendants used patent infringement suits against Teva and Impax to block approval of those parties' ANDAs and prevent generic substitution for TriCor while Defendants were carrying out their product switching scheme. (*E.g.,* D.I. 360, Ex. A at ¶¶

206-26.) A party that pursues litigation is generally immune from antitrust liability for that conduct, because such petitioning activity is protected by the First Amendment. *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 56-57, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) ("*PRE* "); **\*425**E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 136-37, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). The litigant will not be immune, however, if the litigation is a "sham." *PRE,* 508 U.S. at 56, 60, 113 S.Ct. 1920. Accordingly, all the Plaintiffs, except for Impax,FN14 also specifically allege that those lawsuits were sham litigation and, therefore, not immune from antitrust scrutiny. (D.I. 360, Ex. A at ¶¶ 212-26; C.A. 05-340, D.I. 29 at ¶¶ 120-23, 126-46; C.A. 05-340, D.I. 30 at ¶¶ 76-79, 82-102; C.A. 05-340, D.I. 31 at ¶¶ 80-83, 86-88, 92-109; C.A. 05-360, D.I. 24 at ¶¶ 81-85; C.A. 05-360, D.I. 35 at ¶¶ 62-64.) Specifically, those Plaintiffs allege that Defendants pursued those suits without a reasonable basis for claiming infringement (D.I. 360, Ex. A at ¶¶ 212-15; C.A. 05-340, D.I. 29 at ¶¶ 120-23, 126-28; C.A. 05-340, D.I. 30 at ¶¶ 76-79, 82-84; C.A. 05-340, D.I. 31 at ¶¶ 80-83, 86-88; C.A. 05-360, D.I. 24 at ¶ 85; C.A. 05-360, D.I. 35 at ¶ 64), and knowing that some of the patents asserted were unenforceable due to inequitable conduct before the PTO (D.I. 360, Ex. A at ¶¶ 218-22; C.A. 05-340, D.I. 29 at ¶¶ 129-46; C.A. 05-340, D.I. 30 at ¶¶ 85-102; C.A. 05-340, D.I. 31 at ¶¶ 92-109; C.A. 05-360, D.I. 24 at ¶¶ 83-84; C.A. 05-360, D.I. 35 at ¶ 63).

> FN14. The pertinent allegations of Impax in support of its claim of an overall anticompetitive scheme are discussed separately, *infra* Section IV.C.

[9] Litigation is a sham, and therefore not immune under the antitrust laws, if it satisfies a two-part test:

First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

reasonably calculated to elicit a favorable out-come, the suit is immunized under *Noerr,* and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals an attempt to interfere *directly* with the business relationships of a competitor, through the use of the governmental *process*-as opposed to the *outcome* of that process-as an anticompetitive weapon.

*PRE, 508 U.S. at 60-61, 113 S.Ct. 1920* (internal quotation marks and citations omitted). Under that test, the intent of the parties in pursuing litigation is irrelevant unless the litigation is objectively unreasonable. *Id. at 62, 113 S.Ct. 1920.* Objective reasonableness is equivalent in this context to the existence of probable cause to sue, and "[t]he existence of probable cause to institute legal proceedings precludes a finding that an antitrust defendant has engaged in sham litigation." *Id.* "Probable cause ... requires no more than a reasonable belief that there is a chance that a claim may be held valid upon adjudication." *Id. at 62-63, 113 S.Ct. 1920* (internal citation and quotation marks omitted).

[10] According to Defendants, the undisputed facts demonstrate that they had probable cause to bring the four patent infringement suits against Teva and Impax based on the capsule and tablet ANDA filings. Accordingly, they assert that they are immune from antitrust liability for pursuing those suits. (D.I. 384 at 17-25.) Because the facts that Defendants point to do not demonstrate probable cause in the face of Plaintiffs' allegations, which I must accept as true in the context of this Motion to Dismiss, the sham litigation claims will not be dismissed.

### 1. Probable Cause for Alleging Infringement

For both sets of lawsuits, Defendants are alleged to have proceeded without a **\*426** reasonable basis for asserting that the accused products in-

fringed their patents. Teva, the Direct Purchasers, and the Indirect Purchasers all allege that Defendants pursued the Tablet Litigation without testing the accused generic products to determine whether they included the elements claimed by the asserted patent claims. As to the Capsule Litigation, the Direct Purchasers also allege that Defendants knew that their infringement position depended on an objectively unreasonable claim construction.

Defendants first argue (D.I. 384 at 20-21) that they were not required to carry out any particular testing of an accused product, so long as they did conduct "a good faith, informed comparison of the claims of [their] patent[s] against the accused subject matter." *Q-Pharma Inc. v. Andrew Jergens Co., 360 F.3d 1295, 1302 (Fed.Cir.2004).* However, Plaintiffs' allegation is precisely that Defendants failed to carry out such a comparison. Thus, Defendants' assertion is contrary to the allegations, viewed in the light most favorable to Plaintiffs, and cannot support the Motion to Dismiss.

In response to the Direct Purchasers' allegation concerning the Capsule Litigation, Defendants contend (D.I. 384 at 24-25) that the mere fact that they lost those suits on summary judgment, because of a losing claim construction argument, does not demonstrate that they had no probable cause to make that argument. Indeed, they emphasize, "when the antitrust defendant has lost the underlying litigation, a court must resist the understandable temptation to engage in post hoc reasoning by concluding that an ultimately unsuccessful action must have been unreasonable or without foundation." *PRE, 508 U.S. at 60 n. 5, 113 S.Ct. 1920* (internal citation and quotation marks omitted). However, while the fact that the Defendants lost may not be sufficient on its own to prove that the suit was baseless, neither does that fact contradict the Direct Purchasers' allegation that the suit was baseless. Defendants point to nothing in the published opinions that establishes as a matter of law that Defendants had probable cause to bring suit. Thus, those opinions, standing alone,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

432 F.Supp.2d 408, 2006-1 Trade Cases P 75,270
**(Cite as: 432 F.Supp.2d 408)**

provide no basis to dismiss the Direct Purchasers' claim.

### 2. Summary Judgment Opinion

As to the allegations based on the Tablet Litigation, Defendants argue that I may take judicial notice of the summary judgment opinion I issued, which, according to Defendants, demonstrates that there was probable cause to bring those suits. (D.I. 384 at 19-20.) However, Defendants point to nothing in that opinion that establishes as a matter of law that Defendants had probable cause to bring suit. Given Plaintiffs' allegations concerning the lack of a good faith infringement analysis and the knowing assertion of unenforceable patents, factual issues which are not addressed in the opinion relied on by Defendants, I will not dismiss the present claims at the pleading stage.

### 3. Inequitable Conduct

Again regarding the Tablet Litigation, Plaintiffs allege that Defendants knew that the patents-in-suit were unenforceable for inequitable conduct and, despite that knowledge, continued to pursue the litigation. Defendants respond, first, that inequitable conduct cannot be the basis for a sham litigation claim, and second, that Plaintiffs' allegations improperly depend on the subjective knowledge of Defendants rather than the objective reasonableness of the patent infringement suits. (D.I. 384 at 21-23.) Both of those arguments fail.

First, in support of their argument that sham litigation may not be based on inequitable**427** conduct, Defendants assert that the Supreme Court has specifically addressed the issue of antitrust liability arising from the enforcing of patents obtained by fraud. (*Id.* at 21-22.) In *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 176-77, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), the Court held that the maintenance and enforcement of a patent obtained "by knowingly and willfully misrepresenting facts to the Patent Office" may be the

basis of monopolization claims under Section 2. Because the Court in *Walker Process* required intentional fraud to form the basis for antitrust liability, *id. at 177, 86 S.Ct. 347,* Defendants reason that inequitable conduct alone, which covers a wider range of conduct, is not sufficient to support a *Walker Process* claim. *Argus Chem. Corp. v. Fibre Glass-Evercoat Co.*, 812 F.2d 1381, 1384 (Fed.Cir.1987). "Simply put, *Walker Process* fraud is a more serious offense than inequitable conduct." *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1070 (Fed.Cir.1998). Thus, Defendants argue, allowing inequitable conduct to be the basis for a sham litigation claim, which would strip the antitrust immunity from Defendants' litigation conduct, would allow Plaintiffs to improperly circumvent the intentional fraud requirement set forth in *Walker Process.*

However, the conduct sufficient to show that Defendants had no reasonable basis to bring suit need not be the same as that required to support a *Walker Process* claim. In *PRE,* the Supreme Court noted, referring to *Walker Process,* that it was not deciding "whether and, if so, to what extent *Noerr* permits the imposition of antitrust liability for a litigant's fraud or other misrepresentations." 508 U.S. at 61 n. 6, 113 S.Ct. 1920. According to the Federal Circuit [FN15]:

> FN15. "[W]hether conduct in procuring or enforcing a patent is sufficient to strip a patentee of its immunity from the antitrust laws is to be decided as a question of Federal Circuit law." *Nobelpharma,* 141 F.3d at 1068.

*PRE* and *Walker Process* provide alternative legal grounds on which a patentee may be stripped of its immunity from the antitrust laws; both legal theories may be applied to the same conduct. Moreover, we need not find a way to merge those decisions. Each provides its own basis for depriving a patent owner of immunity from the antitrust laws; either or both may be applicable to a particular party's conduct in obtaining and enforcing a patent. The Supreme

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Court saw no need to merge these separate lines of cases and neither do we.

*Nobelpharma,* 141 F.3d at 1071. For a sham litigation claim, "[i]n contrast with a *Walker Process* claim, a patentee's activities in procuring the patent are not necessarily at issue. It is the bringing of the lawsuit that is subjectively and objectively baseless that must be proved." *Id.* at 1072. Therefore, contrary to Defendants' assertion, a sham litigation claim based on inequitable conduct is not an end-run around the requirements of *Walker Process;* it is, instead, a different claim, predicated on the objective and subjective reasonableness for bringing the lawsuit, rather than on the conduct before the Patent Office. Either theory may be used to overcome *Noerr* immunity.FN16

> FN16. While the difference between *Walker Process* and sham litigation liability may be "somewhat elusive," Areeda ¶ 706a, at 187, a patentee might use a fraudulently obtained patent in an anti-competitive way without litigation, or conversely, the patentee may bring litigation that is objectively baseless for reasons other than fraud, including inequitable conduct. *Id.* at 187-88, 86 S.Ct. 347.

Defendants also argue that Plaintiffs' allegations of sham litigation are based on **\*428** Defendants' subjective knowledge of inequitable conduct, which skips the necessary first step of examining whether the suits were objectively baseless. (D.I. 384 at 22-23.) That argument again mischaracterizes Plaintiffs' allegations, which state that any reasonable litigant in Defendants' position, knowing that the patents were unenforceable, would not have pursued the litigation. The objective prong of the *PRE* test requires an inquiry into the reasonableness of the belief that the litigation will be successful on the merits. *PRE,* 508 U.S. at 60, 62-63, 113 S.Ct. 1920. By contrast, the subjective prong of the test does not inquire into that belief, but looks rather at whether Defendants intended to use the litigation process to harm competitors. *Id.* at 60-61, 113 S.Ct. 1920. Plaintiffs' allega-

tions concerning the objective prong necessarily include the information about inequitable conduct that was available to Defendants when they decided to pursue the lawsuits. Contrary to Defendants' argument, those allegations relate to the objective reasonableness of pursuing those lawsuits and not solely to Defendants' subjective motivation.

Therefore, because the complaints adequately allege sham litigation, the Motion will be denied as to the sham litigation claims.

### C. *Allegations of an Overall Scheme to Monopolize*

[11] Defendants argue that Plaintiffs' allegations of an overall scheme to monopolize fall to state a claim, because, if liability is not found based on individual acts, then none can be found on the acts taken together. (D.I. 384 at 29.) That argument is contrary to the law. When determining antitrust liability based on a collection of factual allegations, "the courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation." *LePage's,* 324 F.3d at 162 (citing *Cont'l Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962)); *see also* *City of Anaheim v. S. Cal. Edison Co.,* 955 F.2d 1373, 1376 (9th Cir.1992) ("[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect ... We are dealing with what has been called the 'synergistic effect' of the mixture of the elements."). Thus, Plaintiffs are entitled to claim that individual acts are antitrust violations, as well as claiming that those acts as a group have an anticompetitive effect even if the acts taken separately do not.

Defendants also argue that litigation conduct that is immune under *Noerr* cannot be included in the collection of facts used to support an overall scheme claim. (D.I. 384 at 29-30.) As discussed above, *supra* Section IV.B, the sham litigation allegations are sufficient to survive

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Defendants' Motion, so, for those plaintiffs that have alleged sham litigation, their allegations of an overall scheme properly include the litigation conduct. Thus, for Teva, the Direct Purchasers, and the Indirect Purchasers, the overall scheme allegations based on litigation conduct survive this Motion.

One plaintiff, Impax, has not alleged sham litigation. Impax argues, however, that even though that litigation may be immune under *Noerr,* it may still be relied on as part of a claim based on an overall scheme. (C.A. 03-120, D.I. 313 at 14.) To support that proposition, Impax, as well as Teva and Pacificare, cite several cases. (*Id.;* D.I. 404 at 34-36; C.A. 05-360, D.I. 69 at 28-29.) The primary source for the proposition that even good faith litigation may be considered as part of an overall scheme appears to be **\*429***Kobe, Inc. v. Dempsey Pump Co.,* 198 F.2d 416, 425 (10th Cir.1952).* In that case, the Tenth Circuit held that patent litigation, brought with the belief that patents were infringed, which "standing alone would not be sufficient to sustain a claim" under the antitrust laws, may still be "considered with [an] entire monopolistic scheme." *Id.* That decision focused on the "real purpose" behind the litigation, which was "to further the existing monopoly and to eliminate [the other party] as a competitor." *Id.*

Three cases cited by Impax, Teva, and Pacificare mention *Kobe.* First, the Federal Circuit cited *Kobe* for the proposition that "patent owners may incur antitrust liability ... where there is an overall scheme to use the patent to violate antitrust laws." *Atari Games Corp. v. Nintendo of Am., Inc.,* 897 F.2d 1572, 1576-77 (Fed.Cir.1990).* However, the court did not consider that theory or rely on it to support its decision to reverse the grant of a preliminary injunction; instead, the Federal Circuit merely cites *Kobe* in a list of possible bases for liability, without further discussion. Second, the Ninth Circuit recited the conclusion of *Kobe,* but it then went on to distinguish it. *Handgards, Inc. v. Ethicon, Inc.,* 601 F.2d 986, 994 (9th Cir.1979).* In the third case, a District Court in a

passage of dicta cited *Kobe* to support its conclusion that evidence concerning litigation was admissible to prove an overall scheme. *ID Sec. Sys. Can., Inc. v. Checkpoint Sys., Inc.,* 249 F.Supp.2d 622, 656 (E.D.Pa.2003).* Thus, *Atari, Handgards,* and *ID Security* support Plaintiffs' position only to the extent that they cite *Kobe.*

The other cases cited by Plaintiffs do not support their proposition that immunized litigation may be considered as part of an overall scheme. First, while the Supreme Court has stated, as quoted by Teva (D.I. 404 at 35), that "[i]t is well settled that First Amendment rights [e.g., the right to petition] are not immunized from regulation when they are used as an integral part of conduct which violates a valid statute," *Cal. Motor Transp.,* 404 U.S. at 514, 92 S.Ct. 609* the Court went on to apply the *Noerr* standard and found that the complaint in that case stated a claim only after concluding that the plaintiffs' allegations were "within the 'sham' exception in the *Noerr* case," *id. at 516, 92 S.Ct. 609.* Accordingly, that case does not support liability when the predicate litigation is not a sham. Finally, the decisions in *United States v. Singer Manufacturing Co.,* 374 U.S. 174, 194-95, 83 S.Ct. 1773, 10 L.Ed.2d 823 (1963)* and *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau,* 690 F.2d 1240, 1263-64 (9th Cir.1982)* state that an unlawful agreement, *Singer,* 374 U.S. at 194-95, 83 S.Ct. 1773,* or an unlawful overall scheme, *Clipper Exxpress,* 690 F.2d at 1263-64,* do not become lawful because they may be enforced by immunized litigation. In other words, the immunized litigation does not immunize other conduct. *See Clipper Exxpress,* 690 F.2d at 1265* ("If [the plaintiff] can prove that the defendants engaged in activities which violated the antitrust laws, those violations do not become immune simply because the defendants used legal means ... to enforce the violations.").

Thus, Plaintiffs' position ultimately depends on *Kobe* for support. However, the holding in *Kobe,* which predates *Noerr,* is contrary to more recent pronouncements by the Supreme Court

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

concerning *Noerr* immunity. First, the Tenth Circuit's focus on the "real purpose" behind the litigation is contrary to the Supreme Court's holding in *PRE* that "only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation." 508 U.S. at 60, 113 S.Ct. 1920. Second, and more fundamentally, the proposition that litigation with an objective basis may nevertheless be part of an overall scheme **\*430** to monopolize is contrary to the Supreme Court's statement that such immunized conduct cannot form the basis for antitrust liability "either standing alone or as part of a broader scheme ...." *United Mine Workers of Am. v. Pennington,* 381 U.S. 657, 670, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). The holding in *Kobe* must therefore yield to the Supreme Court's interpretation of *Noerr* immunity. That interpretation is also reflected in the Federal Circuit's statement that "a patent owner who brings suit to enforce [a patent] is exempt from the antitrust laws, even though such a suit may have an anticompetitive effect, unless the infringement defendant proves ... [*Walker Process* fraud or sham litigation]." *In re Indep. Serv. Orgs. Antitrust Litig.,* 203 F.3d 1322, 1326 (Fed.Cir.2000). No provision is made for liability predicated on immune litigation as part of an alleged overall scheme to violate antitrust laws.

[12] Therefore, Plaintiffs may not use litigation conduct to support a claim of an overall scheme to monopolize if they cannot prove that the litigation was a sham.[FN17] On the current state of the pleadings, Impax, in particular, may not use Defendants' conduct in the Tablet Litigation because Impax fails to allege sham litigation. However, because Impax's other allegations unrelated to litigation survive this Motion, its overall scheme claim also survives based on those allegations.

> FN17. If the antitrust plaintiff can prove the existence of sham litigation, the litigation
> conduct can be included in the mix of things alleged to violate the antitrust laws. If not, the antitrust claim can still

be heard on the merits, but without the sham litigation allegations. In this way, courts avoid the risk of such mixed allegations being used as a subterfuge to avoid the stringent requirements of *Walker Process* or *Noerr* immunity.
IP & Antitrust § 11.4f.

### D. *Antitrust Injury*

[13] Antitrust plaintiffs not only must prove an antitrust violation, injury, and causation, they also must show that the injury they have sustained is an antitrust injury, "which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Antitrust injury "should reflect the anticompetitive effect either of the violation or of the anticompetitive acts made possible by the violation." *Id.*

#### 1. *Walker Process* Claims

[14] Defendants make two arguments concerning antitrust injury, one for the *Walker Process* claims and a second for the sham litigation claims. First, as to the *Walker Process* claims, Defendants argue (D.I. 384 at 27-29) that the claims based on *Walker Process* fraud for the '881 patent must be dismissed because adding that patent to the Tablet Litigation did not result in an additional thirty-month stay and, therefore, Plaintiffs have not adequately pleaded antitrust injury from the enforcement of the '881 patent alone. While that argument has superficial appeal, it fails on closer examination. The *Walker Process* claims are of two types. First, Plaintiffs each allege an overall scheme to monopolize that includes the fraudulent conduct. Second, Teva makes a separate Section 2 claim based on the fraud in procuring the '881 patent.

[15] For the first type of claim, Defendants' argument fails because the presence of an antitrust injury must be determined after considering Defendants' conduct as a whole. As discussed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

432 F.Supp.2d 408, 2006-1 Trade Cases P 75,270
**(Cite as: 432 F.Supp.2d 408)**

above, *supra* Section IV.C, "the courts must look to the monopolist's**431** conduct taken as a whole rather than considering each aspect in isolation." *LePage's,* 324 F.3d at 162 (citing *Cont'l Ore,* 370 U.S. at 699, 82 S.Ct. 1404). Since the claim depends on proof of the anti-competitive effect of the conduct as a whole, the question of antitrust injury should also be based on that conduct as a whole. *SmithKline Beecham Corp. v. Apotex Corp.,* 383 F.Supp.2d 686, 699-703 (E.D.Pa.2004); *Biovail Corp. Int'l v. Hoechst Aktiengesellschaft,* 49 F.Supp.2d 750, 760 (D.N.J.1999). Defendants do not argue that Plaintiffs have failed to allege antitrust injury for their overall scheme claims taken as a whole.

For Teva's separate *Walker Process* claim (D.I. 360, Ex. A at ¶¶ 344-55), Defendants' argument also fails, because in support of that claim, Teva has alleged that it was excluded from the fenofibrate market while the Tablet Litigation remained unresolved. The assertion made by Teva and Impax (C.A. 03-120, D.I. 313 at 5) FN18 that the '881 litigation, based on a patent allegedly obtained by fraud, delayed resolution of the Tablet Litigation is consistent with those allegations. FN19 Such exclusion from the market is "precisely the type of injury that the antitrust laws were intended to prevent," because it reflects an injury to competition. *Biovail,* 49 F.Supp.2d at 772. Thus, Teva has adequately alleged antitrust injury for that claim as well. FN20

> FN18. That assertion, made by Impax in opposition to this Motion, is joined by Teva. (D.I. 404 at 2 n. 1.)

> FN19. Attorneys' fees resulting from the addition of the '881 suit may also be an appropriate antitrust injury, although that proposition appears to be controversial. *Compare Bristol-Myers Squibb Co. v. Ben Venue Labs.,* 90 F.Supp.2d 540, 543-46 (D.N.J.2000) (fees may be antitrust injury) *with Brotech Corp. v. White Eagle Int'l Techs. Group, Inc.,* No.

Civ.A.03-232, 2004 WL 1427136, at *6-*7 (E.D.Pa. June 21, 2004) (fees alone are not antitrust injury). Because the delayed market entry is sufficient injury, I need not decide, for purposes of this Motion, whether attorneys' fees are also an antitrust injury.

> FN20. Defendants argue (D.I. 384 at 28) that Impax has also failed to plead antitrust injury from a free-standing *Walker Process* claim, but, as Impax correctly points out (C.A. 03-120, D.I. 313 at 7), it does not make such a claim.

### 2. Sham Litigation Claims

Defendants' second argument concerning antitrust injury is that, assuming the '405 patent lawsuit was not a sham, Plaintiffs have failed to plead antitrust injury for the sham litigation claims based on the other lawsuits. (D.I. 384 at 29.) That argument fails because I have already concluded, *supra* Section IV.B, that the sham litigation claims, including those concerning the '405 patent, are not subject to dismissal at this stage.

### E. *Allegations of Joint Conduct*

Plaintiffs' claims are directed at both Abbott and Fournier. Defendants argue (D.I. 384 at 31-38) that because some of those claims are only pleaded adequately as to one of the two Defendants, they must be dismissed as to the other. Defendants argue, first, that the pleadings are insufficient to support claims of *Walker Process* fraud and allegations of inequitable conduct against Abbott, and second, that the they are insufficient to support the product-switching claims against Fournier.

### 1. Allegations Against Abbott

Defendants are correct that the *Walker Process* and inequitable conduct allegations must be pleaded with particularity according to Federal Rule of Civil Procedure 9(b), because they are varieties of fraud. **432***Unitherm Food Sys., Inc.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*v. Swift- Eckrich, Inc.,* 375 F.3d 1341, 1358 (Fed.Cir.2004) (*Walker Process* claims); *EMC Corp. v. Storage Tech. Corp.,* 921 F.Supp. 1261, 1263 (D.Del.1996) (inequitable conduct claims). Rule 9(b) requires that "the circumstances constituting fraud or mistake shall be stated with particularity." Knowledge, however, "may be averred generally." Fed.R.Civ.P. 9(b).

[16] Defendants do not argue that the allegations of Fournier's conduct before the PTO are insufficient to support the claims of fraud and inequitable conduct. Rather, they argue that nothing in those factual allegations implicates Abbott. (D.I. 384 at 32-36.) It is true that a plaintiff "cannot sue multiple defendants for fraud merely by alleging fraud with particularity as to one defendant." *Sandvik AB v. Advent Int'l Corp.,* 83 F.Supp.2d 442, 448 (D.Del.1999). Thus, the complaints must allege Abbott's conduct with sufficient particularity to support the claims against it.

[17] Plaintiffs' complaints are sufficient to support the *Walker Process* claims against Abbott. A *Walker Process* claim may be made against a party that knowingly enforces a patent procured by fraud on the PTO, even if that party did not itself prosecute the patent. *Walker Process,* 382 U.S. at 177 n. 5, 86 S.Ct. 347; *Nobelpharma,* 141 F.3d at 1062, 1067-68. Thus, to adequately plead that claim, Plaintiffs must allege that Abbott knew that the '881 patent was obtained by fraud and still asserted that patent against Teva and Impax. Plaintiffs have done so. Indeed, they allege that Abbott and Fournier worked together in the prosecution of the fenofibrate patents, that Abbott knew that the '881 patent was obtained by fraud, and that an Abbott employee received from Fournier the technical report that allegedly was fraudulently withheld from the PTO. (D.I. 360, Ex. A at ¶¶ 105-82; C.A. 03-120, D.I. 289 at ¶¶ 73-103.) Abbott's knowledge, combined with its pursuit of litigation against Teva and Impax, is sufficient to support the *Walker Process* fraud allegations.

In support of their overall scheme claim, and in

particular with respect to their sham litigation allegation, the Direct Purchasers allege that "Defendants were guilty of inequitable conduct in obtaining the '881 patent." (C.A. 05-340, D.I. 29 at ¶ 129; C.A. 05-340, D.I. 30 at ¶ 85; C.A. 05-340, D.I. 31 at ¶ 92.) Again, Defendants argue that no factual allegations in that complaint implicate Abbott because they all concern Fournier's conduct before the PTO. That is indeed the case. However, each of those allegations also states that Defendants knew about the inequitable conduct (C.A. 05-340, D.I. 29 at ¶ 129; C.A. 05-340, D.I. 30 at ¶ 85; C.A. 05-340, D.I. 31 at ¶ 92), and each is made to support the contention that Defendants had no reasonable basis to bring and maintain the Tablet Litigation. (C.A. 05-340, D.I. 29 at ¶ 145-46; C.A. 05-340, D.I. 30 at ¶¶ 101-02; C.A. 05-340, D.I. 31 at ¶¶ 108-09.) Both Abbott and Fournier pursued that litigation, and the reasonableness of Abbott's belief in its merits is relevant, whether or not Abbott was directly communicating with the PTO. Thus, while the specific allegation that "Defendants were guilty of inequitable conduct in obtaining the '881 patent" must be understood as implicating only Fournier, that does not justify dismissing the claim against Abbott, because Abbott allegedly knew of the inequitable conduct, which in turn rendered the patents unenforceable and made enforcement efforts wrongful. FN21

> FN21. Abbott alternatively argues that the allegations be stricken pursuant to Rule 12(f) as to Abbott. (D.I. 384 at 36.) Rule 12(f) motions to strike are "not favored and usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties or if the allegations confuse the issues.... It is thus a drastic remedy to be resorted to only when required for the interests of justice." *Plaum v. Jefferson Pilot Fin. Ins. Co.,* No. Civ.A.04-4597, 2004 WL 2980415, at *2 (E.D.Pa. Dec.22, 2004). For the *Walker Process* claim, the plead-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ings adequately support the claim and will not be stricken. I will also not strike the Direct Purchasers' inequitable conduct allegation, because it is fairly read to support the claim against Abbott.

**\*433** 2. Allegations Against Fournier

According to Defendants, the complaints show that the decisions concerning the changes in product formulations, the availability of old formulations, and the NDDF listing were made by Abbott. (D.I. 384 at 36-38.) However, Plaintiffs have alleged that Abbott and Fournier worked together in the alleged scheme of changing the fenofibrate formulations, obtaining patents covering those products, enforcing those patents against Teva and Impax, and ensuring that old formulations were no longer available for generic substitution. Contrary to Defendants' assertion, those are not "blanket" allegations that fail to meet the pleading requirements of Rule 8. (*Id.* at 37 (citing *Mountain View Pharm. v. Abbott Labs., 630 F.2d 1383, 1387-88 (10th Cir.1980)* (finding that pleadings that failed to give notice of which of 28 defendants were involved in conduct were inadequate)).) Thus, the claims against Fournier will not be dismissed.[FN22]

FN22. Fournier also moves alternatively for allegations to be stricken pursuant to Rule 12(f). Because the allegations support the antitrust claims against Fournier, I will not strike any of those allegations. *See supra* note 21.

F. *State Law Claims*

Defendants briefly argue that the remaining claims for tortious interference, state law antitrust violations, and unfair competition and fraud violations must also be dismissed for failure to state a claim. Each of those arguments fails.

[18] First, as to the tortious interference claims, Defendants argue that Plaintiffs must, in their complaints, identify specific relationships that have been disrupted. (D.I. 384 at 30-31.)

However, Defendants provide no support for that contention, instead citing to cases where courts granted summary judgment because of a failure to prove the existence of any such relationships. (*Id.* at 31 (citing *Lucent Info. Mgmt. v. Lucent Techs., 5 F.Supp.2d 238, 243 (D.Del.1998); Kirkwood Kin Corp. v. Dunkin' Donuts, Inc., No. 94C-03-189, 1995 WL 411319, at \*9 (Del.Super.Ct. June 30, 1995)*).) Contrary to Defendants' argument, it has been held in an antitrust case similar to this that the "allegation that [the defendant] brought a sham patent infringement suit against [the plaintiff] with the purpose of keeping it out of the generic [drug] market [was] sufficient to state a claim for tortious interference with prospective business advantages." *SmithKline, 383 F.Supp.2d at 704.* Therefore, the tortious interference claims will not be dismissed.

Second, as to the state law antitrust claims, Defendants assert that those claims "generally follow the standards and precedents of the federal antitrust laws and should be dismissed for the same reasons" as set forth for the federal claims. (D.I. 384 at 38.) Even if that assertion is correct, I have already concluded, *supra* Sections IV.A-IV.E, that the federal claims will not be dismissed, and so, for the same reasons, neither will the state law claims.

Third, for the unfair competition and fraud claims, Defendants argue that such claims "generally require some level of **\*434** consumer deception or fraud," and that Plaintiffs have failed to allege fraud. (D.I. 384 at 38-39.) Defendants' general argument, with citations to decisions based on three of the fifty-one consumer protection laws asserted by Plaintiffs, fails to show that the claims should be dismissed. As the Indirect Purchasers note, under Delaware law, for example, the plaintiff need not prove all the elements of common law fraud. (C.A. 05-360, D.I. 70 at 23 (citing *Stephenson v. Capano Dev., Inc., 462 A.2d 1069, 1074 (Del.1983)*).) Also, Plaintiffs have alleged that the NDDF codes were deceptively changed and that patents were obtained through fraud. De-

fendants have failed to demonstrate that such allegations are insufficient under any statute. Therefore, the claims will not be dismissed.

### V. CONCLUSION

Accordingly, based on the foregoing reasons and authorities, I will deny the Consolidated Motion to Dismiss. An appropriate order will follow.

### *ORDER*

For the reasons set forth in the Memorandum Opinion issued in this matter today,

IT IS HEREBY ORDERED that the Consolidated Motion to Dismiss (C.A. 02-1512, D.I. 383; C.A. 02-1512, D.I. 429; C.A. 03-120, D.I. 294; C.A. 05-340, D.I. 38; C.A. 05-360, D.I. 39) is DENIED.

D.Del.,2006.
Abbott Laboratories v. Teva Pharmaceuticals USA, Inc.
432 F.Supp.2d 408, 2006-1 Trade Cases P 75,270

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# **<u>Exhibit D</u>**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ABBOTT LABORATORIES, an Illinois corporation, FOURNIER INDUSTRIE ET SANTÉ, a French corporation, and LABORATOIRES FOURNIER S.A., a French corporation, <br><br>                Plaintiffs, <br><br>       v. <br> TEVA PHARMACEUTICALS USA, Inc., a Delaware corporation, <br>                Defendant, | C.A. No. 02-1512 (KAJ) <br> (consolidated) |
| TEVA PHARMACEUTICALS USA, Inc., a Delaware corporation, and TEVA PHARMACEUTICAL INDUSTRIES LTD., an Israeli corporation, <br><br>       Counterclaim Plaintiffs, <br><br>       v. <br> ABBOTT LABORATORIES, an Illinois corporation, FOURNIER INDUSTRIE ET SANTÉ, a French corporation, and LABORATOIRES FOURNIER S.A., a French corporation, <br><br>       Counterclaim Defendants, | |
| ABBOTT LABORATORIES, an Illinois corporation, FOURNIER INDUSTRIE ET SANTÉ, a French corporation, and LABORATOIRES FOURNIER S.A., a French corporation, <br><br>       Plaintiffs, <br><br>       v. <br> IMPAX LABORATORIES, INC., a Delaware corporation <br><br>       Defendant. | C.A. No. 03-120 (KAJ) <br> (Consolidated) |

## SCHEDULING ORDER

This 27th day of October, 2005, the Court having conducted an initial Rule 16 scheduling and planning conference pursuant to Local Rule 16.2(a) on July 27, 2005, and the parties having determined after discussion that the matter cannot be resolved at this juncture by settlement, voluntary mediation, or binding arbitration;

IT IS ORDERED that:

1.    Rule 26(a)(1) Initial Disclosures.   Unless otherwise agreed to by the parties, the parties shall make their initial disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1) by September 15, 2005.

2.    Production of Patent Litigation Materials.   By August 31, 2005, Teva and Impax will allow access to all prior discovery in this case to the parties in the litigation referred to as In re TriCor Direct Purchaser Antitrust Litigation and In re TriCor Indirect Purchaser Antitrust Litigation (hereinafter the "Purchaser Actions").  Those materials shall be treated in the Purchaser Actions in accordance with Local Rule 26.2 until an appropriate protective order is entered in those actions.

3.    Amendment of Pleadings and Rule 12 Briefing Schedule.   All parties shall file first amended counterclaims, if they intend to do so, by no later than September 23, 2005.  Thereafter, the following briefing schedule applies to any motions to dismiss to be filed against those pleadings under Rule 12:

| | | |
|---|---|---|
| a. | Opening briefs filed: | October 19, 2005 |
| b. | Responding briefs filed: | December 2, 2005 |
| c. | Reply briefs filed | December 22, 2005 |

2

Discovery is not stayed, and the pendency of any potentially dispositive motions, under Rule 12 or otherwise, shall not relieve any party of its obligations to respond to discovery requests and produce responsive discovery in a timely manner.

    4.    <u>Joinder of Other Parties and Amendment of Pleadings</u>. All subsequent motions to join other parties, and to amend or supplement the pleadings further shall be filed on or before April 1, 2006.

    5.    <u>Discovery</u>

    a.    <u>Document Production</u>. Any party may serve document requests on or after September 1, 2005. As to any document requests served on or before October 1, 2005, production of responsive documents shall be completed by February 15, 2006. The existence of the February 15, 2006 deadline is not a ground for undue delay in producing documents prior to February 15. Nothing in this paragraph shall preclude a party from serving document requests at any time, so long as the timing of those requests is consistent with the discovery deadlines set forth in Paragraphs 5f and 5g below. The deadlines in the Paragraph 5a do not apply to the production contemplated in Paragraph 5b below.

    b.    <u>Production of Documents Submitted to the FTC</u>. Any party that has submitted documents to the United States Federal Trade Commission ("FTC"), whether voluntarily or pursuant to compulsory process, in connection with the FTC investigation identified as Abbott Laboratories, File 005-0124, shall produce those documents to all other parties, including the parties to the Purchaser Actions. Production of such documents shall begin immediately upon entry of this order. All documents submitted to the FTC as of August 1, 2005, shall be produced in this litigation by no later

3

than September 15, 2005, and any additional documents shall be produced within twenty-one days after they are submitted to the FTC, but no earlier than September 15, 2005. Documents to be produced shall include all correspondence to or from the FTC concerning the document submissions and all logs concerning the documents. The FTC documents shall be treated in the Purchaser Actions in accordance with Local Rule 26.2 until an appropriate protective order is entered in those actions.

   c. Location of Depositions. Any party or representative (officer, director, or managing agent) of a party filing a civil action in this district court must ordinarily be required, upon request, to submit to a deposition at a place designated within this district. Exceptions to this general rule may be made by order of the Court. A defendant who becomes a counterclaimant, cross-claimant, or third-party plaintiff shall be considered as having filed an action in this Court for the purpose of this provision. Notwithstanding the general rule, and without waiving any party's right to require that depositions be held in this district and be taken in accordance with the procedures set forth in the Federal Rules, the parties will cooperate to schedule depositions in locales that are practical given the locations (which include foreign countries) and schedules of the witnesses.

   d. Timing of Depositions. No depositions in this matter shall be noticed to occur prior to January 16, 2006.

   e Other Fact Discovery. Any party may serve interrogatories, requests to admit, or any other request for written discovery on or after September 1, 2005.

4

f.     Fact Discovery Cut Off. All fact discovery in this case shall be initiated so that it will be completed on or before October 31, 2006. Unless otherwise ordered by the Court, the limitations on discovery set forth in Local Rule 26.1 shall be strictly observed.

g.     Expert Testimony. Any party bearing the burden of proof on any issue shall file its initial Federal Rule of Civil Procedure 26(a)(2) disclosures of expert testimony concerning that issue on or before December 15, 2006. Any party may file an opposing expert report to contradict or rebut evidence on the same subject matter identified by another party on or before January 30, 2007. Any party filing an initial expert report shall be entitled to file a reply report on or before February 28, 2007. Expert depositions shall be completed by March 30, 2007. To the extent any objection to expert testimony is made pursuant to the principles announced in Daubert v. Merrell Dow Pharm., Inc. 509 U.S. 579 (1993), it shall be made by motion no later than the deadline for dispositive motions set forth herein, unless otherwise ordered by the Court.

h.     Discovery Disputes. Should counsel find they are unable to resolve a discovery dispute, the party seeking the relief shall contact chambers at (302) 573-6001 to schedule a telephone conference, and shall notify all other parties on the same day that is has done so. Not less than forty-eight hours prior to the conference, the party seeking relief shall file with the Court a letter, not to exceed three pages, outlining the issues in dispute and its position on those issues. (The Court does not seek extensive argument or authorities at this point; it seeks simply a statement of the issue to be addressed and or summary of the basis for the party's position on the issue.) Not less than twenty-four hours prior to the conference, any party opposing the application for

5

relief may file a letter, not to exceed three pages, outlining that party's reasons for its opposition. Should the Court find further briefing necessary upon conclusion of the telephone conference, the Court will order it. Disputes over protective orders are to be addressed in the first instance in accordance with this paragraph.

6.      Protective Order. The Protective Order entered during the patent phase of this litigation shall continue in effect in these actions. The parties may propose changes to the Protective Order as may be appropriate for the antitrust phase of the case.

7.      Papers Filed Under Seal. When filing papers under seal, counsel should deliver to the Clerk an original and one copy of the papers.

8.      Quarterly Status Reports. Pursuant to Local Rule 16.1(b)(1), the parties will file a joint quarterly status report on November 15, 2005, and every three months thereafter, unless a different schedule is ordered by the Court. The reports will cover the status of discovery and any motions or other procedural matters that are pending or anticipated.

9.      Status Conference. On May 22, 2006, the Court will hold a Rule 16(a), (b) and (c) conference by telephone with counsel beginning at 4:30 p.m. Plaintiff's counsel shall initiate the telephone call. If all parties agree that there is nothing to report, nor anything to add to the interim status report or to this order, they may so notify the Court in writing before the conference is scheduled to occur, and the conference will be taken off of the Court's calendar.

10.     Case Dispositive Motions. All case dispositive motions, an opening brief, and affidavits, if any, in support of the motion shall be served and filed on or before May

6

2, 2007. Responding briefs shall be filed on or before June 1, 2007 and reply briefs shall be filed on or before June 22, 2007.

11.     Applications by Motion. Except as otherwise specified herein, any application to the Court shall be by written motion filed with the Clerk. Unless otherwise requested by the Court, counsel shall not deliver copies of papers or correspondence to Chambers. Any non-dispositive motion should contain the statement required by Local Rule 7.1.1.

12.     Pretrial Conference. On October 22, 2007, the Court will hold a Final Pretrial Conference in Chambers with counsel beginning at 4:30 p.m. Unless otherwise ordered by the Court, the parties should assume that filing the pretrial order satisfies the pretrial disclosure requirement of Federal Rule of Civil Procedure 26(a)(3). The parties shall file with the Court the joint proposed final pretrial order with the information required by the form of Final Pretrial Order which accompanies this Scheduling Order on or before September 24, 2007.

13.     Motions *in Limine*. Motions *in limine* shall not be separately filed. All *in limine* requests and responses thereto shall be set forth in the proposed pretrial order. The *in limine* request and any response shall contain the authorities relied upon; each *in limine* request may be supported by a maximum of five pages of argument and may be opposed by a maximum of five pages of argument. If more than one party is supporting or opposing an *in limine* request, such support or opposition shall be combined in a single five (5) page submission, unless otherwise ordered by the Court. No separate briefing shall be submitted on *in limine* requests, unless otherwise permitted by the Court.

7

14.     Jury Instructions, Voir Dire, and Special Verdict Forms. Where a case is to be tried to a jury, pursuant to Local Rules 47 and 51 the parties should file proposed voir dire, instructions to the jury, and special verdict forms and jury interrogatories three full business days before the final pretrial conference. That submission shall be accompanied by a computer diskette (in WordPerfect format) which contains the instructions, proposed voir dire, special verdict forms, and jury interrogatories.

15.     Trial. This matter is scheduled for a three week jury trial beginning at 9:30 a.m. on November 26, 2007. Each side shall have 36 hours to present its case.


UNITED STATES DISTRICT
JUDGE

8

# Exhibit E

PAGES 1 - 59

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CLAUDIA WILKEN, JUDGE

IN RE STATIC RANDOM ACCESS   )      MDL C-07-1819 CW
(SRAM) ANTITRUST LITIGATION,)
                                    FRIDAY, JUNE 1, 2007

                                    OAKLAND, CALIFORNIA

            REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

FOR THE DIRECT-PURCHASER          COTCHETT, PITRE & MCCARTHY
PLAINTIFFS:                       840 MALCOLM ROAD
                                  BURLINGAME, CALIFORNIA 94010
                            BY:   JOSEPH W. COTCHETT, ESQUIRE
                                  STEVEN N. WILLIAMS, ESQUIRE

                                  HAGENS BERMAN SOBOL SHAPIRO
                                  1301 FIFTH AVENUE, SUITE 2900
                                  SEATTLE, WASHINGTON 98101
                            BY:   ANTHONY D. SHAPIRO, ESQUIRE

                                  FREED KANNER LONDON & MILLEN
                                  2201 WAUKEGAN ROAD, SUITE 130
                                  BANNOCKBURN, ILLINOIS 60015

                                  SAVERI & SAVERI
                                  111 PINE STREET, SUITE 1700
                                  SAN FRANCISCO, CALIFORNIA 94111
                            BY:   GUIDO SAVERI, ESQUIRE

                                  MEREDITH COHEN
                                  GREENFOGEL & SKIRNICK
                                  117 SOUTH 17TH STREET
                                  PHILADELPHIA, PENNSYLVANIA 19103

                            BY:   STEVEN J. GREENFOGEL, ESQUIRE


              (APPEARANCES CONTINUED:)

REPORTED BY:          DIANE E. SKILLMAN, CSR #4909, RPR, FCRR
                      OFFICIAL COURT REPORTER

DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

```
 1    APPEARANCES CONTINUED:

 2    FOR THE INDIRECT-              ZELLE, HOFMANN, VOELBEL,
      PURCHASER PLAINTIFFS:         MASON & GETTE
 3                                  44 MONTGOMERY STREET, SUITE 3400
                                    SAN FRANCISCO, CALIFORNIA 94104
 4                            BY:   FRANCIS O. SCARPULLA, ESQUIRE
                                    PAMELA E. WOODSIDE, ESQUIRE
 5                                  QIANWEI FU, ESQUIRE

 6                                  MURRAY & HOWARD
                                    436 14TH STREET, SUITE 1413
 7                                  OAKLAND, CALIFORNIA 94612
                              BY:   SCOTT J. YUNDT, ESQUIRE
 8

 9                                  GIRARD GIBBS
                                    601 CALIFORNIA STREET, 14TH FLOOR
10                                  SAN FRANCISCO, CALIFORNIA 94108
                              BY:   AARON M. SHEANIN, ESQUIRE
11
                                    MINAMI TAMAKI
12                                  360 POST STREET, 8TH FLOOR
                                    SAN FRANCISCO, CALIFORNIA 94108
13                            BY:   B. MARK FONG, ESQUIRE

14                                  FURTH LEHMANN & GRANT
                                    225 BUSH STREET, 15TH FLOOR
15                                  SAN FRANCISCO, CALIFORNIA 94104
                              BY:   MICHAEL P. LEHMANN, ESQUIRE
16

17    FOR DEFENDANT                 THELEN REID BROWN
      NEC ELECTRONICS:              RAYSMAN & STEINER
18                                  101 SECOND STREET, SUITE 1800
                                    SAN FRANCISCO, CALIFORNIA 94105
19                            BY:   PAUL R. GRIFFIN, ESQUIRE

20    FOR DEFENDANT                 O'MELVENY & MYERS
      HYNIX SEMICONDUCTOR:          275 BATTERY STREET
21                                  SAN FRANCISCO, CALIFORNIA 94111
                              BY:   MICHAEL F. TUBACH, ESQUIRE
22
                                    O'MELVENY & MYERS
23                                  400 SOUTH HOPE STREET
                                    LOS ANGELES, CALIFORNIA 90071
24                            BY:   KENNETH R. O'ROURKE, ESQUIRE

25


        DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930
```

```
1    FOR DEFENDANT              DLA PIPER
     GSI TECHNOLOGY:           401 B STREET, SUITE 1700
2                              SAN DIEGO, CALIFORNIA 92101
                          BY:  JEFFREY M. SHOHET, ESQUIRE
3                              MARK H. HAMER, ESQUIRE

4    FOR DEFENDANT              MORRISON & FOERSTER
     FUJITSU LTD.:             425 MARKET STREET
5                              SAN FRANCISCO, CALIFORNIA 94105
                          BY:  STUART C. PLUNKETT, ESQUIRE
6
     FOR DEFENDANT              WHITE & CASE
7    ETRON TECHNOLOGY:         701 THIRTEENTH STREET, NW
                              WASHINGTON, DC 20005
8                          BY:  MATTHEW S. LEDDICOTTE, ESQUIRE

9    FOR DEFENDANT              COVINGTON & BURLING
     INTEGRATED DEVICE         ONE FRONT STREET, 35TH FLOOR
10   TECHNOLOGY:               SAN FRANCISCO, CALIFORNIA 94111
                          BY:  ANITA F. STORK, ESQUIRE
11

12   FOR DEFENDANTS            MCDERMOTT WILL & EMERY
     HITACHI AND RENESAS       600 THIRTEENTH STREET, NW
13   TECHNOLOGY AMERICA:       WASHINGTON, DC 20005
                          BY:  CRAIG P. SEEBALD, ESQUIRE
14

15   FOR DEFENDANT              COLLETTE ERICKSON
     WINBOND ELECTRONICS:      FARMER & O'NEILL
16                             235 PINE STREET, SUITE 1300
                              SAN FRANCISCO, CALIFORNIA 94104
17                         BY:  WILLIAM S. FARMER, ESQUIRE

18                             FINNEGAN HENDERSON FARABOW
                              GARRETT & DUNNER
19                             STANFORD RESEARCH PARK
                              3300 HILLVIEW AVENUE
20                             PALO ALTO, CALIFORNIA 94304
                          BY:  STEVEN H. MORRISSETT, ESQUIRE
21
     FOR DEFENDANT              PILLSBURY WINTHROP
22   SHARP ELECTRONICS:        SHAW PITTMAN
                              50 FREMONT STREET
23                             SAN FRANCISCO, CALIFORNIA 94105
                          BY:  ROXANE A. POLIDORA, ESQUIRE
24

25
```

DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

```
 1    FOR DEFENDANT              WILSON SONSINI GOODRICH
      CYPRESS SEMICONDUCTOR:     GOODRICH & ROSATI
 2                              650 PAGE MILL ROAD
                                PALO ALTO, CALIFORNIA 94304
 3                         BY:  MAURA L. REES, ESQUIRE

 4    FOR DEFENDANT              PAUL, HASTINGS, JANOFSKY
      ALLIANCE SEMICONDUCTOR:    & WALKER
 5                              55 SECOND STREET, 24TH FLOOR
                                SAN FRANCISCO, CALIFORNIA 94105
 6                         BY:  KEVIN C. MCCANN, ESQUIRE

 7                              PAUL, HASTINGS, JANOFSKY
                                & WALKER
 8                              695 TOWN CENTER DRIVE, 17TH FLOOR
                                COSTA MESA, CALIFORNIA 92626
 9                         BY:  PETER M. STONE, ESQUIRE

10    FOR DEFENDANT              HELLER EHRMAN
      SONY ELECTRONICS:          333 BUSH STREET
11                              SAN FRANCISCO, CALIFORNIA 94104
                           BY:  STEPHEN V. BOMSE, ESQUIRE
12

13    FOR DEFENDANT              GIBSON, DUNN & CRUTCHER
      MICRON TECHNOLOGY:         ONE MONTGOMERY STREET
14                              SAN FRANCISCO, CALIFORNIA 94104
                           BY:  JOEL S. SANDERS, ESQUIRE
15

16    FOR DEFENDANT              LATHAM & WATKINS
      TOSHIBA AMERICA            505 MONTGOMERY STREET
17    ELECTRONIC CORP.:          SAN FRANCISCO, CALIFORNIA 94111
                           BY:  DANIEL M. WALL, ESQUIRE
18

19    FOR DEFENDANT              STROOCK & STROOCK & LAVAN
      EPSON AMERICA &            2029 CENTURY PARK EAST
20    EPSON ELECTRONICS          LOS ANGELES, CALIFORNIA 90067
      AMERICA:              BY:  DANIEL A. ROZANSKY, ESQUIRE
21

22    FOR DEFENDANT              SHEPPARD MULLIN RICHTER
      SAMSUNG SEMICONDUCTOR:     & HAMPTON
23                              FOUR EMBARCADERO CENTER
                                SAN FRANCISCO, CALIFORNIA 94111
24                         BY:  GARY L. HALLING, ESQUIRE

25
```

```
 1   FOR DEFENDANT                SIDLEY AUSTIN
     STMICROELECTRONICS:          555 CALIFORNIA STREET
 2                                SAN FRANCISCO, CALIFORNIA 94104
                              BY: SAMUEL R. MILLER, ESQUIRE
 3

 4   FOR DEFENDANT                KRIEG KELLER SLOAN
     MITSUBISHI:                  REILLEY & ROMAN
 5                                114 SANSOME STREET, 4TH FLOOR
                                  SAN FRANCISOC, CALIFORNIA 94104
 6                            BY: MICHAEL D. LISI, ESQUIRE

 7

 8   FOR INTERVENOR:              DEPARTMENT OF JUSTICE
                                  ANTITRUST DIVISION
 9                                450 GOLDEN GATE AVENUE
                                  SAN FRANCISCO, CALIFORNIA 94102
10                            BY: NIALL E. LYNCH,
                                  ASSISTANT CHIEF
11

12

13

14

15

16

17

18

19

20

21


22

23

24

25
```

```
1    FRIDAY, JUNE 1, 2007                              1:30 P.M.

2

3              THE CLERK:  CALLING THE MATTER OF IN RE STATIC

4    RANDOM ACCESS ANTITRUST LITIGATION.  CIVIL ACTION NUMBER

5    C-07-1819.

6              COUNSEL, PLEASE COME FORWARD AND STATE YOUR

7    APPEARANCES FOR THE RECORD.

8              THE COURT:  ACTUALLY, I DON'T WANT EVERYONE TO STATE

9    THEIR APPEARANCES.  LET'S HAVE ANY LEAD COUNSEL WHO ARE PRESENT

10   STATE THEIR APPEARANCES, AND THE REST OF YOU CAN STAY AFTER

11   COURT AND -- WELL, I GUESS YOU HAVE EVERYBODY'S CARD.  WE WILL

12   JUST ENTER YOUR APPEARANCES FROM YOUR BUSINESS CARDS.

13             FOR THE DEFENDANTS, I THINK THERE'S NO OPPOSITION TO

14   WAS IT THELEN BEING LIAISON COUNSEL?

15             MR. GRIFFIN:  YES, YOUR HONOR.

16             THE COURT:  SO LET'S HAVE YOU STATE YOUR APPEARANCES

17   AS WELL AS THE LEAD COUNSEL FOR PLAINTIFFS.

18             MR. COTCHETT:  JOSEPH COTCHETT FOR THE DIRECT

19   PURCHASER CLASS.

20             MR. SCARPULLA:  GOOD AFTERNOON, YOUR HONOR, FRANCIS

21   SCARPULLA APPEARING ON BEHALF OF THE INDIRECT-PURCHASER

22   PLAINTIFFS.

23             MR. GRIFFIN:  PAUL GRIFFIN, THELEN REID, YOUR HONOR,

24   LIAISON COUNSEL FOR DEFENDANTS.

25             THE COURT:  OKAY.
```

DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

1          SO I WILL TELL YOU MY THOUGHTS ON THE THINGS THAT

2     HAVE COME BEFORE ME.  I AM NOT -- I DON'T READ BELL V. TWOMBLY

3     TO OUTLAW DISCOVERY PRIOR TO THE PLEADINGS BEING SETTLED.

4     THERE WILL BE LIMITATIONS ON DISCOVERY, WHICH WE WILL TALK

5     ABOUT SHORTLY, BUT I AM NOT GOING TO ORDER NO DISCOVERY BASED

6     ON THAT CASE OR ON ANYTHING ELSE.

7          MY INCLINATION WOULD BE TO ORDER THAT ALL DOCUMENTS

8     PRODUCED TO THE DEPARTMENT OF JUSTICE ALSO BE PRODUCED TO

9     PLAINTIFFS.  THAT ALL DOCUMENTS PRODUCED IN THE DRAM CASES BE

10    DEEMED TO HAVE BEEN PRODUCED IN THIS CASE.

11         I DON'T KNOW WHAT YOU WANT TO DO ABOUT INITIAL

12    DISCLOSURES.  IF THOSE THINGS WILL ENCOMPASS THE INITIAL

13    DISCLOSURES, OTHERWISE I WOULD BE INCLINED TO ORDER INITIAL

14    DISCLOSURES TO THE EXTENT THEY ARE DOCUMENTS AS OPPOSED TO

15    ANYTHING ELSE.

16         MR. GRIFFIN:  YOUR HONOR, WITH YOUR HONOR'S

17    PERMISSION, MAY WE ADDRESS TWOMBLY?  MR. SHOHET --

18         THE COURT:  OKAY.  LATER.

19         BUT, SO ANYWAY, I WOULD BE INCLINED ALSO TO ORDER

20    INITIAL DISCLOSURES AS IN THE ORDINARY CASE AS LONG AS THOSE

21    DISCLOSURES ENCOMPASS DOCUMENTS AS OPPOSED TO ANYTHING ELSE --

22         MR. COTCHETT:  CORRECT.

23         THE COURT:  -- WHICH GENERALLY THEY DO.

24         I AM AGREEABLE TO APPOINTING A SPECIAL MASTER FOR

25    DISCOVERY.  I WOULD BE INTERESTED IN YOUR THOUGHTS AS TO WHO

```
 1    THAT MIGHT BE.  I WOULD SUGGEST PERHAPS JUDGE LEGGE OR JUDGE
 2    SMITH.  AGAIN, NOT TO ENDORSE A PARTICULAR PROVIDER, BUT THEY
 3    ARE BOTH FORMER --
 4            MR. COTCHETT:  HOW ABOUT IF WE TALK AMONG OURSELVES
 5    AND GET YOU A NAME, BUT THOSE TWO NAMES ARE PERFECT.
 6            THE COURT:  IN TERMS OF -- WELL, WE TALKED ABOUT THE
 7    DEFENDANTS' REQUEST THAT THELEN BE THE LIAISON COUNSEL AND THAT
 8    CERTAIN ATTORNEYS WHO ARE SUGGESTED COMPRISE THE STEERING
 9    COMMITTEE.  I DON'T THINK THAT'S OPPOSED AND THAT SEEMS FINE TO
10    ME.
11            MR. GRIFFIN:  IT'S NOT OPPOSED, YOUR HONOR, AND
12    THAT'S AGREEABLE, AS I UNDERSTAND IT, TO THE DEFENDANTS AS LONG
13    AS THE LIAISON COUNSEL FOR THE DEFENSE IS ADMINISTRATIVE IN
14    HOUSEKEEPING.
15            THE COURT:  RIGHT.  YOU CAN'T BIND THE DEFENDANTS.
16    THEY ARE ALL SEPARATE ENTITIES.  I UNDERSTAND THAT, BUT I JUST
17    WANT SOMEONE I CAN TALK TO.
18            MR. GRIFFIN:  YES.  THAT'S ME, YOUR HONOR.
19            THE COURT:  OKAY.  NOW, IN TERMS OF -- THEN, I
20    THINK, ARE YOU NOT, IN AGREEMENT THAT E-FILING WILL SERVE AS
21    SUFFICIENT NOTICE FOR EVERYTHING --
22            MR. COTCHETT:  YES.
23            MR. GRIFFIN:  YES.
24            THE COURT:  -- OTHER THAN THE INITIAL SERVICE OF
25    PROCESS, OF COURSE.
```

DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

1          MR. COTCHETT:  YES, YOUR HONOR.

2          THE COURT:  I HAVE BEEN HAVING SOME DIFFICULTIES

3     WITH VARIOUS PEOPLE WANTING TO ENTER INTO SIDE DEALS ABOUT

4     SERVICE.  I WOULD LIKE -- I WANT TO GET THINGS ON TRACK.  I

5     DON'T PARTICULARLY WANT TO WAIT FOR SERVICE UNTIL AFTER A

6     CONSOLIDATED AMENDED COMPLAINT HAS BEEN FILED.  I JUST AS SOON

7     SERVE THE ORIGINAL COMPLAINT AND THEN AFTER THAT THE

8     CONSOLIDATED AMENDED COMPLAINT CAN BE SERVED SIMPLY BY MAIL.

9     IT DOESN'T HAVE TO BE PERSONALLY SERVED AGAIN.

10          SO ALL THE PROPOSED ORDERS I HAVE BEEN GETTING I

11     HAVE BEEN DENYING AND REFERRING TO YOU ALL --

12          MR. COTCHETT:  YES.

13          THE COURT:  -- TO DO SOMETHING WITH.

14          WHAT I WOULD LIKE TO DO IS SET A DATE BY WHICH ALL,

15     AT LEAST, DOMESTIC DEFENDANTS MUST BE SERVED OR, REALLY, YOU

16     MIGHT AS WELL JUST ACCEPT SERVICE.  YOU ARE ALL THE SAME

17     PEOPLE.  YOU KNOW WHAT'S GOING ON.  THERE'S NO POINT IN REALLY

18     STANDING ON CEREMONY AS FAR AS PERSONAL SERVICE.

19          I WOULD LIKE TO SET A DATE FOR SERVICE OF ALL

20     DOMESTIC DEFENDANTS AND THEN I'D ALSO LIKE TO SET A DATE FOR

21     SERVICE OF ALL FOREIGN DEFENDANTS WHICH MAY HAVE TO BE FURTHER

22     IN THE FUTURE.  I DON'T KNOW WHAT'S REALISTIC.  IF YOU'RE

23     HAVING TO DO THE HAGUE CONVENTION, I GUESS THAT TAKES THREE OR

24     FOUR MONTHS.

25          MR. GRIFFIN:  THERE ARE SOME FOREIGN DEFENDANTS,

DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

```
1    YOUR HONOR, THAT ARE INSISTING ON --

2              THE COURT:  SOME WHAT?

3              MR. GRIFFIN:  FOREIGN DEFENDANTS WHO ARE INSISTING

4    ON FORMAL SERVICE.

5              THE COURT:  AND WHO HAVEN'T?

6              MR. GRIFFIN:  WHO HAVE NOT APPEARED.

7              THE COURT:  WHO HAVEN'T APPEARED.

8              MR. SCARPULLA:  FRANCIS SCARPULLA, YOUR HONOR, MAY

9    IT PLEASE THE COURT.  THERE MAY BE SOME FOREIGN DEFENDANTS IN

10   COUNTRIES WHO ARE NOT SIGNATORIES TO THE HAGUE CONVENTION, YOUR

11   HONOR, WHICH MEANS THAT THEY HAVE TO BE SERVED IN A DIFFERENT

12   FASHION.

13             THE COURT:  IT'S ACTUALLY EASIER.

14             MR. COTCHETT:  IT IS EASIER, YOUR HONOR.

15             MR. SCARPULLA:  SOMETIMES IT'S EASIER, SOMETIMES IT

16   MAY NOT BE EASIER, YOUR HONOR.

17             THE COURT:  IT'S EITHER EASIER OR IMPOSSIBLE, LET'S

18   PUT IT THAT WAY.

19             (LAUGHTER).

20             MR. SCARPULLA:  RIGHT.  IT'S EITHER EASIER OR YOU

21   CAN'T DO IT.

22             THE COURT:  RIGHT.

23             MR. GRIFFIN:  YOU'RE ABSOLUTELY RIGHT.

24             MR. COTCHETT:  THAT'S RIGHT.

25             THE COURT:  YOU WILL HAVE TO MAKE THE BEST OF THAT.
```

DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

```
1              MR. SCARPULLA:  AGAIN, MAY IT PLEASE THE COURT, IF

2     EACH OF THE CURRENTLY FILED COMPLAINTS, AT LEAST FOR THE

3     INDIRECT-PURCHASERS, THERE ARE, AS YOUR HONOR KNOWS, I BELIEVE

4     UPWARDS OF 50 OF THOSE, IF YOU HAVE TO FILE EACH ONE -- IF YOU

5     HAVE TO SERVE EACH ONE OF THOSE COMPLAINTS AT ABOUT 10,000 A

6     COMPLAINT FOR GOING THROUGH THE HAGUE, THAT IS A HUGE AMOUNT OF

7     MONEY, AS YOUR HONOR MIGHT UNDERSTAND.

8              SO THAT IS WHY WE, AS INDIRECTS, RESPECTFULLY

9     SUGGESTED THAT WE PERMIT -- BE PERMITTED TO SERVE ONLY ONE

10    COMPLAINT ON THE FOREIGN DEFENDANTS -- WE DON'T CARE ABOUT THE

11    DOMESTIC -- ON THE FOREIGN DEFENDANTS, AND THEN SERVE, IF

12    NECESSARY, THE CONSOLIDATED AMENDED COMPLAINT.  BUT I DON'T --

13    I AM NOT SURE WHETHER WE CAN JUST MAIL THAT TO THOSE FOREIGN

14    DEFENDANTS UNDER THE HAGUE CONVENTION.

15             THE COURT:  NOT UNDER THE HAGUE, YOU CAN'T.

16             MR. SCARPULLA:  NO.  SO WE HAVE TO DO THAT TWICE.

17             THE COURT:  WELL, NO, I THINK THE SECOND TIME YOU

18    CAN JUST MAIL IT.

19             MR. SCARPULLA:  I AM NOT SURE YOU CAN.

20             THE COURT:  AFTER THE FIRST TIME THEY WILL HAVE

21    COUNSEL AND YOU CAN SERVE THEIR ATTORNEYS.

22             MR. SCARPULLA:  YOU WILL HAVE COUNSEL, YES, YOUR

23    HONOR.

24             THE COURT:  AND THEN YOU CAN SERVE THEIR ATTORNEYS

25    BY E-FILING AT THAT POINT.
```

1        MR. COTCHETT: WE WILL LOOK AT THOSE ISSUES AND

2  BRING THAT UP AT THE NEXT CASE MANAGEMENT CONFERENCE.

3        THE COURT: WHAT YOU'RE SAYING IS THAT FOR THE

4  INITIAL SERVICE, YOU WANT TO SERVE SOME SORT OF CONSOLIDATED

5  BUT UNAMENDED COMPLAINT?

6        MR. SCARPULLA: NO.

7        MR. COTCHETT: NO.

8        THE COURT: SO YOU DON'T HAVE TO SERVE A WHOLE BUNCH

9  OF DIFFERENT ONES.

10       MR. SCARPULLA: FOR THE INDIRECT-PURCHASERS ONLY,

11  YOUR HONOR, IF YOUR HONOR WOULD PERMIT US TO SERVE THE FOREIGN

12  DEFENDANTS WITH THE CONSOLIDATED AMENDED COMPLAINT ONLY, THAT

13  WOULD BE PREFERABLE. IF NOT --

14       THE COURT: I DON'T WANT TO WAIT THAT LONG.

15       MR. SCARPULLA: THEN WE WOULD PREFER TO SERVE THEM

16  ONLY WITH ONE OF THE MULTIPLE COMPLAINTS.

17       THE COURT: THAT'S FINE.

18       MR. SCARPULLA: RATHER THAN ALL 50 OF THEM.

19       THE COURT: THAT'S, IN THEORY, THAT'S FINE WITH ME

20  UNLESS THERE IS SOME ISSUE ABOUT THEN THEY WILL SAY I WASN'T

21  SERVED WITH THE OTHER ONE.

22       MR. SCARPULLA: EXACTLY.

23       THE COURT: WHY DON'T YOU DO A CONSOLIDATED -- HOW

24  CAN I SAY IT. FIRST AMENDED CONSOLIDATED COMPLAINT THAT IS

25  SIMPLY STICKS ALL OF THE --

DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

```
 1                    MR. SCARPULLA:  PULLS EVERYTHING TOGETHER.

 2                    THE COURT:  -- COMPLAINTS IN ONE BIG COMPLAINT,

 3       WHICH IS UNDERSTOOD NOT TO REALLY COUNT FOR ANYTHING OTHER THAN

 4       SERVICE, AND SERVE THAT ON EVERYBODY.

 5                    MR. SCARPULLA:  THAT'S FINE.

 6                    THE COURT:  AND HAVE A LITTLE COVER LETTER IN THERE

 7       THAT SAYS THIS IS JUST A PLACE HOLDER AND REALLY THERE'S GOING

 8       TO BE A REAL CONSOLIDATED SECOND AMENDED COMPLAINT THAT WILL

 9       COME OUT AT A CERTAIN DATE, BUT JUST TO SAVE ALL THAT PAPERWORK

10       AND MONEY, YES, I THINK THAT MAKES PERFECT SENSE.

11                    MR. SCARPULLA:  THAT WILL BE FINE, YOUR HONOR.

12                    MR. COTCHETT:  WE WILL DO THE SAME AS TO THE

13       DIRECTS.

14                    THE COURT:  OKAY.

15                    MR. GRIFFIN:  THIS IS ONE OF THE SEVERAL REASONS WHY

16       WE THINK THE FILING OF AN AMENDED CONSOLIDATED COMPLAINT IS

17       REALLY A NECESSARY FIRST STEP.

18                    THE COURT:  NO.  I DON'T WANT TO WAIT THAT LONG.  IT

19       TAKES LONG ENOUGH AS IT IS TO GET THESE FOREIGN DEFENDANTS

20       ROPED IN, SO I WANT TO GET THAT STARTED IMMEDIATELY.  AND

21       WHATEVER I HAVE TO DO TO DO THAT, I AM GOING TO DO.  OTHERWISE,

22       WE WILL BE DRAGGING THINGS OUT WAITING FOR, YOU KNOW, EXTANT

23       DEFENDANTS TO GET SERVED.

24                    MR. COTCHETT:  SO MIGHT I RECOMMEND THE JUNE 29TH AS

25       A DATE TO SERVE THE DOMESTIC PEOPLE?
```

```
1                THE COURT:  THAT'S FINE.

2                MR. COTCHETT:  OKAY.  WE WILL GET THAT DONE BY THEN.

3                THE COURT:  YEAH.  AND THEN WHAT ABOUT THE -- WHAT'S

4    A REASONABLE DATE, WITH THE UNDERSTANDING IT CAN ALWAYS BE

5    EXTENDED IF IT HAD TO GO, WHAT, CAN WE SAY LIKE 120 DAYS FOR

6    THE FOREIGN DEFENDANTS?

7                MR. COTCHETT:  WE COULD, BUT BEFORE THAT WHAT I

8    WOULD SUGGEST DOING IS SETTING ANOTHER DATE FOR A CASE

9    MANAGEMENT CONFERENCE WHEN WE CAN BRING BACK TO YOU THE

10   PROBLEMS WITH THE VARIOUS DIFFERENT -- FIRST, LET ME SAY THIS.

11               THERE ARE APPROXIMATELY 24 DEFENDANTS BY MY COUNT.

12   SOME DIFFERENT IN THE INDIRECT AS IN THE DIRECT.  I AM SURE IN

13   CONFIDENT WHEN WE DO, WHEN WE SIT DOWN WITH THE DEFENDANTS,

14   SOME OF THEM, AND I DON'T MEAN TO MAKE THIS AS AN ADMISSION,

15   BUT SOME OF THEM WILL BE GONE.  WE WILL WORK OUT WHOSE PROPERLY

16   IN THE CASE AND WHO IS NOT.

17               MY SUGGESTION IS, LET US SERVE ALL DOMESTIC THAT WE

18   BELIEVE SHOULD BE SERVED BY THE 29TH.  THEN SET A CASE

19   MANAGEMENT CONFERENCE PERHAPS 60 OR 90 DAYS OUT.  WE WILL COME

20   BACK TO YOU THEN AND SAY, JUDGE, WE HAVE FOUR THAT WE HAVE TO

21   SERVE THROUGH THE HAGUE.  WE HAVE THREE -- OBVIOUSLY WE WILL

22   START ON THAT, BUT WE WILL MAKE A REPORT TO YOU AT THAT TIME.

23   WE, TOO, WANT TO MOVE THIS AS QUICKLY AS POSSIBLE SO WE WILL

24   NOT DELAY.

25               THE COURT:  LET'S TABLE FOR THE MINUTE WHEN WE ARE
```

DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

1    GOING TO HAVE ANOTHER CASE MANAGEMENT CONFERENCE, BUT WHAT I

2    WOULD LIKE TO DO AND AM GOING TO DO IS JUST ORDER --

3            MR. COTCHETT:  120 DAYS?

4            THE COURT:  OCTOBER 1ST AS A HOPEFUL DATE FOR

5    SERVICE OF ALL FOREIGN DEFENDANTS.

6            MR. COTCHETT:  THEN IF WE HAVE A PROBLEM WITH THAT,

7    WE WILL COME BACK TO YOU AND SAY HERE'S THE PROBLEM.

8            THE COURT:  YES.

9            MR. SCARPULLA:  THAT'S FINE.

10           THE COURT:  IF EVERYONE WILL AIM TOWARDS THAT AND

11   TRY AND GET THAT DONE.

12           MR. GRIFFIN:  YES, YOUR HONOR.

13           THE COURT:  OKAY.

14           THEN THE DOJ'S MOTION TO INTERVENE, WHICH I AM

15   INCLINED TO GRANT.

16           MR. COTCHETT:  I DON'T THINK YOU ARE GOING TO HAVE A

17   PROBLEM WITH THAT.

18           SITTING IN THE COURTROOM TODAY IS THE DISTINGUISHED

19   NIALL LYNCH FROM THE DEPARTMENT OF JUSTICE.

20           MR. LYNCH:  THANK YOU, YOUR HONOR.  NIALL LYNCH ON

21   BEHALF OF THE UNITED STATES.

22           MR. COTCHETT:  WE HAD A CONVERSATION OUTSIDE.  WE

23   ARE GOING TO PROBABLY BE ABLE TO AGREE TO THAT.

24           THE COURT:  OKAY.  WELL, YOU MAY NOT NEED TO BECAUSE

25   I WAS GOING TO ORDER IT.

     DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

```
1            (LAUGHTER).

2            MR. COTCHETT:  THERE IT IS.  IT IS SIMPLE, JUDGE.

3            THE COURT:  AND THEN THE NEXT MOTION, WHICH IS TO

4   LIMIT DISCOVERY, FOR THE MOMENT, AT LEAST, TO DOCUMENT

5   DISCOVERY, WHICH AS WAS DONE IN THE DRAM CASE, SEEMS REASONABLE

6   TO ME.

7            MR. COTCHETT:  THAT'S FINE.

8            MR. SCARPULLA:  YOUR HONOR, AGAIN, WE HAVE HAD

9   CONVERSATIONS WITH MR. LYNCH.  IT IS FINE WITH US.

10           MR. GRIFFIN:  WE CERTAINLY AGREE, YOUR HONOR.

11           THE COURT:  OKAY.  SO THAT MOTION IS GRANTED AS

12  WELL.

13           MR. LYNCH:  GREAT.  THANK YOU, YOUR HONOR.

14           THE COURT:  NOTICE DATES FOR THOSE ARE OFF CALENDAR.

15  NO OPPOSITIONS WILL BE REQUIRED FOR THEM.

16           MR. LYNCH:  THAT WAS EASY.

17           MR. COTCHETT:  THAT'S WHY I REFERRED TO HIM AS THE

18  DISTINGUISHED MR. LYNCH.

19           THE COURT:  BECAUSE HE WINS ALL HIS MOTIONS?

20           MR. COTCHETT:  THERE IS ONE ADDITIONAL ISSUE WE HAVE

21  WHEN YOU ARE DONE.

22           MR. GRIFFIN:  YOUR HONOR, THE DEFENDANTS WOULD LIKE

23  AN OPPORTUNITY TO CONSULT WITH MR. LYNCH BEFORE THE FINAL

24  WORDING OF THE ORDER IS ENTERED, IF THAT WOULD BE ACCEPTABLE.

25           THE COURT:  WHICH ORDER?
```

DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

1      MR. GRIFFIN:  ON THE STAY.

2      MR. LYNCH:  I HAVE NO OBJECTION IF THERE'S A

3  PARTICULAR THING THE PLAINTIFFS AND DEFENDANTS WANT TO TWEAK,

4  ALLOW CERTAIN LIMITED DISCOVERY OF THE NOT RELATED TO THE

5  MERITS, SIMILAR TO WHAT WE DID IN THE DRAM CASE, I HAVE NO

6  OBJECTION.

7      THE COURT:  YOU GAVE ME A PROPOSED ORDER ALREADY?

8      MR. LYNCH:  I GAVE YOU A PROPOSED ORDER THAT WAS A

9  BLANKET BAN ON ALL DEPOSITIONS AND INTERROGATORIES.

10      THE COURT:  WHY DON'T I WAIT UNTIL NEXT FRIDAY.  BY

11  NEXT FRIDAY, YOU CAN EITHER SEND ME A STIPULATION THAT THE

12  PROPOSED ORDER IS OKAY OR A DIFFERENT PROPOSED ORDER THAT'S

13  STIPULATED TO, OR IF THERE IS SOME SUBSTANTIVE OBJECTION TO THE

14  ORDER, THEN I GUESS WHOEVER OBJECTS CAN FILE THEIR OBJECTION BY

15  NEXT FRIDAY.

16      MR. GRIFFIN:  THAT WOULD BE ACCEPTABLE, YOUR HONOR.

17      MR. LYNCH:  WE JUST FILED THE MOTION YESTERDAY.  SO

18  SOME OF THE COUNSEL MAY NOT EVEN HAVE SEEN THE ORDER YET.

19      THE COURT:  OKAY.

20      MR. COTCHETT:  BEFORE MR. LYNCH LEAVES COUNSEL

21  PODIUM, I DO HAVE A QUESTION TO PUT THROUGH THE COURT TO HIM,

22  AND ACTUALLY IT'S ONE ISSUE ON PRODUCTION OF DOCUMENTS.

23      WE ASKED THE DEFENDANTS IF THEY WOULD PROVIDE US

24  WITH THE SUBPOENAS ISSUED BY THE DOJ SO WE CAN TRACK THE

25  PRODUCTION OF WHAT THEY TURNED OVER.

DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

1     AND WE ALSO ASKED MR. LYNCH.  MR. LYNCH HAS A VERY

2     VALID REASON, WHICH I WOULD ASK THAT HE GIVE TO THE COURT RIGHT

3     NOW WHY HE CAN'T GIVE IT TO US, BUT HE HAS NO OBJECTION TO THE

4     DEFENDANTS GIVING IT TO US.  AND I WOULD ASK THE COURT TO TAKE

5     JUST 30 SECONDS AND HEAR FROM MR. LYNCH ON THAT ISSUE.

6     THE COURT:  I DON'T DOUBT THAT HE CAN'T DO IT

7     BECAUSE OF RULE 6(E), BUT THE DEFENDANTS COULD.

8     MR. COTCHETT:  RIGHT.  IT MAKES -- WE WOULD ASK YOUR

9     HONOR TO ORDER THAT.  VERY SIMPLY, IT MAKES IT MUCH EASIER FOR

10    US TO MOVE THIS CASE ALONG IF WE CAN TRACK THEIR DOCUMENT

11    PRODUCTION TO THE DOJ IN ACCORDANCE WITH THE SUBPOENA AS ASKED

12    FOR.

13    THE COURT:  ALL RIGHT.  I HAVE INDICATED ALREADY

14    THAT I AM INCLINED TO ORDER THAT ALL DOCUMENTS PRODUCED TO THE

15    DOJ BE PRODUCED TO PLAINTIFFS.  I WILL HEAR FROM THE DEFENDANTS

16    ONCE WE GET THROUGH THE INITIAL MATTERS AS TO WHETHER THEY HAVE

17    A PROBLEM WITH THAT.

18    I DON'T SUPPOSE YOU HAVE A PROBLEM OR --

19    MR. LYNCH:  NO.  I MEAN --

20    THE COURT:  DO YOU HAVE A PROBLEM WITH THEM TURNING

21    OVER THEIR SUBPOENAS?  YOU ARE BOUND TO SECRECY, BUT THEY

22    AREN'T.

23    MR. LYNCH:  CORRECT.  AS YOU KNOW 6(E) PRECLUDES US

24    FROM HANDING OVER GRAND JURY MATERIALS.  6(E) ALLOWS FOR THE

25    VOLUNTARY DISCLOSURE BY A WITNESS OR DEFENDANT.  I DON'T KNOW

DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

1    HOW THAT WOULD PLAY OUT IN TERMS OF COMPELLED REQUESTS FOR IT,

2    BUT WE SIMPLY DON'T HAVE AN OBJECTION ONE WAY OR THE OTHER TO

3    DISCLOSURE OR NONDISCLOSURE BY THE DEFENDANTS.

4            THE COURT:  OKAY.  WHY DON'T WE NEXT GO THROUGH THE

5    TIMETABLE THAT YOU ALL SET OUT.  AND I AM LOOKING NOW AT A NEW

6    TIMETABLE THAT WAS SUBMITTED.

7            MR. GRIFFIN:  YOUR HONOR, WOULD IT MAKE SENSE TO

8    HEAR US ON THE TWOMBLY ISSUE BEFORE WE GET TO THE SPECIFICS OF

9    THE SCHEDULE?

10           MR. MILLER:  SAM MILLER OF SIDLEY AUSTIN

11   REPRESENTING ST MICROELECTRONICS.

12           I WOULD ASK YOU BEFORE YOU ORDER THE PLAINTIFFS TO

13   HAVE TO SERVE THE EXISTING COMPLAINTS, I WOULD ASK YOU TO

14   RECONSIDER THIS BECAUSE IT'S MY BELIEF IN LIGHT OF TWOMBLY AND

15   IN LIGHT OF DISCUSSIONS WITH PLAINTIFFS' COUNSEL THAT A NUMBER

16   OF THE DEFENDANTS WHO WERE NAMED IN SOME OF THOSE COMPLAINTS

17   ARE GOING TO BE DROPPED AND, THEREFORE, IT WOULD BE INEFFICIENT

18   AND COSTLY AND UNNECESSARY TO ARGUE ABOUT SERVICE FOR THOSE

19   DEFENDANTS WHERE I BELIEVE THAT PROMPTLY THE PLAINTIFFS IN

20   INTEND TO FILE NEW AMENDED CONSOLIDATED COMPLAINTS WITHIN THE

21   NEXT TWO WEEKS OR SO.  AND, THEREFORE, WE'RE NOT WASTING ANY

22   TIME.

23           BUT TO IMPOSE OBLIGATIONS ON DEFENDANTS THAT ARE

24   GOING TO DISAPPEAR FROM THIS CASE AND, IN OUR VIEW, DON'T

25   BELONG IN THIS CASE, I RESPECTFULLY SUBMIT IS INAPPROPRIATE AND

1    I THINK SOME OF THE DEFENDANTS HERE ARE PREPARED TO ADDRESS

2    THAT WITH YOU BEFORE YOU GO AHEAD AND ORDER THAT.

3         THE COURT:  WELL, THE CONSOLIDATED AMENDED COMPLAINT

4    AT THIS POINT IS NOT PROPOSED TO BE FILED UNTIL AUGUST 31ST,

5    WHICH IS SEVERAL MONTHS AWAY.  I'M NOT -- WELL, IN TERMS OF

6    REQUIRING SERVICE, I SUGGEST YOU ALL JUST WAIVE SERVICE AND

7    ACCEPT SERVICE FROM PLAINTIFFS.  I DON'T SEE ANY POINT IN

8    HAVING PERSONAL SERVICE ON CORPORATIONS THAT HAVE APPEARED IN

9    OTHER CASES.

10        SO I WOULD SUGGEST THAT ANY DIFFICULTIES WITH

11   SERVICE BE ACCOMPLISHED BY WAIVER, NOT WAIVING PERSONAL

12   JURISDICTION OR ANY OTHER COMPLAINTS YOU MIGHT WANT TO HAVE,

13   BUT AT LEAST NOT REQUIRING SOME PROCESS SERVER TO COME OUT TO

14   THE AGENT'S OFFICE.

15        IN TERMS OF DEFENDANTS WHO ARE GOING TO BE DROPPED,

16   YOU CAN CERTAINLY DISCUSS IT WITH PLAINTIFFS.  THEY MAY AGREE

17   TENTATIVELY THAT SOMEBODY IN PARTICULAR IS GOING TO BE DROPPED

18   AND AGREE THAT THAT PERSON DOESN'T HAVE TO DISCLOSE DOCUMENTS

19   WHILE THEY ARE WAITING FOR THAT, BUT FOR THE RUN-OF-THE-MILL, I

20   JUST WANT TO HAVE A SCHEDULE AND I WANT TO HAVE THINGS MOVING.

21   AND I DON'T WANT TO WAIT UNTIL AUGUST 31ST TO DO THAT.

22        SO, YOU KNOW, I HAVE MY MIND PRETTY WELL MADE UP ON

23   THIS BELL V. TWOMBLY THING.  I READ IT --

24        MR. GRIFFIN:  WOULD YOU INDULGE US --

25        THE COURT:  IF YOU WANT TO TALK FOR FIVE MINUTES

DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

1    ABOUT IT --

2              MR. GRIFFIN:  WE THINK IT'S AN IMPORTANT POINT.

3              THE COURT:  -- YOU CAN DO THAT.

4              MR. GRIFFIN:  MR. SHOHET WILL ADDRESS IT --

5              MR. COTCHETT:  WE ARE NOT GOING TO GO THROUGH THE

6    SCHEDULE FIRST?

7              THE COURT:  WELL, THEY WANT TO TALK ABOUT IT, SO LET

8    THEM TALK FOR FIVE MINUTES.  IT'S FIVE AFTER TWO.

9              MR. GRIFFIN:  -- ADDRESS TWOMBLY AND THEN

10   MR. TUBACH, IF WE NEED TO, YOUR HONOR, WILL GO THROUGH THE

11   SCHEDULE WITH THE DATES.

12             THE COURT:  OKAY.

13             MR. SHOHET:  JEFF SHOHET ON BEHALF OF GSI

14   TECHNOLOGY.

15             YOUR HONOR, THE TWOMBLY CASE IS AN IMPORTANT CASE

16   THAT JUST CAME DOWN.  AND WE PUT IT BEFORE THE COURT FOR THIS

17   CMC BECAUSE WE EXPECTED THE ISSUE OF HOW MUCH DISCOVERY, IF

18   ANY, SHOULD GO FORWARD.

19             NOW, WE ARE NOT IN CONTROL OF THE TIMETABLE BY WHICH

20   THE PLAINTIFFS AMEND THEIR COMPLAINT OR FILE A CONSOLIDATED

21   AMENDED COMPLAINT WHICH ADDRESSES THE PLEADING DEFICIENCIES OF

22   THE EXISTING COMPLAINTS.

23             THE COURT:  YOU ARE NOT IN CONTROL OF IT.  YOU

24   CAN -- I AM AND YOU CAN TELL ME IF YOU THINK THEY ARE TAKING

25   TOO LONG.

DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

```
1              MR. SHOHET:  WELL THEY'RE TAKING UNTIL AUGUST 30 AND

2    IF THE COURT IS GOING TO ALLOW DISCOVERY TO PROCEED IN LIGHT OF

3    WHAT WE THINK IS A FAIRLY BRIGHT LINE TEST SET OUT BY THE

4    SUPREME COURT FOR THE THRESHOLD REQUIREMENT OF STATING A VALID

5    CLAIM AGAINST A PARTY -- AGAINST A DEFENDANT AS TO WHOM

6    DISCOVERY IS SUPPOSED TO PROCEED, THERE IS A FAIRLY BRIGHT LINE

7    TEST SET FORTH, AND WE HAVE PUT IN THE CMC STATEMENT AN EXAMPLE

8    OF ONE OF THE COMPLAINTS WHICH WE FEEL PRETTY CLEARLY DOES NOT

9    MEET THAT TEST.

10             NOW, THE COURT DOESN'T SAY ONLY EASY DISCOVERY

11   SHOULD GO FORWARD, OR DISCOVERY YOU HAVE ALREADY DONE, OR EVEN

12   IF IT'S NOT TOO DIFFICULT, YOU SHOULD BE ALLOWED TO HAVE THAT

13   DISCOVERY, THE COURT SAYS QUITE CLEARLY THAT THE PROCESS IS YOU

14   STATE A VALID CLAIM, IT ADOPTS THE ASSOCIATED GENERAL

15   CONTRACTOR RULE WHICH SAYS, AND BEFORE YOU STATED THAT VALID

16   CLAIM OR UNTIL YOU STATE THAT VALID CLAIM, A CASE SHOULD NOT BE

17   ALLOWED TO PROCEED AGAINST THE DEFENDANT.

18             NOW, MY CLIENT, YOUR HONOR, I CAN SAY IS A VERY

19   SMALL MARKET SHARE DEFENDANT.  IT HAS NEVER RECEIVED A SUBPOENA

20   FROM THE GRAND JURY.  IT'S A START-UP COMPANY.  IT DOESN'T

21   INVOLVE ITSELF IN THE SALE OF COMMODITY SRAM; IT ONLY

22   MANUFACTURES HIGHLY SPECIALIZED DETAILED DIFFERENTIATED

23   PRODUCT.  IT HAS NO IDEA WHY IT WAS NAMED IN THIS COMPLAINT.  I

24   AM NOT THE ONLY DEFENDANT THAT FITS THAT DESCRIPTION.  INDEED,

25   MOST OF THE DEFENDANTS SITTING OUT HERE HAVE NO IDEA WHY THEY
```

DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

1    WERE NAMED IN THE COMPLAINT.

2           BUT NOT ONLY THE TWOMBLY CASE, YOUR HONOR, IS IT NOT

3    PLAUSIBLE THAT MY CLIENT WAS INVOLVED IN AN INDUSTRY-WIDE

4    CONSPIRACY TO SET -- SOME CONSPIRACY TO SET PRICES FOR

5    COMMODITY SRAM, IT'S IMPLAUSIBLE THAT WE WOULD BE SO INVOLVED

6    IF THERE WERE SUCH A CONSPIRACY.

7           MY CLIENT SHOULDN'T BE REQUIRED TO PROCEED ONE MORE

8    MINUTE IN THIS CASE UNTIL A VALID CLAIM WITH FACTS THAT STATE

9    WHY MY CLIENT IS HERE AND WHY MY CLIENT SHOULD HAVE TO RESPOND

10   TO ANY DISCOVERY OR ANY FURTHER ACTION IN THIS CASE.  I THINK

11   THAT'S WHAT TWOMBLY SAYS AND I THINK IT IS APPROPRIATE.

12          NOW, IF THE COURT IS CONCERNED -- IF THE COURT IS

13   SAYING, WELL, WE HAVEN'T YET TESTED THE VALIDITY OF THOSE

14   COMPLAINTS, AND UNTIL WE TEST THE VALIDITY OF THOSE COMPLAINTS

15   TWOMBLY DOESN'T APPLY, I WOULD SAY THEN LET'S GET THE AMENDED

16   CONSOLIDATED COMPLAINT ON FILE RIGHT AWAY BEFORE MY CLIENT HAS

17   TO SPEND ANOTHER NICKLE ON THIS CASE, LET'S TEST IT.  AND IF I

18   DON'T BELONG IN THIS CASE, LET'S GET ME OUT AND THE OTHER

19   DEFENDANTS WHO ARE SO SITUATED.

20          THANK YOU.

21          MR. GRIFFIN:  YOUR HONOR, JUST TO SUPPLEMENT, WE

22   THINK THE PROCEEDING WITH THE DISCOVERY IS PUTTING THE CART

23   BEFORE THE HORSE HERE IN CERTAIN RESPECTS, AND EVEN THE

24   COMPANIES THAT DID RECEIVE A GRAND JURY SUBPOENA, I THINK ARE

25   ENTITLED UNDER TWOMBLY TO A SUFFICIENT COMPLAINT.

     DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

1   IF THE PLAINTIFFS CONTEND THAT THE CURRENT

2   COMPLAINTS ARE SUFFICIENT, THEN WE WOULD LIKE AN OPPORTUNITY TO

3   TEST THEM UNDER TWOMBLY WITH MOTIONS, AND WOULD SUGGEST THAT

4   THAT WOULD BE THE APPROPRIATE FIRST STEP BEFORE DISCOVERY

5   ENSUES, YOUR HONOR.

6          THE COURT:  OKAY.

7          MR. GRIFFIN:  WE ALSO, BY THE WAY, WOULD NEED A

8   PROTECTIVE ORDER MOTION, PROTECTIVE ORDER WORKED OUT BEFORE ANY

9   CONSIDERATION OF DISCOVERY.

10         THE COURT:  YOU CAN USE THE PROTECTIVE ORDER ON THE

11  COURT'S WEBSITE AS A TEMPORARY PROTECTIVE ORDER AND THEN IF YOU

12  NEED TO NEGOTIATE SOMETHING DIFFERENT OR TAILOR SOMETHING

13  DIFFERENT, YOU CAN SUBSTITUTE A NEW ONE LATER.  BUT FOR THE

14  MOMENT THAT ONE IS IN EFFECT AS OF THIS MOMENT.

15         SO, SOMEBODY CAN GET ME A COPY TO SIGN SO YOU CAN GO

16  AHEAD WITH DISCOVERY NOW.

17         THE DISCOVERY I HAVE IN MIND IS INITIAL DISCLOSURES,

18  DOCUMENTS GIVEN TO THE GOVERNMENT, SUBPOENAS GIVEN TO THE

19  GOVERNMENT, AND ANY DOCUMENTS THAT WERE PRODUCED IN CONNECTION

20  WITH THE DRAM CASES.  FOR STARTERS, THAT'S GENERALLY WHAT I

21  HAVE IN MIND.  AND THAT OUGHT TO GIVE THE PLAINTIFFS ENOUGH TO

22  DO FOR A LITTLE WHILE, AT LEAST.

23         BEYOND THAT, THE NEXT STEP WOULD BE PERHAPS

24  ADDITIONAL WRITTEN DISCOVERY OR ADDITIONAL DOCUMENT DISCOVERY,

25  BUT NO INTERROGATORY OR DEPOSITION DISCOVERY.  MEANWHILE, IF

DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

1   THERE ARE -- IF PLAINTIFF HAS CANDIDLY ADMITTED THAT THERE ARE

2   SOME DEFENDANTS WHO PROBABLY WON'T BE PROCEEDED WITH, I

3   ANTICIPATE THAT THE PLAINTIFFS WOULD BE WILLING TO SPEAK ON AN

4   INDIVIDUAL BASIS WITH ALL OF THE DEFENDANTS AND DISCUSS THE

5   SHOWINGS THAT COULD BE MADE WITH EACH OF THEM, AND DISCUSS

6   DELAYS OF RECEIVING DISCOVERY FROM THEM UNTIL THOSE SESSIONS

7   CAN BE HELD.  AND YOU MIGHT WELL BE ABLE TO AVOID EVEN DOING

8   THAT MUCH UNTIL YOU HAVE BEEN ABLE TO REACH SOME AGREEMENT WITH

9   THE PLAINTIFFS.

10          SO, I SUGGEST YOU TRY THAT FIRST.  IF YOU FEEL THAT

11  YOU ARE BEING COMPELLED TO TURN OVER BURDENSOME DISCOVERY AND

12  NOT LISTENED TO IN TERMS OF POSSIBLE DISMISSALS AND SO ON, THEN

13  I SUPPOSE YOU CAN MAKE SOME SORT OF A MOTION.  BUT I THINK THAT

14  THE PLAINTIFFS WILL PROCEED REASONABLY IN NEGOTIATING THOSE

15  THINGS WITH INDIVIDUAL DEFENDANTS.

16          MR. SHOHET:  YOUR HONOR, WE DO UNDERSTAND THAT THERE

17  HAVE BEEN SOME DISCUSSIONS, AND PERHAPS AN AGREEMENT THAT WOULD

18  STIPULATE TO THE DROPPING OF THE DEFENDANTS THAT AT LEAST

19  DIDN'T GET GRAND JURY SUBPOENAS, WITH AN AGREEMENT THAT PERHAPS

20  THEY CAN BE BROUGHT BACK IN IF AT A LATER TIME FACTS WERE TO

21  DEVELOP THAT WOULD INDICATE THAT THEY WERE A PART OF SOME

22  CLAIM.

23          BUT THE POINT HERE FOR MY CLIENT AT THIS POINT IS WE

24  DID NOT RECEIVE -- WE DIDN'T PRODUCE ANY DOCUMENTS IN DRAM

25  BECAUSE WE WEREN'T A DEFENDANT IN DRAM, AND WE HAVEN'T RECEIVED

1  A GRAND JURY SUBPOENA, SO WE HAVE NO DISCOVERY TO GIVE TO THE

2  PLAINTIFFS --

3          THE COURT:  THEN DON'T COMPLAIN.

4          MR. SHOHET:  WHY SHOULD WE BE SITTING AROUND WHILE

5  IN THE CASE WHILE THEY'RE GETTING DISCOVERY SUPPOSEDLY TO BUILD

6  A CASE, IF THERE IS ONE.  IT SEEMS TO ME THAT THERE'S NO HARM

7  TO THE PLAINTIFFS --

8          THE COURT:  I JUST LIMITED WHAT DISCOVERY THEY ARE

9  GOING TO GET.  SO I AM NOT REALLY --

10          MR. SHOHET:  THEY'RE GOING TO GET --

11          THE COURT:  I DON'T WANT --

12          (SIMULTANEOUS COLLOQUY.)

13          MR. SHOHET:  WHY NOT JUST LET US OUT NOW --

14          THE COURT:  SIR --

15          MR. SHOHET:  IT SEEMS TO ME WHY WOULDN'T IT BE

16  APPROPRIATE FOR THEM TO LET US OUT NOW.  THEY CAN BRING US BACK

17  IN IF THEY FIND FACTS --

18          THE COURT:  YOU ARE WELCOME TO DISCUSS THAT WITH

19  THEM.

20          MR. SHOHET:  ALL RIGHT.

21          THE COURT:  I CERTAINLY CAN'T DO THAT WITHOUT A

22  MOTION.

23          SO LET'S MOVE ON.

24          MR. GRIFFIN:  YOUR HONOR, MAY I ADDRESS THE THIRD

25  POINT, THE DRAM PRODUCTION?

DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

1      THE COURT:  YES.

2      MR. GRIFFIN:  THE DEFENDANTS SUBMIT THAT THAT IS

3  OVERBROAD.  TO THE EXTENT THAT THERE ARE ANY SRAM DOCUMENTS IN

4  OUR DRAM PRODUCTIONS, THEY ARE CERTAINLY FREE TO ASK US FOR

5  THOSE.  BUT TO ORDER US TO WHOLESALE TURN OVER ALL THE DRAM

6  DOCUMENTS, WE THINK, IS OVERBROAD AND NOT NECESSARY.

7      THE COURT:  THEY ARE NOT AT YOUR EXPENSE.

8      MR. GRIFFIN:  THEY'RE DIFFERENT CASES --

9      THE COURT:  BUT IT'S NOT GOING TO HURT ANYTHING.  IT

10  WON'T BE AT YOUR EXPENSE.

11      MR. GRIFFIN:  WELL IT'S, WE BELIEVE IT'S OVERBROAD

12  AND UNNECESSARY.  TO THE EXTENT THERE IS SRAM RELEVANT

13  MATERIAL, WE CERTAINLY WILL CONSIDER THAT.

14      THE COURT:  I WOULD LIKE TO HAVE -- THE REASON WE

15  HAVE LIAISON COUNSEL IS TO NOT HAVE A LOT OF DIFFERENT PEOPLE

16  SPEAKING.  SO IF YOU ALL CAN PLAN THINGS OUT BEFOREHAND.  AND

17  IF YOU NEED TO SAY SOMETHING, ANY OF THE OTHERS OF YOU, JUST

18  ADDRESS IT TO THE LIAISON COUNSEL AT SIDEBAR.

19      MR. GRIFFIN:  WE PREVIOUSLY ARRANGED, YOUR HONOR,

20  THAT MR. TUBACH WILL BE THE ONE TO DISCUSS THE SCHEDULE WITH

21  YOU.

22      THE COURT:  OKAY.

23      I GUESS THE FIRST ITEM WAS PRODUCING THE DOCUMENTS

24  THAT WERE PRODUCED TO THE DOJ AND THE DRAM DOCUMENTS.

25      YOU'VE GOT JUNE 8TH.  THAT SEEMS A LITTLE QUICK.  IT

1   SEEMS LIKE IT CAN BE JUNE 15TH WOULD --

2           MR. COTCHETT:  YES, YOUR HONOR.

3           THE COURT:  -- WORK AT THE TIME WE ARE DOING THE

4   REST OF THEM.

5           AND THEN --

6           MR. TUBACH:  WE'VE PRODUCED -- GOOD AFTERNOON, YOUR

7   HONOR, MICHAEL TUBACH.  I HAVE BEEN DESIGNATED TO SPEAK ON

8   SCHEDULING, YOUR HONOR.

9           THE COURT:  SURE.

10          MR. TUBACH:  WE PRODUCED A LOT OF ORIGINAL

11  DOCUMENTS.  TO THE EXTENT DOCUMENTS ARE PRODUCED TO THE GRAND

12  JURY, SOME -- MANY OF THE DEFENDANTS HAVE PRODUCED ORIGINAL

13  DOCUMENTS WHICH ARE NOT EASY TO BE PRODUCED IN ANY OTHER

14  FASHION EXCEPT BY PHOTOCOPIES.

15          IS THE COURT INDICATING -- BECAUSE IT SAID IT WOULD

16  BE COSTLESS TO THE DEFENDANTS, BUT THE PLAINTIFFS WOULD BE

17  PAYING FOR COPIES OF ANY DOCUMENTS WE PRODUCE?

18          THE COURT:  I ASSUME SO.

19          MR. TUBACH:  IT MAY TAKE -- I'M SUGGESTING THAT IT

20  MAY BE DIFFICULT TO GET THAT MANY COPIES PRODUCED BY JUNE 15TH.

21  IT IS TWO WEEKS AWAY.

22          THE COURT:  YOU SHOULD PROBABLY DO WHAT -- YOU

23  SHOULD PROBABLY HAVE SOME SORT OF SERVICE, SOME CENTRAL

24  DOCUMENT DEPOSITORY WITH SOME KIND OF SERVICE WHERE THE

25  DOCUMENTS ARE PUT AND THEN PEOPLE ORDER THE ONES THAT THEY

        DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

1    WANT.

2              MR. TUBACH:  WE CAN CERTAINLY TRY TO WORK THAT OUT.

3              THE COURT:  THERE ARE COMPANIES THAT DO THAT.

4              MR. TUBACH:  I THINK THAT'S GOING TO TAKE LONGER

5    THAN TWO WEEKS.  WE HAVE 24, I THINK IT WAS, DEFENDANTS.  MANY

6    OF WHOM HAVE RECEIVED GRAND JURY SUBPOENAS.  GETTING ANYTHING

7    DONE IN TWO WEEKS IS GOING TO INVOLVE HUNDREDS AND HUNDREDS OF

8    THOUSANDS OF PAGES.  IT'S NOT LIKELY TO HAPPEN IN TWO WEEKS.

9    WE CAN CERTAINLY TALK TO THE PLAINTIFFS ABOUT SETTING A

10   SCHEDULE FOR PRODUCING THEM.

11             THE COURT:  IF YOU HAVE SOME REASONABLE REASON WHY

12   YOU CAN'T DO IT, YOU CAN TALK TO THEM ABOUT IT.

13             IN THIS DAY AND AGE, IT SEEMS YOU PROBABLY CAN AND

14   THAT YOU SHOULD DISCUSS SOME SORT OF CENTRAL DOCUMENT

15   DEPOSITORY WHERE EVERYBODY IS GOING TO BE ABLE TO GET ACCESS TO

16   EITHER THE ELECTRONICALLY FILED ONES OR THE ONES THAT HAVE TO

17   BE DONE IN HARD COPY.  YOU CAN SCAN THINGS.

18             ONCE IT IS PRODUCED ONCE, IT'S NOT THAT HARD TO

19   PRODUCE IT AGAIN.  IT'S GOING TO COST SOME MORE MONEY, WHICH

20   THE PLAINTIFFS WILL HAVE TO PAY FOR.

21             I DID HAVE A QUESTION ABOUT THE SECOND BOX IN YOUR

22   CHART WHICH HAS TO DO WITH SALES DATA.

23             WHAT IS THAT?  IS THAT INITIAL DISCLOSURE OR IS

24   THAT --

25             MR. TUBACH:  THAT'S JUST FREE DISCOVERY, YOUR HONOR.

1              THE COURT:  THAT'S FREE-FLOATING DISCOVERY?

2              MR. SCARPULLA:  MAY IT PLEASE THE COURT, YOUR HONOR,

3     FRANCIS SCARPULLA APPEARING ON BEHALF OF THE INDIRECT-PURCHASER

4     PLAINTIFFS.

5              WHAT WE HAVE IN MIND IS SOMETHING VERY SIMPLE, AND

6     THAT IS TO GIVE US THE TOTAL SALES OF SRAM BY YEAR IN THE CLASS

7     PERIOD.  THAT'S A NUMBER THAT YOU GET OUT OF A COMPUTER RUN.

8     AND AT LEAST FOR US, BECAUSE WE HAVE SEPARATE STATES, THERE IS

9     ANOTHER COMPUTER RUN THAT SHOULD GIVE YOU, BECAUSE THESE

10    COMPANIES ARE SOPHISTICATED COMPANIES, WHICH I ASSUME THEY ARE,

11    THEY MUST HAVE THE INFORMATION OF SALES BY DRAM -- SORRY, OF

12    SRAM BY STATE, BY WHATEVER PERIOD OF TIME THEY TAKE, WHETHER

13    IT'S QUARTERLY, MONTHLY, YEARLY.  THAT'S ALL WE WANT.  IT'S A

14    SIMPLE COMPUTER RUN.  IT'S ONE DISK THEY CAN GIVE US.

15             THE COURT:  IT'S NOT AN EXISTING DOCUMENT.

16             MR. SCARPULLA:  I BELIEVE IT IS, YOUR HONOR.  I DO

17    NOT KNOW.

18             MR. TUBACH:  I THINK THAT'S ON INFORMATION AND

19    BELIEF.

20             MR. SCARPULLA:  BUT I DO KNOW IF YOU ARE A

21    MULTINATIONAL CORPORATION, YOU KEEP THIS KIND OF INFORMATION

22    AVAILABLE.  YOU HAVE TO KNOW IT.  YOU HAVE TO PAY TAXES AT EACH

23    STATE YOU ARE SELLING IT.  YOU HAVE TO KNOW WHAT YOUR SALES ARE

24    TO PEOPLE WITHIN THE DIRECT SALES WITH OTHER STATES.

25             THE COURT:  OKAY.  I CAN'T GRANT A DISCOVERY REQUEST

      DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

```
1     THAT HASN'T BEEN MADE.  AND I AM NOT GOING TO ORDER ANY
2     DISCOVERY OTHER THAN DOCUMENT PRODUCTION.
3                MR. SCARPULLA:  CORRECT.
4                THE COURT:  TO THE EXTENT IT IS AN EXISTING
5     DOCUMENT, PERHAPS YOU WILL GET IT IN THE THINGS THAT I HAVE
6     ORDERED.
7                MR. SCARPULLA:  WE HAD PLANNED A MEET AND CONFER
8     WITH THEM, YOUR HONOR, TO MAKE THIS AS SIMPLE AND EASY AS
9     POSSIBLE.
10               THE COURT:  IF YOU CAN DO THAT, THAT WILL BE FINE,
11    BUT I AM NOT ORDERING THAT.
12               MR. SCARPULLA:  THAT WAS SOMETHING THEY GAVE US AS
13    PART OF THE INITIAL DISCOVERY IN DRAM.
14               THE COURT:  OKAY.  WELL, TO THE EXTENT YOU CAN GET
15    AN AGREEMENT TO THAT EFFECT, THAT'S FINE.  IF NOT, IT WOULD
16    COME UNDER THE CATEGORY OF DOCUMENT DISCOVERY THAT I WILL ALLOW
17    PERHAPS AFTER THE MOTION TO DISMISS, OR REALLY INTERROGATORIES
18    THAT WILL BE LATER DOWN THE LINE.
19               BUT IF YOU CAN PERSUADE THEM THAT IT IS IN THEIR
20    INTEREST TO MOVE MORE EFFICIENTLY BY GIVING YOU THAT THING THAT
21    YOU WANT, THEN YOU ARE WELCOME TO WORK THAT OUT.
22               MR. SCARPULLA:  THANK YOU, YOUR HONOR.
23               THE COURT:  WHY DO YOU WANT -- MAYBE YOU SAID THIS
24    SOMEWHERE BUT I FORGOT -- WHY ARE YOU NOW WAITING UNTIL
25    AUGUST 31ST TO FILE YOUR CONSOLIDATED AMENDED COMPLAINT?
```

1          MR. COTCHETT:  THE ANSWER TO THAT IS REALLY SIMPLE.

2    WE ANTICIPATE GETTING THE DOJ DOCUMENTS HOPEFULLY WITHIN A

3    REASONABLE PERIOD OF TIME.  THESE ARE THOUSANDS, IF NOT

4    MILLIONS OF DOCUMENTS.  IT'S GOING TO TAKE US ABOUT THAT LENGTH

5    OF TIME TO REVIEW THEM FOR THE CONSOLIDATED AMENDED COMPLAINT.

6          THE COURT:  AND YOU NEED THEM TO MAKE THE

7    CONSOLIDATED AMENDED COMPLAINT OR YOU --

8          MR. COTCHETT:  NO.

9          THE COURT:  -- WANT TO USE THEM SO YOU DON'T HAVE TO

10   DO IT TWICE?

11         MR. COTCHETT:  USE THEM SO WE DON'T HAVE TO DO IT

12   TWICE IS THE FIRST ISSUE.

13         CERTAINLY WE HAVE A COMPLAINT ON FILE.  WE ARE GOING

14   TO FILE AN AMENDED COMPLAINT, THE CONSOLIDATED COMPLAINT

15   ELIMINATING CERTAIN DEFENDANTS.  THE REVIEW OF THOSE DOCUMENTS

16   WILL ASSIST US TO ELIMINATE CERTAIN DEFENDANTS AND MOVE

17   FORWARD.

18         MR. TUBACH:  WHAT THE PLAINTIFFS ARE ESSENTIALLY

19   SAYING IS, LET US RUMMAGE THROUGH YOUR FILES AND SEE IF WE CAN

20   COME UP WITH A BASIS FOR THE COMPLAINTS THAT WE FILED.

21         THEY ARE NOT ENTITLED TO DO THAT.  IF THEY NEED

22   UNTIL AUGUST 31ST TO FILE A CONSOLIDATED AMENDED COMPLAINT, I

23   DON'T THINK ANY DEFENDANT WILL OBJECT TO THAT.  THAT'S

24   PERFECTLY FINE IF THEY NEED A LONGER TIME TO DO THAT.

25         BUT THE WHOLE POINT OF THIS PROCESS IS THEY

1    SHOULDN'T BE FILING A COMPLAINT UNLESS THEY HAVE A BASIS TO DO

2    IT.  SOME OF THESE COMPLAINTS WERE FILED SIX DAYS AFTER THE

3    GRAND JURY SUBPOENAS WERE PUBLICLY DISCLOSED.  I CAN'T IMAGINE

4    THAT THERE WAS A LOT OF INVESTIGATION THAT HAPPENED IN THOSE

5    SIX DAYS.

6          IF THE PLAINTIFFS HAVE A SUFFICIENT BASIS TO FILE A

7    CONSOLIDATED AMENDED COMPLAINT, THEY SHOULD DO SO.  THEY

8    INDICATED ON JUNE 15TH.  IF THEY NEED LONGER TO GET IT TOGETHER

9    I AM FINE WITH THAT, BUT THEY SHOULDN'T BE GIVEN DISCOVERY TO

10   HELP MAKE A CASE THAT THEY DON'T HAVE.

11        THE COURT:  WELL, THAT COULD BE TRUE, BUT IN THE

12   INTEREST OF MOVING THINGS ALONG, I AM GOING TO ALLOW THAT.  THE

13   CHANCES ARE THERE WILL BE MOTIONS TO DISMISS, THERE WILL BE

14   GRANTED IN PART WITH LEAVE TO AMEND, I WILL HAVE TO GIVE THEM

15   LEAVE TO AMEND.

16        IF THEY HAVE THE THINGS THEY NEED THE FIRST TIME

17   THEY DO IT, MAYBE THEY'LL ONLY HAVE TO AMEND TWICE INSTEAD OF

18   THREE TIMES AND WE WILL ALL SAVE MONTHS OF WORK.  SO I THINK

19   IT'S MOST EFFICIENT TO HAVE TWO TRACKS GOING ON PREPARING THEIR

20   CONSOLIDATED AMENDED COMPLAINT AND DOING THE BEST THAT THEY CAN

21   ON THE FIRST TRY TO ELIMINATE THE -- I AM GOING TO BE REQUIRED

22   TO GIVE THEM LEAVE TO AMEND ANYWAY.  SO MIGHT AS WELL BE AS

23   GOOD AS THEY CAN GET THE FIRST TIME.

24        MR. COTCHETT:  THANK YOU, YOUR HONOR.

25        THE COURT:  SO, ASSUMING YOU FILE ON AUGUST 31ST,

```
1    THE DEFENDANTS' PROPOSED DATES TO RESPOND TO IT NO LONGER APPLY

2    AND THE PLAINTIFFS DIDN'T GIVE PROPOSED DATES FOR THAT, SO WHAT

3    SHALL I SET AS A DATE FOR SERVE DEFENDANTS TO RESPOND TO THE

4    CONSOLIDATED AMENDED COMPLAINT?

5              MR. TUBACH:  YOUR HONOR, WE HAVE SET OUT A SCHEDULE.

6    PERHAPS THE SCHEDULE CAN SIMPLY BE SHIFTED TO TAKE INTO ACCOUNT

7    THE NEW FILING DATE, AND GO FORWARD.  I CAN -- BASICALLY SIX

8    WEEKS TO RESPOND.

9              THE COURT:  PROPOSE SIX WEEKS.  OKAY.

10             MR. TUBACH:  IT MIGHT MAKE MORE SENSE --

11             THE COURT:  SO MID-OCTOBER.  OCTOBER 15TH TO

12   RESPOND?

13             MR. TUBACH:  YOUR HONOR, IT MIGHT MAKE MORE SENSE TO

14   HAVE ONE -- IF WE ARE GOING TO HAVE SEPARATE SERVICE DATES FOR

15   THE FOREIGN AND THE DOMESTIC DEFENDANTS, IT MIGHT BE MORE

16   EFFICIENT TO HAVE ONE DEADLINE FOR ALL DEFENDANTS TO RESPOND TO

17   THE CONSOLIDATED AMENDED COMPLAINT; OTHERWISE THE COURT IS

18   ESSENTIALLY GOING TO BE LOOKING AT TWO DIFFERENT BRIEFS, TWO

19   DIFFERENT SETS OF BRIEFS AFTER THE DEFENDANTS ARE SERVED.

20             THE COURT:  TWO DIFFERENT MOTIONS TO DISMISS.

21             OH, I DON'T WANT TO WAIT THAT LONG.  I'M AFRAID IT

22   WILL TAKE TOO LONG.

23             WHAT WAS THE DATE I GAVE FOR SERVING THE FOREIGN

24   DEFENDANTS?

25             MR. TUBACH:  IT WAS OCTOBER 1, YOUR HONOR.
```

1           THE COURT:  OKAY.  WELL, LET'S MAKE IT 20 DAYS AFTER

2     OCTOBER 1 THEN.  SO THAT WOULD BE ABOUT THREE WEEKS.

3           SO LET'S SAY OCTOBER 22ND FOR ALL -- FOR ANYBODY WHO

4     GETS SERVED BY OCTOBER 1 MUST FILE THEIR ANSWER OR MOTION TO

5     DISMISS BY OCTOBER 22ND.

6           AND THEN HOW LONG WOULD YOU LIKE -- I AM GOING TO

7     ASSUME IT IS GOING TO BE A MOTION TO DISMISS.  HOW LONG DO YOU

8     WANT TO OPPOSE?

9           MR. COTCHETT:  15 DAYS, YOUR HONOR.

10          THE COURT:  SO THAT WOULD BE NOVEMBER 5TH.

11          AND THEN THE REPLY COULD BE WHAT?

12          MR. TUBACH:  IF WE CAN HAVE THREE WEEKS, YOUR HONOR.

13          THE COURT:  THREE?

14          MR. TUBACH:  THREE.

15          THE COURT:  THE 26TH.

16          AND THEN WE WILL HEAR IT ON THE 20TH OF DECEMBER AT

17    2:00 O'CLOCK.

18          THE JUSTICE DEPARTMENT WANTS HOW LONG FOR THE STAY

19    OF DISCOVERY OTHER THAN DOCUMENT DISCOVERY?

20          MR. LYNCH:  OUR REQUEST, YOUR HONOR, IS THAT IT

21    WOULD BE FOR 12 MONTHS.  AND THAT WE WOULD COME BACK TO YOU

22    AND -- IF WE WANTED ADDITIONAL TIME AT THAT TIME WE WOULD MAKE

23    A REQUEST.  AND IF WE DIDN'T NEED ADDITIONAL TIME, THEN WE

24    WOULD INFORM THE COURT AT THAT TIME.

25          THE COURT:  SO 12 MONTHS FROM NOW?

```
1           MR. LYNCH:  CORRECT.

2           THE COURT:  SO I GUESS WHAT WE CAN DO THEN IS SAY

3    THAT WHEN -- ONCE THE PLEADINGS ARE SETTLED, OR AT LEAST THIS

4    FIRST ROUND OF MOTIONS TO DISMISS ARE DECIDED, THEN WE WILL

5    OPEN UP ALL DOCUMENT DISCOVERY.  AND AT THE END OF A YEAR, WE

6    WILL -- WHICH WOULD BE JUNE 1ST OF '08, PRESUMABLY WE WILL OPEN

7    UP ALL OTHER WRITTEN DISCOVERY.  AND MAYBE WE WILL WAIT AND DO

8    DEPOSITIONS SOMETIME AFTER THAT.  AND THAT'S ALL SUBJECT TO

9    CHANGE IF THE DEPARTMENT ASKS FOR MORE TIME.

10          MR. LYNCH:  WE WILL CERTAINLY ADVISE THE COURT OF

11   THE STATUS OF OUR INVESTIGATION IF WE NEED ADDITIONAL TIME WITH

12   REGARD TO THE STAY.

13          THE COURT:  OKAY.

14          SO THE NEXT MOVE THEN IS CLASS CERTIFICATION

15   MOTIONS.  AND IN LIGHT OF THIS SCHEDULE THAT WE ARE NOW

16   SETTING, WHEN DO YOU WANT TO MAKE YOUR CLASS CERTIFICATION

17   MOTIONS?

18          MR. COTCHETT:  I APOLOGIZE, YOUR HONOR.

19          THE COURT:  THE NEXT STEP IS CLASS CERTIFICATION

20   MOTIONS.  WHEN WOULD YOU LIKE TO MAKE THOSE?

21          MR. COTCHETT:  WELL, WE SHOULD SCHEDULE IT, I WOULD

22   THINK AND HOPE, AFTER THE NEXT CMC CONFERENCE UNLESS YOU'D LIKE

23   TO DO IT RIGHT NOW.

24          THE COURT:  I JUST AS SOON DO IT NOW.

25          MR. COTCHETT:  OKAY.
```

1           THE COURT:  WE MIGHT HAVE TO CHANGE IT, BUT AT

2    LEAST --

3           MR. COTCHETT:  GOOD.  OKAY.  THEN I AM LOOKING

4    SOMETIME IN JANUARY, YOUR HONOR.

5           THE COURT:  OKAY.

6           MR. SCARPULLA:  THAT'S FINE WITH US, YOUR HONOR,

7    TOO.

8           MR. TUBACH:  OF WHICH YEAR?

9           THE COURT:  WE ARE UP TO '08 NOW.

10           MR. TUBACH:  SO THE PROPOSAL IS TO FILE CLASS CERT.

11    MOTIONS WITHOUT ANY DISCOVERY OTHER THAN THE GRAND JURY

12    DOCUMENTS --

13           THE COURT:  I GUESS --

14           MR. SCARPULLA:  WE WOULD FILE THE INITIAL -- EXCUSE

15    ME, YOUR HONOR.  FRANCIS SCARPULLA APPEARING ON BEHALF OF THE

16    INDIRECT-PURCHASER PLAINTIFFS.

17           WE WOULD FILE OUR MOTIONS IN JANUARY.

18           MR. COTCHETT:  AND THEN WORK OUT FROM THERE.

19           MR. SCARPULLA:  AND THEN WORK OUT FROM THERE.

20           THE COURT:  YEAH.  THAT'S THE IDEA.

21           MR. COTCHETT:  I WOULD SUGGEST JANUARY 11TH, YOUR

22    HONOR.

23           THE COURT:  THAT SEEMS A LITTLE QUICK, BUT IT'S YOUR

24    PROBLEM.  SO IF YOU WANT DO IT THAT SOON, YOU CAN.

25           MR. COTCHETT:  WE WILL DO IT.

```
1              THE COURT:  I CAN'T SWEAR I'LL HAVE THE ORDER OUT ON

2    THE MOTION TO DISMISS THAT QUICK.

3              MR. SCARPULLA:  WELL, THEN --

4              MR. COTCHETT:  SO THEN WE OUGHT TO PUSH IT OUT THEN

5    BECAUSE WE OUGHT TO WAIT FOR THAT ORDER.  THAT ORDER WILL

6    CERTAINLY TELL US WHERE WE ARE.

7              MR. TUBACH:  IT MIGHT MAKE MORE SENSE TO COME BACK

8    OR TO TALK ABOUT THIS --

9              THE COURT:  NO, I'D RATHER JUST SET DATES.  AND IF

10   THEY DON'T WORK, WE CAN ALWAYS CONTINUE THEM, BUT AT LEAST

11   WE'LL KNOW THE BROAD OUTLINES OF WHAT WE ARE TRYING TO DO HERE.

12             MR. TUBACH:  THERE MAY BE AN AMENDED COMPLAINT.

13             THE COURT:  I'M SURE THERE MIGHT BE.  AND IF THERE

14   IS, WE MAY HAVE TO CHANGE EVERYTHING, BUT --

15             MR. COTCHETT:  SURE.  LET'S GO OVER THEN TO

16   FEBRUARY, FEBRUARY 15TH.

17             THE COURT:  OKAY.

18             YOU CAN FILE YOUR CLASS -- AND I AM GOING TO HAVE

19   YOU FILE THEM AT THE SAME TIME.  I MAY NOT HEAR THEM AT THE

20   SAME TIME.

21             MR. COTCHETT:  YES.

22             THE COURT:  I MAY --

23             MR. SCARPULLA:  THAT'S FINE, YOUR HONOR.

24             THE COURT:  -- RESCHEDULE THE HEARING DATES

25   DEPENDING ON HOW BURDENSOME IT IS.
```

1          LET'S HAVE YOU FILE BOTH -- IT'S GOING TO BE TWO

2   SEPARATE MOTIONS?

3          MR. SCARPULLA:  IT'S GOING TO BE TWO SEPARATE

4   MOTIONS, YOUR HONOR.  YES.

5          THE COURT:  FILE THEM ON FEBRUARY 15TH.  WE CAN HAVE

6   AN OPPOSITION ON MARCH 15TH.


7          MR. TUBACH:  YOUR HONOR, BEFORE WE OPPOSE CLASS

8   CERT., WE WILL PROBABLY WANT TO TAKE SOME DISCOVERY TO SEE

9   WHETHER OR NOT THERE'S ANY LEGITIMATE BASIS FOR THE PLAINTIFF

10  SERVING AS CLASS REPRESENTATIVES, FOR INSTANCE.

11         THE COURT:  DO YOU WANT TO START THAT NOW?

12         MR. TUBACH:  NO, I DON'T.  I MEAN, I THINK THAT'S

13  PART OF THE PROBLEM.  IF WE'RE IN A STAY MODE, WHICH DOJ'S

14  REQUESTED AND THE COURT HAS ENTERED, I'M NOT SURE HOW WE CAN

15  PROCEED TO --

16         THE COURT:  WELL, MY IDEA --

17         MR. SCARPULLA:  STAY DISCOVERY --

18         (SIMULTANEOUS COLLOQUY.)

19         THE COURT:  EXCUSE ME.

20         I DON'T THINK THE DOJ CARES IF YOU TAKE DISCOVERY OF

21  THE PLAINTIFFS.  IF YOU WANT TO DO THAT, YOU CAN GO AHEAD AND

22  DO THAT, I THINK.  YOU DON'T MIND THAT.

23         MR. COTCHETT:  NOT AT ALL.

24         MR. SCARPULLA:  TALK WITH MR. LYNCH ABOUT THAT.

25         THE COURT:  YOU CAN START YOUR CLASS CERT.

```
1    DISCOVERY, AT LEAST WRITTEN -- DO WRITTEN DISCOVERY FIRST

2    BEFORE YOU START DOING DEPOSITIONS, BUT YOU CAN GO AHEAD AND

3    START THAT RIGHT NOW IF YOU WANT TO.

4              MR. TUBACH:  YOUR HONOR, SO THE DEFENDANTS ARE NOT

5    LIMITED TO DOING ANY DISCOVERY?

6              THE COURT:  THE DEFENDANTS MAY DO CLASS

7    CERTIFICATION DISCOVERY EFFECTIVE IMMEDIATELY STARTING FIRST

8    WITH WRITTEN DISCOVERY AND PROCEEDING TO DEPOSITIONS AFTER AN

9    AGREED UPON POINT.

10             MR. TUBACH:  IF IT'S NOT LIMITED TO THE PLAINTIFFS,

11   WE CAN DO THIRD PARTY DISCOVERY ALSO?

12             MR. LYNCH:  WELL, YOUR HONOR, THIS IS EXACTLY THE

13   TYPE OF THING I THINK THE PARTIES SHOULD SIT DOWN AND DECIDE

14   WHAT DISCOVERY IS ALLOWABLE AND WHAT'S NOT.

15             WE'RE ABSOLUTELY OPPOSED TO THE DEFENDANTS HAVING

16   OPEN-ENDED DISCOVERY SAY AGAINST OTHER CO-DEFENDANTS.  THAT'S

17   SOMETHING THAT WE ARE VERY CONCERNED ABOUT.  WE HAVE NO

18   OBJECTION IF THEY WANT TO CONDUCT DEPOSITIONS OR ANY DISCOVERY

19   TOWARDS PLAINTIFFS, NAMED PLAINTIFFS.  THAT'S FINE.

20             I THINK SOME OF THIS DETAIL IS SOMETHING THAT MIGHT

21   BE BEST FOR US TO HASH OUT OVER THE NEXT WEEK AND FOR US TO

22   PRESENT A DISCOVERY ORDER TO YOU.

23             THE COURT:  EITHER THAT OR IF YOU, MAYBE YOU WILL

24   HAVE TO GO TO THE SPECIAL MASTER, BUT GENERALLY SPEAKING, WHAT

25   I AM THINKING ABOUT IS DISCOVERY OF THE PLAINTIFFS ABOUT THEIR
```

1    ADEQUACY AND NUMEROSITY AND ALL THOSE CLASS CERT. ISSUES, BUT,

2    NO, NOT USING THAT AS A WAY OF GETTING DISCOVERY FOR THE

3    CRIMINAL CASE ON OTHER DEFENDANTS OR THIRD PARTIES.  IT'S HARD

4    TO IMAGINE HOW THIRD PARTY DISCOVERY WOULD BE RELEVANT TO CLASS

5    CERTIFICATION, BUT --

6           MR. TUBACH:  WE NEED TO, FOR INSTANCE, IT'S NOT JUST

7    NUMEROSITY --

8           THE COURT:  OKAY.  WELL, WHY DON'T YOU TRY TO TALK

9    ABOUT IT AMONGST YOURSELVES AND IF YOU ARE UNABLE TO RESOLVE

10   IT, THEN I WILL REFER IT TO A SPECIAL MASTER TO DEFINE.

11          WHAT I HAVE IN MIND IS CLASS CERTIFICATION DISCOVERY

12   DIRECTED AT PLAINTIFFS YOU CAN START DOING RIGHT NOW.  AND IF

13   YOU WANT MORE THAN THAT, THEN YOU WILL HAVE TO MEET AND CONFER

14   ABOUT IT.

15          MR. TUBACH:  I CAN TELL THE COURT NOW WE WILL NEED

16   MORE THAN THAT.  THAT'S THE PROBLEM.

17          THE COURT:  OKAY.  WELL, MEET AND CONFER ABOUT THAT

18   AND THEN GO TO THE SPECIAL MASTER.

19          MR. TUBACH:  IF WE ARE SETTING A DEADLINE NOW FOR US

20   TO RESPOND TO THIS CLASS CERT. MOTION, I CAN -- IF THE COURT

21   WANTS TO SET A DEADLINE, THAT'S FINE.  I AM PRETTY CONFIDENT

22   WE'RE GOING TO HAVE TO COME BACK AND ASK THAT THAT BE PUT OFF

23   UNLESS WE ARE ALLOWED TO DO THE KIND OF DISCOVERY WE'RE GOING

24   TO NEED TO DO TO BE PREPARED TO OPPOSE CLASS CERTIFICATION.

25          MR. LYNCH:  YOUR HONOR, ONE COMMENT?

DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

1          THE COURT:  IF YOU HAVE TO ASK TO PUT IT OFF, YOU

2   CAN ASK TO PUT IT OFF, BUT LET'S TRY FOR MARCH 15TH.

3          MR. TUBACH:  YOUR HONOR, CAN WE HAVE LONGER THAN A

4   MONTH?  THEY'RE GOING TO HAVE EIGHT MONTHS TO PREPARE THEIRS.

5          THE COURT:  WHAT DO YOU WANT?

6          MR. TUBACH:  CAN WE HAVE 60 DAYS?

7          THE COURT:  OKAY.  APRIL 12TH.

8          THE CLERK:  THAT'S A SATURDAY.

9          THE COURT:  I AM LOOKING AT THE WRONG YEAR NOW.

10          APRIL 17TH.

11          AND A REPLY ON WHAT, MAY 1ST?

12          MR. COTCHETT:  THAT'S FINE, YOUR HONOR.

13          THE COURT:  HEARING ON MAY 15TH.

14          MR. COTCHETT:  DID YOU SAY MAY?

15          THE COURT:  YES.

16          MR. COTCHETT:  16TH?  THAT WOULD BE A FRIDAY?

17          THE COURT:  I AM SWITCHING MY LAW AND MOTION TO

18   THURSDAYS.

19          MR. COTCHETT:  OH, I SEE.

20          THE COURT:  SO THURSDAY, MAY 15TH AT 2:00 O'CLOCK

21   FOR HEARING.

22          AND THAT WILL BE OUR YEAR FOR THE LIMITATION ON

23   DOCUMENT DISCOVERY.  SO I GUESS AT THAT POINT WE WILL START ALL

24   DISCOVERY.

25          MR. LYNCH:  YOUR HONOR, THE DEPARTMENT OF JUSTICE

1    WOULD LIKE AN OPPORTUNITY, AT LEAST AFTER THE 12 MONTHS, TO

2    REVISIT THE ISSUE --

3              THE COURT:  I UNDERSTAND.  NONE OF THESE DATES ARE

4    SET IN STONE, BUT WE ARE TRYING TO GET A BROAD OUTLINE HERE.

5              MR. LYNCH:  RIGHT.

6              THE COURT:  SO, ASSUMING THAT THAT DOESN'T HAPPEN

7    AND THE YEAR IS UP, AND YOU'RE HAPPY TO GO FORWARD, THEN WE'LL

8    BE LOOKING AT ALL FACT DISCOVERY, AND WE WILL BE ASKING

9    OURSELVES HOW LONG DO WE NEED TO DO ALL FACT DISCOVERY.

10             AND HOW LONG DOES EACH OF YOU THINK THAT WILL BE?

11             MR. TUBACH:  SIX MONTHS, YOUR HONOR.

12             MR. COTCHETT:  THAT'S FINE WITH US.

13             THE COURT:  OKAY.  SO WE THEN -- ACTUALLY WE BETTER

14   HAVE A RULING ON THE CLASS CERT. MOTIONS.  SO IF WE ASSUME THAT

15   THAT WOULD COME OUT IN MID-JUNE, SIX MONTHS WOULD BE

16   MID-DECEMBER OR MID-JANUARY.

17             MR. TUBACH:  MID-JANUARY.

18             THE COURT:  DECEMBER.

19             MR. LYNCH:  DECEMBER.

20             THE COURT:  SO, WHY DON'T WE SAY TENTATIVELY THE

21   FACT DISCOVERY CUTS OFF ON DECEMBER 31ST OF '08.

22             WELL, ON THE EXPERTS, I AM NOT GOING TO DO IT --

23   WELL, THE WAY I AM GOING TO DO IT IS PLAINTIFFS WILL DISCLOSE

24   THEIR EXPERTS FIRST, THEN DEFENDANTS WILL DISCLOSE THEIR

25   EXPERTS, THEN PLAINTIFF WILL DISCLOSE REBUTTAL EXPERTS, AND

DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

1    THEN ALL EXPERT DISCOVERY WILL COMMENCE AND END AT THE SAME

2    TIME.

3              MR. COTCHETT:  GOOD.

4              THE COURT:  SO, IF WE WERE TALKING ABOUT AN END OF

5    FACT DISCOVERY ON DECEMBER 31ST, WHY DON'T WE DISCLOSE EXPERTS

6    ON JANUARY -- PLAINTIFFS DISCLOSE EXPERTS JANUARY 30TH.  DOES

7    THAT WORK?

8              MR. COTCHETT:  THAT WILL WORK.

9              THE COURT:  DEFENDANTS DISCLOSE EXPERTS ON

10   FEBRUARY 27TH.  AND PLAINTIFFS DISCLOSE ANY REBUTTAL EXPERTS ON

11   MARCH 13TH.  AND EXPERT DISCOVERY CUTS OFF -- HOW LONG WILL

12   THAT TAKE, THREE MONTHS FOR EXPERT --

13             MR. TUBACH:  THE COURT IS SAYING "PLAINTIFFS

14   EXPERTS".  DOES THAT INCLUDE THE REPORTS?

15             THE COURT:  YES.  DISCLOSURE INCLUDES REPORTS.

16             MR. COTCHETT:  60 DAYS, YOUR HONOR, WOULD DO IT.

17             THE COURT:  60 DAYS?

18             MR. TUBACH:  AFTER MARCH 13TH?  YES.

19             THE COURT:  ALL RIGHT.  SO THEN EXPERT DISCOVERY

20   WOULD CUT OFF ON MAY 15TH.  AND WE'VE GOTTEN OURSELVES UP TO

21   '09 NOW, I GUESS?

22             MR. COTCHETT:  YES, YOUR HONOR.

23             THE COURT:  AND THEN YOU WANT TO FILE YOUR

24   DISPOSITIVE MOTIONS, THE DEFENDANTS SAY, A MONTH AFTER EXPERT

25   DISCOVERY HAS CLOSED.  SO YOU WOULD BE FILING THEM ON

     DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

1    JUNE 18TH, '09.

2         AND I AM GOING SO SET THE SAME BRIEFING SCHEDULE,

3    BUT, AGAIN, I MAY END UP HAVING TO HEAR THEM ON SEPARATE DATES.

4    BUT IF DEFENDANTS -- WELL, I GUESS WE WILL HAVE TO TALK ABOUT

5    THIS MORE, BUT I WOULD LIKE TO HAVE THE DISPOSITIVE MOTIONS BE,

6    TO THE EXTENT POSSIBLE, A JOINT MOTION THAT RAISES ANY

7    ARGUMENTS THAT ARE COMMON TO MOST OR ALL DEFENDANTS.  AND IF

8    NECESSARY, SEPARATE ADDITIONAL MOTIONS WHICH DO NOT REPEAT IN

9    ANY WAY THE JOINT MOTION, BUT WHICH BRING OUT ONLY FACTS AND

10    LAW THAT ARE PARTICULAR TO A GIVEN DEFENDANT.  SO YOU'RE GOING

11    TO HAVE TO COORDINATE AMONGST YOURSELVES TO DO THAT AS MUCH AS

12    YOU CAN.

13         MR. TUBACH:  WE WILL DO THAT AS EFFICIENTLY AS WE

14    CAN, YOUR HONOR.  THERE'S NO -- NOBODY WANTS TO BURDEN THE

15    COURT WITH A BUNCH OF BRIEFS.

16         THE COURT:  SO, HOW FAR HAVE I GOTTEN?

17         MR. TUBACH:  JUNE 18TH, '09.

18         THE COURT:  SO THE PLAINTIFFS CAN FILE THEIR

19    OPPOSITION, CAN WE SAY, ON JULY 16TH?  AND THAT --

20         MR. COTCHETT:  YOUR HONOR, COULD WE HAVE 40 DAYS

21    AFTER, IF YOU DON'T MIND.  I CAN ANTICIPATE THESE --

22         THE COURT:  ALL RIGHT.  JULY 30TH.

23    AND --

24         MR. TUBACH:  IF WE CAN HAVE A MONTH TO RESPOND, YOUR

25    HONOR.

DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

1           THE COURT:  I GUESS WE HAVE TWO OPPOSITIONS.

2           MR. COTCHETT:  CORRECT.

3           THE COURT:  BUT I HOPE IT WOULDN'T BE MORE THAN TWO.

4           MR. COTCHETT:  I WOULD THINK NOT.

5           THE COURT:  OKAY.

6           THEN A REPLY ON AUGUST 27TH.

7           AND WE WOULD TRY TO HEAR IT ON, LET'S SAY

8    SEPTEMBER 17TH AT 2:00 O'CLOCK.

9           SETTLEMENT, WHAT DO YOU WANT TO DO TO SETTLE THE

10   CASE?  YOU'VE GOT IT WAY HERE AT THE END AFTER YOU HAVE DONE

11   EVERYTHING ELSE.

12          MR. SCARPULLA:  IT'S A LITTLE PREMATURE.

13          THE COURT:  WELL, IT MAY BE PREMATURE NOW, BUT IT'S

14   GOING TO BE WAY LATE IF YOU DO IT A MONTH BEFORE TRIAL.  SO

15   LET'S TALK ABOUT WHAT YOU'RE GOING TO DO AND WHEN YOU'RE GOING

16   TO DO IT.

17          WHAT WAS DONE TO SETTLE THE DRAM CASES?

18          MR. COTCHETT:  HERE IS WHAT I SUGGEST.  I SUGGEST WE

19   GET A SPECIAL MASTER IN PLACE, WHICH WE'LL AGREE UPON, AND COME

20   BACK TO YOU WITH A NAME.  AND AT THE SAME TIME, WE WILL SUGGEST

21   TO YOU ONE OR MORE PEOPLE AS SPECIAL SETTLEMENT MASTERS.  SO WE

22   SEPARATE THE TASK FROM DISCOVERY TO SETTLEMENT, AND WE'LL COME

23   BACK TO YOU WITH SOME NAMES.

24          THE COURT:  OKAY.

25          MR. TUBACH:  WE ARE HAPPY TO TALK ABOUT THAT, YOUR

1    HONOR.  I THINK AT THIS POINT, OBVIOUSLY SETTLEMENT DISCUSSIONS

2    ARE ALWAYS WORTH HAVING AT THE RIGHT TIME.  I THINK AT THIS

3    POINT TRYING TO FIGURE OUT WHEN WE ARE GOING TO DO IT IS

4    SOMETHING THAT THE COURT CAN ORDER EASILY IN SIX MONTHS OR NINE

5    MONTHS.  AT THIS POINT I'M NOT SURE IT MAKES A LOT OF SENSE TO

6    SET A DEADLINE TO TRY AND TALK SETTLEMENT.

7            THE COURT:  WELL, I THINK IT DOES.  I THINK YOU

8    COULD HAVE INITIAL TALKS AFTER THE PLEADINGS ARE SETTLED, SAY

9    EARLY PART OF NEXT YEAR.

10           SO LET'S HAVE AN INITIAL SETTLEMENT CONFERENCE HELD

11   BY SAY FEBRUARY 28TH OF '08.  AND YOU CAN START NOW DECIDING

12   WHO YOU ARE GOING TO GO TO.

13           WHO WENT -- WHO WORKED ON THE DRAM CASES?

14           MR. SCARPULLA:  FOR THE --

15           MR. COTCHETT:  WE HAD A COUPLE.

16           THE COURT:  WAS IT A SETTLEMENT JUDGE FOR THE DRAM

17   CASES?

18           MR. COTCHETT:  IT WAS.

19           MR. SCARPULLA:  WE DID, YOUR HONOR.

20           THE COURT:  WHO WAS IT?

21           MR. SCARPULLA:  WE HAD JUDGE WEINSTEIN OVER AT JAMS

22   FOR THE INDIRECT-PURCHASERS.  AND, I BELIEVE, FOR A PORTION OF

23   THE DIRECT-PURCHASERS, TOO --

24           MR. COTCHETT:  THAT'S CORRECT.

25           MR. SCARPULLA:  -- I AM NOT POSITIVE.

```
 1              THE COURT:  OKAY.  WELL, PRESUMPTIVELY I WOULD SAY
 2     THEN THAT WOULD BE A GOOD IDEA FOR THIS CASE.  YOU MIGHT AS
 3     WELL TALK TO HIM RIGHT NOW AND GET SOME DATES LINED UP FOR
 4     EARLY NEXT YEAR.
 5              MR. TUBACH:  WE'LL NEED TO TALK.  WE HAVE --
 6              THE COURT:  YOU CAN DO THAT.  AND IF YOU WANT TO
 7     AGREE ON SOMEBODY ELSE, THAT'S FINE.  IF YOU CAN'T AGREE AND
 8     YOU WANT TO SUBMIT NAMES, THAT'S FINE, TOO, BUT I CERTAINLY
 9     THINK JUDGE WEINSTEIN WOULD BE A GOOD CHOICE.
10              MR. WALL:  YOUR HONOR, MY NAME IS DAN WALL.  I
11     REPRESENT TOSHIBA.
12              THE COURT:  WOULD YOU MIND DISCUSSING YOUR ISSUE
13     WITH YOUR SPOKESPERSON FIRST?
14              MR. WALL:  THIS IS THE PROBLEM, YOUR HONOR.
15              THE COURT:  WOULD YOU MIND DISCUSSING YOUR ISSUE
16     WITH MR. TUBACH.
17              (DEFENSE COUNSEL CONFER.)
18              MR. SCARPULLA:  YOUR HONOR, SINCE --
19              THE COURT:  YOU ARE GOING TO NEED TO WAIT BECAUSE HE
20     CAN'T LISTEN TO TWO THINGS AT ONCE.
21              (PAUSE IN THE PROCEEDINGS.)
22              MR. TUBACH:  YOUR HONOR, I KNOW THE COURT IS
23     RELUCTANT TO HEAR FROM MULTIPLE DEFENSE LAWYERS, BUT THE FACT
24     OF THE MULTIPLE PEOPLE SITTING HERE MEANS THEY HAVE DIVERGENT
25     VIEWS AND THEY HAVE DIFFERENT CLIENTS AND THEY HAVE DIFFERENT
```

1    INTERESTS, AND I WOULD ASK THE COURT TO HEAR FROM MR. WALL.

2              THE COURT:  HOW MANY OTHERS?

3              MR. TUBACH:  JUST MR. WALL.

4              THE COURT:  JUST MR. WALL?

5              MR. TUBACH:  MR. WALL.

6              THE COURT:  OKAY.

7              MR. WALL:  YOUR HONOR, THE PROBLEM, AND IT'S BEEN

8    REPEATING ITSELF THROUGHOUT THE AGENDA IS THAT THERE ARE AN

9    AWFUL LOT OF US WHO WERE NEVER SUED IN THE DRAM CASES AND DO

10   NOT -- FEEL VERY STRONGLY THAT THESE CASES CAN'T JUST BE

11   DRAM II.  IN FACT, THERE'S THREE DISTINCT GROUPS OF --

12             THE COURT:  JUST TELL ME WHAT YOU WANT.

13             MR. WALL:  WHAT I WOULD LIKE, YOUR HONOR, IS, IS I

14   OBJECT TO THE -- I DON'T REALLY WANT TO HAVE A SETTLEMENT JUDGE

15   WHO WAS THE SETTLEMENT JUDGE IN THE DRAM CASES.

16             THE COURT:  OKAY.  WELL, I DIDN'T ORDER THAT

17   SETTLEMENT JUDGE.  I SUGGESTED THAT IN MY EXPERIENCE HE IS A

18   GOOD ONE.  AND THE FACT THAT HE KNOWS SOMETHING ABOUT THE CASES

19   MIGHT BE A SELLING POINT.

20             ON THE OTHER HAND, IF YOU DON'T WANT TO DO THAT,

21   THEN YOU WILL AGREE ON SOMEONE ELSE.  AND IF YOU CAN'T AGREE ON

22   SOMEONE ELSE, THEN YOU WILL EACH SUBMIT YOUR PROPOSALS TO ME

23   AND I WILL DECIDE.

24             MR. WALL:  THAT'S FINE, YOUR HONOR.  BUT

25   RESPECTFULLY, THIS WILL BE A RECURRING ISSUE IN THESE CASES

1    BECAUSE THERE ARE SOME OF US THAT WERE IN DRAM AND SETTLED

2    THOSE CASES.  THERE ARE SOME OF US WHO RECEIVED GRAND JURY

3    SUBPOENAS HERE BUT WERE NOT IN THE DRAM CASES.  THERE ARE SOME

4    PEOPLE THAT WERE IN NEITHER.

5              AND IT IS VERY DIFFICULT, I CAN TELL YOU, SITTING

6    THROUGH THIS HEARING TODAY TO HAVE EVERYTHING FUNNELED THROUGH

7    A LIAISON REPRESENTATIVE WHO STANDS IN A DIFFERENT POSITION

8    FUNDAMENTALLY ON THOSE ISSUES.

9              SO, WE DON'T WANT TO BURDEN YOUR HONOR WITH A LOT OF

10   EXTRA PEOPLE ARGUING, BUT QUITE HONESTLY, I DON'T THINK IT'S

11   GOING TO WORK TO HAVE IT -- EVERYTHING FUNNELED THROUGH ONE OR

12   TWO PEOPLE ON THESE ISSUES.

13             SO, I HOPE YOU UNDERSTAND.  I SAY THAT NOT TO BURDEN

14   THE COURT, BUT BECAUSE I DO THINK IT MATTERS SUBSTANTIVELY.

15             THE COURT:  OKAY.

16             MR. WALL:  THANK YOU, YOUR HONOR.

17             THE COURT:  SO I DON'T KNOW IF IT MAKES SENSE TO SET

18   A TRIAL DATE.  WE'RE IN MID-SEPTEMBER WITH CASE DISPOSITIVE

19   MOTIONS, SO THE EARLIEST WE COULD POSSIBLY TRY IT WOULD BE

20   PROBABLY THE BEGINNING OF 2010 REALISTICALLY.

21             MR. TUBACH:  WE ARE QUITE FAR OUT THERE.  MY ONLY

22   REQUEST WOULD BE TO MAKE SURE THAT IT'S FAR ENOUGH OUT THAT IN

23   THE EVENT THE COURT IS GRANTING DISPOSITIVE MOTIONS EITHER AS

24   TO SOME OR ALL OF THE DEFENDANTS, THAT THOSE DEFENDANTS NOT

25   HAVE INVESTED A HUGE AMOUNT OF RESOURCES IN PREPARING FOR

     DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

1    TRIAL.

2            THE COURT:  THAT'S WHY I AM SAYING 2010.  IF WE HEAR

3    THE MOTIONS IN SEPTEMBER, THAT MAY TAKE ME SOME TIME TO DECIDE

4    THEM.  IF WE HAVE TO MOVE IT, WE'LL MOVE IT.  BUT LET'S SAY WE

5    ARE AIMING AT A TRIAL DATE OF JANUARY 11TH OF 2010.

6            MR. TUBACH:  YOUR HONOR, I THINK THAT WE WOULD WANT

7    AT LEAST TWO MONTHS AFTER THAT.

8            THE COURT:  TWO MONTHS AFTER WHAT?

9            MR. TUBACH:  JANUARY 11TH.  TWO MONTHS LATER.  IF

10   YOU'RE GOING TO -- IF IT'S GOING TO TAKE YOU, I THINK, WORKING

11   ON LITTLE ELSE, IT MIGHT TAKE YOU A MONTH TO GET OUT THE

12   DISPOSITIVE RULINGS.  THAT'S MIDDLE OF OCTOBER.  THAT ONLY

13   GIVES US A MONTH AND A HALF, TWO MONTHS WITH THE INTERVENING

14   HOLIDAYS TO PREPARE FOR WHAT PROMISES, UNLESS THE COURT RULES

15   IN THE RIGHT WAY FOR SUMMARY JUDGMENT, TO BE A GARGANTUAN

16   TRIAL.

17           THE COURT:  OKAY.  HOW ABOUT MARCH 1ST?

18           MR. TUBACH:  WITH THE COURT'S INDULGENCE.

19           THE COURT:  DARE I ASK HOW LONG IT WILL TAKE TO TRY?

20           MR. COTCHETT:  I AM GOING TO SHOCK YOU AND TELL YOU

21   I THINK IT CAN BE DONE IN LESS THAN 30 DAYS.

22           THE COURT:  FOR THE DIRECT-PURCHASERS OR FOR THE

23   WHOLE CASE?

24           MR. COTCHETT:  I THINK FOR THE WHOLE CASE.

25           MR. SCARPULLA:  DEPENDS ON IF YOUR HONOR LETS US TRY

1    IT WITH AT LEAST LIABILITY WITH THE DIRECTS, THEN I TEND TO

2    AGREE WITH MR. COTCHETT.

3              THE COURT:  THAT IT CAN BE DONE IN 30 DAYS?

4              MR. COTCHETT:  SURELY.

5              MR. SCARPULLA:  WE MAY NEED A LITTLE EXTRA TIME IF

6    WE ARE MULTIPLE STATES TRYING IT.

7              MR. TUBACH:  EVEN THE CONCEPT OF TRYING -- THESE ARE

8    ALL STATE -- MOSTLY STATE LAW CLAIMS THAT THE

9    INDIRECT-PURCHASERS HAVE BROUGHT.  THE CONCEPT OF TRYING ALL

10   THOSE CASES TOGETHER ALONG WITH THE DIRECTS, THAT'S NOT

11   SOMETHING THAT WE HAVE HASHED OUT ON OUR SIDE OF THE TABLE.  I

12   AM NOT PREPARED AT THIS POINT TO MAKE --

13             THE COURT:  I AM TRYING TO FIGURE OUT HOW MANY

14   MONTHS TO BLOCK OFF ON MY CALENDAR.

15             MR. TUBACH:  TWO IS GOING TO BE SAFE.

16             THE COURT:  TWO MONTHS?

17             MR. TUBACH:  TWO MONTHS.

18             THE COURT:  OKAY.  SO WE WILL PUT IT DOWN FOR A

19   TWO-MONTH -- SOMEONE DEMAND A JURY?

20             MR. COTCHETT:  YES, YOUR HONOR.

21             MR. SCARPULLA:  I THINK EVERYBODY DID.

22             MR. COTCHETT:  EVERYBODY DID.

23             THE COURT:  I SUPPOSE YOU DON'T WANT TO CONSENT TO A

24   MAGISTRATE JUDGE.

25             MR. COTCHETT:  I DON'T THINK SO, YOUR HONOR.

     DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

1          MR. TUBACH:  I DON'T THINK WE CAN WISH THIS ON A

2    MAGISTRATE JUDGE.

3          THE COURT:  ALL RIGHT.  OKAY.  SO PUT IT DOWN FOR A

4    60-DAY JURY TRIAL STARTING MARCH 1ST, 2010, PRETRIAL CONFERENCE

5    ON FEBRUARY 9TH AT 2:00 O'CLOCK.

6          NOW, I HAVE ONE OTHER THING I WANT TO TALK ABOUT,

7    WHICH I GUESS I CAN'T REALLY DO ANYTHING ABOUT, BUT I AM

8    CONCERNED ABOUT OPT-OUTS.  AND I DON'T WANT TO GO TO A LOT OF

9    TROUBLE AND LITIGATE THE CASE FOR YEARS AND YEARS AND THEN

10   SUDDENLY FIND I HAVE A BUNCH OF OPT-OUTS WHO THEN WANT TO START

11   OVER LITIGATING IT AGAIN.

12         I AM ASKING FOR ADVICE ANY OF YOU MIGHT HAVE ABOUT

13   WHETHER I CAN SET A DEADLINE FOR OPT-OUTS.

14         MR. COTCHETT:  THE ANSWER IS YOU CAN AFTER YOU

15   DECIDE THE CLASS CERT. MOTION.

16         THE COURT:  OKAY.

17         MR. TUBACH:  THAT'S PART OF THE NORMAL CLASS

18   CERTIFICATION PROCESS.  IF THE COURT IS TO GRANT CLASS

19   CERTIFICATION, IT WOULD THEN HAVE TO GIVE NOTICE TO THE CLASS

20   MEMBERS WHO WOULD THEN BE GIVEN AN OPPORTUNITY TO OPT OUT OF

21   THE CLASS.

22         THE COURT:  YEAH, BUT THIS HAPPENED TO ME IN ANOTHER

23   CASE AND I WAS SORT OF TAKEN BY SURPRISE.  I HAD OPT-OUTS

24   FILING NEW LITIGATION.

25         MR. TUBACH:  I THINK THERE IS LITTLE YOU CAN DO TO

DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

1    STOP THEM, YOUR HONOR.  THEY HAVE THE RIGHT TO PURSUE

2    LITIGATION.

3              THE COURT:  IT SEEMED SO LATE THAT THEY DID IT.

4              MR. COTCHETT:  WELL, THERE ARE ALL TYPES OF RULINGS

5    THAT I THINK THE COURT CAN MAKE THAT WILL APPLY TO SUBSEQUENT

6    OPT-OUTS.  YOUR PRIOR --

7              THE COURT:  I KNOW WHAT IT WAS.  I AM SORRY FOR

8    INTERRUPTING.

9              IT WASN'T LIKE THEY JUST WANTED TO OPT OUT AND SORT

10   OF CONTINUE WITH THEIR OWN LINE OF REPRESENTATION.  THEY WANTED

11   TO START OVER, SAYING NOW WE NEED TO DO THE DISCOVERY.  WE JUST

12   GOT INTO THIS CASE YESTERDAY, AND WE WANT TO START DOING THE

13   DISCOVERY THAT'S BEEN GOING ON FOR YEARS.

14             MR. COTCHETT:  I DON'T THINK THAT HAPPENS, YOUR

15   HONOR.

16             THE COURT:  IT DOES.  IT HAPPENED TO ME THE OTHER

17   DAY.  AND THERE DIDN'T SEEM TO BE ANYTHING I COULD DO ABOUT IT

18   AT THAT POINT.  SO I AM WONDERING IF THERE'S SOME WAY I CAN

19   DEAL WITH IT IN ADVANCE.

20             YOU KNOW, AN OPT OUT GETS A NEW LAWYER.  THE NEW

21   LAWYER COMES IN AND SAYS, I'M NEW HERE, I NEED TO START OVER.

22             MR. COTCHETT:  LET US THINK ABOUT THAT AND BRING

23   THAT UP TO YOU AT THE NEXT CASE MANAGEMENT CONFERENCE.

24             MR. TUBACH:  IT MAY MAKE SENSE NOT TO SET A TRIAL

25   DATE FOR THAT REASON, YOUR HONOR, BECAUSE I THINK, AS A

     DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

1  PRACTICAL MATTER, THERE WILL BE LITTLE THE COURT CAN DO TO STOP

2  COMPANIES OR DIRECT OR INDIRECT PURCHASERS FROM OPTING OUT AND

3  PURSUING THEIR OWN LITIGATION.

4          THAT CERTAINLY HAPPENED IN DRAM.  AND, FRANKLY,

5  THERE'S LITTLE THE COURT CAN DO --

6          THE COURT:  I AM JUST GOING TO SET A DATE, SO I WILL

7  REMEMBER BECAUSE I'M AFRAID I WILL FORGET, I AM GOING TO SET A

8  PROPOSED DATE FOR OPT-OUTS OF, GIVE ME A MONTH AFTER I'VE HEARD

9  THE CLASS CERTIFICATION MOTION.

10         MR. TUBACH:  IT HAS TO BE TAGGED TO WHEN THEY GET

11 NOTICE, YOUR HONOR.

12         MR. SCARPULLA:  WHEN THEY GET NOTICE, YOUR HONOR.

13         MR. TUBACH:  THERE ARE CERTAIN RULES ABOUT HOW LONG

14 CLASS MEMBERS HAVE TO OPT OUT OF LITIGATION.  GENERALLY IT'S 30

15 DAYS.  SO, IT WOULD HAVE TO BE 30 DAYS, GENERALLY, FROM WHEN

16 THE NOTICE IS SENT TO THE CLASS MEMBERS.

17         THE COURT:  SO WE WILL AIM TO SEND THE NOTICE 30

18 DAYS AFTER THE HEARING AND WE'LL AIM TO HAVE THAT OPT OUT 30

19 DAYS AFTER THAT.

20         I AM JUST SAYING THIS SO I DON'T FORGET ABOUT IT.  I

21 WANT IT IN THE SCHEDULE.

22         MR. COTCHETT:  YES.

23         THE COURT:  DOES ANYBODY KNOW THE DATE I SET FOR THE

24 CLASS CERTIFICATION HEARING?

25         MR. COTCHETT:  MAY 15TH, YOUR HONOR.


DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

1              MR. SCARPULLA:  OF, I BELIEVE, '09.

2              THE COURT:  JULY 15TH OF '09 FOR OPT OUTS.

3              MR. SCARPULLA:  YOUR HONOR, WE'VE HAD SOME

4    EXPERIENCE WITH THESE LARGE OPT OUTS IN THE DRAM LITIGATION,

5    AND WHAT THEY HAVE DONE IS THEY HAVE FILED THEIR OWN CASES AND

6    THEN THEY HAVE BEEN GIVEN THE DISCOVERY THAT WAS ALREADY TAKEN,

7    GIVEN ACCESS TO IT, SO THEY DO NOT HAVE TO DO IT OVER AGAIN.

8    AND IF THERE IS A SMALL AMOUNT OF DISCOVERY, MOP-UP STUFF, THAT

9    IS SUI GENERIS TO THOSE CLIENTS, THAT'S WHAT THEY HAVE DONE IN

10   THESE CASES.

11             SO I WOULD NOT TEND TO THINK YOUR HONOR WILL FIND

12   SOMEONE WHO WANTS TO OPT OUT AND START AT THE BEGINNING.

13             THE COURT:  WELL, GIVE IT SOME THOUGHT AND SEE IF

14   YOU CAN THINK OF SOMETHING LIKE MAYBE EVEN VERY FAR IN ADVANCE

15   NOTICE, BUT KEEP IN MIND THAT YOU SHOULD FOLLOW THIS

16   LITIGATION, AND IF YOU ARE GOING TO WANT TO OPT OUT LATER, YOU

17   BETTER START GETTING YOUR LAWYER NOW TO FOLLOW THE THING

18   BECAUSE YOU MAY NOT HAVE MUCH TIME LATER ON.

19             I DON'T KNOW, I'M --

20             MR. COTCHETT:  RIGHT.

21             THE COURT:  -- TALKING OFF THE TOP OF MY HEAD BASED

22   ON ANOTHER BIG CASE I HAD RECENTLY WHERE THIS HAPPEN.  SEE IF

23   YOU CAN THINK OF ANYTHING THAT CAN BE DONE.

24             OKAY.  ANYTHING ELSE?

25             MR. COTCHETT:  NEED A DATE FOR THE NEXT CASE

     DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

1    MANAGEMENT CONFERENCE.

2              THE COURT:  OH.  IT WILL BE ON THE DATE THAT THE

3    MOTIONS TO DISMISS ARE HEARD.

4              MR. COTCHETT:  OKAY.

5              THE COURT:  DID I SET A DATE FOR THAT?

6              MR. COTCHETT:  WE DO.

7              THE COURT:  SO ON THAT DATE WE WILL BASICALLY HAVE

8    THE CASE MANAGEMENT CONFERENCE ON ANY DATE WE HAVE ANYTHING

9    ELSE.

10             MR. COTCHETT:  THAT IS SIMPLE.

11             UNIDENTIFIED SPEAKER:  COULD YOU SAY AGAIN THE DATE

12   FOR THE MOTION TO DISMISS?  WE COULDN'T HEAR IT.

13             THE COURT:  I CAN'T SAY ANYTHING BECAUSE I WASN'T

14   WRITING IT DOWN AS I SAID IT.

15             THE CLERK:  DECEMBER 20TH.

16             THE COURT:  SHEILAH WILL -- MAYBE IF I CAN GET

17   SOMEBODY TO DO A SCHEDULING ORDER.

18             MR. COTCHETT:  WE WILL PREPARE ONE, YOUR HONOR, AND

19   GET IT IN TO YOU.

20             THE COURT:  OKAY.

21             MR. TUBACH:  ONE FINAL REQUEST.  I DON'T KNOW HOW

22   THE COURT CAME DOWN ON THE ISSUE OF INITIAL DISCLOSURES, WE

23   WOULD JUST AS SOON, IN LIGHT OF THE FACT THAT THE PLAINTIFFS

24   ARE GOING TO BE GETTING A GIGANTIC VOLUME OF DOCUMENTS, WE

25   WOULD ASK THE COURT TO WAIVE THE INITIAL DISCLOSURE

     DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

1    REQUIREMENTS.  IN TERMS OF DOCUMENTS, THE ONLY THING IT WOULD

2    GENERALLY REQUIRE IS A DESCRIPTION OF DOCUMENTS WHICH SEEMS TO

3    ME TO BE ENTIRELY DUPLICATIVE OF WHAT THE PLAINTIFFS ARE GOING

4    TO BE GETTING ANYWAY.  IT'S A BURDEN THAT DOESN'T SEEM

5    NECESSARY IN LIGHT OF THE VAST VOLUME OF STUFF THAT NEEDS TO BE

6    DONE.

7           MR. COTCHETT:  WE DON'T HAVE A PROBLEM WITH THAT,

8    YOUR HONOR.

9           THE COURT:  OKAY.  SO WE WILL WAIVE THE FORMAL

10   INITIAL DISCLOSURE REQUIREMENT IN LIGHT OF THE DOCUMENTS THAT

11   WE HAVE ORDERED DISCOVERED.

12         MR. SCARPULLA:  I HAVE ONE SUI GENERIS TO THE

13   INDIRECT-PURCHASERS ONLY.

14         READING YOUR HONOR'S PRETRIAL ORDER NUMBER ONE ON

15   THE STRUCTURE OF THE INDIRECT-PURCHASERS, I AM NOT SURE WHETHER

16   YOUR HONOR IS GOING TO GIVE US PERMISSION TO HAVE LAWYERS OTHER

17   THAN THE LAWYERS THAT YOUR HONOR APPOINTED TO THE STEERING

18   COMMITTEE DO ANY WORK ON THIS CASE.

19         AND THE REASON I RAISE THIS BECAUSE, FOR EXAMPLE --

20         THE COURT:  THEY CAN DO WORK ON THE CASE.

21         MR. SCARPULLA:  OKAY.

22         THE COURT:  UNDER YOUR DIRECTION.

23         MR. SCARPULLA:  YES, I UNDERSTAND THAT.  I JUST

24   WANTED -- THERE ARE SOME PEOPLE WHO HAVE GREAT EXPERTISE, FOR

25   EXAMPLE, IN THE LAW OF NEW YORK, WHICH I JUST DON'T HAVE.

1                    THE COURT:  SURE.  SURE.  UNDER YOUR DIRECTION, SO

2      IT'S NOT DUPLICATIVE.  THAT'S ALL I CARE.

3                    MR. SCARPULLA:  RIGHT.  THAT'S FINE.

4                    MR. COTCHETT:  THANK YOU VERY MUCH, YOUR HONOR.

5                    MR. TUBACH:  THANK YOU.

6                    MR. GRIFFIN:  THANK YOU, YOUR HONOR.

7                    THE COURT:  THANK YOU.

8

9                    (PROCEEDINGS ADJOURNED AT 2:45 P.M.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


                DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

CERTIFICATE OF REPORTER

I, DIANE E. SKILLMAN, OFFICIAL COURT REPORTER FOR THE

UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

CERTIFY THAT THE FOREGOING PROCEEDINGS IN MDL C-07-1819 CW, IN

RE STATIC RANDOM ACCESS (SRAM) ANTITRUST LITIGATION, PAGES 1

THROUGH 59, WERE REPORTED BY ME, A CERTIFIED SHORTHAND

REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION

INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND

TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT THE TIME OF

FILING.

THE VALIDITY OF THE REPORTER'S CERTIFICATION OF

SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL

FROM THE COURT FILE.

_____

DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

# **Exhibit F**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE STATIC RANDOM ACCESS MEMORY
(SRAM) ANTITRUST LITIGATION

_____/

No. M:07-cv-01819 CW
MDL No. 1819

SUPPLEMENTAL CASE
MANAGEMENT ORDER
NO. 1

A case management conference was held on June 1, 2007.  The
Court filed an amended minute order and case management order on
June 8, 2007.  This supplemental case management order addresses
additional matters ordered by the court or agreed to by the
parties:

I.    Standing Order

      All parties shall abide by the Court's Standing Order.

II.   Service of Documents

      E-filing through the Court's ECF system shall constitute
service for all documents required to be served with the exception
of initial service of process on a party.

III.  Initial Disclosures Waived

      The parties are not required to make the initial disclosures
provided for by Federal Rule of Civil Procedure 26.

IV.   Case Management Schedule

     The parties shall abide by the schedule set in the Court's
June 8, 2007 amended minute order and case management order.  If a
party seeks to change any previously set dates, it may do so
pursuant to Civil Local Rule 16-2(d) and (e).

     A.   Defendants' Document Production

     All charges for copying documents produced by Defendants to
the Department of Justice or any Grand Jury for the purposes of
making copies available to Plaintiffs shall be paid by Plaintiffs.
All documents already produced in the DRAM litigation shall be
deemed produced in this case.  Defendants shall produce to
Plaintiffs all documents they have produced to the Department of
Justice by June 15, 2007.  Should any Defendant produce any
documents to the Department of Justice or any Grand Jury in
connection with the investigation of SRAM chips after June 15,
2007, such Defendant shall produce such documents to Plaintiffs
within 45 days of their production to the Department of Justice
and/or any Grand Jury.  Documents produced, or deemed produced, in
this action shall be treated as outside counsel
attorneys'-eyes-only until entry of a stipulated protective order
governing production of the documents.

     B.   Service of Defendants

     Plaintiffs shall complete service of the named domestic
defendants on or before June 29, 2007.  Plaintiffs shall complete
service of the named non-domestic defendants on or before October
1, 2007, unless they can show good cause for failing to do so in
spite of their diligence.

United States District Court
For the Northern District of California

**United States District Court**
**For the Northern District of California**

C.   Class Certification Discovery

Defendants may begin to take limited discovery from Plaintiffs in preparation for drafting their oppositions to Plaintiffs' motions for class certification.

D.   Full Document Discovery

Full document discovery shall begin after the Court rules on any motions to dismiss.

E.   Full Fact Discovery

Full fact discovery, including but not limited to written discovery and depositions, shall begin on June 8, 2008.  The parties reserve all rights to seek protective orders in the event any party serves Requests for Admission.

F.   Opt-Outs

In the event one or more classes are certified in these actions, the Court sets a tentative deadline of July 15, 2009 for any class member to opt out of the class.  However, that date may change, and the actual deadline for class members to opt out of any class will be contained in the notice provided to class members.

V.   Consolidated Motions

To the extent possible, Defendants shall file consolidated motions.  If necessary, individual Defendants may file supplemental motions which do not repeat in any way the joint motions, but which address only facts and law particular to a given Defendant.  To the extent possible, Plaintiffs shall do the same when filing their oppositions to Defendants' motions.

VI.  Protective Order

The model stipulated protective order found on the Court's

1  website is hereby entered in this case.

2  VII. Special Master for Discovery

3       The parties shall meet and confer regarding selection of a

4  special master to oversee discovery in this case, and report to the

5  Court.

6  VIII. Special Settlement Master

7       The parties shall meet and confer regarding selection of a

8  special master to oversee settlement efforts in this case, and

9  report to the Court.  An initial settlement conference shall be

10  held on or before February 28, 2008.

11

12       IT IS SO ORDERED.

13

14       6/21/07

15  Dated: _____      _____

16                                        CLAUDIA WILKEN
                                          United States District Judge
17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
**For the Northern District of California**

4

# Exhibit G

1   ELAINE T. BYSZEWSKI (SBN 222304)
    HAGENS BERMAN SOBOL SHAPIRO LLP
2   700 South Flower Street, Suite 2940
    Los Angeles, CA 90017-4101
3   Telephone: (213) 330-7150
    Facsimile: (213) 330-7152
4         -and-
    STEVE W. BERMAN
5   HAGENS BERMAN SOBOL SHAPIRO LLP
    1301 Fifth Avenue, Suite 2900
6   Seattle, WA 98101
    Telephone: (206) 623-7292
7   Facsimile: (206) 623-0594

8   Attorneys for Plaintiff

9   [Additional Counsel Listed on Signature Page]

10

                   **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
11
                       **FOR THE COUNTY OF LOS ANGELES**
12
                       **CENTRAL CIVIL WEST COURTHOUSE**
13

14  JAMES WEISS, individually and on behalf of all )    Case No. BC 323107
    others similarly situated,                       )
15                                                    )    Assigned to the Honorable Victoria G.
                                                      )    Chaney, Department 324
16                                Plaintiff,          )
                                                      )    CLASS ACTION
17        v.                                          )
                                                      )    **THIRD AMENDED CLASS ACTION**
18  ASTRAZENECA PHARMACEUTICALS LP;                   )    **COMPLAINT FOR VIOLATIONS OF**
    and ZENECA, INC.                                  )    **THE UNFAIR COMPETITION LAW,**
19                                                    )    **THE FALSE ADVERTISING LAW, THE**
                                  Defendants.         )    **CONSUMERS LEGAL REMEDIES**
20                                                    )    **ACT, AND THE COMMON LAW OF**
                                                      )    **UNJUST ENRICHMENT**
21                                                    )
                                                      )
22                                                    )
                                                      )
23                                                    )

24

25

26

27

28

                        THIRD AMENDED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

· **PAGE**

I.    NATURE OF THE ACTION .................................................................................1

II.   PARTIES ..........................................................................................................7

III.  JURISDICTION AND VENUE ...........................................................................8

IV.   FACTUAL ALLEGATIONS ...............................................................................9

      A.    Prilosec – A Blockbuster Drug for AstraZeneca .......................................9

      B.    The Loss of Patent Protection Results in Lower Prices and Reduced Profits ..........10

      C.    The AstraZeneca Solution – The New Purple Pill Nexium .....................................12

      D.    The Promotion of Prescription Drugs.......................................................................18

      E.    A Massive Promotional Campaign and Predatory Price Is Used to
            Establish Nexium............................................................................................................20

      F.    Nexium Is Not More Effective ....................................................................................23

      G.    AstraZeneca's Marketing Campaign Has Been Successful: Nexium's
            Price is Increased and Sells Billions Per Year........................................................30

      H.    Further examples of Misleading Promotion and Advertising ...............................31

V.    CLASS ALLEGATIONS ....................................................................................49

THIRD AMENDED CLASS ACTION COMPLAINT

1    Plaintiff James Weiss ("Plaintiff"), by counsel and for his Third Amended Class Action

2    Complaint for Violations of the Unfair Competition Law ("UCL"), Bus. & Prof. Code § 17200 *et*

3    *seq.,* the False Advertising Law, Bus. & Prof. Code § 17500 *et seq.*, and the Consumers Legal

4    Remedies Act ("CLRA"), Civ. Code § 1750 *et seq.*, alleges upon personal knowledge and belief as

5    to his own acts, and upon information and belief (based on the investigation of counsel) as to all

6    other matters, as to which allegations Plaintiff believes substantial evidentiary support will exist

7    after a reasonable opportunity for further investigation and discovery, on behalf of the general

8    public and all others similarly situated, as follows:[1]

## I.    NATURE OF THE ACTION

10    1.    AstraZeneca Pharmaceuticals LP and Zeneca, Inc. ("AstraZeneca") had a patent for

11    the drug Prilosec which by the year 2000 was the most widely prescribed drug in the world.

12    Prilosec is a proton-pump-inhibitor ("PPI") or acid pump inhibitor that is used to treat heartburn.

13    Prilosec is comprised of an organic molecule, omeprazole, which – like most organic molecules –

14    exists in two forms (or "isomers') that are mirror images of each other. Prilosec is what is called a

15    "racemic" formulation of this molecule, meaning that it is comprised of a mixture of both mirror

16    images (so-called "S" and "R") of this molecule. By 2000, sales of Prilosec had reached $6 billion,

17    making it the top selling drug in the world in terms of sales.

18    2.    A patented drug is also referred to as a "brand name" drug. Brand name drugs

19    which face no competition are the most profitable drugs for drug manufacturers. In the year 2000,

20    the average retail price of a prescription drug was more than three times that of a generic drug.[2]

---

[1] Plaintiff Weiss files this Third Amended Complaint per the Stipulation and Order dated October 24, 2005. The sole purpose of this amendment is to remove all references to the associational plaintiffs following the Court's September 21, 2005 Ruling that, due to the passage of Proposition 64 in November 2004, associational standing can no longer be asserted in pursuit of UCL and False Advertising Law claims even where the associations' members have injury in fact. Though the associational plaintiffs do not intend to seek immediate writ review of the Court's ruling, they do not by this amendment intend to forgo their right to appeal the Court's ruling upon final judgment entered in this action. Moreover, the original complaint on behalf of the associational plaintiffs was filed prior to the passage of Proposition 64. Although the Court has ruled that Proposition 64 applies to pending cases, the California Supreme Court has granted review of this issue. *See, e.g., Californians for Disability Rights v. Mervyns*, Cal. Supreme Court Case No. S131798 (review granted 04/27/05). If the California Supreme Court determines that Proposition 64 does not apply to pending cases, the associational plaintiffs would have standing to proceed under the pre-Proposition 64 UCL and False Advertising Law. *See Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 17 Cal. 4th 553 (1998). The associational plaintiffs would then request this Court to exercise its inherent authority to reconsider its previous rulings based on the Supreme Court's decision. *See LeFrancois v. Goel*, 35 Cal. 4th 1094, 1108 (2005).

[2] *Trends as Indicators in the Charges*, Health Care Marketplace 2004 Update, Kaiser Family Foundation.

1       3.     The patent for Prilosec was set to expire in 2001 and AstraZeneca anticipated that it

2    would face stiff competition from generic manufacturers. It is a fact well known to drug

3    manufacturers that entry of generics results in a substantial loss of market share, sharply reduced

4    prices, and a decrease in profits. AstraZeneca was facing the loss of its most profitable drug.

5       4.     Within AstraZeneca, a group of marketers, lawyers and scientists was formed to

6    come up with a solution for what the company believed was a looming patent-expiration disaster.

7    The group called itself the "Shark Fin Project" after the dismal shape the sales chart would trace if

8    they did nothing: an inverted V. In response, AstraZeneca launched a multi-prong attack. First, it

9    attacked generic manufacturers in court seeking to delay entry of competition. Second, shortly

10    before the patent on Prilosec was set to expire, the company got FDA approval for the newly

11    patented Nexium. Then it launched a massive advertising campaign to persuade Prilosec users and

12    their doctors that Nexium was somehow better. Very quickly, Nexium became the most heavily

13    advertised drug in the United States. The media was blanketed with Nexium ads – "Today's purple

14    pill is Nexium, from the makers of Prilosec." To help with the switch, AstraZeneca originally

15    priced Nexium below Prilosec, gave discounts to managed care plans and hospitals, barraged

16    doctors with free samples, and even offered coupons in newspapers. AstraZeneca's 6,000

17    salespeople barraged doctors with studies proclaiming Nexium's superiority. The promotional

18    campaign reportedly cost the company a half billion dollars in just 2001. Virtually overnight,

19    Nexium – the new purple pill – began to replace Prilosec. Soon the company dropped all

20    references to the older drug, Prilosec, in its advertisements. Now they just refer to "the purple pill

21    called Nexium." It is as though Prilosec never happened. (In fact, Prilosec is now sold over the

22    counter for a fraction of the cost of Nexium, Prilosec sells at $0.46 per pill and Nexium at over

23    $4.00 per pill.)

24       5.     To get FDA approval for Nexium, AstraZeneca had to test it in several clinical

25    trials. Some of these trials merely compared Nexium with placebos to show that it worked better

26    than nothing, since that is all the FDA requires. But four trials, compared Nexium head to head

27    with Prilosec (for esophageal erosions), and these were crucial to the marketing strategy. The

28    company wanted to show that Nexium was better than Prilosec – an advance over the older drug.

THIRD AMENDED CLASS ACTION COMPLAINT

6.    Instead of comparing equivalent doses, which would have been 20 mg of Nexium, versus the standard 20-milligram dose of Prilosec (the dose recommended for most indications – duodenal ulcer, erosive esophagitis, and GERD), the company included higher doses of Nexium in its studies.  Four studies were performed by AstraZeneca comparing Nexium 40 mg to Prilosec 20 mg.  With the dice loaded in that way, Nexium looked like an improvement – but still only marginally so and in just two of the four trials.[3]  In fact, the only surprise is that at the high doses chosen for comparison, Nexium didn't do better than Prilosec did.  Two studies compared equivalent 20 mg doses of Nexium and Prilosec.  In one, patients with endoscopy confirmed esophagitis treated with Nexium were 3% more likely to have healed after eight weeks of therapy with Nexium, (89.9% vs. 86.9%).  In practical terms this meant that patients taking Nexium 20 mg appreciated symptom relief in 7-8 days, whereas those who took Prilosec 20 mg improved in 7-9 days.  But even the miniscule benefit was neutralized by the 3.1% greater incidence of the most common side effects including headache, abdominal pain, and diarrhea that occurred in the people taking Nexium (though this total was not tallied in the article presenting the results of this study).[4]  Furthermore, if there were a necessity to improve therapeutic efficacy beyond that provided by Prilosec 20 mg, the logical approach would have been simply to double the standard dose of Prilosec, allow generic competition, and forget about Nexium – but that would not have been of help to the profit-making objective of AstraZeneca.

7.    Instead, based on the flawed trial comparing 40 mg of Nexium to 20 mg of Prilosec, AstraZeneca promoted Nexium to doctors and consumers as the "first proton pump inhibitor (PPI) to offer significant clinic improvements over Losec and its main competitor, lansoprazole, in terms of acid control and clinical efficacy."[5]  It also claimed that Nexium was more effective in acid inhibition than other comparable drugs and provided relief in a shorter period of time.  AstraZeneca repeated this message in a barrage of marketing activities directed to patients and doctors.  For

---

[3] Gardiner Harris, op. cit.

[4] Kahrilas PJ, Falk GW, Johnson DA, et al.  Esomeprazole Improves Healing and Symptom Resolution as Comared with Omeprazole in Reflux Oeshpagitis Patients : A Randomized Controlled Trial. The Esomperazole Study Investigators. *Alimentary Pharmacology & Therapeutics*. 2000: 14(10):1249-1258.

[5] AstraZeneca Annual Report Form 20-F-2000 at p. 11.

THIRD AMENDED CLASS ACTION COMPLAINT

1  example, at the Pri-Med primary care continuing medical education conference held in Boston in

2  October 2004, one of the largest in the country, AstraZeneca representatives engaged physicians in

3  discussions about Nexium and encouraged doctors to take their marketing material.  The back

4  cover of one pamphlet is headlined "Acid Protection THE NEXIUM DIFFERENCE."  The graph

5  presents the results of a study showing that Nexium 40 mg. maintains gastric acid suppression

6  (gastric pH>4) for 14.0 hours compared to, among other drugs, Prilosec 20 mg, which only

7  maintained gastric pH at this level for 11.8 hours.  To a trusting doctor attending the conference,

8  this might appear to be a convincing advantage of Nexium 40 mg and the basis of his or her

9  decision to prescribe this drug at this dose for patients.  The problem is, however, that the results of

10  another AstraZeneca-sponsored study showed the clinical irrelevance of this data about stomach

11  pH – at least for many patients.  This study – accepted for publication seven months *before* the

12  marketing material was handed out at the Pri-Med conference – showed that there was absolutely

13  no advantage to Nexium 20 or 40 mg over Prilosec 20 mg for patients with "endoscopy-negative

14  reflux disease" (a large percentage of the patients for whom Nexium is prescribed):

15
16  "Conclusions: More than 60% of endoscopy-negative reflux disease
     patients reported heartburn resolution, but, after 4 weeks of therapy,
     these proportions did not differ significantly between treatments
17  [Nexium 20 mg, Nexium 40 mg, and Prilosec 20 mg]."[6]

18      8.      The attendees of the conference were, therefore, left unaware that their patients

19  would get equivalent relief from their reflux symptoms from Nexium, costing $4.76-$4.96 per pill,

20  as they would from over-the-counter Prilosec, costing $0.67 per pill (and perhaps also avoid the

21  expense and time required for a doctor visit to obtain the prescription for Nexium).

22      9.      Furthermore, if it were clinically important to suppress stomach acid for a longer

23  period of time, the difference between a single daily dose of Nexium 40 mg working for 14.0 hours

24  compared to a single dose of Prilosec working for 11.8 would be irrelevant.  The reasonable

25  conclusion would be that the clinically superior strategy would be to give Prilosec 20 mg twice

26  daily, costing $1.34 per day, or Nexium 20 mg twice daily, costing $9.92 per day).

27      [6] Amrstrong D, Talley NJ, Lauristen K, et al. The Rolw of Acid Suppression in Patients with Endoscopy-Negative
     Reflux Disease: The effect of Treatment with Esomeprazole or omeprazole. Alimentary Pharmacology & Therapeutics.
28  2004; 20: 413-421.

1    10.    Through its massive false advertising campaign, AstraZeneca persuaded Prilosec

2    patients and their physicians that the "New Purple Pill," Nexium, was better and more effective

3    than Prilosec in treating heartburn.  Thus, Nexium became the most heavily marketed drug in

4    America.  The media was blanketed with Nexium ads – "Today's Purple Pill is Nexium, from the

5    makers of Prilosec."    To encourage and entice patients and physicians to switch to Nexium,

6    AstraZeneca originally priced Nexium below Prilosec, gave deep discounts to managed care plans

7    and hospitals, bombarded doctors with free samples because AstraZeneca knew that frequently

8    doctors prescribe those medicines that they can give to patients as free samples, and even offered

9    coupons in newspapers.  AstraZeneca's six thousand strong sales force flooded physician offices

10    and induced doctors to prescribe Nexium with spurious data proclaiming Nexium's superiority to

11    omeprazole, which was now available as a generic.  The promotional campaign reportedly cost

12    AstraZeneca a half-billion dollars in just 2001.  Practically overnight, the "New Purple Pill,"

13    Nexium, began to replace Prilosec for brand name recognition as the heartburn medicine of choice

14    by the public and physicians.    Soon the company dropped all reference to Prilosec in its

15    advertisements in an orchestrated effort to make people forget about Prilosec.  Now, they just refer

16    to "the purple pill called Nexium."  It's as though Prilosec never happened.  Most physicians and

17    clearly the general public do *not* know that the "New Purple Pill," esomeprazole or Nexium, is

18    nothing more than the S-isomer of omeprazole.    Thus, AstraZeneca's subterfuge was very

19    successful.  Practically speaking, Nexium is "exactly the same as" half of Prilosec, which explains

20    why they no longer refer to Nexium as the "New Purple Pill."  AstraZeneca now refers to Nexium

21    as just the "Purple Pill."

22    11.    To capture the market, it originally sold Nexium at prices below that of Prilosec.

23    After Nexium was accepted by doctors and consumers, AstraZeneca raised the price to roughly $4

24    per pill.  Prilosec sells for $0.46 per pill.  One particularly striking example of "underpricing" to

25    get into Nexium into use was described by the BOSTON GLOBE in 2002:

26        "In exchange for getting Nexium at a fantastic discount, the hospitals
        [Brigham and Women's and Massachusetts General Hospital] agreed
27        to make it their primary PPI.  The switch will save Mass. General
        alone more than $300,000 a year.  And the price discount is clearly
28        worth it for AstraZeneca, since patients will be discharged on

- 5 -

THIRD AMENDED CLASS ACTION COMPLAINT

1   Nexium, residents will be trained on Nexium, and doctors across the
2   country will be told that Nexium is the first choice of world-famous
    Mass. General."[7]

3       12.    AstraZeneca's campaign worked, while sales of Prilosec fell in response to generic

4   competition, sales of Nexium sky rocketed to reach $3.3 billion by 2003.

5       13.    AstraZeneca's Nexium promotional and advertising campaign has resulted in

6   billions of dollars of unnecessary drug expenditures at a time when the rising cost of American

7   health care is creating a crisis and drug costs are the most rapidly increasing component of the

8   health care system. AstraZeneca justified Nexium's superiority and effectiveness based on its own

9   previously noted clinical studies comparing 40 mg of Nexium to 20 mg of Prilosec. The findings

10  from these studies were then used by AstraZeneca to proclaim Nexium's effectiveness. But a dose

11  of 40 mg is not needed in most patients. A MEDLINE search for studies comparing 20 mg of

12  Nexium and Prilosec revealed two published studies, both sponsored by AstraZeneca and both

13  measured relief of symptoms from heartburn and esophagitis. One study (already mentioned

14  above) showed no advantage of Nexium 20 or 40 mg over Prilosec 20 mg in patients with

15  endocscopy-negative esophagitis symptoms (*i.e.*:  absolutely no advantage for Nexium).[8]  The

16  other study, which included people with endoscopy-positive esophagitis, declared Nexium the

17  winner:

18          CONCLUSION: Esomeprazole [Nexium] was more effective than
19          omeprazole [Prilosec] in healing and symptom resolution in GERD
            patients with reflux oesophagitis, and had a tolerability profile
20          comparable to that of omeprazole.

21  Nexium 20 mg may have been more effective than Prilosec 20 mg from a statistical point of view,

22  but from a clinical point of view the difference was miniscule:  Patients taking Nexium averaged

23  relief one day sooner (seven vs. eight days) and at the end of eight weeks 3% more of the patients

24  taking Nexium 20 mg had resolution of esophagitis than those taking Prilosec 20 mg (89.9% vs.

25  86.9 %, respectively).  And this advantage was cancelled out by the 3.1% greater frequency of

26  adverse events that occurred in those taking Nexium 20 mg compared to those taking Prilosec 20

27  [7] Neil Swidey, *The Costly Case of the Purple Pill*, BOSTON GLOBE, November 17, 2002.

28  [8] Armstrong, op. cit.

THIRD AMENDED CLASS ACTION COMPLAINT

1    mg. This data hardly supports the idea that people should be spending $4.96 per pill for Nexium

2    20 mg when they could be getting Prilosec 20 mg without a prescription for $0.67 per pill (if, of

3    course, there were no shortage of OTC Prilosec). As a result of this misleading campaign,

4    hundreds of thousands of patients have taken Nexium and continue to do so when there is, in fact,

5    no advantage over Prilosec, and billions of dollars in unnecessary prescription costs have been

6    paid.

7         14.    Recently, the former administrator of the federal Centers for Medicare and Medicaid

8    services ("CMS"), Thomas Scully, stated to a convention of the American Medical Association:

9    "You should be embarrassed if you prescribe Nexium because it increases costs with no medical

10   benefits."[9] Mr. Scully noted, "[t]he fact is Nexium is Prilosec ... [i]t is the same drug. It is a mirror

11   compound." Mr. Scully further stated that "*Nexium is a game that is being played on the people

12   who pay for drugs.*" Mr. Scully's comments are too late — AstraZeneca has succeeded in

13   capturing the market.

14        15.    In this action, Plaintiff seeks restitution and equitable relief arising out of

15   AstraZeneca's sale and promotion of Nexium pursuant to practices and acts that are unfair,

16   deceptive and unlawful in violation of the Unfair Competition Law, Bus. & Prof. Code §§ 17200 *et*

17   *seq.,* the False Advertising Law, Bus. & Prof. Code § 17500 *et seq.*, and the Consumers Legal

18   Remedies Act, Civ. Code § 1750 *et seq.*

19                              **II.    PARTIES**

20        16.    Plaintiff James Weiss ("Weiss") is an individual residing at 1710 East Fir Avenue,

21   Apt. 104, Fresno, California 93720-3609. During the Relevant Period, Plaintiff Weiss purchased

22   Nexium and was injured by the illegal conduct alleged herein. Specifically, he took Nexium for

23   approximately two months during December 2003 and January 2004 to treat gastro-intestinal reflux

24   disease. Initially, Plaintiff Weiss received free samples from his doctor. Thereafter he paid co-

25   payments through his insurance plan. Because Nexium was not on his formulary, he paid extra for

26   it but received rebates back from the manufacturer. As an individual, Plaintiff Weiss pursues this

27

28        [9] NEW YORK TIMES, April 21, 2003.

representative action on behalf of himself and the general public, and he pursues this class action on behalf of himself and all those similarly situated.

17.    Defendant Zeneca, Inc. ("Zeneca") is a Delaware corporation with its principal place of business at Malvern, Pennsylvania. Zeneca is a wholly owned subsidiary of AstraZeneca Group PLC, a limited liability company domiciled in the United Kingdom.

18.    Defendant AstraZeneca Pharmaceuticals LP is a Delaware corporation, with its principal place of business located at 1800 Concord Pike, Wilmington, Delaware. AstraZeneca Pharmaceuticals LP is owned and controlled by AstraZeneca Group PLC, a public limited liability company domiciled in the United Kingdom.

19.    Zeneca, Inc., AstraZeneca Pharmaceuticals LP and AstraZeneca Group PLC are collectively referred to as "AstraZeneca."

20.    AstraZeneca maintains research and development and manufacturing facilities worldwide, including in the United States. AstraZeneca reported annual sales of $18.8 billion in 2003, with an operating profit of $4.2 billion. Its 2003 sales of Nexium were $3.3 billion, or 17% of all sales.

## III.    JURISDICTION AND VENUE

21.    This Court has subject-matter jurisdiction over this representative action pursuant to Bus. & Prof. Code §§ 17204 and 17535. This Court has personal jurisdiction over the parties because Plaintiff submits to the jurisdiction of the Court and Defendants systematically and continually conducted business in the County of Los Angeles and the State of California.

22.    Venue is proper in this Court pursuant to Bus. & Prof. Code §§ 17204 and 17535 and Civ. Code § 1780 (c) because Defendants conduct business in the County of Los Angeles and in the State of California, including marketing, advertising, and sales directed to California residents. Further, at all times mentioned in this Complaint, Defendants made misrepresentations and material omissions to residents of the County of Los Angeles and the State of California.

23.    Federal court subject-matter jurisdiction over this representative action does not exist. Complete diversity of citizenship between Plaintiff and Defendants does not exist. Under

- 8 -

1   applicable federal law, damages, punitive damages, attorneys' fees and costs cannot be aggregated

2   to meet the minimum jurisdictional amount for federal court subject-matter jurisdiction. Plaintiff

3   asserts no federal question and/or violations of federal law.

## IV.    FACTUAL ALLEGATIONS

### A.    Prilosec – A Blockbuster Drug for AstraZeneca

24.    Prilosec (also known as Losec) is a proton pump inhibitor and according to AstraZeneca's publicly filed documents by the year 2000 had "set a new global standard in short and long-term treatment of acid related diseases." According to AstraZeneca's publicly filed documents, Prilosec had benefited patients in 530 million patient treatments since 1980 and "is the world's largest selling pharmaceutical." Prilosec was AstraZeneca's most profitable drug with worldwide sales of over $6 billion by 2000.[10]

25.    Patent protection for omeprazole, the active substance in Prilosec, expired in all major markets by the end of 2000 but patent term extensions extended protection until April 2001 in the United States.

26.    Omeprazole, the active ingredient in Prilosec, is a "racemic" mixture containing S- and R-enantiomers. Enantiomers are molecules that have two non-superimposable mirror image forms, *i.e.*, a right and left hand version. Racemic mixtures, such as Prilosec, contain equal proportions of the two enantiomers. So, 20 mg of Prilosec (*i.e.*, omeprazole) is really 10 mg of the R-enantiomer and 10 mg of the S-enantiomer.

27.    However, in humans, the S-enantiomer of omeprazole is more active than the R-enantiomer, in part due to its better metabolization.

28.    With the looming loss of patent protection, AstraZeneca faced the erosion of its number one drug. To put this in perspective, sales of Prilosec of $5.9 billion in 2000 comprised 39% of AstraZeneca's revenue, with the next drug at 8%. Facing the loss of its most profitable drug, AstraZeneca undertook a series of steps to delay the April 2001 expiration of its patent on Prilosec. Three legal arguments helped to keep the patent on Prilosec in effect until November of

---

[10] 2001 Annual Report at p. 38.

THIRD AMENDED CLASS ACTION COMPLAINT

1    2002, protecting Prilosec sales of $10 million per day, and more important, providing additional

2    time to switch patients over to Nexium.[11]  These three tactics included:

3    • Arguing that the protective coat put on Prilosec to shield the active contents from

4        degradation by the acidity in the stomach.  According to the WALL STREET JOURNAL

5        this is a standard problem that is addressed in standard industry textbooks and

6        products are routinely sold to solve it.  A British judge invalidated AstraZeneca's

7        claim to a patent on the coating based on its "obviousness," but the case took longer

8        to work its way through US Courts.

9    • AstraZeneca patented the idea of treating H. Pylori infections with a combination of

10       Prilosec and antibiotics.  Therefore, they argued, taking the antibiotics with a

11       generic version of Prilosec would violate their patent.

12   • AstraZeneca patented a metabolite of Prilosec, a molecule that exists briefly as the

13       body digests omeprazole.  AstraZeneca then argued that people taking a generic

14       version of Prilosec would violate its patent by metabolizing the drug into this

15       intermediate chemical for which they held the patent.

16   Though these tactics are more relevant to discussions of patent law, they are relevant in this case

17   because they gave AstraZeneca more time to accomplish its primary goal:  switching as many

18   people as possible directly from its blockbuster drug Prilosec to its "new purple pill" Nexium.

19   **B.    The Loss of Patent Protection Results in Lower Prices and Reduced Profits**

20        29.    For every year from 1995 through 2002, the pharmaceutical industry was the most

21   profitable industry in the United States, although its profitability declined somewhat in 2002.  In

22   2003, drug companies ranked as the third most profitable industry (14.3%), with mining, crude-oil

23   production the most profitable industry (20.1%) and commercial banks the second most profitable

24   (18.6%).  Drug companies were more than three times as profitable as the median for all Fortune

25   500 companies in 2003 (14.3% compared to 4.6%).[12]

26

27   [11] Gardiner Harris, *AstraZeneca Fends Off Generics for Prilosec ---- New Heartburn Drug Nexium Is Introduced*, WALL STREET JOURNAL, June 6, 2002.

28   [12] Kaiser Family Foundation, *Trends as Indicators in the Charges*, Health Care Marketplace 2004 Update..

THIRD AMENDED CLASS ACTION COMPLAINT

30.    The most profitable drugs are brand name drugs.  Brand name drugs typically sell at three times or more that of a generic drug.

31.    A Kaiser Family Foundation report noted certain trends causing price increases all of which are germane to this case:

**Prescription Drug Prices**[13]

The average price of a prescription continues to increase, fueled by increases in manufacturer prices for existing drugs and <u>by proportionately higher prices for newer, brand name drugs</u>. Manufacturer price increases in recent years have been higher than in the mid-1990s.

- The overall average retail prescription price was $45.79 in 2000, more than double the average price in 1990 ($22.06) (Exhibit 13).  Increases in average retail prices reflect both price increases for existing drugs and <u>shifts in use to newer, more expensive medicines</u>.

- The average retail price of a prescription for a brand name drug was more than 3 times that of a generic drug in 2000 ($65.29 compared to $19.33).  This price differential between average brand and generic prescription prices has increased over time, from slightly less than 2.9 times in 1996 to 3.4 times in 2000 (Exhibit 13).

32.    As set forth herein, each of these factors is implicated in this case, as Nexium is a newer drug with a significantly higher price than the equivalent generic.

33.    The Kaiser report also noted the increasing promotion of drugs by pharmaceutical manufacturers:

**Prescription Drug Promotion**

Promotion for prescription drugs by pharmaceutical manufacturers has continued to grow, reaching nearly $16 billion in 2000. Spending on traditional forms of promotion, such as "detailing" (the personal selling activities of pharmaceutical manufacturer sales representatives, directed mainly at office-based physicians) and "sampling" (leaving drug samples at sales visits), both continue to increase.  But growth has been most rapid for a more recent form of promotion, direct-to-consumer (DTC) advertising.

- Total promotional spending by pharmaceutical manufacturers for prescription drugs grew at an average annual rate of 14% from 1996 to 2000, more than a 70% increase in total promotional spending since 1996 (Exhibit 17).

---

[13] Kaiser Family Foundation, Prescription Drug Trends — A Chartbook Update, November 2001.

- 11 -

THIRD AMENDED CLASS ACTION COMPLAINT

- The average annual growth rate in DTC advertising spending was 33% between 1996 and 2000, compared to a 14% growth rate for total promotional spending during the same period. In 2000, spending for DTC advertising ($2.5 billion) comprised 16% of total promotional spending, up from 9% in 1996. However, the major expenditures for promoting prescription drugs continue to be detailing (with spending approximately twice that for DTC promotion) and sampling (which, when valued at retail value, is m ore than triple the amount of DTC spending) (Exhibit 17).

Spending for television advertising (nearly $1.6 billion in 2000) has been an increasing proportion of DTC advertising, rising from 13% in 1994 to 64% of total DTC spending in 2000. TV advertising has grown more rapidly than other forms of DTC advertising: the average annual percent increase in TV advertising spending was 88% from 19994-2000, compared to 25% for print and other forms of DTC promotion (Exhibit 18).

## C.    The AstraZeneca Solution – The New Purple Pill Nexium

34.    Faced with the catastrophic loss of sales from its flagship drug, AstraZeneca carefully plotted a new strategy. The plotting was done by members of the "Shark Fin Project," a secret group of marketers, lawyers and scientists charged with developing a strategy for averting the patent-expiration disaster. The name of the group derives from the dismal shape the sales chart would trace if AstraZeneca did nothing: an inverted V. Eventually the centerpiece of that strategy was the marketing and promotion of the new drug Nexium. Nexium was viewed by several executives as the poorest solution because it was not any better for ordinary heartburn than Prilosec.

35.    AstraZeneca's plan was to promote Nexium as an improvement to Prilosec and to have brand loyalty built before the expiration of Prilosec's patents. AstraZeneca knew that brand loyalty is critical – once a doctor locks onto a drug for a certain treatment – he/she is unlikely to change. The same is true for the consumer.

36.    AstraZeneca sponsored several studies to justify the use of Nexium. The study that it used to obtain FDA approval concluded that Nexium *at twice* the standard dose of Prilosec was *slightly* more effective:

Investigators observed that the time intragastric pH was greater than four during a 24-hour period was longer with **Nexium 40 mg** once daily than standard healing doses for erosive esophagitis of four other

- 12 -

branded proton pump inhibitors currently available by prescription in the United States. On day five, intragastic pH was maintained above 4.0 for a mean of 14.0 hours with **Nexium** 40 mg, 12.1 hours with Aciphex 20 mg, 11.8 hours with **Prilosec 20 mg**, 11.5 hours with Prevacid 30 mg, and 10.1 hours with Protonix 40 mg. **Nexium** also provided a significantly higher percentage of patients with an intragastric pH > 4.0 for > 12 hours relative to the other proton pump inhibitors (p<0.05).

Acid suppression is, however, only a "surrogate endpoint," meaning that it is not of clinical importance in its own right, but a marker presumed to be of importance. Even if duration of suppression of gastric acid secretion were a valid measure upon which to make a clinical decision, these results show that a single dose of Nexium 40 mg (keeping gastric pH above 4 for 14 hours) would hardly be the choice over giving Prilosec 20 mg (keeping gastric pH above 4 for 11.8 hours) twice daily.

37.    AstraZeneca had conducted two multi-center, randomized, double-blind, placebo-controlled studies in a total of 717 patients comparing four weeks of treatment of Nexium 20mg or 40mg once daily versus placebo for resolution of heartburn or GERD symptoms. The patients all had at least a six-month history of heartburn episodes, no erosive esophagitis by endoscopy, and had heartburn on at least four of the seven days immediately preceding randomization. Not surprisingly, the percentage of patients that were symptom-free of heartburn was significantly higher in the Nexium groups compared to those groups that received a placebo, or nothing. Thus, the FDA gave AstraZeneca approval to market Nexium, the "New Purple Pill," for the treatment of heartburn because it worked better than a placebo, NOT because it was better than Prilosec. The only thing that these two studies proved was that the "New Purple Pill" was better than a placebo in the treatment of heartburn, NOT that it was better than omeprazole, or Prilosec. As a matter of fact, when Nexium was compared to omeprazole in three European symptomatic GERD trials, NO significant treatment related differences were seen.

38.    Thus, in these three European symptomatic GERD trials, which AstraZeneca had knowledge of (see NEXIUM package insert); Nexium was proven NOT to be better than omeprazole or Prilosec. Yet, defendants marketed and continue to market Nexium as if the "New Purple Pill" is an improvement and better than omeprazole for the treatment of heartburn, which

- 13 -

they knew and continue to know is false. AstraZeneca knew that Nexium would NOT be better than Prilosec for the treatment of heartburn. Thus, with omeprazole available as a generic drug, AstraZeneca had to create and perpetuate the myth that Nexium, the "New Purple Pill," was somehow better than generic omeprazole, and better than OTC Prilosec, which both sell at a fraction of the cost of Nexium. Thus, to sell Nexium to an unsuspecting public and to a somewhat gullible, if not ignorant (but well wined and dined and not lacking for ball point pens), medical profession, AstraZeneca needed some data, no matter how spurious, to claim that the "New Purple Pill" was and is better than omeprazole. Thus, they conducted four clinical trials, which compared escalating doses of 20mg and 40mg of Nexium to the standard dose of 20mg of omeprazole for the treatment of erosive esophagitis, NOT simple heartburn or symptomatic GERD. These trials were crucial to the marketing strategy. AstraZeneca was desperate to show that the "New Purple Pill" was better than Prilosec.

39.    Please note what AstraZeneca did. They chose to study the effects of Nexium versus omeprazole in patients with erosive esophagitis, NOT simple heartburn or symptomatic GERD. Also, AstraZeneca chose to compare escalating doses of Nexium to the standard 20 milligrams (mg) dose of Prilosec. Instead of comparing likely equivalent doses (which would have been no more than 20 and possibly as little as 10 milligrams of Nexium, versus the standard 20-milligram dose of Prilosec) the company used higher doses of Nexium. Thus, they compared 20mg and 40mg of Nexium with 20mg of Prilosec. They escalated the dose of Nexium because they knew that the effect of PPI's is dose dependent or dose-related, yet they only escalated the dose of Nexium, they did NOT escalate the dose of Prilosec. To be fair and objective they should have escalated the dose of Prilosec as well. They even acknowledge the dose dependency of PPI's in the package insert of NEXIUM; "By acting specifically on the proton pump, esomeprazole blocks the final step in acid production, thus reducing gastric acidity. This effect is dose-related up to a daily dose of 20 to 40mg and leads to inhibition of gastric acid secretion." Thus, with the trials designed in their favor with escalating doses of Nexium, one would have expected Nexium to do much better than Prilosec. Yet, in two of the four trials, there was NO significant difference between Nexium 20mg, Nexium 40mg, and Prilosec 20mg, for the treatment of erosive

- 14 -

1    esophagitis.    In the other two trials, Nexium 40mg appeared to offer only a very slight

2    improvement in the healing rates of erosive esophagitis when compared to Prilosec 20mg.  In one

3    study, Nexium 20mg was compared to Prilosec 20mg, resulting in a healing rate of 89.9% for

4    Nexium 20mg compared to a healing rate of 86.9% for Prilosec 20mg.  This is NOT a *significant*

5    *improvement in the clinical efficacy* of Nexium over Prilosec.  As a matter of fact, in the Medical

6    Review of Nexium, the FDA stated that, "*superiority of NEXIUM over omeprazole was not*

7    *demonstrated*" in these studies.    Furthermore the FDA stated, "*There are no studies which*

8    *demonstrate that H is superior to O, clinically or even statistically*" (H designates esomeprazole

9    or Nexium and O designates omeprazole or Prilosec).  The significant finding in these trials is that

10   Nexium didn't do better than Prilosec did even at the escalated dose of Nexium 40mg, which is

11   twice the standard dose of Prilosec 20mg.    The logical objective conclusion from these studies

12   would have been to simply double the standard dose of Prilosec, allow generic competition, sell

13   Prilosec over-the-counter, and forget about the "New Purple Pill," but that would not have helped

14   the profit making objective of AstraZeneca.

15       40.    Designing a clinical trial for the treatment of erosive esophagitis in and of itself is

16   not fraudulent or deceptive, but to use the data (healing rates) from those trials to claim that

17   Nexium is better than Prilosec for the treatment of common everyday heartburn or symptomatic

18   GERD, is fraudulent and deceptive, when in fact in those same studies, the data did NOT

19   demonstrate that Nexium 20mg was better than Prilosec 20mg for the resolution of heartburn

20   symptoms.  In one of those studies, even the escalated dose of Nexium 40mg was NOT better than

21   Prilosec 20mg for the resolution of heartburn symptoms.  Yet, AstraZeneca promoted Nexium to

22   physicians and the public as the "first proton pump inhibitor (PPI) to offer significant clinical

23   improvements over Losec... in terms of acid control and clinical efficacy."  Losec is another name

24   for Prilosec.

25       41.    The FDA's Medical Review of Nexium's new drug application tells a very different

26   story.  This FDA's review summarized all of the studies – published or not – submitted with

27   AstraZeneca's NDA for three indications for Nexium:    healing of erosive esophagitis (four

28

THIRD AMENDED CLASS ACTION COMPLAINT

1    studies), maintenance of healing of erosive esphagitis (two studies), treatment of symptomatic

2    GERD (gastroesophageal reflux disease) (five studies).[14]  The Medical Review reports that:

3
          "All of these studies were well-designed and apparently well-
          executed, double-blind, randomized, with appropriate: a) controls; b)
4         patient populations; c) consistent inclusion criteria and reasons for
          exclusion; and d) sufficient sample size for appropriate statistical
5         power."

6         42.    So what did these high quality studies show?  For healing of erosive esophagitis:

7
          "…a superiority claim of NEXIUM over omeprazole [Prilosec] is
8         NOT SUPPORTED by either the comparison of H20 [Nexium 20
          mg] vs. O20 [Prilosec 20 mg] or the comparison of H40 [Nexium 40
9         mg] vs. H20 [Nexium 20 mg]. [FDA's emphasis]

10        43.    For maintenance of healing of erosive esophagitis:   The two studies compared

11   various doses of Nexium to placebo only, not to an active comparator, like Prilosec.

12        44.    For treatment of symptomatic GERD:

13
          "…claims of superiority [of Nexium] to omeprazole are – once again
14        – not supported.  Neither H40 [Nexium 40 mg] nor H20 [Nexium 20
          mg] could be differentiated from O20 [Prilosec 20 mg].

15        45.    The "SUMMARY OF BENEFITS VS RISKS" section of the FDA's Medical

16   Review of the Nexium new drug application is worth quoting at length:

17
          It is important to point out that in order to determine whether one
18        compound is superior to another, these drugs need to be tested at
          comparable amounts: H20 [Nexium 20 mg] vs. O 20 [Prilosec 20
19        mg]; H40 [Nexium 40 mg] vs. O 40 [Prilosec 40 mg].  The sponsor's
          comparisons of H40 to O 20 do not yield valid conclusions about the
20        superiority of H [Nexium] over O [Prilosec], although these
          comparisons are adequate to demonstrate that [Nexium] is active in
21        the assessed indications.  Therefore the sponsor's conclusions that
          [Nexium] has been shown to provide a significant clinical advance
22        over [Prilosec] in the first-line treatment of patients with acid-related
          disorders is not supported by data.  [Underlining and bold are from
23        FDA report.] [15]

24        46.    And the final conclusion of this report:

25        In addition, it is recommended not to allow the sponsor to claim that
          [Nexium] has any significant clinical advantage over [Prilosec] in the
26

27        [14] Hugo E. Gallo-Torres, MD, PhD, Medical Team Leader, Medical Review(s), FDA Center for Drug Evaluation
     and Research, Application Number: 21-153/21-154, September 21, 2000. pp 3-6.

28        [15] Ibid., p. 171.

THIRD AMENDED CLASS ACTION COMPLAINT

first-line treatment of these acid-related disorders because no data in support of such a claim have been submitted.[16]

47.    Nonetheless, AstraZeneca claimed that Nexium offered "significant clinical improvements over Losec... in terms of acid control and clinical efficacy." Thus, AstraZeneca claimed that Nexium was significantly more effective than Prilosec for the treatment of heartburn and that it provided relief in a shorter period of time. AstraZeneca repeated this message in a barrage of marketing activities directed to patients (the public) and physicians, and is still promoting this message as outlined in ¶ 7 above.

48.    Another deceptive aspect about using erosive esophagitis in a clinical trial to support the use of Nexium for simple heartburn is that erosive esophagitis can only be diagnosed by an invasive procedure called endoscopy. AstraZeneca is shrewd enough to know that a physician is NOT going to perform an endoscopy, and diagnose erosive esophagitis, before writing a prescription for Nexium when a person first complains of heartburn. In other words, most patients who are given a prescription of Nexium, are NOT being treated for erosive esophagitis. Instead, most patients have received Nexium, the "New Purple Pill" for symptomatic GERD or simple heartburn, which AstraZeneca knows is just as effectively treated with omeprazole, or Prilosec. Yet, AstraZeneca used the spurious data from the erosive esophagitis trials to persuade physicians and patients that the "New Purple Pill" should be prescribed over omeprazole for simple heartburn. Due to the effectiveness and power of the massive false Direct-to-Consumer ("DTC") advertising that AstraZeneca orchestrated, the general public has been indoctrinated to demand the brand name Nexium to treat simple heartburn. And the primary care physicians and specialists comply with the demand because they have been misled by the studies with unfair comparisons, continuing education lectures that are dominated by experts with financial ties to drug companies, advertising, and deceptive drug detailing practices of AstraZeneca's drug reps. Thus, instead of prescribing generic omeprazole or OTC Prilosec for simple heartburn, the physician writes a prescription for Nexium. Furthermore, the only acid-related indication for which the dose of Nexium is 40 mg is the healing of erosive gastritis (the recommended dose for maintenance of

---

[16] *Ibid.*, p. 174.

THIRD AMENDED CLASS ACTION COMPLAINT

healing of erosive esophagitis and symptomatic relief of GERD is 20 mg daily).  And, the price of 40 mg is actually lower than the price of 20 mg tablets, $4.76 vs. $4.96, respectively.  One might assume from the emphasis on benefit for the treatment of erosive esophagitis and the curious pricing structure that AstraZeneca were trying to get doctors to prescribe Nexium 40 mg so that the dose would necessitate a prescription and provide a disincentive to switching to OTC Prilosec (when there is no longer a shortage).

49.    AstraZeneca did not publish a clinical study of the effectiveness of 20 mg of Nexium versus 20 mg of Prilosec.  This study found that Nexium was not more effective than Prilosec.

50.    AstraZeneca did not publish the negative study comparing 40 mg of Nexium and 20 mg of Prilosec.

**D.    The Promotion of Prescription Drugs**

51.    Promotional spending by pharmaceutical manufacturers has risen steadily in recent years, more than doubling from $9.2 billion in 1996 to $19.1 billion in 2001, an average annual increase of 16%.  While most promotional spending (86%) remains directed at physicians, a growing proportion is directed at consumers, especially through television ads.

52.    Pharmaceutical manufactures use several types of promotion, each of which has been growing in recent years and was employed in this case:

> ***Detailing*** (29% of spending) is the sales activities of drug representatives directed toward physicians.  Most detailing is directed at office-based physicians ($4.8 billion), the rest at hospital-based physicians ($700 million).[17]
>
> ***Sampling*** (55% of spending) is the free drug samples that pharmaceutical representatives provide to office-based physicians.  Sampling, valued at retail pharmacy prices, totaled $10.5 billion in 2001.  Recently, samples are also being made available through DTC advertising venues like TV, newspapers, and the Internet. *Id.*
>
> ***Direct-to-Consumer*** *(DTC) Advertising* (14% of spending) includes advertisements targeted toward consumers through magazines, newspapers, television, radio, and outdoor advertising. *Id.*

---

[17] Kaiser Family Foundation, *Impact of Direct-to-Consumer Advertising on Prescription Drug Spending*, June 2003.

THIRD AMENDED CLASS ACTION COMPLAINT

> ***Medical Journal Advertising*** (2% of spending) is the value of professional journal advertisements. *Id.*

53.    While DTC advertising remains a relatively small part of overall industry promotion, its rapid spending growth in recent years (increasing an average of 28% annually from 1996-2001), frequent presence on television and in magazines, and extensive use in promoting newer, more expensive medications, have attracted the attention of critics who worry that ***it encourages patients to demand high-cost prescriptions for ailments that could be treated effectively with lower cost options***.    AstraZeneca's intent was to take advantage of this phenomenon and it succeeded in using its massive Nexium campaign, described below, to encourage consumers to make such demands.

54.    A recent study by researchers at the Harvard School of Public Health (M.B. Rosenthal and A.M. Epstein), Massachusetts Institute of Technology (E.R. Berndt), and Harvard Medical School (J.M. Donohue and R.G. Frank) finds that DTC advertising has a significant effect on prescription drug spending.    The complete report of their study, *Demand Effects of Recent Changes in Prescription Drug Promotion*, May 29, 2003, can be found at www.kff.org.

55.    Significant findings from the study include:

> ***The analysis of advertising and sales growth in the five therapeutic classes studied produces an advertising elasticity of .10, which means that on average a 10% increase in DTC advertising of drugs within a class results in a 1% percent increase in sales of drugs in the class.***   The study offers the case of proton pump inhibitors (or PPIs, for treatment of ulcers) as an example.    Between 1998 and 1999, DTC advertising spending for PPIs increased 60% (from $49.7 million to $80.1 million) and PPI sales increased 36% (from $4.2 billion to $5.7 billion).    Applying the estimated elasticity of .1 to the results for this drug class, the study estimates that $252 million, or about 17% (or 6 percentage points), of the 36% increase in PPI sales from 1998 to 1999 is attributable to the increase in DTC advertising.

> ***Applying the elasticity to the growth in DTC advertising for the 25 largest therapeutic drug classes, the study estimates that increases in DTC advertising between 1999 and 2000 accounted for 12% of drug sales growth during that period.***   Applying the 5-class analysis results to the 25 classes with the highest retail spending finds that DTC advertising growth during the year resulted in an additional $2.6 billion in drug spending in 2000.

> ***DTC advertising is an important, but not the primary, driver of growth in prescription drug spending.   However, DTC advertising***

> *produces a significant return for the pharmaceutical industry: every additional $1 the industry spent on DTC advertising in 2000 yielded an additional $4.20 in sales.*

**E.    A Massive Promotional Campaign and Predatory Price Is Used to Establish Nexium**

56.    After the sponsored study was concluded, AstraZeneca used the study to promote Nexium as a superior product and launched a massive promotion employing detailing, sampling, and DTC advertising directed at doctors and consumers.

57.    For example, in its 2000 Annual Report, AstraZeneca claimed that:

> *Nexium* is the first PPI to offer significant clinical improvements over *Losec* in terms of acid control and clinical efficacy, shown in clinical studies involving over 30,000 patients performed across 20 countries.  It is expected to establish a new, improved treatment standard for the PPI class.

> *Nexium* offers more effective acid inhibition than other PPIs and in the treatment of reflux oesophagitis, provides healing and symptom relief in more patients and in a shorter period of time than *Losec*.  It is an effective, long-term therapy for GERD patients and can be taken when needed (on demand) to prevent relapse.   For the treatment of active duodenal ulcers, seven-day *Nexium* triple therapy (in combination with two antibiotics for the eradication of Hpylori) heals most patients without the need for follow-up antisecretory monotherapy.

58.    AstraZeneca used these themes in a massive promotional campaign launched to have Nexium replace Prilosec as its flagship drug.  AstraZeneca sales representatives spent 2000 and 2001 in a frenzied sales pitch as to the superior qualities of Nexium.  And, in the first ten months of 2001 alone, AstraZeneca spent $98 million on direct-to-consumer promotions, again claiming Nexium was superior to Prilosec.   To put the advertising blitz that followed in perspective, the previous record for DTC spending in one year had been set by Vioxx in 2000, spending $161 million more than what was spent marketing Pepsi or Budweiser beer.  In 2002, the first full year that Nexium was on the market, $183 million was spent on DTC advertising.  The following year this increased to $257 million.   Coincident with this enormous amount of advertising, Nexium sales roled 58% in 2003, making it the 7th largest selling drug in the United States.

THIRD AMENDED CLASS ACTION COMPLAINT

1    59.    Nexium advertisements directed to physicians claimed that the new drug was more

2    powerful than Prilosec:  "we've captured the essence of Prilosec and created a new PPI ...

3    introducing Nexium the powerful new PPI from the makers of Prilosec...."

4    60.    To prepare its pitch AstraZeneca flew its entire sales force of 6,000 to Hawaii where

5    they spent an intensive session training on how to pitch Nexium.  They were trained to push

6    Nexium even if doctors were resistant or happy with Prilosec.  Teleconferences were held whereby

7    the sales force rehearsed the pitch to be made to doctors.  In addition its sales force was penalized

8    in their bonuses if they gave away free samples of Prilosec.

9    61.    Its 6,000 person sales force flooded doctors' offices with free samples and claims of

10   Nexium's superiority.  A July 6, 2002 WALL STREET JOURNAL article depicts one type of pitch

11   made to doctors:

12   Peter Halper, an internist at a large group practice in Manhattan, has
     a computer given him by a drug-marketing firm on condition he chat
13   with drug-company marketers via the Internet from time to time.
     Recently, he checked in with AstraZeneca.  The face of a salesman
14   popped onto his screen, asking him how he was and then launching
     into a pitch for Nexium
15
     Dr. Halper asked the salesman why Nexium was better.
16
     "The proof's in the healing rates," said the live salesman, who cited
17   data comparing 40 mg. of Nexium to 20 mg. of Prilosec.  'We're
     safer, with no drug-to-drug interactions.   We're also the No. 1
18   proton-pump inhibitor among gastrointestinal specialists.'  While he
     spoke, several graphs flashed on the screen.
19
     'So have I shown you how we differ from the other drugs?' the
20   salesman asked.  Dr. Halper said he had.  'Do you need any more
     samples delivered?' No, Dr. Halper said, he had plenty.
21
     Minutes later, two salesmen from AstraZeneca arrived to talk to
22   Dr. Halper about Nexium.  They made sure to restock his cabinet
     with free Nexium.  Since many physicians view Prilosec and Nexium
23   as virtually identical, they often prescribe whichever one is in their
     free-sample closet.   Patients who begin with free samples often
24   continue with paid prescriptions, so the freebies are effective
     marketing tools.
25
26   62.    No mention in this pitch was made of the fact that equivalent doses of Nexium was

27   not effective, nor was the claim of "superiority" accurate in that the clinical studies comparing

28

- 21 -

1    higher doses of Nexium to the standard dose of Prilosec showed just a slight increase in efficacy,

2    and that one of the trials showed no increase in efficacy.

3        63.    AstraZeneca also engaged in a massive advertising campaign directed at consumers.

4    The intent of these advertisements was to cause consumers to want to use Nexium.  Studies show

5    that such advertisements are effective in causing patients to pressure doctors into prescribing

6    expensive and marginally helpful new drugs.   Doctors find it easier and faster to write the

7    prescription than to explain cheaper alternatives.  This is why such direct-to-consumer advertising

8    is prohibited in every other developed country (except New Zealand).

9        64.    The promotional campaign was massive in terms of spending and effort:

10       To promote **Nexium,** AstraZeneca retained the professional and
         consumer advertising agencies that handle the **Prilosec** promotion.
11       The professional ad agency of record for **Nexium** is Grey Healthcare
         Group Inc. (ghgroup.com). Klemtner Advertising Inc., a division of
12       Nelson Communications' Healthcare Resources Group Inc., is the
         consumer advertising agency of record.
13
14       AstraZeneca last year spent $ 97.9 million on the consumer
         campaign for **Nexium** through October, placing the product as the
15       third most-promoted prescription drug to consumers during this
         period. This amount was 84.4% of AstraZeneca's total expenditure
16       for direct-to-consumer advertising in the first 10 months of the year.
         The company's direct-to-consumer campaign expenditure for
17       **Nexium** totaled more than the entire consumer advertising efforts in
         that period for Abbott Laboratories (abbott.com), Eli Lilly & Co.
18       (lilly.com), and Novartis (novartis.com).  Nexium was the fourth
         most-promoted drug in medical journals in 2001, according to
19       Perq/HCI (www.perqhciresearch.com).

20       65.    The effectiveness of such advertising was not lost on AstraZeneca.  A Kaiser Family

21   Foundation study found that:

22       •   Nearly a third (30%) of adults have talked to their doctor about a
             drug they saw advertised, and 44% of those who talked to their
23           doctor received a prescription for the medication they inquired
             about.  This means that one in eight Americans (13%) has
24           received a specific prescription in response to seeing a drug ad.

25       •   After viewing specific prescription drug ads, about four in ten
             said they were very or somewhat likely to talk to their doctor
26           about the drug they saw advertised (37%) and/or to talk to their
             doctor about the health condition mentioned in the ad (40%).

27

28

- 22 -

THIRD AMENDED CLASS ACTION COMPLAINT

1

2

66.    Millions of patients, including those in California, were exposed to advertisements for Nexium.

67.    AstraZeneca also engaged in what would, if Prilosec was manufactured by another company, be predatory pricing in violation of federal and state antitrust law.  It offered Nexium at prices below the price of its own Prilosec, hoping that if it established Nexium as a replacement with doctors and consumers, it could later raise the price of Nexium and reap substantial profit after Prilosec's patent had expired.

**F.    Nexium Is Not More Effective**

68.    The truth is that there is no evidence that Nexium is superior, at standard doses, to Prilosec and other PPIs:

> However, it appears that AstraZeneca, the manufacturer of Prilosec, has been remarkably successful in switching consumers to its newer and more expensive PPI: *Nexium* (esomeprazole),"the purple pill." Sales of omeprazole (both brand name Prilosec and generic) declined from $4 billion (February 2002 to January 2003) to $2.9 billion (February 2003 to January 2004), while sales of *Nexium* increased from $2.3 billion to $3.6 billion for the same time frame. The number of omeprazole (brand name and generic) prescriptions declined from 21.5 million to 17.1 million for those time periods, while the number of *Nexium* prescriptions increased from 15.1 million to 21.3 million, according to NDCHealth.

> Drugs for Peptic Ulcers

> This is remarkable since there is no evidence that Nexium is any more effective than Prilosec.  The two medications are close chemical relatives. Prilosec is made up of two molecules which are mirror images of each other, while Nexium is made of one of those same molecules.  Clinical trials found that 20 mg or 40 mg of Nexium is somewhat more effective than 20 mg of Prilosec in healing esophageal erosion. However, no tests were done to compare 40 mg of Nexium against 40 mg of Prilosec. "Some patients may need 20 mg while some need 40 mg," Dr. Abramowicz says. "When optimal doses are used, Prilosec and generic omeprazole appear to be as effective as Nexium or any other PPI." *(Source:* **MANAGED HEALTHCARE EXECUTIVE***, April 1, 2004.)*

69.    The situation was described by HEALTH FACTS as follows:

> It's tempting to dismiss Nexium as just another "me too" drug, one chemical notch away from the other PPIs, and one more example of a pharmaceutical company trying to make us think it has come up with something new. But actually Nexium signals a new pharmaceutical industry twist.  Normally, a company makes a me-too drug to cut into

- 23 -

a competitor's profits, but in this case, both Prilosec and Nexium are made by the same company. AstraZeneca's reason for competing with its own product is obvious. Prilosec (called Losec in Canada) will soon go off patent, and generic versions will become available at about two-thirds the cost.

Gone is the pretense that carried the day for Prozac's competitors, who claimed that their me-too antidepressants (Zoloft, Paxil, etc) had fewer side effects. There is no significant difference in side effects between Prilosec and Nexium. Both drugs come in delayed-release form, so AstraZeneca has not introduced a new format. In fact, Nexium offers no innovation; the drug owes its existence entirely to AstraZeneca's need to retain the company's considerable share of the $8.3 billion PPI Market.

70.    The Los Angeles Times described the marketing of Nexium as follows:

As an example, Cohen **compares Nexium,** the new stomach-acid controller, to **Prilosec,** which is virtually identical and for which a generic is available for a price about 10 times less. But once a patient tries **Nexium** and is doing well, he's not going to want to switch, Cohen says. "Every dollar that goes into these 'me-too' drugs that are virtually the same as existing drugs is a dollar that is bled out of the health-care system. Drug companies are looking for their profits and will squeeze it every way they can." *(Source: The* **Los Angeles Times,** *February 15, 2004.).*

71.    In 2003, CMS Administrator, Tom Scully, told physicians at a convention of the American Medical Association that they should not prescribe the heartburn treatment Nexium because Prilosec, an older version of the medication that became available in generic form last December, costs less and provides the same level of treatment. Mr. Scully told doctors, "You should be embarrassed if you prescribed Nexium," because it increases costs with no medical benefits. "The fact is, Nexium is Prilosec," Mr. Scully said. "It is the same drug. It is a mirror compound." Mr. Scully said he had no problem paying thousands of dollars a year for an innovative drug that saves lives, like Gleevec, for certain types of leukemia and gastrointestinal tumors. But he said, "'*Nexium is a game that is being played on the people who pay for the drugs' making it one of the most successful launches ever of a new medicine.*"

72.    To obtain approval from the U.S. Food and Drug Administration ("FDA") for Nexium, AstraZeneca had to test it in several clinical trials. Some of these trials merely compared Nexium with placebos to show that it worked better than nothing, since that is all the FDA requires. But four trials compared Nexium head-to-head with Prilosec for esophageal erosions, and

1   these were crucial to AstraZeneca's marketing strategy.  The Company wanted to show that
2   Nexium was better than Prilosec – an advance over the older drug.

3       73.    In total, AstraZeneca submitted 11 efficacy studies and three supportive trials for
4   consideration by the FDA with its NDA for Nexium.  *See* Stephen G. Hundley, *FDA*
5   *Pharmacology/Toxicology Review and Evaluation*, Nexium NDA 21-154, 1-2 (October 31, 2000)
6   ("FDA Review").  Only ***four*** of the eleven studies and the three supportive trials actually compared
7   Nexium with omeprazole.  The remaining studies compared Nexium with a placebo.

8       74.    Study 172 compared the efficacy of 40 mg Nexium, 20 mg Nexium, and 20 mg
9   omeprazole in healing erosive esophagitis.  A sample size of 500 patients per treatment was chosen
10  in order to ensure the ability to detect a 10% difference in healing with 95% accuracy.  Not
11  surprisingly, 40 mg Nexium had a statistically significant higher healing proportion than 20 mg
12  omeprazole, 87.6% versus 81.4%.  However, the targeted therapeutic gain of 10% was not reached.
13  In addition, there was no statistically significant difference between 20 mg of Nexium and 20 mg
14  omeprazole according to the FDA reviewer.

15      75.    Study 172 also evaluated 40 mg Nexium, 20 mg Nexium and 20 mg omeprazole for
16  heartburn resolution.  The study revealed that there was no significant difference in heartburn
17  resolution between 20 mg Nexium and 20 mg omeprazole.  In fact, there was only a statistical
18  difference at week 4, not at week 8, between 40 mg Nexium and 20 mg omeprazole.  The study's
19  authors did claim a statistically significant lower number of heartburn free nights with 20 mg of
20  Nexium versus 20 mg omeprazole, but there was no significant difference in heartburn free days
21  and more patients using 20 mg of omeprazole had sustained heartburn resolution by day one of the
22  study.

23      76.    Possibly to remedy the failure to obtain the targeted therapeutic gain of 10% in
24  Study 172, study 173 attempted to reproduce the unremarkable, statistically significant difference
25  between 40 mg of Nexium and 20 mg of omeprazole.  This time, however, there was no
26  statistically significant difference between 40 mg Nexium and 20 mg omeprazole.  Even at twice
27  the dose, the study "failed to demonstrate the superiority of [Nexium] over[omeprazole]."  *FDA*
28  *Review* at 10.  Study 173 did not even attempt to compare 20 mg Nexium and 20 mg omeprazole.

- 25 -

77.     AstraZeneca attempted yet again to prove that 40 mg of Nexium was better at healing erosive esophagitis than 20 mg of omeprazole in Study 222. This time, however, over 1000 patients per treatment were used. This number of patients reduced the amount of therapeutic gain required to ensure a 95% accuracy rate from 10% to 5% therapeutic gain. With this lower measure of therapeutic gain, AstraZeneca was finally able to show, within the parameters of the study, that 40 mg of Nexium was more effective than 20 mg of omeprazole.

78.     However, the FDA reviewer noted that "the superiority of [40 mg Nexium] over [20 mg omeprazole] was demonstrated by comparing two treatments at different dose level [sic] and does not lead to the conclusion that [Nexium] is superior to omeprazole in healing [erosive esophagitis]." *FDA Review* at 14.

79.     Study 174 compared 20 mg Nexium with 20 mg omeprazole. As with Study 172, the FDA reviewer found no statistically significant difference in healing between 20 mg of Nexium and omeprazole. *FDA Review* at 10.

80.     Of the three supportive trials submitted by AstraZeneca with the Nexium NDA, one compared 40 mg and 20 mg Nexium with 20 mg omeprazole; one compared 40 mg Nexium and 20 mg omeprazole; and one compared 20 mg Nexium and 20 mg omeprazole. "All three studies failed to demonstrate superiority of [Nexium] over [20 mg omeprazole]." *FDA Review* at 36.

81.     The package insert provided with Nexium contains charts summarizing substantially similar study results. The percentage healing rates provided are different in absolute terms than the rates cited by the FDA reviewer, due to the inclusion of different data and/or other variations between the data and samples used, but the overall results are substantially similar to those found by the FDA reviewer. The studies are summarized in the following chart:

THIRD AMENDED CLASS ACTION COMPLAINT

EROSIVE ESOPHAGITIS HEALING RATE (LIFE-TABLE ANALYSIS)

| Study | No. of Patients | Treatment Groups | Week 4 | Week 8 | Significance Level* |
|-------|-----------------|------------------|--------|--------|---------------------|
| 1 | 588 | NEXIUM 20 mg | 68.7% | 90.6% | N.S. |
|   | 588 | Omeprazole 20 mg | 69.5% | 88.3% | |
| 2 | 654 | NEXIUM 40 mg | 75.9% | 94.1% | p<0.001 |
|   | 656 | NEXIUM 20 mg | 70.5% | 89.9% | p<0.05 |
|   | 650 | Omeprazole 20 mg | 64.7% | 86.9% | |
| 3 | 576 | NEXIUM 40 mg | 71.5% | 92.2% | N.S. |
|   | 572 | Omeprazole 20 mg | 68.6% | 89.8% | |
| 4 | 1216 | NEXIUM 40 mg | 81.7% | 93.7% | p<0.001 |
|   | 1209 | Omeprazole 20 mg | 68.7% | 84.2% | |

*log-rank test vs. omeprazole 20 mg.
N.S. = not significant (p>0.05).

82.    One notable difference between the results cited by the FDA reviewer and those provided in the package insert is that a statistically significant difference is indicated between 20 mg Nexium and 20 mg omeprazole in study 2 in the chart, whereas the FDA reviewer found no statistically significant difference in the equivalent Study, Study 172, between 20 mg Nexium and 20 mg omeprazole. This is because the package insert chart evaluated statistical significance at the .05 level, whereas the FDA reviewer required a more stringent .025 significance level. Furthermore, the difference was only statistically significant at eight weeks, not at four weeks.

83.    Another chart provided in the package insert for Nexium purporting to summarize "Sustained Resolution of Heartburn" shows no statistically significant difference between 20 mg Nexium and 20 mg omeprazole in the same study:

SUSTAINED RESOLUTION* OF HEARTBURN (EROSIVE ESOPHAGITIS PATIENTS)

| Study | No. of Patients | Treatment Groups | Cumulative Percent# with Sustained Resolution Day 14 | Day 28 | Significance Level* |
|-------|-----------------|------------------|-------|--------|---------------------|
| 1 | 573 | NEXIUM 20 mg | 64.3% | 72.7% | N.S. |
|   | 555 | Omeprazole 20 mg | 64.1% | 70.9% | |
| 2 | 621 | NEXIUM 40 mg | 64.8% | 74.2% | p<0.001 |
|   | 620 | NEXIUM 20 mg | 62.9% | 70.1% | N.S. |
|   | 626 | Omeprazole 20 mg | 56.5% | 66.6% | |
| 3 | 568 | NEXIUM 40 mg | 65.4% | 73.9% | N.S. |
|   | 551 | Omeprazole 20 mg | 65.5% | 73.1% | |
| 4 | 1187 | NEXIUM 40 mg | 67.6% | 75.1% | p<0.001 |
|   | 1188 | Omeprazole 20 mg | 62.5% | 70.8% | |

*Defined as 7 consecutive days with no heartburn reported in daily patient diary.
#Defined as the cumulative proportion of patients who have reached the start of sustained resolution.
*log-rank test vs. omeprazole 20 mg.
N.S. = not significant (p>0.05).

- 27 -

1    84.    An examination of the chemical make-up of Prilosec and Nexium also illuminates

2    the inherent flaws of AstraZeneca's studies supporting its NDA for Nexium.

3    85.    Prilosec (*i.e.*, omeprazole) contains equal proportions of the two enantiomers (R and

4    S). 20 mg of Prilosec is really 10 mg of the Senantiomer. However, in humans, the Senantiomer is

5    more active than the Renantiomer, in part due to its better metabolization. Thus, when faced with

6    the expiration of its patent on Prilosec, AstraZeneca patented just the S-enantiomer of omeprazole

7    under the name esomeprazole or Nexium. Nexium contains just the S-enantiomer of omeprazole,

8    and therefore, is simply Prilosec without the less active R-enantiomer.

9    86.    Even when comparing equal dose. Nexium has a greater proportion of the more

10    active S-enantionmer than Prilosec. "[A] 20 mg tablet of single-isomer esomeprazole [*i.e.*,

11    Nexium] contains the same amount of active ingredient as a 40 mg tablet of race omeprazole [*i.e.*,

12    Prilosec]." Stephen C. Stinson, *Chiral Drugs*, 78 SCIENT/TECHNOLOGY No. 43, 55-78 (October 23,

13    2000), available at:    http://pubs.acs.org/cen/coverstory/7843/print/7843scit1.html. (last visited

14    February 14, 2005).

15    87.    Therefore, even in the one study that showed a slight benefit of 20 mg Nexium over

16    20 mg Prilosec, the results of which the FDA reviewer found non-significant, AstraZeneca

17    compared essentially non-equivalent doses. According to one clinician, "40 mg esomeprazole vs

18    20 mg omeprazole is closer to quadruple the dose, not double ... and the 20 mg vs 20 mg study was

19    not a fair comparison of equal doses." Dr. Barbara Mintzes, Centre for Health Services and Policy

20    Research University of British Columbia, posting on EssentialDrugs.org, June 7, 2002, available

21    at: http://www.essentialdrugs.org/edrug/archive/200206/msg0016.php.

22    88.    Surprisingly, despite the greater amount of S-enantiomer in Nexium, Nexium does

23    not work significantly better when comparing equal 20 mg doses of Nexium and Prilosec according

24    to the FDA reviewer. Even though studies show that Nexium has greater bioavailability and

25    controls gastric pH levels better than Prilosec, these differences do not translate into significantly

26    better clinical outcomes.

27    89.    The truth is that there is no evidence that Nexium is superior, at standard doses, to

28    Prilosec and other PPIs:

However, it appears that AstraZeneca, the manufacturer of Prilosec, has been remarkably successful in switching consumers to its newer and more expensive PPI: *Nexium* (esomeprazole),"the purple pill." Sales of omeprazole (both brand name Prilosec and generic) declined from $4 billion (February 2002 to January 2003) to $2.9 billion (February 2003 to January 2004), while sales of *Nexium* increased from $2.3 billion to $3.6 billion for the same time frame. The number of omeprazole (brand name and generic) prescriptions declined from 21.5 million to 17.1 million for those time periods, while the number of *Nexium* prescriptions increased from 15.1 million to 21.3 million, according to NDCHealth.

Drugs for Peptic Ulcers

This is remarkable since there is no evidence that Nexium is any more effective than Prilosec. The two medications are close chemical relatives. Prilosec is made up of two molecules which are mirror images of each other, while Nexium is made of one of those same molecules. Clinical trials found that 20 mg or 40 mg of Nexium is somewhat more effective than 20 mg of Prilosec in healing esophageal erosion. However, no tests were done to compare 40 mg of Nexium against 40 mg of Prilosec. "Some patients may need 20 mg while some need 40 mg," Dr. Abramowicz says. "When optimal doses are used, Prilosec and generic omeprazole appear to be as effective as Nexium or any other PPI." *(Source:* MANAGED HEALTHCARE EXECUTIVE, *April 1, 2004.)*

90.    The situation was described by HEALTH FACTS as follows:

It's tempting to dismiss Nexium as just another "me too" drug, one chemical notch away from the other PPIs, and one more example of a pharmaceutical company trying to make us think it has come up with something new. But actually Nexium signals a new pharmaceutical industry twist. Normally, a company makes a me-too drug to cut into a competitor's profits, but in this case, both Prilosec and Nexium are made by the same company. AstraZeneca's reason for competing with its own product is obvious. Prilosec (called Losec in Canada) will soon go off patent, and generic versions will become available at about two-thirds the cost.

Gone is the pretense that carried the day for Prozac's competitors, who claimed that their me-too antidepressants (Zoloft, Paxil, etc) had fewer side effects. There is no significant difference in side effects between Prilosec and Nexium. Both drugs come in delayed-release form, so AstraZeneca has not introduced a new format. In fact, Nexium offers no innovation; the drug owes its existence entirely to AstraZeneca's need to retain the company's considerable share of the $8.3 billion PPI Market.

91.    The LOS ANGELES TIMES described the marketing of Nexium as follows:

As an example, Cohen **compares Nexium,** the new stomach-acid controller, to **Prilosec,** which is virtually identical and for which a generic is available for a price about 10 times less. But once a

- 29 -

THIRD AMENDED CLASS ACTION COMPLAINT

> patient tries **Nexium** and is doing well, he's not going to want to switch, Cohen says. "Every dollar that goes into these 'me-too' drugs that are virtually the same as existing drugs is a dollar that is bled out of the health-care system. Drug companies are looking for their profits and will squeeze it every way they can." *(Source:* LOS ANGELES TIMES *February 15, 2004.)*

92.    The Oregon Health Resources Commission ("OHRC") released its Update Report on Proton Pump Inhibitors ("PPIs") in April 2004. The Subcommittee conducted evidence based reviews of six PPIs: Prilosec, Prilosec OTC, Nexium, Prevacid, Protonix, and Aciphex.

93.    The Subcommittee compared the six PPIs for esophagitis healing, relief of symptoms or prevention of relapse in adult patients with GERD, finding:

> The PPI Subcommittee agrees by consensus that there is no overall clinically significant difference between proton pump inhibitors for esophagitis healing, relief of symptoms or prevention of relapse in adult patients with GERD.

94.    The Subcommittee found no evidence to support the use of one PPI over another:

> It is the decision of the HRC Proton Pump Inhibitor Subcommittee that the evidence does not demonstrate a clinical difference in efficacy to justify selection of any PPI as clinically superior to the other drugs in the class.

95.    The Subcommittee's findings are facts known to AstraZeneca but omitted from its sales pitches and promotional campaign.

**G.    AstraZeneca's Marketing Campaign Has Been Successful:  Nexium's Price is Increased and Sells Billions Per Year**

96.    Sales of Prilosec have plummeted in response to generic competition. In its 2003 Annual Report, AstraZeneca's Chief Executive boasted of the transformation from Prilosec to Nexium, trumpeting the $3.3 billion in Nexium sales achieved in less than three years "after its introduction."

97.    Having established Nexium's position and capitalizing on brand loyalty, AstraZeneca then raised the price of Nexium. It now sells for $4.09 per pill versus $0.46 per pill for Prilosec.

98.    A recap of Prilosec and Nexium sales reveals the success of Nexium in replacing Prilosec:

- 30 -

PRILOSEC VS NEXIUM SALES RECORDS
1998 THROUGH 1st HALF 2004

| YEAR | WORLDWIDE PRILOSEC/LOSEC | U.S. PRILOSEC | WORLDWIDE NEXIUM | U.S NEXIUM |
|------|--------------------------|---------------|------------------|------------|
| 1998 | 4,845,000,000[18] | | -- | -- |
| 1999 | 5,909,000,000[19] | | -- | -- |
| 2000 | 6,260,000,000[20] | | 17,000,000[21] | Launched |
| 2001 | 5,684,000,000[22] | 3,694,000,000[23] | 580,000,000[24] | 456,000,000[25] |
| 2002 | 4,623,000,000[26] | 2,847,000,000[27] | 1,978,000,000[28] | 1,525,000,000[29] |
| 2003 | 2,565,000,000[30] | 867,000,000[31] | 3,300,000,000[32] | 2,477,000,000[33] |
| 2004 | 1,071,000,000[34] | 208,000,000[35] | 1,826,000,000[36] | 1,280,000,000[37] |

**H.    Further examples of Misleading Promotion and Advertising**

99.    The following Nexium advertisement appeared in print publications in the State of California:

---

[18] Source:  2000 Annual Report p. 41.

[19] *Ibid.*

[20] Source:  2000 Annual Report p. 38.

[21] Source:  2001 Annual Report p. 7.

[22] Source:  2001 Annual Report p. 7.

[23] Source:  2001 Profit & Loss Statement p. 7.

[24] Source:  2001 Annual Report p. 7.

[25] Source:  2001 Annual Report pp. 34, 36.

[26] Source:  2002 Annual Report p. 9.

[27] Source:  2002 Profit & Loss Statement p. 8.

[28] Source:  2002 Annual Report p. 9.

[29] Source:  2002 Profit & Loss Statement p. 8.

[30] Source:  2003 Annual Report pp. 5, 13.

[31] Source:  Consolidated Profit & Loss p. 18.

[32] Source:  2003 Annual Report pp. 1, 13.

[33] Source:  2003 Annual Report p. 13.

[34] Source:  2004 Second Quarter Product Sales p. 17.

[35] Source:  *Ibid.*

[36] Source:  *Ibid.*

[37] Source:  *Ibid.*

THIRD AMENDED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24




**Relieve the heartburn
Heal the damage.**
*It's possible with the
purple pill called NEXIUM.*

25   100.   The foregoing advertisement is misleading and/or deceptive as it fails to disclose

26   that AstraZeneca has manufactured and distributed for sale Nexium solely to maintain the superior

27   profits that derive from sales of a brand name drug, as opposed to a generic drug, and that

28   AstraZeneca manufacturers a far less expensive drug that is equally as effective.  The foregoing

- 32 -

THIRD AMENDED CLASS ACTION COMPLAINT

1    advertisement is part of an unfair scheme by AstraZeneca to falsely promote and create demand for

2    this product through a combination of promotion to doctors and direct to consumer advertising.

3    The effect of the unfair scheme was to create demand for Nexium where no such demand would

4    have existed at the prices charged for Nexium if AstraZeneca had told the truth about Nexium, and

5    a further effect was to increase the price of Nexium beyond its worth if the truth had been told.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THIRD AMENDED CLASS ACTION COMPLAINT

101.    The following print advertisement appeared in advertisements circulated in the State of California:



## It's Different For People
## with Acid Reflux Disease.

If you've changed your diet, treated the symptoms, but still suffer from persistent heartburn 2 or more days a week, you could have acid reflux disease. And if you do, it can affect everything, from what you eat to how you sleep. But for many people, just one prescription NEXIUM a day— combined with sensible diet and lifestyle changes—can mean 24-hour, day and night heartburn relief. Even after meals.

### Relieve the heartburn. Heal the damage.

 NEXIUM tackles acid reflux at the source. That's important because even a little heartburn, over time, can still mean serious damage to your esophagus. For most people, NEXIUM heals that damage. Your results may vary.

Unlike your stomach, your esophagus offers no protection against churning acid. When acid rises into the esophagus, it can eventually wear away the lining. This condition is called erosive esophagitis and only a doctor can determine if you have it.

NEXIUM works by "turning off" many of the pumps that produce acid. Once the amount of acid has been reduced, NEXIUM can begin to heal any erosions caused by acid reflux disease. Most erosions heal in 4 to 8 weeks with NEXIUM. Your results may vary.

Talk with your health care professional to see if NEXIUM is right for you. NEXIUM has a low occurrence of side effects including headache, diarrhea and abdominal pain. Symptom relief does not rule out serious stomach conditions.

Don't let acid reflux get in the way.

### Relief. Healing. NEXIUM.



# Nexium
(esomeprazole magnesium)

For a Free Trial Offer, visit us at purplepill.com or call 1-800-49-NEXIUM
Please read the important Product Information about NEXIUM on the following page and discuss it with your doctor.

AstraZeneca

102.    The foregoing advertisement is misleading and/or deceptive as it fails to disclose that AstraZeneca has manufactured and distributed for sale Nexium solely to maintain the profits

- 34 -

1   that derive from sales of a brand name drug versus a generic drug and that AstraZeneca

2   manufacturers a far less expensive drug that is equally as effective. The foregoing advertisement is

3   part of an unfair scheme by AstraZeneca to falsely promote and create demand for this product

4   through a combination of promotion to doctors and direct to consumer advertising. The effect of

5   the unfair scheme was to create demand for Nexium where no such demand would have existed at

6   the prices charged if AstraZeneca had told the truth about Nexium and a further effect was to

7   increase the price of Nexium beyond its worth if the truth had been told.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THIRD AMENDED CLASS ACTION COMPLAINT

1    103.    The following advertisement was published by AstraZeneca and appeared in print

2    media in California:



The most frequently reported adverse events with NEXIUM and Prilosec are headache, diarrhea, and abdominal pain. Symptomatic response to therapy does not preclude the presence of gastric malignancy.

NEXIUM and Prilosec should be used only for the conditions, dosages, and durations specified in the full Prescribing Information. Before prescribing NEXIUM or Prilosec, please see brief summary of full Prescribing Information on next page.

*Consecutive quarters from October 2001 through December 2002. IMS HEALTH/NDTI.

Please visit our Web site at www.Nexium-us.com

AstraZeneca



- 36 -

104.    The foregoing advertisement is misleading and/or deceptive as it fails to disclose that AstraZeneca has manufactured and distributed for sale Nexium solely to maintain the profits that derive from sales of a brand name drug and that AstraZeneca manufacturers a far less expensive drug that is equally as effective.    The foregoing advertisement is part of an unfair scheme by AstraZeneca to falsely promote and create demand for this product through a combination of promotion to doctors and direct to consumer advertising.    The effect of the unfair scheme was to create demand for Nexium where no such demand would have existed if AstraZeneca had told the truth about Nexium and a further effect was to increase the price of Nexium beyond its worth if the truth had been told.

THIRD AMENDED CLASS ACTION COMPLAINT

1    105.    The following advertisement appeared in print in the State of California:





THIRD AMENDED CLASS ACTION COMPLAINT

1       106.   The foregoing advertisement is misleading and/or deceptive as it fails to disclose

2    that AstraZeneca has manufactured and distributed for sale Nexium solely to maintain the profits

3    that derive from sales of a brand name drug and that AstraZeneca manufacturers a far less

4    expensive drug that is equally as effective.  The foregoing advertisement is part of an unfair

5    scheme by AstraZeneca to falsely promote and create demand for this product through a

6    combination of promotion to doctors and direct to consumer advertising.  The effect of the unfair

7    scheme was to create demand for Nexium where no such demand would have existed if

8    AstraZeneca had told the truth about Nexium and a further effect was to increase the price of

9    Nexium beyond its worth if the truth had been told.  Further, by referring to clinical evidence, but

10   by suppressing clinical evidence as to studies shown, a lack of superiority over Prilosec, the

11   advertisement is made even additionally deceptive.

THIRD AMENDED CLASS ACTION COMPLAINT

107.    The following advertisement appeared in print media in California:



**It's different
for people with
acid reflux disease.**

**It's not just heartburn you may have to worry about, but the threat of a damaged esophagus.**

 If you suffer from acid reflux disease, any food can trigger an attack of heartburn. And over time, all that churning acid could do real harm to your esophagus. So, if you've changed your diet and treated your symptoms, but the heartburn still comes back two or more days a week, ask your doctor about prescription NEXIUM.

Unlike your stomach, the lining of your esophagus offers little protection against churning acid. When acid rises into the esophagus, even if you feel only a little heartburn–it can eventually wear away the lining. This condition is called erosive esophagitis, and only a doctor can determine if you have it.

AstraZeneca

That's why you should ask your doctor about NEXIUM. The Healing Purple Pill. For many, just one NEXIUM a day–along with a sensible diet and lifestyle changes can mean 24-hour heartburn relief. And NEXIUM goes deeper, for most people healing the erosions in your esophagus caused by acid reflux disease. Most erosions heal in 4 to 8 weeks. Your results may vary.

NEXIUM has a low occurrence of side effects, the most common being headache, diarrhea, and abdominal pain. Symptom relief does not rule out serious stomach conditions.

Next time, ask your doctor about NEXIUM. The Healing Purple Pill.
**Healing Is Such A Great Feeling.**

Please read the important Product Information about NEXIUM on the following page and discuss it with your doctor.

Visit purplepill.com today for a FREE Trial Offer



**Nexium**
(esomeprazole magnesium)

1-800-79-NEXIUM

- 40 -

1    108.    The foregoing advertisement is misleading and/or deceptive as it fails to disclose

2    that AstraZeneca has manufactured and distributed for sale Nexium solely to maintain the profits

3    that derive from sales of a brand name drug and that AstraZeneca manufacturers a far less

4    expensive drug that is equally as effective.    The foregoing advertisement is part of an unfair

5    scheme by AstraZeneca to falsely promote and create demand for this product through a

6    combination of promotion to doctors and direct to consumer advertising.    The effect of the unfair

7    scheme was to create demand for Nexium where no such demand would have existed if

8    AstraZeneca had told the truth about Nexium and a further effect was to increase the price of

9    Nexium beyond its worth if the truth had been told.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THIRD AMENDED CLASS ACTION COMPLAINT

1

109.    The following advertisement appeared in the print media in the State of California:

2

3

4

# Nighty-Night?
## Or Up All Night?



## It's Different For People with Acid Reflux Disease.

How often is it that you're up at night because heartburn just won't leave you alone? If you've changed your diet, treated the symptoms, but still suffer from persistent heartburn 2 or more days a week, you could have acid reflux disease. And if you do, it can affect everything, from how you sleep to what you eat. But for many people, just one prescription NEXIUM daily—along with sensible diet and lifestyle changes—can take away the heartburn, day and night, for a full 24 hours.

### Relieve the heartburn. Heal the damage.

NEXIUM tackles acid reflux at the source. That's important because even a little heartburn, over time, can still mean serious damage to your esophagus. For most people, NEXIUM heals that damage. Your results may vary.

Unlike your stomach, your esophagus offers no protection against churning acid. When acid rises into the esophagus, it can eventually wear away the lining. This condition is called erosive esophagitis and only a doctor can determine if you have it.

NEXIUM works by "turning off" many of the pumps that produce acid. Once the amount of acid has been reduced, NEXIUM can begin to heal any erosions caused by acid reflux disease. Most erosions heal in 4 to 8 weeks with NEXIUM. Your results may vary.

Talk with your health care professional to see if NEXIUM is right for you. NEXIUM has a low occurrence of side effects, including headache, diarrhea and abdominal pain. Symptom relief does not rule out serious stomach conditions.

Don't let acid reflux keep you up

### Relief. Healing. NEXIUM.



**Nexium**®
(esomeprazole magnesium)

For a Free Trial Offer, visit us at purplepill.com or call 1-800-79-NEXIUM

Please read the important Product Information about NEXIUM on the following page and discuss it with your doctor.

AstraZeneca

- 42 -

1    110.   The foregoing advertisement is misleading and/or deceptive as it fails to disclose

2    that AstraZeneca has manufactured and distributed for sale Nexium solely to maintain the profits

3    that derive from sales of a brand name drug and that AstraZeneca manufacturers a far less

4    expensive drug that is equally as effective.   The foregoing advertisement is part of an unfair

5    scheme by AstraZeneca to falsely promote and create demand for this product through a

6    combination of promotion to doctors and direct to consumer advertising.  The effect of the unfair

7    scheme was to create demand for Nexium where no such demand would have existed if

8    AstraZeneca had told the truth about Nexium and a further effect was to increase the price of

9    Nexium beyond its worth if the truth had been told.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

111.    The following advertisement appeared in print media in California:

2

3

# It's happening across America

4

Nationwide, doctors who specialize in acid reflux disease have switched
more patients to NEXIUM–the purple pill–than to any other prescription of its kind.

5



6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21     112.    The foregoing advertisement is misleading and/or deceptive as it fails to disclose

22   that AstraZeneca has manufactured and distributed for sale Nexium solely to maintain the profits

23   that derive from sales of a brand name drug and that AstraZeneca manufacturers a far less

24   expensive drug that is equally as effective.  The foregoing advertisement is part of an unfair

25   scheme by AstraZeneca to falsely promote and create demand for this product through a

26   combination of promotion to doctors and direct to consumer advertising.  The effect of the unfair

27   scheme was to create demand for Nexium where no such demand would have existed if

28   AstraZeneca had told the truth about Nexium and a further effect was to increase the price of

- 44 -

THIRD AMENDED CLASS ACTION COMPLAINT

1    Nexium beyond its worth if the truth had been told.  Further this advertisement also is deceptive

2    where it states that "nationwide, doctors who specialize in acid reflux have switched more patients

3    to Nexium," in that such switching was the result of an unfair and deceptive promotional scheme

4    not, as implied in the advertisement, due to the superiority of Nexium.

THIRD AMENDED CLASS ACTION COMPLAINT

113.    The following advertisement appeared in print media in California:



The clinical relevance of pH data has not been established.

The most frequently reported adverse events with NEXIUM are headache, diarrhea, and abdominal pain. Symptomatic response to therapy does not preclude the presence of gastric malignancy. Patients treated with PPIs and warfarin concomitantly may need to be monitored for increases in INR and prothrombin time.

Before prescribing NEXIUM, please see the brief summary of full Prescribing Information on next page.

IMS Health, National Prescription Audit Plus; January 2003 through November 2003, based on TRx.

Please visit our Web site at www.Nexium-us.com

AstraZeneca

- 46 -

1

114.    The foregoing advertisement is misleading and/or deceptive as it fails to disclose

2

that AstraZeneca has manufactured and distributed for sale Nexium solely to maintain the profits

3

that derive from sales of a brand name drug and that AstraZeneca manufacturers a far less

4

expensive drug that is equally as effective.   The foregoing advertisement is part of an unfair

5

scheme by AstraZeneca to falsely promote and create demand for this product through a

6

combination of promotion to doctors and direct to consumer advertising.   The effect of the unfair

7

scheme was to create demand for Nexium where no such demand would have existed if

8

AstraZeneca had told the truth about Nexium and a further effect was to increase the price of

9

Nexium beyond its worth if the truth had been told.   Further, by referring to clinical data while

10

suppressing clinical data regarding the lack of superiority over Prilosec, the advertisement is

11

misleading.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THIRD AMENDED CLASS ACTION COMPLAINT

115.    The following advertisement appeared in print media in California:





- 48 -

THIRD AMENDED CLASS ACTION COMPLAINT

1    116.    The foregoing advertisement is misleading and/or deceptive as it fails to disclose

2    that AstraZeneca has manufactured and distributed for sale Nexium solely to maintain the profits

3    that derive from sales of a brand name drug and that AstraZeneca manufactures a far less expensive

4    drug that is equally as effective.    The foregoing advertisement is part of an unfair scheme by

5    AstraZeneca to falsely promote and create demand for this product through a combination of

6    promotion to doctors and direct to consumer advertising.    The effect of the unfair scheme was to

7    create demand for Nexium where no such demand would have existed if AstraZeneca had told the

8    truth about Nexium and a further effect was to increase the price of Nexium beyond its worth if the

9    truth had been told.    This advertisement is also misleading in that the statement "Nexium heals

10   better than the other leading medicine," fails to disclose that it does not heal better than Nexium's

11   own drug Prilosec.

12   117.    The foregoing advertisements are just examples of the themes and messages

13   conveyed in hundreds of advertisements distributed to doctors and/or consumers.    The net effect of

14   this misleading campaign was to establish Nexium as a superior drug for acid relief and as such to

15   allow it to command a price substantially in excess of generic Prilosec.

16                    **V.    CLASS ALLEGATIONS**

17   118.    Plaintiff Weiss brings this action on behalf of himself, the general public, and a

18   Class defined as follows:  All persons or entities in California who purchased Nexium in the four

19   (4) years preceding the filing of this Complaint up to and including the present.    Said Class

20   includes third party payors, cash payors and those making a co-pay.

21   119.    The Class consists of hundreds of thousands of individuals and entities throughout

22   California, making individual joinder impractical.    The disposition of the claims of the Class

23   members in a single class action will provide substantial benefits to all parties and to the Court.

24   120.    The claims of the representative Plaintiff are typical of the claims of the Class

25   because he, like all Class members, has purchased Nexium and has been harmed by Defendants'

26   misconduct because he would not have purchased Nexium had he known the truth.

27

28

1    121.    The factual and legal bases of Defendants' misconduct are common to all Class

2    members and represent a common thread of deception and other misconduct resulting in injury to

3    the representative Plaintiff and all members of the Class.

4    122.    There are many questions of law and fact common to the representative Plaintiff and

5    the Class, and those questions substantially predominate over any questions that may affect

6    individual Class members. Common questions include, but are not limited to, the following:

7
8    (a)    Whether Defendants' active concealment of and/or failure to disclose
the true benefits and costs of Nexium was likely to mislead or deceive
within the meaning of the UCL;

9
10    (b)    Whether Defendants' active concealment of and/or failure to disclose
the true nature of Nexium's effectiveness is unfair within the meaning
11    of UCL, in that the harm to consumers and the public of such conduct
outweighs its benefits;

12
13    (c)    Whether Defendants' active concealment of and/or failure to disclose
the true nature of Nexium's effectiveness and benefits is unlawful
14    within the meaning of the UCL, in that it constitutes a violation of
Section 17500;

15
16    (d)    Whether Defendants engaged in false advertising within the meaning of
the UCL and Section 17500 when it represented, through its
17    advertisements, promotions and other representations, that Nexium had
characteristics that it does not actually have or omitted to disclose
18    material facts regarding Nexium's actual characteristics;

19    (e)    Whether Defendants should be declared financially responsible for
notifying all Class members of the true nature of Nexium; and

20
21    (f)    Whether Defendants should be ordered to disgorge, for the benefit of
the Class, all or part of its ill-gotten profits received from the sale of
22    Nexium, and/or to make restitution to Plaintiff and the members of the
Class.

23

24    123.    Plaintiff Weiss will fairly and adequately represent and protect the interests of the

25    Class. Plaintiff has retained counsel with substantial experience in prosecuting consumer class

26    actions, including actions involving pharmaceutical sales. Plaintiff and his counsel are committed

27    to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do

28    so. Neither Plaintiff nor his counsel has any interests adverse to those of the Class.

- 50 -

THIRD AMENDED CLASS ACTION COMPLAINT

1     124.    Plaintiff Weiss and the members of the Class suffered, and will continue to suffer,

2    harm as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other

3    available methods for the fair and efficient adjudication of the controversy. Absent a class action,

4    most members of the Class likely would find the cost of litigating their claims to be prohibitive, and

5    will have no effective remedy at law. Because of the relatively small size of each individual Class

6    member's claims, few Class members likely could afford to seek legal redress for Defendants'

7    misconduct. Absent a class action, Class members will continue to suffer harm and Defendants'

8    misconduct will proceed without remedy. The class treatment of common questions of law and fact is

9    also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of

10    the courts and the litigants, and promotes consistency and efficiency of adjudication. Additionally,

11    Defendants have acted and failed to act on grounds generally applicable to the representative Plaintiff

12    and the Class and require Court imposition of relief as to the Class as a whole.

13                      **FIRST CAUSE OF ACTION**

14                  **Violations of Unfair Competition Law**

15         **(Business and Professions Code §§ 17200, *et seq.*)**

16     125.    The preceding paragraphs of this Complaint are realleged and incorporated by

17    reference as if fully set forth herein. Plaintiff asserts this claim on behalf of himself, the general

18    public, and the members of the Class.

19     126.    Defendants' actions, as complained of herein, constitute unfair, and deceptive

20    unlawful practices committed in violation of the Unfair Competition Law, Bus. & Prof. Code

21    §§ 17200 *et seq.*

22     127.    Defendants violated the "fraudulent" prong of § 17200, the "unfair" prong of

23    § 17200, and the "unlawful" prong of § 17200 by engaging in the following conduct:

24         (a)    The totality of Defendants' conduct was unfair and part of a scheme to

25    create demand for a product that would not have existed had the truth been told to doctors and

26    consumers. In the context of the pharmaceutical industry, where doctors and consumers expect

27    companies to accurately report on the efficacy and safety of a drug, and where the drug companies

28    have superior knowledge, it is an unfair practice to market a more expensive product without full

THIRD AMENDED CLASS ACTION COMPLAINT

1    disclosure that the virtually exact same product can be bought from the same manufacturer at a
2    lower price and which has the same clinical benefits;

3            (b)      Defendants' promotion of Nexium as "more powerful," offering "significant
4    improvements over Prilosec," and as being "more effective" were false and/or misleading in that
5    except for rare patients none of the above are true; in comparable doses Nexium is not more
6    effective, in the 40 mg Nexium to 20 mg Prilosec there is only a slight improvement for heartburn
7    and one trial of 40 to 20 showed no statistical difference. Further Nexium is far more expensive
8    than comparable drugs and in fact Nexium was promoted solely for financial reasons and not due
9    to any material increase in medical efficacy;

10           (c)      Defendants' conduct was unfair, unlawful and deceptive in that Defendants'
11   suppressed studies that demonstrated that Nexium was not more effective than Prilosec for most
12   patients, and was not more effective at equivalent doses to the then therapeutic dose of Prilosec,
13   and omitted to disclose this fact to doctors while promoting the drug;

14           (d)      Defendants' conduct was unfair in that by promoting Nexium directly to
15   consumers, without disclosure of the above, who have inferior knowledge and sophistication,
16   Defendants created demand for Nexium that would not have existed if Defendants had disclosed
17   the true cost and benefits of Nexium versus Prilosec and/or other PPIs;

18           (e)      Defendants omitted material information known to them in order to induce
19   doctors to prescribe Nexium and consumers to purchase Nexium and this information included the
20   fact that there was no basis to tout Nexium as superior, several tests showed that it was not more
21   effective and from a cost-benefit standpoint Nexium was inferior;

22           (f)      Defendants' conduct in selling Nexium at a cost below Prilosec in order to
23   establish brand loyalty, while secretly intending to raise prices once such loyalty was established,
24   was unfair and deceptive;

25           (g)      Defendants' conduct in sending sales teams into doctors' offices with free
26   samples, false promotional material, and knowing that doctors do not have the time to analyze
27   clinical studies and thus rely on deceptive promotional literature, was unfair and deceptive;

28

1    (h)    Defendants' conduct in launching a promotional campaign to promote a drug

2    that is not statistically proven to be more effective and is not beneficial from a cost/benefit analysis

3    is an unfair and unconscionable practice; and

4    (i)    Defendants engaged in an unfair and unlawful practice by promotion

5    Nexium over Prilosec when Defendants knew that the FDA's review of the Nexium new drug

6    application showed Nexium to be no more effective than Prilosec, and in fact, the FDA found,

7    "there are no studies which demonstrate that H (Nexium) is superior to O (Prilosec) clinically or

8    even statistically."

9    128.    Plaintiff and each member of the Class was injured by Defendants' conduct in that

10   the cumulative effect of Defendants' unfair and deceptive campaign was to cause each Class

11   member to pay a price for Nexium that would not have been the established price if Defendants

12   had disclosed that Nexium was no different from Prilosec.

13   129.    All of the conduct alleged herein occurs and continues to occur in Defendants'

14   business.  Defendants' wrongful conduct is part of a pattern or generalized course of conduct

15   repeated on thousands of occasions daily.

16   130.    Plaintiff requests that this Court enter such orders or judgments as may be necessary

17   to restore to any person in interest, any money which may have been acquired by means of such

18   unfair practices, as provided in Bus. & Prof. Code § 17203 and Civil Code § 3345, and for such

19   other relief as set forth below.

20   **SECOND CAUSE OF ACTION**

21   **Untrue and Misleading Advertising**
22   **(Business and Professions Code § 17500, *et seq.*)**

23   131.    The preceding paragraphs of this Complaint are realleged and incorporated by

24   reference.  Plaintiff asserts this claim on behalf of himself, the general public, and the members of

25   the Class.

26   132.    Bus. & Prof. Code § 17500 provides that "[i]t is unlawful for any ... corporation ...

27   with intent ... to dispose of ... personal property ... to induce the public to enter into any

28   obligation relating thereto, to make or disseminate or cause to be made or disseminated before the

- 53 -

THIRD AMENDED CLASS ACTION COMPLAINT

1   public in this state, … any statement … which is untrue or misleading, and which is known, or

2   which by the exercise of reasonable care should be known, to be untrue or misleading …."

3       133.    As a result of the violations of Section 17500 described above, Defendants have

4   been, and will be, unjustly enriched at the expense of Plaintiff and the general public. Specifically,

5   Defendants have been unjustly enriched by their receipt of monies received from customers who

6   purchased Nexium which is advertised and/or otherwise marketed in this State, and was promoted

7   and sold through advertising and marketing materials which materially misrepresent the quality and

8   functions of the product.

9       134.    Pursuant to Bus. & Prof. Code § 17535, as private attorney generals suing on behalf

10   of the general public, Plaintiff is entitled to the remedies set forth below.

**THIRD CAUSE OF ACTION**

**Violations of the Consumers Legal Remedies Act**
**(Cal. Civ. Code § 1750 *et seq.*)**

13       135.    The preceding paragraphs of this Complaint are realleged and incorporated by

14   reference. Plaintiff Weiss asserts this claim on behalf of himself and the members of the Class.

16       136.    Plaintiff Weiss and the members of the Class are consumers who purchase goods

16   (Nexium) from Defendants for personal, family, or household purposes.

17       137.    Representing that goods (Nexium) have characteristics, uses, benefits, or qualities

18   that they do not have and advertising goods with intent not to sell them as advertised constitutes

19   unfair or deceptive trade practices under the provisions of the CLRA, Civil Code § 1770 (a)(5), (7),

20   (8), and (9).

21       138.    Plaintiff Weiss and the members of the Class have all been directly and proximately

22   injured by Defendants' conduct, and such injury includes the purchase of Nexium, which they

23   would not have purchased were they truthfully and fully informed of material facts concerning the

24   product.

25       139.    In accordance with Civil Code § 1780 (a), Plaintiff Weiss and members of the Class

26   seek injunctive and equitable relief as to Defendants' violations of the CLRA

27

28

THIRD AMENDED CLASS ACTION COMPLAINT

1        140.   In accordance with Section 1782(a) of the CLRA, Civ. Code § 1782(a), on

2    December 2, 2004, Plaintiff's counsel served Defendants AstraZeneca Pharmaceuticals L.P. and

3    Zeneca, Inc. with notice of their alleged violations of the CLRA by certified mail, return receipt

4    requested. A true and correct copy of this notice is attached hereto as *Exhibit A.* Within thirty (30)

5    days of the date of such notification, Defendants failed to provide appropriate relief for their

6    violations of the CLRA. Therefore, in accordance with Section 1782(b)-(d) of the CLRA, Civ.

7    Code § 1782(b)-(d), Plaintiff is entitled to maintain an action for damages under Section 1780 of

8    the CLRA, Civ. Code § 1780. Plaintiff and the members of the Class have all been directly and

9    proximately damaged as a result of Defendants' use or employment of the acts, methods and/or

10    practices enumerated in the preceding paragraphs of this FAC and, therefore, Plaintiff and Class

11    members are entitled to bring this action against Defendants and to recover and/or obtain relief,

12    including actual damages, punitive damages, injunctive relief, restitution of money or property,

13    such other relief as provided in Civil Code § 1780 and the Prayer for Relief, and any other relief

14    which this Court deems proper. In accordance with Section 1782(d) of the CLRA, Civ. Code

15    § 1782(d), Plaintiff is entitled to file this Amendment without leave of Court to include a request

16    for damages, as set forth herein.

17    **FOURTH CAUSE OF ACTION**

18    **Unjust Enrichment**

19        141.   The preceding paragraphs of this complaint are realleged and incorporated by

20    reference and asserted by plaintiff Weiss on behalf of the class.

21        142.   To the detriment of plaintiff and members of the Class, AstraZeneca has been, and

22    continues to be, unjustly enriched as a result of the unlawful and/or wrongful collection of, *inter*

23    *alia*, excessive charges for Nexium.

24        143.   AstraZeneca has unjustly benefited through the unlawful and/or wrongful collection

25    of, *inter alia*, excessive charges for Nexium and continues to so benefit to the detriment and at the

26    expense of Plaintiff and members of the Class.

27

28

1    144.    Accordingly, plaintiff and members of the Class seek full restitution of the

2  Defendants' enrichment, benefits and ill-gotten gains acquired as a result of the unlawful and/or

3  wrongful conduct alleged herein.

4                                **PRAYER FOR RELIEF**

5    WHEREFORE, Plaintiff and members of the Class request that the Court enter an order or

6  judgment against Defendants as follows:

7    A.    Certification of the Class and appointment of Plaintiff Weiss as Class

8  Representative and his counsel of record as Class Counsel;

9    B.    Equitable relief in the form of restitution and/or disgorgement of all unlawful or

10  illegal profits received by Defendants as a result of the unfair, unlawful and/or deceptive conduct

11  alleged in this Complaint;

12    C.    Prejudgment and post-judgment interest on such monetary relief, awarded in

13  accordance with California law;

14    D.    Appropriate injunctive relief;

15    E.    An order awarding Plaintiff the costs of bringing this suit, including attorneys' fees;

16    F.    All other relief to which Plaintiff and members of the Class may be entitled at law

17  or in equity; and

18    G.    Actual damages, punitive damages, injunctive relief, restitution of money or

19  property, and such other relief as provided in Civil Code § 1780.

20    DATED:  October 31, 2005

21                                HAGENS BERMAN SOBOL SHAPIRO LLP

22

23    By

24                                ELAINE T. BYSZEWSKI
                                  700 South Flower Street, Suite 2940
                                  Los Angeles, CA 90017-4101
25                                Telephone: (213) 330-7150

26                                STEVE W. BERMAN
                                  HAGENS BERMAN SOBOL SHAPIRO LLP
27                                1301 Fifth Avenue, Suite 2900
                                  Seattle, WA 98101
28                                Telephone: (206) 623-7292

THIRD AMENDED CLASS ACTION COMPLAINT

THOMAS M. SOBOL
HAGENS BERMAN SOBOL SHAPIRO LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone:  (617) 482-3700

Attorneys for Plaintiff

THIRD AMENDED CLASS ACTION COMPLAINT

1

## DECLARATION OF SERVICE VIA E-MAIL

2      I, the undersigned, declare:

3      That declarant is and was, at all times herein mentioned, a citizen of the United States and a

4 resident of the County of Los Angeles, over the age of 18 years, and not a party to or interested in

5 the within action; that declarant's business address is 700 South Flower Street, Suite 2940, Los

6 Angeles, California 90017-4101.

7      On October 31, 2005, I served the foregoing document(s) described as **THIRD AMENDED**

8 **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE UNFAIR COMPETITION LAW, THE FALSE**

9 **ADVERTISING LAW, THE CONSUMER LEGAL REMEDIES ACT, AND THE COMMON LAW OF UNJUST**

10 **ENRICHMENT** by E-MAIL on all interested parties in this action set forth in the attached **Service**

11 **List**.

12      I declare under penalty of perjury that the foregoing is true and correct. Executed this 31st

13 day of October, 2005, at Los Angeles, California.

14

15

16                                   KALYN BAKER

17

18

19

20

21

22

23

24

25

26

27

28

# SERVICE LIST

**JAMES WEISS V. ASTRAZENECA PHARMACEUTICALS LP AND ZENECA, INC.**
BC323107
Dept 324
Central Civil West

## PLAINTIFF(S)

Elaine T. Byszewski
**Hagens Berman Sobol Shapiro LLP**
700 South Flower Street
Suite 2940
Los Angeles, CA 90017
Elaine@hbsslaw.com
(Via email)

Steve W. Berman
Craig R. Spiegel
**Hagens Berman Sobol Shapiro LLP**
1301 Fifth Avenue
Suite 2900
Seattle, WA 98101
Steve@hbsslaw.com
(Via email)

Thomas M. Sobol
**Hagens Berman Sobol Shapiro LLP**
One Main Street, 4th Floor
Cambridge, MA 02142
Tom@hbsslaw.com
(Via email)

## DEFENDANT(S)

Peter I. Ostroff
Mark E. Haddad
Catherine Valerio Barrad
Alycia A. Degan
**Sidley Austin Brown & Wood LLP**
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013-1010
Telephone: 213.896.6000
Facsimile: 213.896.6600
postroff@Sidley.com
cbarrad@Sidley.com
Mhaddad@sidley.com
Adegen@sidley.com
(Via email)

# **Exhibit H**

1  CRAIG R. SPIEGEL (SBN 122000)
   ELAINE T. BYSZEWSKI (SBN 222304)
2  HAGENS BERMAN SOBOL SHAPIRO LLP
   700 South Flower Street, Suite 2940
3  Los Angeles, CA  90017-4101
   Telephone:  (213) 330-7150
4  Facsimile:  (213) 330-7152

5  Attorneys for Plaintiffs in Both Actions

6  [Additional Counsel Listed on Signature Page]

7  PETER I. OSTROFF (SBN 45718)
   ALYCIA A. DEGEN (SBN 211350)
8  SIDLEY AUSTIN LLP
   555 West Fifth Street, Suite 4000
9  Los Angeles, CA 90013-1010
   Telephone:  (213) 896-6000
10 Facsimile:  (213) 896-6600

11 Attorneys For Defendants In Both Actions

12
                **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
13
                     **FOR THE COUNTY OF LOS ANGELES**
14
                   **CENTRAL CIVIL WEST COURTHOUSE**
15

16 | JAMES WEISS, individually and on behalf of all others similarly situated, | Case No. BC 323107 |
   |---|---|

17 Plaintiff,    CLASS ACTION

18 v.    **JOINT DISCOVERY STATEMENT**

19 ASTRAZENECA PHARMACEUTICALS LP;
   and ZENECA, INC.    Date:  May 8, 2006
20 Defendants.    Time:  10:30 a.m.
                   Dep't:  324  [Hon. Victoria G. Chaney]
21

22 KATHLEEN LEDWICK, individually and on behalf of all others similarly situated,    Case No. BC 324518

23 Plaintiff,    CLASS ACTION

24 v.    **JOINT DISCOVERY STATEMENT**

25 ASTRAZENECA PHARMACEUTICALS LP;
   and ZENECA, INC.    Date:  May 8, 2006
26 Defendants.    Time:  10:30 a.m.
                   Dep't:  324  [Hon. Victoria G. Chaney]
27

28

Plaintiffs James Weiss and Kathleen Ledwick ("Plaintiffs") and Defendants AstraZeneca Pharmaceuticals LP and Zeneca Inc. ("Defendants" or "AstraZeneca"), by counsel, hereby file their Joint Discovery Statement, in advance of the further status conference scheduled for May 8, 2006, at 10:30 a.m. as follows:

## I.    PLAINTIFFS' DOCUMENT REQUESTS

Plaintiffs served their First Request for Production ("First RFP") on September 26, 2005. A copy of those requests is attached hereto as *Exhibit A*. AstraZeneca objected to Plaintiffs requests on numerous grounds but had produced documents nonetheless. A copy of AstraZeneca's Response is attached hereto as *Exhibit B*. The parties continued to disagree on various issues regarding whether Plaintiffs were entitled to further production. Accordingly, the parties have discussed a general approach whereby AstraZeneca will produce responsive documents pursuant to a method intended to reduce unnecessary burden, expense, and duplication. This joint discovery statement sets forth the general approach to which the parties have agreed and then discusses particular issues, setting forth any remaining disputes between the parties.

### A.    General Approach

Rather than require AstraZeneca to search every custodial file that could conceivably contain responsive documents, the parties have discussed a general approach whereby they will mutually endeavor to identify approximately ten individuals who had the most relevant responsibility between 1999 and 2004 and are most likely to have relevant and non-duplicative documents in their custodial files for each outstanding area of discovery. Plaintiffs acknowledge that discovery is continuing and AstraZeneca is not currently in the position to definitively determine those with the "most" relevant responsibility or "most" likely to have responsive documents in their custodial file. AstraZeneca's willingness to attempt to identify such individuals at this juncture does not imply a continuing obligation to reassess such identification. AstraZeneca will provide Plaintiffs with the names, job titles, functions, departments, and time periods of the identified individuals. Plaintiffs will supplement this information with knowledge gained from the 30(b)(6) deposition taken in the related Massachusetts litigation and cross-noticed in this litigation, which cross-notice Plaintiffs have previously objected to. The parties will discuss these individuals

1     and then identify the appropriate custodial files to be searched for documents responsive to

2     Plaintiffs' requests.   AstraZeneca agrees to review additional custodial files upon reasonable

3     request from Plaintiffs, after Plaintiffs' review of the materials from the files of the individuals

4     referenced above and after the parties have met and conferred to determine the reasonableness of

5     Plaintiffs' request, in accordance with the spirit of the general approach set forth above.

6     　　　Plaintiffs have agreed to receive responsive documents pursuant to the general approach

7     described above based on AstraZeneca's representation that discovery would otherwise be unduly

8     burdensome, expensive, time consuming and duplicative.   By agreeing to this approach, however,

9     Plaintiffs do not concede that AstraZeneca's position is correct and reserve the right to seek further

10     discovery.   Moreover, to the extent that AstraZeneca engages in review of documents in places

11     other than the custodial files selected pursuant to the general approach described herein *and* for the

12     purpose of locating documents that would be responsive to Plaintiffs' First RFP, it agrees to

13     provide Plaintiffs with any responsive document located by such review.

14     　　　The following sections B, C, and D discuss application of this general approach of

15     identification and review of custodial files for each of the outstanding areas of discovery.

16     　　　**B.     Documents Re Marketing Objectives And Themes**

17     　　　Plaintiffs' First RFP No. 6 seeks documents regarding marketing objectives and themes.

18     AstraZeneca is willing to produce responsive documents subject to the general approach discussed

19     above.   AstraZeneca's marketing objectives and themes were directed at consumers, healthcare

20     professionals, and managed care organizations.   To locate sufficient documents responsive to

21     Plaintiffs' requests, it will be necessary, at a minimum, to search the custodial files of at least ten

22     individuals for each of those three areas.

23     　　　In order to review the selected custodial files, AstraZeneca requested Plaintiffs to provide

24     specificity as to the meaning of "documents relating to marketing objectives and themes," but did

25     not agree with Plaintiffs' stated specificity.   Therefore, the following paragraphs set forth the

26     parties' contentions on how that phrase should be interpreted.

27     　　　***Plaintiffs' Contention***:   Plaintiffs contend that "documents relating to marketing objectives

28     and themes" means those documents that constitute or relate to, including communications

-2-

regarding, market research, marketing concepts, creative briefs, advertisements, approval thereof, media plans, marketing plans, and any other internal strategy plan regarding the marketing of Nexium.

***AstraZeneca's Contention***:  AstraZeneca contends that "documents relating to marketing objectives and themes"should be limited to the following documents, including communications regarding such documents:  marketing plans, media plans, advertisements and creative briefs.

Additionally, Plaintiffs specifically requested AstraZeneca to provide documents regarding the "Shark Fin Project."  The following paragraphs set forth the parties' contentions regarding production of such documents.

***Plaintiffs' Contention***:  The "Shark Fin Project" was the genesis of AstraZeneca's marketing strategy for Nexium.  Counsel for AstraZeneca assert that no documents exist that refer to such a project by name but admit that they have not made inquiry as to whether anyone at AstraZeneca acknowledges participation in the "Shark Fin Project."  Plaintiffs contend that inquiry should be made as to who was involved in the "Shark Fin Project" so that their custodial files can be reviewed for responsive documents consistent with the general approach.

***AstraZeneca's Contention***:  AstraZeneca agrees to make an inquiry as to whether anyone at AstraZeneca acknowledges participation in anything referred to as the "Shark Fin Project."

**C.     Communications With Sales Employees**

Plaintiffs' First RFP No. 10 seeks communications with sales employees.  AstraZeneca is willing to produce responsive documents subject to the general approach discussed above. AstraZeneca has generally described for Plaintiffs the current structure of the healthcare provider sales force to Plaintiffs with the understanding that a similar structure has been in place since the launch of Nexium:  today the state of California contains nine sales districts (managed by District Sales Managers ("DSMs")), each of which is part of the same Region (managed by Regional Sales Directors ("RSDs")).  Consistent with the general approach outlined above, AstraZeneca will work with Plaintiffs to identify the custodian files to be reviewed for responsive documents.  The custodians identified may, subject to Plaintiffs' selection, include individuals who managed the sales specialists.

JOINT DISCOVERY STATEMENT

1    Additionally, AstraZeneca will produce to Plaintiffs the "Nexium Learning System," and

2    the sales training materials indexed in eSTaR, which will include materials from the Hawaii launch

3    training. However, AstraZeneca has explained that materials from the Hawaii launch training will

4    not be identified as such in eSTaR. Accordingly, AstraZeneca will work with Plaintiffs to identify

5    individuals whose custodial files will provide information as to which sales training materials

6    constitute those used at the Hawaii launch training.

7    **D.    Communications To And From Doctors**

8    Plaintiffs' First RFP No. 2 seeks communications to and from doctors. AstraZeneca is

9    willing to produce responsive documents subject to the general approach discussed above.

10    Also, AstraZeneca has produced the 182 standard responses to the Professional Information

11    Requests ("PIRs") to Plaintiffs. AstraZeneca has informed Plaintiffs that it has the capability to

12    identify which PIR responses were sent to California doctors. Plaintiffs have requested and

13    AstraZeneca has agreed to identify which PIR responses were sent to Plaintiffs' doctors.

14    Thereafter, Plaintiffs will assess whether they need AstraZeneca to identify which PIR responses

15    were sent to all other California doctors.

16    Additionally, AstraZeneca has confirmed that it has a database that collects the call notes of

17    the sales representatives who call on healthcare providers which permits identification of the call

18    notes entered by the sales representatives responsible for promoting Nexium to healthcare

19    professionals in California. Plaintiffs have requested and AstraZeneca has agreed to produce all

20    such call notes for calls made on Plaintiffs' healthcare professionals. The parties will also discuss

21    how Plaintiffs might receive a representative slice of the database with respect to California sales

22    call notes without Plaintiffs now requesting all such California call notes, in accordance with the

23    spirit of the general approach (as the parties are dealing with a database rather than custodial files).

24    Thereafter, Plaintiffs will assess whether they need AstraZeneca to produce all call notes for calls

25    made on healthcare professionals in California to promote Nexium.

26    ///

27    ///

28    ///

- 4 -

E.    **Communications With Third-party Payors ("TPPs")**

Plaintiffs' First RFP No. 5 seeks communications with TPPs such as insurance companies and health maintenance organizations. AstraZeneca disputes whether documents responsive to this request are relevant to class certification or at all.

*__Plaintiffs' Contention__*:  Plaintiffs contend that discovery of communications with TPPs is necessary because (1) to the extent that the messages communicated to consumers/physicians and TPPs were the same there will be sufficient predominance of common questions for class certification to include the latter and (2) such discovery is necessary even if the proposed class did not include TPPs, in order to show that AstraZeneca engaged in a common course of conduct to cause consumers to purchase Nexium rather than Prilosec. AstraZeneca urged TPPs to place Nexium on their formularies in order to increase sales of Nexium, as well as to convince TPPs to pay for Nexium instead of Prilosec. AstraZeneca's communications with TPPs regarding Nexium were part and parcel of its communications with doctors, TPPs and consumers to increase the sales of Nexium. Thus, this information is relevant even if TPPs were not alleged to be class members. Moreover, any concerns regarding the adequacy and typicality of the current class representatives should be raised at the class certification stage of proceeding.

*__AstraZeneca's Contention__*:    AstraZeneca has produced to Plaintiffs its NEXIUM® Formulary Submission Dossier, which is information that AstraZeneca supplies to TPPs and other managed care organizations in order to provide information about Nexium to them, for the purpose of being included on their formulary lists. AstraZeneca has also produced its standard contracts relating to Nexium between AstraZeneca and TPP or other managed care organizations. AstraZeneca contends that any further discovery regarding communications with TPPs is inappropriate because TPPs are not properly part of this case. With the exception of Plaintiffs' class definitions, there are no allegations relating to TPPs in Plaintiffs' Complaints. *See*, e.g., *Advanced Modular Sputtering, Inc. v. Superior Court*, 132 Cal.App.4th 826, 835 (2005) ("the allegations of a complaint limit discovery in. . . civil actions"). Furthermore, as consumers, Plaintiffs Weiss and Ledwick cannot be adequate or typical class representatives for TPPs. Apparently, the Plaintiffs claim that AstraZeneca falsely advertised Nexium, that the false

- 5 -

1    advertising caused them to purchase Nexium and that they were injured as a result of their purchase

2    of Nexium.  Proof of these facts would not establish a claim on behalf of any TPP.  Given the

3    burden and expense that Plaintiffs' RFP No. 5 would impose on AstraZeneca, this discovery which

4    does not relate to the issues in this case should not be conducted.

5           **F.    Communications To TPPs, Doctors, Or Consumers Re Superiority Of Nexium**

6           Plaintiffs' First RFP Nos. 8 and 9 seek communications to TPPs, doctors, or consumers

7    regarding the alleged superiority of Nexium.  The parties have agreed that the responses to RFP

8    Nos. 8 and 9 with respect to TPPs and doctors are subsumed within the responses to RFP Nos. 2

9    and 5, set forth in Sections D and E above.  As to consumers, additional custodians will have to be

10    identified in accordance with the general approach.

11           Also, as part of the meet and confer process, Plaintiffs have requested that AstraZeneca

12    inform them of any database that record inquiries made by consumers and AstraZeneca has agreed

13    to do so.

14    **II.    PLAINTIFFS' PMK DEPOSITIONS**

15           On April 6, 2006, Plaintiffs noticed the deposition of the person most knowledgeable at

16    AstraZeneca regarding ten marketing-related topics, designated (a)-(j).  A copy of that notice is

17    attached hereto as ***Exhibit C***.  The parties have met and conferred regarding three issues raised by

18    AstraZeneca.  The following paragraphs discuss the parties' contentions regarding those three

19    issues:

20           ***AstraZeneca's Contention***:  First, topics (c), (e), and (f) seek discovery related to not only

21    TPPs, but also other entities, including "wholesalers, purchasing groups, and pharmacy benefit

22    managers."  The reasons articulated by AstraZeneca in Section I(E) above with respect to the

23    inappropriateness of extensive discovery regarding TPPs apply with even greater force with respect

24    to wholesalers, purchasing groups, and pharmacy benefit managers because neither the Plaintiffs

25    nor any of the named plaintiffs in any related action is a wholesaler, purchasing group, or

26    pharmacy benefit manager, and Plaintiffs' complaints contain no allegations concerning those

27    types of entities. Plaintiffs cannot be adequate or typical representatives for such entities.

28

1        Second, with respect to topic (d), AstraZeneca cannot produce a witness respecting the so

2    called, undefined, and unexplained "Shark Fin Project."

3        Third, AstraZeneca's refinement of the terms "plan and themes" discussed in Section I(B)

4    above should apply to topics (e)-(i).

5        ***Plaintiffs' Contention***:  First, as discussed in Section I(E) above, Plaintiffs contend that

6    discovery of communications with TPPs is necessary because (1) to the extent that the messages

7    communicated to consumers/physicians and TPPs were the same there will be sufficient

8    predominance of common questions for class certification to include the latter and (2) such

9    discovery is necessary even if the proposed class did not include TPPs, in order to show that

10   AstraZeneca engaged in a common course of conduct to cause consumers to purchase Nexium

11   rather than Prilosec.

12       Second, Plaintiffs contend that the genesis of AstraZeneca's strategy and marketing

13   message for Nexium was with the Shark Fin Project, which is an important aspect of the common

14   course of conduct alleged by Plaintiffs.

15       Third, Plaintiffs' refinement of the phrase "plan and themes" discussed in Section I(B)

16   above should apply to topics (e)-(i).

17       The parties agree that the PMK depositions should commence, subject to the availability of

18   appropriate witnesses and after the production of the documents referenced above, on mutually

19   convenient dates and place(s) in May 2006, if possible.

20   **III.    DEFENDANTS' DOCUMENT REQUESTS**

21       **A.    Insurance Records**

22       AstraZeneca has requested that Plaintiffs execute authorizations for the release of their

23   insurance records.  A copy of Defendant Zeneca Inc.'s First Set of Requests for Production is

24   attached as ***Exhibit D.***  For Plaintiff Ledwick, AstraZeneca intends to subpoena insurance records

25   from Blue Cross Blue Shield of Illinois.  For Plaintiff Weiss, AstraZeneca intends to subpoena

26   insurance records Advantek Benefit Administrators and Aetna Health of California, Inc.  Plaintiffs

27   do not object to the execution of authorizations for the release of insurance records, so AstraZeneca

28   may discover the terms of the named plaintiffs' prescription drug coverage.   Any subpoena

1    directed at an insurance company for which a named plaintiff has provided an authorization will be

2    limited to requesting the terms of such prescription drug coverage, unless the parties subsequently

3    agree to a broader scope of permissible discovery. However, AstraZeneca may also seek medical

4    records from these insurance companies, to the extent they have them, consistent with language

5    discussed below.

6         The parties agree that all plaintiff-specific documents obtained from their insurance

7    companies will be deemed designated as "Confidential" within the meaning of the Agreed

8    Protective Order Regarding Confidential Information entered in the actions, notwithstanding

9    paragraph 8 of said Protective Order.

10    **B.    Medical Records**

11         AstraZeneca has requested that Plaintiffs execute authorizations for the release of their

12    medical records. For Plaintiff Ledwick, AstraZeneca intends to subpoena medical records from Dr.

13    Robert L. Andrews, Dr. J. Michael Gospe, Dr. Paul W. Hornberger, Dr. L. Wayne Keiser, Dr.

14    Michael A. Lustberg, Dr. Bruce N. Tucker, and Dr. Harvey Young.  For Plaintiff Weiss,

15    AstraZeneca intends to subpoena medical records from Dr. Ajit Arora, Dr. Terril A. Efrid, Dr.

16    Michel Gen, Dr. Phil Lugo, Dr. John R. Nelson, Dr. Brenda J. Regier, and Dr. Mary A. Sadlek.

17         Plaintiffs have objected to such third-party discovery on relevancy and privacy grounds.

18    Notwithstanding those objections, as part of the meet and confer process, Plaintiffs have agreed to

19    execute such authorizations for the release of medical records.  Any subpoena directed at

20    healthcare provider for which a named plaintiff has provided an authorization will be limited to

21    requesting "any medical treatment or consultation with healthcare providers between January 1,

22    2000 and the present date regarding any of the following conditions: dyspepsia, heartburn,

23    gastroesophageal reflux disease, acid reflux, esophagitis, erosive esophagitis, gastric or duodenal

24    ulcers, h. pylori infection, epigastric pain, stomach pain, esophageal pain, and stomach or

25    esophageal complaints or disorders of any kind and any symptoms related thereto," unless the

26    parties subsequently agree to a broader scope of discovery.

27         The parties agree that any plaintiff-specific documents obtained from healthcare providers

28    will be deemed designated as "Confidential" within the meaning of the Agreed Protective Order

- 8 -

1  Regarding Confidential Information entered in the actions, notwithstanding paragraph 8 of said

2  Protective Order.

3       DATED:  April 28, 2006

                                    HAGENS BERMAN SOBOL SHAPIRO LLP
4

5

6  By

                                    ELAINE T. BYSZEWSKI
                                    700 South Flower Street, Suite 2940
7                                    Los Angeles, CA 90017-4101
                                    Telephone: (213) 330-7150
8

                                    STEVE W. BERMAN
9                                    CRAIG R. SPIEGEL
                                    HAGENS BERMAN SOBOL SHAPIRO LLP
10                                   1301 Fifth Avenue, Suite 2900
                                    Seattle, WA 98101
11                                   Telephone: (206) 623-7292

12                                   THOMAS M. SOBOL
                                    HAGENS BERMAN SOBOL SHAPIRO LLP
13                                   One Main Street, 4th Floor
                                    Cambridge, MA 02142
14

                                    RONALD S. GOLDSER
15                                   ZIMMERMAN REED, PLLP
                                    651 Nicollet Mall, Suite 501
16                                   Minneapolis, MN 55402

17                                   JASON J. THOMPSON
                                    CHARFOOS & CHRISTENSEN, P.C.
18                                   5510 Woodward Avenue
                                    Detroit, MI 48202
19

                                    *Attorneys for Plaintiffs in Both Actions*
20
        DATED:  April 28, 2006
21
                                    SIDLEY AUSTIN LLP
22

23

                                    By
24                                   PETER I. OSTROFF
                                    MARK E. HADDAD
25                                   ALYCIA A. DEGEN
                                    ANNE MAYER TURK
26                                   555 West Fifth Street, Suite 4000
                                    Los Angeles, CA 90013-1010
27                                   Telephone: (213) 896-6000

                                    *Attorneys for Defendants in Both Actions*
28

                                    - 9 -

1    Regarding Confidential Information entered in the actions, notwithstanding paragraph 8 of said

2    Protective Order.

3        DATED:  April 28, 2006

HAGENS BERMAN SOBOL SHAPIRO LLP

4

5

By_____
6    ELAINE T. BYSZEWSKI
700 South Flower Street, Suite 2940
7    Los Angeles, CA  90017-4101
Telephone:  (213) 330-7150
8

STEVE W. BERMAN
9    CRAIG R. SPIEGEL
HAGENS BERMAN SOBOL SHAPIRO LLP
10    1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
11    Telephone:  (206) 623-7292

12    THOMAS M. SOBOL
HAGENS BERMAN SOBOL SHAPIRO LLP
13    One Main Street, 4th Floor
Cambridge, MA  02142
14

RONALD S. GOLDSER
15    ZIMMERMAN REED, PLLP
651 Nicollet Mall, Suite 501
16    Minneapolis, MN 55402

17    JASON J. THOMPSON
CHARFOOS & CHRISTENSEN, P.C.
18    5510 Woodward Avenue
Detroit, MI 48202
19

20    *Attorneys for Plaintiffs in Both Actions*

DATED:  April 28, 2006
21
SIDLEY AUSTIN LLP
22

23    By _____
PETER I. OSTROFF
24    MARK E. HADDAD
ALYCIA A. DEGEN
25    ANNE MAYER TURK
555 West Fifth Street, Suite 4000
26    Los Angeles, CA 90013-1010
Telephone:  (213) 896-6000
27

*Attorneys for Defendants in Both Actions*
28

- 9 -

JOINT DISCOVERY STATEMENT

# EXHIBIT A

1     ELAINE T. BYSZEWSKI (SBN 222304)
       HAGENS BERMAN SOBOL SHAPIRO LLP
2     700 South Flower Street, Suite 2940
       Los Angeles, CA  90017-4101
3     Telephone: (213) 330-7150
             -and-
4     STEVE W. BERMAN
       HAGENS BERMAN SOBOL SHAPIRO LLP
5     1301 Fifth Avenue, Suite 2900
       Seattle, WA 98101
6     Telephone: (206) 623-7292

7     Attorneys for Plaintiffs

8     [Additional Counsel Listed on Signature Page]

9               **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10                 **FOR THE COUNTY OF LOS ANGELES**

11                 **CENTRAL CIVIL WEST COURTHOUSE**

| | |
|---|---|
| 12    THE AMERICAN FEDERATION OF LABOR   ) | Case No. BC 323107 |
|       AND CONGRESS OF INDUSTRIAL           ) | |
| 13    ORGANIZATIONS ("AFL-CIO"); CONGRESS ) | <u>CLASS ACTION</u> |
|       OF CALIFORNIA SENIORS ("CCS"); and      ) | |
| 14    CALIFORNIA ALLIANCE FOR RETIRED    ) | **PLAINTIFFS' FIRST REQUEST FOR** |
|       AMERICANS, individually and on behalf and   ) | **PRODUCTION OF DOCUMENTS** |
| 15    the general public, and JAMES WEISS,       ) | |
|       individually and on behalf of all others similarly ) | Dep't:  324 [Hon. Victoria G. Chaney] |
| 16    situated,                              ) | |
|                         Plaintiffs,   ) | |
| 17         v.                                 ) | |
| 18    ASTRAZENECA PHARMACEUTICALS LP;   ) | |
|       and ZENECA, INC.                      ) | |
| 19                Defendants.   ) | |
| 20    KATHLEEN LEDWICK, individually and on   ) | Case No. BC 324518 |
|       behalf of all others similarly situated,      ) | |
| 21                                ) | <u>CLASS ACTION</u> |
|                         Plaintiff,    ) | |
| 22         v.                                 ) | **PLAINTIFFS' FIRST REQUEST FOR** |
|                                 ) | **PRODUCTION OF DOCUMENTS** |
| 23    ASTRAZENECA PHARMACEUTICALS LP;   ) | |
|       and ZENECA, INC.                      ) | Dep't:  324 [Hon. Victoria G. Chaney] |
| 24               Defendants.   ) | |

25

26          **PROPOUNDING PARTY:**     **PLAINTIFFS**

27          **RESPONDING PARTY:**     **DEFENDANTS**

28          **SET NUMBER:**            **ONE**

# EXHIBIT A

FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

1       PLEASE TAKE NOTICE that pursuant to Code of Civil Procedure § 2031, plaintiffs

2   request that defendant Astrazeneca Pharmaceuticals LP and Zeneca, Inc. provide written responses

3   under oath and produce the following documents for inspection and copying at the offices of

4   HAGENS BERMAN SOBOL SHAPIRO LLP, 700 South Flower Street, Suite 2940, Los Angeles,

5   California 90017-4101 within 30 days of service of this request. Please use the Definitions &

6   Instructions that follow.

7                           **DEFINITIONS & INSTRUCTIONS**

8       1. "AND," AND "OR" shall be construed both conjunctively AND disjunctively, AND

9   each shall include the other whenever such dual construction will serve to bring within the scope of

10  these Requests any documents and information that otherwise would not be brought within their

11  scope.

12      2. "AZ" means defendants Zeneca, Inc. AND AstraZeneca Pharmaceuticals, L.P., AND

13  where appropriate in the context, their parents, subsidiaries, divisions OR affiliates AND their

14  respective officers, directors OR employees.

15      3. "CLASS PERIOD" means the four (4) years preceding the filing of the above-captioned

16  actions up to and including the present.

17      4. "COMMUNICATE" OR "COMMUNICATION" means AND includes every manner

18  OR means of transfer, exchange, OR disclosure of information, fact, idea, OR inquiry, whether

19  orally OR by document, AND whether face-to-face, by telephone, mail, telecopier, personal

20  delivery, OR otherwise.

21      5. "DOCUMENT" OR "DOCUMENTS" includes but is not limited to "writings AND

22  records," as defined by Evidence Code § 150 AND includes but is not limited to the following

23  items, whether printed, recorded, reproduced, created, generated OR prepared by any physical,

24  mechanical OR electromechanical process: agreements, ledgers, bills, billings, communications,

25  correspondence, telegrams, mailgrams, AND facsimile transmissions, fax messages, modem

26  transmissions, diaries, notebooks, drafts, notes, spreadsheets, charts, graphs, diagrams, models,

27  simulations, drawings, sketches, impressions, molds, tangible things, brochures, pamphlets,

28  advertisements, circulars, press releases, tapes, photographs, printouts, hard copies, data stored on

- 2 -

floppy disks, CD-ROM disks, tape drives, OR any magnetic-optical storage device, cases, statutes, rules, regulations, practice guides, textbooks, treatises, other legal authorities, any marginal comments appearing on any DOCUMENT, AND any AND all printings, writings, motion picture, still pictures, awards, copies OR reproductions thereof.

6. "IDENTIFY," when used with reference to any DOCUMENT, means to state the following:

    a. the date, if any, of the DOCUMENT;

    b. the title, if any, of the DOCUMENT;

    c. all authors of the DOCUMENT;

    d. the type of DOCUMENT (*e.g.*, letter, email, memo, report, table, etc.);

    e. all addressees AND recipients of the DOCUMENT; and

    f. a summary of the contents of the DOCUMENT.

7. "RELATE TO" AND "RELATING TO" include but are not limited to analyzing, considering, constituting, defining, evidencing, containing, describing, concerning, commenting, discussing, embodying, explaining, reflecting, detailing, identifying, mentioning, demonstrating, alluding to, referencing, edifying, stating, summarizing, referring to, dealing with OR in any way pertaining to, in whole OR in part, the subject.

8. "YOU" AND "YOUR" means AZ and all agents, employees, associates, representatives AND attorneys acting on AZ's behalf.

9. With respect to each DOCUMENT that YOU contend that YOU are not required to disclose because of any privilege OR work-product doctrine:

    a. IDENTIFY the DOCUMENT;

    b. state the nature of the privilege asserted (*e.g.*, attorney-client, self-incrimination, work-product, etc.);

    c. IDENTIFY all facts, statutes, OR rules that YOU contend support the assertion of such privilege; and

    d. IDENTIFY each person who has seen the DOCUMENT.

1    10. When a DOCUMENT is identified by name in quotation marks, all DOCUMENTS by

2    that name should be produced regardless of the use of upper-case and lower-case letters in that

3    name (*e.g.*, a request for all DOCUMENTS entitled "Optim.xls" requires production of documents

4    entitled "optim.xls").

5    **REQUESTS FOR PRODUCTION**

6    **REQUEST NO. 1**

7    All press releases or company announcements concerning the approval, benefits, risks,

8    efficacy, pricing, attributes or qualities of Nexium.

9    **REQUEST NO. 2**

10    All communications to or from doctors concerning the approval, pricing, benefits, efficacy,

11    attributes or qualities of Nexium.

12    **REQUEST NO. 3**

13    All communications to or from consumers concerning the approval, pricing, benefits,

14    attributes, efficacy or benefits of Nexium.

15    **REQUEST NO. 4**

16    All advertisements displayed or sent to doctors or consumers relating to Nexium.

17    **REQUEST NO. 5**

18    All communications with third party payors regarding the approval, benefits, efficacy,

19    safety, pricing, or benefits of Nexium, including but not limited to documents relating to efforts by

20    AZ to have Nexium placed on formularies.

21    **REQUEST NO. 6**

22    All documents discussing or relating to the marketing objectives and themes to be used in

23    promoting Nexium.

24    **REQUEST NO. 7**

25    All communications with the FDA regarding the efficacy of Nexium or the superiority of

26    Nexium versus Prilosec or other PPIs.

27

28

- 4 -

1

**REQUEST NO. 8**

2      All communications to third party payors, doctors or consumers relating to the superiority

3   of Nexium over Prilosec or other PPIs.

4

**REQUEST NO. 9**

5      All documents sent to third party payors, doctors or consumers comparing Nexium to other

6   drugs.

7

**REQUEST NO. 10**

8      All communications with AZ sales employees regarding or relating to the advertising,

9   promotions, position and marketing of Nexium including, without limitation, detail kits, and

10  suggested questions and answers for doctors, any videos, slide presentations or other training

11  materials.

12

**REQUEST NO. 11**

13     Any video referring or relating to the training of sales employees with respect to Nexium.

14

**REQUEST NO. 12**

15     Any documents measuring, referring or relating to consumer reactions to Nexium DTC

16  campaigns, including, without limitation, any audits of such campaigns.  For example, documents

17  derived from Verispan's Direct-to-Consumer Audit Service.   This request would encompass

18  documents relating to focus group testing or response to such advertising.

19     DATED: September 26, 2005

20                                                     HAGENS BERMAN SOBOL SHAPIRO LLP

21

22     By _____
                                              ELAINE T. BYSZEWSKI

23                                                     700 South Flower Street, Suite 2940
                                              Los Angeles, CA  90017-4101

24                                                     Telephone:  (213) 330-7150

25                                                     STEVE W. BERMAN
                                              HAGENS BERMAN SOBOL SHAPIRO LLP

26                                                     1301 Fifth Avenue, Suite 2900
                                              Seattle, WA  98101

27                                                     Telephone:  (206) 623-7292

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THOMAS M. SOBOL
HAGENS BERMAN LLP
One Main Street, 4th Floor
Cambridge, MA 02142
Telephone: (617) 482-3700

Attorneys for Plaintiffs

- 6 -

# EXHIBIT B

1  | Peter I. Ostroff (SBN 045718)
2  | Mark E. Haddad (SBN 205945)
   | Alycia A. Degen (SBN 211350)
3  | SIDLEY AUSTIN BROWN & WOOD LLP
   | 555 West Fifth Street, Suite 4000
4  | Los Angeles, California  90013-1010
   | Telephone:    (213) 896-6000
5  | Facsimile:    (213) 896-6600

6  | Attorneys For Defendants
   | AstraZeneca Pharmaceuticals LP and Zeneca Inc.

7

8  | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9  | FOR THE COUNTY OF LOS ANGELES

10 | CENTRAL CIVIL WEST COURTHOUSE

11 | JAMES WEISS, individually and on behalf of )   Case No. BC 323107
12 | all others similarly situated,             )
                                               )   CLASS ACTION
13 |              Plaintiff,                    )
                                               )
14 |         vs.                               )   DEFENDANTS' RESPONSE TO FIRST
                                               )   REQUEST FOR PRODUCTION OF
15 | ASTRAZENECA PHARMACEUTICALS LP; )   DOCUMENTS
   | and ZENECA, INC.                          )
16 |                                           )   Assigned to:    Hon. Victoria Chaney
   |              Defendants.                   )                   Department 324
17 |                                           )
                                               )
18 |                                           )   Complaint Filed: October 18, 2004
                                               )
19 | _____ )
   | KATHLEEN LEDWICK, individually and on )   Case No. BC 324518
20 | behalf of all others similarly situated,  )
                                               )   CLASS ACTION
21 |              Plaintiff,                    )
   |         vs.                               )   DEFENDANTS' RESPONSE TO FIRST
22 |                                           )   REQUEST FOR PRODUCTION OF
   |                                           )   DOCUMENTS
23 | ASTRAZENECA PHARMACEUTICALS LP; )
   | and ZENECA, INC.                          )
24 |                                           )   Assigned to:    Hon. Victoria Chaney
   |              Defendants.                   )                   Department 324
25 |                                           )
                                               )   Complaint Filed: November 15, 2004
26 |                                           )
                                               )
27 |                                           )
                                               )
28 | _____ )

EXHIBIT B  11230S

DEFENDANTS' RESPONSE TO FIRST REQUEST FOR PRODUCTION

1     **PROPOUNDING PARTY:  PLAINTIFFS**

2     **RESPONDING PARTY:**    **DEFENDANTS**

3     **SET NUMBER:**        **ONE**

4         Pursuant to California Civil Code Sections 2031.010-2031.260, Defendants

5 AstraZeneca Pharmaceuticals LP and Zeneca Inc. (collectively "Defendants") hereby respond to

6 Plaintiffs' First Request for Production of Documents.

7                    **GENERAL OBJECTIONS**

8         Defendants object to these requests on the ground that they are premature in the

9 context of this litigation.   Moreover, discovery should be sequenced, so that discovery on class

10 certification issues precedes discovery on the merits.

11         Defendants also object to those requests that are not limited to the United States, the

12 geographic area in which AstraZeneca sold NEXIUM® (esomeprazole magnesium), as overly

13 broad, unduly burdensome and irrelevant and not reasonably calculated to lead to the discovery of

14 admissible evidence.  Unless otherwise indicated, Defendants will limit their responses to this

15 geographic area or to the parts of the United States relevant to plaintiffs' claims.

16         Defendants further object to the requests as overly broad and unduly burdensome in

17 that they are not limited in time.   Unless otherwise indicated, Defendants will limit their production

18 to documents created between 1999 and October 2004, when the initial complaint against

19 Defendants was filed.

20         Defendants object to the requests to the extent that they seek documents that are not

21 within their possession, custody or control.  In addition, Defendants object to the definition of "AZ"

22 as including "where appropriate in the context," documents in the possession, custody or control of

23 persons or entities who are residents of foreign countries, as vague and ambiguous in not specifying

24 precisely when such documents are requested, and also as not in compliance with the Hague

25 Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, March 18, 1970, 23

26 U.S.T. 2555, 847 U.N.T.S. 231.

27         The fact that Defendants object to any request or otherwise respond to it should not

28 be taken as an admission that the Defendants accept or admit the existence of any facts assumed by

1  such request, or that such response or objection constitutes admissible evidence as to any such

2  assumed facts. The fact that Defendants respond to all or part of a request is not intended to be, and

3  shall not be construed as, a waiver by Defendants of any part of any objection to any request.

4       Some of the overly broad requests, even when appropriately narrowed so as to appear

5  reasonably calculated to lead to discovery of admissible information, may be interpreted to seek the

6  discovery of information protected from disclosure under the attorney-client privilege or attorney

7  work product immunity and Defendants object to the production of such information.   Any

8  production of any such information would be inadvertent and is not to be construed as a waiver of

9  any privilege or immunity attaching to such information, document or the subject matter thereof.

10  Defendants hereby reserve their rights to demand the immediate return of any such document or

11  information. Defendants will provide a log of any documents from their non-litigation files for

12  which they assert privilege, immunity or exemption. Defendants object to providing a log

13  concerning privileged, immune or exempt communications from their litigation files from this case

14  or other cases with similar allegations because the written compilation of such information would

15  reveal the protected thought processes of attorneys and would be unduly burdensome. Such

16  communications generally can be described as communications between Defendants and their

17  attorneys, the thoughts, impressions and analysis of Defendants' attorneys, and information and

18  material prepared in anticipation of, or in the process of this or similar litigation by or for

19  Defendants, their attorneys, their affiliates and consultants.

20       By providing any information or documents, now or in the future, Defendants are not

21  waiving the right to object to the relevancy and admissibility of this information and documents at

22  the time of trial. Defendants specifically reserve their objections to the admissibility in evidence of

23  any information provided in these responses or any documents produced.

24       Defendants also object to the broad and burdensome nature of each of the requests in

25  light of the time allotted for search and response.   Defendants further object to those requests that

26  ask for "all documents" related to a particular subject as overly broad and unduly burdensome and

27  duplicative, given that a document sent to many people within the company and thus located on

28  numerous computers within the company may be considered a different document in each such

3

DEFENDANTS' RESPONSE TO FIRST REQUEST FOR PRODUCTION

1  location, but the burdensome effort required to locate all such versions of such documents would be

2  unproductive as the production of such redundant information would not lead to the discovery of

3  admissible evidence.   Accordingly, Defendants will search for responsive documents in the

4  locations they deem such documents likely to exist, but will not endeavor to locate "all" such

5  documents in all locations in the company.

6         In addition, Defendants have just begun and have certainly not completed their

7  investigation or preparation for trial.  These responses are based on information presently known to

8  Defendants which expressly reserve the right to supplement or modify these responses based on the

9  discovery of additional or different information or based upon changes in the allegations made in

10  this proceeding.

11         All of the foregoing general objections are incorporated into each of the following

12  specific responses as though set forth in their entirety in each response.

13

14  **SPECIFIC RESPONSES TO REQUESTS FOR PRODUCTION**

15  **REQUEST NO. 1**

16         All press releases or company announcements concerning the approval, benefits,

17  risks, efficacy, pricing, attributes or qualities of Nexium.

18  **RESPONSE TO REQUEST NO. 1**

19         In addition to their general objections, Defendants object to this request as vague and

20  ambiguous in that "company announcements" is not defined and is subject to multiple

21  interpretations; Defendants will interpret it as including only public announcements disseminated

22  outside the company.   Subject to and without waiving their objections, Defendants will produce

23  press releases and public company announcements concerning Nexium.

24  **REQUEST NO. 2**

25         All communications to doctors concerning the approval, pricing, benefits, efficacy,

26  attributes or qualities of Nexium.

27  **RESPONSE TO REQUEST NO. 2**

28         In addition to their general objections, Defendants object to this request as unduly

4

DEFENDANTS' RESPONSE TO FIRST REQUEST FOR PRODUCTION

1   burdensome and not likely to lead to the discovery of admissible evidence in seeking duplicative

2   documents, given that numerous communications with individual physicians exist that repeat the

3   same information, and the production of standard communications, samples of the communications,

4   or the production of information pertaining to particular doctors should suffice to satisfy any

5   legitimate interest of plaintiffs.   Defendants further object to this request as unduly burdensome in

6   asking them to produce all communications which would encompass marketing materials including

7   such things as ballpoint pens, note pads and baseball caps ("logo materials"). Subject to and without

8   waiving their objections, Defendants will produce their Nexium-related promotional materials

9   addressed to physicians as well as their current standard public communications made in response to

10   physician requests for information about Nexium, which are referred to as Standard Responses to

11   Professional Information Requests.

12   **REQUEST NO. 3**

13           All communications to or from consumers concerning the approval, pricing, benefits,

14   attributes, efficacy or benefits of Nexium.

15   **RESPONSE TO REQUEST NO. 3**

16           In addition to their general objections, Defendants object to this request as unduly

17   burdensome and not likely to lead to the discovery of admissible evidence in seeking duplicative

18   documents, given that numerous communications with individuals exist that repeat the same

19   information, and the production of standard communications, samples of the communications or the

20   production of information pertaining to particular individuals should suffice to satisfy any legitimate

21   interest of plaintiffs.    Defendants further object to this request as irrelevant and not reasonably

22   calculated to lead to the discovery of admissible evidence in seeking communications with

23   consumers that have no bearing on this case, including such things as the shelf life of Nexium

24   capsules. Defendants further object to this request as unduly burdensome in asking them to produce

25   all communications which would encompass logo materials. Defendants further object to this

26   request as calling for the production of confidential information regarding test subjects and patients

27   which federal law does not permit them to disclose.   Subject to and without waiving their

28   objections, Defendants will produce their Nexium-related promotional materials addressed to

5

1  consumers as well as their current standard communications pertinent to issues in this case made in

2  response to consumer requests for information about Nexium.

3  **REQUEST NO. 4**

4            All advertisements displayed or sent to consumers relating to Nexium.

5  **RESPONSE TO REQUEST NO. 4**

6            In addition to their general objections, Defendants object to this request as unduly

7  burdensome in asking them to produce all advertisements which would encompass logo materials.

8  Subject to and without waiving their objections, Defendants will produce their Nexium-related

9  promotional materials addressed to consumers or physicians.

10  **REQUEST NO. 5**

11            All communications with third party payors regarding the approval, benefits, efficacy,

12  safety, pricing, or benefits of Nexium, including but not limited to documents relating to efforts by

13  AZ to have Nexium placed on formularies.

14  **RESPONSE TO REQUEST NO. 5**

15            In addition to their general objections, Defendants object to this request as overly

16  broad,  unduly burdensome and not reasonably calculated to lead to the discovery of admissible

17  evidence in the context of this litigation.  Defendants further object to this request as calling for the

18  production of confidential marketing information, which Defendants are unwilling to produce prior

19  to the entry of an appropriate protective order.   Subject to and without waiving their objections,

20  Defendants will produce their Formulary Submission Dossier regarding Nexium as well as their

21  promotional materials addressed to managed care organizations.

22  **REQUEST NO. 6**

23            All documents discussing or relating to the marketing objectives and themes to be

24  used in promoting Nexium.

25  **RESPONSE TO REQUEST NO. 6**

26            In addition to their general objections, Defendants object to this request as calling for

27  the production of documents subject to the privilege for confidential attorney-client communications

28  and the immunity for attorney work product. Defendants further object to this request as calling for

6

1   the production of confidential marketing information, which Defendants are unwilling to produce

2   prior to the entry of an appropriate protective order. Defendants further object to this request as

3   vague and ambiguous in that it is not clear whether it seeks information only about the marketing

4   themes that actually were used in promoting Nexium.   Defendants further object to this request as

5   irrelevant and not reasonably calculated to lead to the discovery of admissible evidence at the class

6   certification stage of this proceeding.

7   **REQUEST NO. 7**

8         All communications with the FDA regarding the efficacy of Nexium or the

9   superiority of Nexium versus Prilosec or other PPIs.

10  **RESPONSE TO REQUEST NO. 7**

11        In addition to their general objections, Defendants object to this request as vague and

12  ambiguous in that it is not clear whether the phrase "or other PPIs" is intended to include all

13  Defendants' communications with the FDA regarding other proton pump inhibitors or is intended to

14  encompass only those discussing the superiority of Nexium compared to other proton pump

15  inhibitors.   Defendants further object to the request for documents discussing the superiority of

16  Nexium compared to other proton pump inhibitors other than Prilosec as overly broad, unduly

17  burdensome and irrelevant and not reasonably calculated to lead to the discovery of admissible

18  evidence.   Defendants further object to this request as calling for the production of confidential

19  information regarding test subjects and patients which federal law does not permit them to disclose

20  in this litigation.   Defendants further object to this request as calling for the production of

21  confidential marketing information, which Defendants are unwilling to produce prior to the entry of

22  an appropriate protective order.   Subject to and without waiving their objections, Defendants will

23  produce their Investigational New Drug Application for Nexium and their New Drug Applications

24  for Nexium related to its indication for gastroesophageal reflux disease and its indication for

25  eradication of bacteria in combination with antibiotics, as well as their correspondence with the

26  Division of Drug Marketing, Advertising and Communications ("DDMAC") of the FDA relating to

27  their promotion of Nexium.

28

**DEFENDANTS' RESPONSE TO FIRST REQUEST FOR PRODUCTION**

1  **REQUEST NO. 8**

2          All communications to third party payors, doctors or consumers relating to the

3  superiority of Nexium over Prilosec or other PPIs.

4  **RESPONSE TO REQUEST NO. 8**

5          In addition to their general objections, Defendants object to this request as duplicative

6  of Requests 2, 3, 4 and 5 above.   Defendants further object to the request for documents comparing

7  Nexium to other proton pump inhibitors other than Prilosec as overly broad, unduly burdensome and

8  irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.  Defendants

9  also object to this request as unduly burdensome and not likely to lead to the discovery of admissible

10  evidence in seeking duplicative documents, given that numerous communications with doctors and

11  individual consumers exist that repeat the same information, and the production of standard

12  communications, samples of the communications, or the production of information pertaining to

13  particular doctors or consumers should suffice to satisfy any legitimate interest of plaintiffs.

14  Defendants further object to this request as unduly burdensome in asking them to produce all

15  communications which would encompass marketing materials including logo materials.   Subject to

16  and without waiving their objections, Defendants will produce their Nexium-related promotional

17  materials addressed to physicians, consumers and managed care organizations, as well as their

18  standard communications pertinent to issues in this case made in response to physician and

19  consumer requests for information about Nexium.

20  **REQUEST NO. 9**

21          All documents sent to third party payors, doctors or consumers comparing Nexium to

22  other drugs.

23  **RESPONSE TO REQUEST NO. 9**

24          In addition to their general objections, Defendants object to this request as duplicative

25  of Requests 2, 3, 4, 5 and 8 above.   Defendants further object to the request for documents

26  comparing Nexium to other proton pump inhibitors other than Prilosec as overly broad, unduly

27  burdensome and irrelevant and not reasonably calculated to lead to the discovery of admissible

28  evidence.  Defendants also object to this request as unduly burdensome and not likely to lead to the

8

**DEFENDANTS' RESPONSE TO FIRST REQUEST FOR PRODUCTION**

1  discovery of admissible evidence in seeking duplicative documents, given that numerous

2  communications with doctors and individual consumers exist that repeat the same information, and

3  the production of standard communications, samples of the communications, or the production of

4  information pertaining to particular doctors or consumers should suffice to satisfy any legitimate

5  interest of plaintiffs.   Defendants further object to this request as unduly burdensome in asking them

6  to produce all communications which would encompass marketing materials including logo

7  materials.   Subject to and without waiving their objections, Defendants will produce their Nexium-

8  related promotional materials addressed to physicians, consumers and managed care organizations,

9  as well as their standard communications pertinent to issues in this case made in response to

10  physician and consumer requests for information about Nexium.

11  **REQUEST NO. 10**

12          All communications with AZ sales employees regarding or relating to the advertising,

13  promotions, position and marketing of Nexium including, without limitation, detail kits, and

14  suggested questions and answers for doctors, any videos, slide presentations or other training

15  materials.

16  **RESPONSE TO REQUEST NO. 10**

17          In addition to their general objections, Defendants object to this request as vague and

18  ambiguous in that the term "sales employees" is not defined and is subject to multiple

19  interpretations; Defendants will construe the term as applying to their employees whose job function

20  has been to detail physicians in order to promote Nexium.    In addition, Defendants object to this

21  request as unduly burdensome and not likely to lead to the discovery of admissible evidence in

22  seeking duplicative documents, given that numerous communications with individual sales

23  representatives exist that repeat the same information, and the production of standard

24  communications, samples of the communications, or the production of information pertaining to

25  particular sales representatives or to particular doctors should suffice to satisfy any legitimate

26  interest of plaintiffs.   Defendants also object to this request as calling for the production of

27  documents subject to the privilege for confidential attorney-client communications.  Defendants

28  further object to this request as calling for the production of confidential marketing information,

9

1  which Defendants are unwilling to produce prior to the entry of an appropriate protective order.

2  Defendants further object to this request as unduly burdensome in asking them to produce all

3  communications which would encompass marketing materials including logo materials.  In addition,

4  Defendants object to this request as overly broad, irrelevant and not reasonably calculated to lead to

5  the discovery of admissible evidence at the class certification stage of this proceeding.

6  **REQUEST NO. 11**

7        Any video referring or relating to the training of sales employees with respect to

8  Nexium.

9  **RESPONSE TO REQUEST NO. 11**

10        In addition to their general objections, Defendants object to this request as vague and

11  ambiguous in that the term "sales employees" is not defined and is subject to multiple

12  interpretations; Defendants will construe the term as applying to their employees whose job function

13  is to detail physicians in order to promote Defendants' products.  Defendants further object to this

14  request as calling for the production of confidential marketing information, which Defendants are

15  unwilling to produce prior to the entry of an appropriate protective order.  In addition, Defendants

16  object to this request as overly broad, irrelevant and not reasonably calculated to lead to the

17  discovery of admissible evidence at the class certification stage of this proceeding.

18  **REQUEST NO. 12**

19        Any documents measuring, referring or relating to consumer reactions to Nexium

20  DTC campaigns, including, without limitation, any audits of such campaigns.  For example,

21  documents derived from Verispan's Direct-to-Consumer Audit Service.  This request would

22  encompass documents relating to focus group testing or response to such advertising.

23  **RESPONSE TO REQUEST NO. 12**

24        In addition to their general objections, Defendants object to this request as calling for

25  the production of documents subject to the privilege for confidential attorney-client communications

26  and the immunity for attorney work product.  Defendants further object to this request as calling for

27  the production of confidential marketing information, which Defendants are unwilling to produce

28  prior to the entry of an appropriate protective order.  Defendants further object to this request as

10

**DEFENDANTS' RESPONSE TO FIRST REQUEST FOR PRODUCTION**

1    irrelevant and not reasonably calculated to lead to the discovery of admissible evidence at the class

2    certification stage of this proceeding.

3    Dated:  November 23, 2005                              SIDLEY AUSTIN BROWN & WOOD LLP

4

5

6                                                          By:  _____

7                                                               Alycia A. Degen
                                                               Attorneys For Defendants
8                                                               ASTRAZENECA PHARMACEUTICALS
                                                               LP and ZENECA INC.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                    11

1
PROOF OF SERVICE

2 STATE OF CALIFORNIA                )
                                     )  ss
3 COUNTY OF LOS ANGELES              )

4

5          I am employed in the County of Los Angeles, State of California.  I am over the age

6 of 18 and not a party to the within action.   My business address is Sidley Austin Brown & Wood

7 LLP, 555 West Fifth Street, Suite 4000, Los Angeles, California 90013-1010.

8          On November 23, 2005, I served the foregoing document described as

9 **DEFENDANTS' RESPONSE TO FIRST REQUEST FOR PRODUCTION OF DOCUMENTS**

10 by E-MAIL on all interested parties in this action as follows:

11                          **PLAINTIFF(S)**

12 Elaine T. Byszewski
13 HAGENS BERMAN SOBOL SHAPIRO LLP
   700 South Flower Street, Suite 2940
14 Los Angeles, CA 90017-4101
   Tel: (213) 330-7150
15 Elaine@hbsslaw.com

16 Steve W. Berman
17 HAGENS BERMAN SOBOL SHAPIRO LLP
   1301 Fifth Avenue, Suite 2900
18 Seattle, WA 98101
   Tel: (206) 623-7292
19 Steve@hbsslaw.com

20 Thomas M. Sobol
21 HAGENS BERMAN SOBOL SHAPIRO LLP
   One Main Street, 4th Floor
22 Cambridge, MA 02142
   Tel:  (617) 482-3700
23 Tom@hbsslaw.com

24 ///

25 ///

26 ///
27

28

1                                          **DEFENDANT(S)**

2   Peter I. Ostroff
3   Mark E. Haddad
    Alycia A. Degen
4   Sidley Austin Brown & Wood LLP
    555 West Fifth Street, Suite 4000
5   Los Angeles, CA 90013-1010
    Tel: 213-896-6000
6   Fax: 213-896-6600
7   postroff@Sidley.com
    mhaddad@Sidley.com
8   adegen@Sidley.com

9           I declare under penalty of perjury under the laws of the State of California that the

10  above is true and correct.

11              Executed on November 23, 2005, at Los Angeles, California.

12

13

14                                                          Lynn Levinson

15

16

17

18

19

20

21

22

23

24

25

26

27

28

    LA1 719706v.1                              -2-

# EXHIBIT C

1  ELAINE T. BYSZEWSKI (SBN 222304)
   HAGENS BERMAN SOBOL SHAPIRO LLP
2  700 South Flower Street, Suite 2940
   Los Angeles, CA  90017-4101
3  Telephone: (213) 330-7150
        -and-
4  STEVE W. BERMAN
   CRAIG R. SPIEGEL (SBN 122000)
5  HAGENS BERMAN SOBOL SHAPIRO LLP
   1301 Fifth Avenue, Suite 2900
6  Seattle, WA 98101
   Telephone: (206) 623-7292
7
   Attorneys for Plaintiffs
8
   [Additional Counsel Listed on Signature Page]
9
                SUPERIOR COURT OF THE STATE OF CALIFORNIA
10
                    FOR THE COUNTY OF LOS ANGELES
11
                    CENTRAL CIVIL WEST COURTHOUSE
12
13  JAMES WEISS, individually and on behalf of all )   Case No. BC 323107
    others similarly situated,                      )
14                      Plaintiffs,                  )   CLASS ACTION
                                                     )
15      v.                                           )
                                                     )   NOTICE OF DEPOSITION OF
16  ASTRAZENECA PHARMACEUTICALS LP;                  )   PERSON(S) MOST QUALIFIED AT
    and ZENECA, INC.,                                )   DEFENDANT ASTRAZENECA
17                      Defendants.                  )   PHARMACEUTICALS LP
                                                     )
18  _____     )   Dep't: 324 [Hon. Victoria G. Chaney]
    KATHLEEN LEDWICK, individually and on           )   Case No. BC 324518
19  behalf of all others similarly situated,         )
                                                     )   CLASS ACTION
20                      Plaintiff,                   )
                                                     )   NOTICE OF DEPOSITION OF
21      v.                                           )   PERSON(S) MOST QUALIFIED AT
                                                     )   DEFENDANT ASTRAZENECA
22  ASTRAZENECA PHARMACEUTICALS LP;                  )   PHARMACEUTICALS LP
    and ZENECA, INC.,                                )
23                      Defendants.                  )   Dep't: 324 [Hon. Victoria G. Chaney]
                                                     )
24  _____     )
25  TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:
26      PLEASE TAKE NOTICE that pursuant to Code of Civil Procedure § 2025.230, Plaintiffs,
27  by and through their attorneys, will take the deposition on oral examination of the person(s) most
28  knowledgeable at AstraZeneca Pharmaceuticals LP, on April 20, 2006, beginning at 10:00 a.m., at

EXHIBIT C 4606

1   the offices of Hagens Berman Sobol Shapiro LLP, located at 700 South Flower Street, Los

2   Angeles, CA 90017. The deposition will be taken before a deposition officer qualified under

3   C.C.P. § 2025.320 and will continue from day to day or to a mutually agreed upon date, with

4   weekends and holidays excluded, until completed.

5   　　　　PLEASE TAKE FURTHER NOTICE that AstraZeneca Pharmaceuticals LP must designate

6   and produce at the deposition those of its officers, directors, managing agents, employees, or agents

7   who are most qualified to testify on its behalf as to the following matters to the extent of any

8   information known or reasonably available to the deponent(s):

9   　　　　(a)　　the content of any presentations made at a meeting or meetings of employees of

10   either defendant (hereafter "AstraZeneca") held in Hawaii for the purpose of training those

11   employees how to sell or promote Nexium;

12   　　　　(b)　　the identity of participants at a meeting or meetings of employees of AstraZeneca

13   held in Hawaii for the purpose of training those employees how to sell or promote Nexium;

14   　　　　(c)　　documents provided by AstraZeneca employees or agents to promote Nexium to

15   doctors, managed care companies, wholesalers, purchasing groups, pharmacy benefit managers,

16   third party payors or consumers in California;

17   　　　　(d)　　the formation of the Shark Fin Project, the identity of individuals who worked on

18   the Shark Fin Project, and the work performed by the Shark Fin Project;

19   　　　　(e)　　AstraZeneca plans and themes for marketing or otherwise promoting Nexium to

20   physicians, managed care companies, wholesalers, purchasing groups, pharmacy benefit managers,

21   third party payors or consumers in California;

22   　　　　(f)　　AstraZeneca plans and themes for inducing managed care companies to list Nexium

23   on their formularies;

24   　　　　(g)　　AstraZeneca plans and themes for marketing or otherwise promoting Nexium to

25   consumers;

26   　　　　(h)　　AstraZeneca plans and themes to induce consumers to switch from Prilosec to

27   Nexium;

28

- 2 -

1          (i)      AstraZeneca plans and themes to induce physicians to prescribe Nexium instead of

2    Prilosec; and

3          (j)      the contents of "detail kits" and training material provided to AstraZeneca sales

4    personnel relating to Nexium.

6          DATED:  April 6, 2006

HAGENS BERMAN SOBOL SHAPIRO LLP

By
ELAINE T. BYSZEWSKI
700 South Flower Street, Suite 2940
Los Angeles, CA  90017-4101
Telephone:  (213) 330-7150

STEVE W. BERMAN
CRAIG R. SPIEGEL
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone:  (206) 623-7292

THOMAS M. SOBOL
HAGENS BERMAN SOBOL SHAPIRO LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone:  (617) 482-3700

Attorneys for Plaintiffs

- 3 -

1  **DECLARATION OF SERVICE VIA E-MAIL**

2  I, the undersigned, declare:

3  That declarant is and was, at all times herein mentioned, a citizen of the United States and a

4  resident of the County of Los Angeles, over the age of 18 years, and not a party to or interested in

5  the within action; that declarant's business address is 700 South Flower Street, Suite 2940, Los

6  Angeles, California 90017-4101.

7  On April 6, 2006, I served the foregoing document(s) described as **NOTICE OF DEPOSITION**

8  **OF PERSON(S) MOST QUALIFIED AT DEFENDANT ASTRAZENECA PHARMACEUTICALS LP** by E-

9  MAIL on all interested parties in this action set forth in the attached **Service List**.

10  I declare under penalty of perjury that the foregoing is true and correct. Executed this 7th

11  day of April 2006, at Los Angeles, California.

12

13

14  KALYN BAKER

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# SERVICE LIST

WEISS . V. ASTRAZENECA PHARMACEUTICALS LP, ET AL.
BC323107, Dept 324

LEDWICK V. ASTRAZENECA PHARMACEUTICALS LP, ET AL.
BC324518, Dept 324

Central Civil West

## PLAINTIFF(S)

Elaine T. Byszewski
**Hagens Berman Sobol Shapiro LLP**
700 South Flower Street
Suite 2940
Los Angeles, CA 90017
Elaine@hbsslaw.com
(Via email)

Thomas M. Sobol
**Hagens Berman Sobol Shapiro LLP**
One Main Street, 4th Floor
Cambridge, MA  02142
Tom@hbsslaw.com
(Via email)

Ronald S. Goldser
**Zimmerman Reed, PLLP**
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
rsg@zimmreed.com
(Via email)

Steve W. Berman
Craig R. Spiegel
**Hagens Berman Sobol Shapiro LLP**
1301 Fifth Avenue
Suite 2900
Seattle, WA  98101
Steve@hbsslaw.com
(Via email)

Jason J. Thompson
**Charfoos & Christensen, P.C.**
5510 Woodward Avenue
Detroit, MI  48202
jthompson@c2law.com
(Via email)

## DEFENDANT(S)

Peter I. Ostroff
Mark E. Haddad
Catherine Valerio Barrad
Alycia A. Degan
Anne Mayer Turk
**Sidley Austin LLP**
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013-1010
Telephone: 213.896.6000
Facsimile: 213.896.6600
postroff@Sidley.com
cbarrad@Sidley.com
Mhaddad@sidley.com
Adegen@sidley.com
ATurk@Sidley.com
(Via email)

# EXHIBIT D

1  | Peter I. Ostroff (SBN 045718)
   | Mark E. Haddad (SBN 205945)
2  | Alycia A. Degen (SBN 211350)
   | Joshua E. Anderson (SBN 211320)
3  | SIDLEY AUSTIN BROWN & WOOD LLP
   | 555 West Fifth Street, Suite 4000
4  | Los Angeles, California 90013-1010
   | Telephone: (213) 896-6000
5  | Facsimile: (213) 896-6600

6  | Attorneys For Defendant
   | Zeneca Inc.

7

8  |              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9  |                   FOR THE COUNTY OF LOS ANGELES

10

11 | JAMES WEISS, individually and on behalf of ) Case No. BC 323107
   | all others similarly situated,             )
12 |                                            ) **CLASS ACTION**
   |                 Plaintiff,                  )
13 |                                            ) Assigned to: Honorable Victoria G. Chaney
   |        vs.                                  ) Department 324
14 |                                            )
   | ASTRAZENECA PHARMACEUTICALS LP; ) Complaint Filed: October 18, 2004
15 | and ZENECA, INC.,                          )
   |                                            ) **DEFENDANT ZENECA INC.'S FIRST SET**
16 |                 Defendants.                 ) **OF REQUESTS FOR PRODUCTION OF**
   |                                            ) **DOCUMENTS TO PLAINTIFF JAMES**
17 |                                            ) **WEISS (NOS. 1-8)**
   |                                            )
18 |                                            )

19

20 | **PROPOUNDING PARTY:**        **Defendant ZENECA INC.**

21 | **RESPONDING PARTY:**         **Plaintiff JAMES WEISS**

22 | **SET NUMBER:**               **One (1)**

23

24 |        Pursuant to California Code of Civil Procedure section 2031.010, Defendant Zeneca Inc.

25 | hereby requests that Plaintiff James Weiss (1) serve a written response to this First Set of Requests

26 | for Production (Nos. 1-8) as required by section 2031.210 and (2) produce for inspection and

27 | copying the documents requested below that are within his possession, custody, or control, on

28 | December 1, 2005, at 10:00 a.m., at the offices of Sidley Austin Brown & Wood LLP, 555 West

---

**DEFENDANT ZENECA INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF JAMES WEISS (NOS. 1-8)**

EXHIBIT  D

11 05

1   Fifth Street, Suite 4000, Los Angeles, California 90013, or at such other time and place as may be

2   agreed upon by counsel.

3   **Definitions**

4       Notwithstanding any definition set forth below, each word, term, or phrase used in these

5   requests is intended to have the broadest meaning permitted under the California Rules of Civil

6   Procedure. As used in these requests, the following terms are to be interpreted in accordance with

7   these definitions:

8       1.    "And," "Or," "Any," "Each," and "All" shall be construed in their broadest form.

9       2.    "ASTRAZENECA" shall mean AstraZeneca Pharmaceuticals LP and Zeneca Inc.

10      3.    "COMMUNICATION" shall mean the transmission or transfer of information of any

11  kind, orally, in writing, or in any other manner, at any time or place, and under any circumstances

12  whatsoever, including without limitation telephone conversations, letters, memoranda,

13  advertisements, electronic mail, notes, notes of meetings, summaries, photographs, motion pictures,

14  audio tapes, video tapes, computer telecommunications, electronic or magnetic media, or other

15  materials or memorials or communication, meetings or any occasions of joint or mutual presence, as

16  well as the transfer of any document from one PERSON to another.

17      4.    "DOCUMENT(S)" shall include anything falling within the definition of "writing"

18  under Evidence Code section 250, and includes, without limitation, the original and all copies of all

19  written, printed, typed, electronic, computer, or otherwise recorded matter, however produced or

20  reproduced, of every kind and description, in whatever form (e.g., final or draft versions), including,

21  but not limited to, all writings, contracts, policy statements, manuals, telephone messages, checks,

22  correspondence, letters, electronic mail or email messages, telegrams, notes, mailgrams, minutes of

23  any meetings, agendas, memoranda, interoffice communications, reports, studies, forecasts, project

24  analyses, working papers, charts, expense account reports, ledgers, journals, financial statements,

25  statements of accounts, calendars, appointment books, diaries, drawings, graphs, photographs, sound

26  recordings, materials stored on electronic media such as computer discs or hard drives, or any other

27  tangible things. "DOCUMENT(S)" shall also mean originals and copies of all of the above upon

28  which notations in writing, print, or otherwise have been made which do not appear on the originals.

-2-

1       5.     DOCUMENTS that "refer or relate to" a specified topic or topics shall include all

2 DOCUMENTS that mention, describe, discuss, memorialize, concern, constitute, contain, evidence,

3 reflect, depict, or refer in any way, whether or not on the face of the DOCUMENT, directly or

4 indirectly, to the specified topic or topics.

5       6.     "HEALTHCARE PROVIDER" shall mean any doctor, nurse practitioner, hospital,

6 clinic, pharmacy, or any other PERSON who has provided healthcare services or consultation to

7 YOU.

8       7.     "NEXIUM" shall mean NEXIUM® (esomeprazole magnesium).

9       8.     "OTHER PPI" shall mean ACIPHEX® (rabeprazole sodium), PREVACID®

10 (lansoprazole), PROTONIX® (pantoprazole sodium), and generic omeprazole.

11      9.     "PERSON(S)" shall mean natural persons, proprietorships, corporations,

12 partnerships, trusts, joint ventures, groups, associations, and organizations, and any other entity,

13 whether real or fictitious, included within the meaning of "person" set forth in California Evidence

14 Code § 175.

15      10.    "PRILOSEC" shall mean PRILOSEC® (omeprazole).

16      11.    "PRILOSEC OTC" shall mean Prilosec OTC™ (omeprazole magnesium).

17      12.    "YOU" or "YOUR" shall mean James Weiss.

**Instructions**

19      1.     If, in responding to these requests, YOU encounter any ambiguities when construing

20 a request, definition, or instruction, the response shall set forth the matter deemed ambiguous and the

21 construction used in responding.

22      2.     If production of any requested DOCUMENT(S) or thing(s) is objected to on the

23 grounds that production is unduly burdensome, describe the burden or expense of the proposed

24 discovery.

25      3.     Each Request seeks production of a DOCUMENT or thing in its entirety, without

26· abbreviation or expurgation, including all attachments, or other matters affixed thereto.

27      4.     All DOCUMENTS and things produced by YOU in response to this Request shall

28 include a production number.

-3-

1    5.    Pursuant to Civil Procedure section 2031.280, YOU are obligated to produce or make

2    available for inspection all DOCUMENTS responsive to this Request, as those DOCUMENTS are

3    kept in the usual course of business or shall organize and label those DOCUMENTS to correspond

4    with the categories in this Request.

5    6.    These Requests apply to all DOCUMENTS and things in YOUR possession, custody

6    or control, or otherwise known or available to YOU, regardless of their location and regardless of

7    whether such DOCUMENTS are held, known by or available to any of YOUR agents, employees,

8    representatives, attorneys, or any other PERSON.

9    7.    The singular shall be construed to include the plural, and the plural shall be construed

10    to include the singular, as necessary to bring within the scope of these Requests any DOCUMENTS

11    that might otherwise be construed to fall outside the scope of these Requests.

12    8.    The present tense shall be construed to include the past tense, and the past tense shall

13    be construed to include the present tense, as necessary to bring within the scope of these Requests

14    any DOCUMENTS that might otherwise be construed to be outside the scope of these Requests.

15    9.    More than one Request herein may ask for the same DOCUMENT. Such duplication

16    is not to be interpreted to narrow or limit the normal interpretation placed upon each individual

17    Request.

18    10.    In accordance with Code of Civil Procedure section 2031.240, where a claim of

19    privilege is asserted in objecting to any Request or part thereof, and any DOCUMENT is not

20    provided on the basis of such assertion:

21                 (1) in asserting the privilege, YOU shall, in the objection to the

22                 Request, or part thereof, identify with specificity the nature of the

23                 privilege (including work product) that is being claimed; and

24
25                 (2) identify that DOCUMENT, supplying the following information:

                     (a) the name of the author, writer, sender, or initiator of each copy of
26
                     the DOCUMENT; (b) the name of each recipient, addressee, or party
27
                     who obtained a copy of the DOCUMENT; (c) the date of each copy of
28

-4-

1    the DOCUMENT or, if no date appears on the DOCUMENT, an

2    estimate thereof, indicated as an estimate; (d) a description of the

3    DOCUMENT, including but not limited to the subject matter, title and

4    number of pages of the DOCUMENT; (e) a statement of the basis of

5    the claim of privilege; (f) the particular Request herein to which the

6    DOCUMENT is responsive; (g) the PERSON(S) in whose custody

7    each copy of the DOCUMENT is presently located; (h) where not

8    apparent, the relationship of the author, writer, sender, initiator,

9    addressee, custodian, and any other recipient to each other; and (i)

10    whether any matter that is not privileged or not work product is

11    discussed or mentioned in the DOCUMENT.

12

13    11.    In accordance with Code of Civil Procedure section 2031.240, if only a portion of any

14 DOCUMENT requested herein is subject to a privilege or work product protection, produce each

15 and every portion of such DOCUMENT for which privilege or work product protection is not

16 claimed. Similarly, in the event an objection is made to any Request or part thereof, produce all

17 DOCUMENTS in the category requested to the full extent that such production would not be subject

18 to the objection.

19    12.    In responding to these Requests, produce all DOCUMENTS within YOUR

20 possession, custody or control at the time of production, including but not limited to DOCUMENTS

21 in the possession, custody or control of YOUR attorneys.

22    13.    To the extent that YOU believe that DOCUMENTS sought by these Requests raise

23 privacy concerns, ASTRAZENECA is willing to enter into a mutually agreeable confidentiality

24 order that complies with the Health Insurance Portability and Accountability Act of 1996.

25

26 **Requests**

### REQUEST FOR PRODUCTION NO. 1:

All DOCUMENTS that refer or relate to each fact called for by each interrogatory in Zeneca

Inc.'s concurrently-served First Set of Interrogatories to Plaintiff James Weiss.

-5-

1 | **REQUEST FOR PRODUCTION NO. 2:**

2 |   All DOCUMENTS that support YOUR contention that YOU purchased, paid for, or

3 | otherwise obtained NEXIUM.

4 | **REQUEST FOR PRODUCTION NO. 3:**

5 |   All DOCUMENTS that refer or relate to any prescription that YOU received for NEXIUM,

6 | PRILOSEC, PRILOSEC OTC, or any OTHER PPI.

7 | **REQUEST FOR PRODUCTION NO. 4:**

8 |   All DOCUMENTS that refer or relate to any advertisement for NEXIUM.

9 | **REQUEST FOR PRODUCTION NO. 5:**

10 |   All DOCUMENTS that refer or relate to YOUR health insurance coverage for NEXIUM,

11 | PRILOSEC, PRILOSEC OTC, or any OTHER PPI between the January 1, 2000 and the present

12 | date, including, but not limited to, DOCUMENTS that refer or relate to any co-payment or

13 | deductible under YOUR health insurance plan for NEXIUM, PRILOSEC, PRILOSEC OTC, or any

14 | OTHER PPI.

15 | **REQUEST FOR PRODUCTION NO. 6:**

16 |   All DOCUMENTS that refer or relate to any COMMUNICATION between YOU and

17 | ASTRAZENECA.

18 | **REQUEST FOR PRODUCTION NO. 7:**

19 |   All DOCUMENTS that refer or relate to any COMMUNICATION between YOU and

20 | YOUR HEALTHCARE PROVIDER regarding NEXIUM, PRILOSEC, PRILOSEC OTC or any

21 | OTHER PPI.

22 | **REQUEST FOR PRODUCTION NO. 8:**

23 |   All DOCUMENTS that refer or relate to any medical treatment that you received between

24 | January 1, 2000 and the present date.

25

26

27

28

**DEFENDANT ZENECA INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF JAMES WEISS (NOS. 1-8)**

1

2    Dated: November 1, 2005                    SIDLEY AUSTIN BROWN & WOOD LLP

3

4                                              By: _____
                                                   Mark E. Haddad
5                                                  Attorneys For Defendant Zeneca Inc.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-7-

**DEFENDANT ZENECA INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF JAMES WEISS (NOS. 1-8)**

1                             PROOF OF SERVICE

2   STATE OF CALIFORNIA        )
                                  )  ss

3   COUNTY OF LOS ANGELES   )

4

5           I am employed in the County of Los Angeles, State of California. I am over the age

6   of 18 and not a party to the within action. My business address is Sidley Austin Brown & Wood

7   LLP, 555 West Fifth Street, Suite 4000, Los Angeles, California 90013-1010.

8           On November 1, 2005, I served the foregoing document described as **DEFENDANT**

9   **ZENECA INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO**

10   **PLAINTIFF JAMES WEISS (NOS. 1-8)** by E-MAIL on all interested parties in this action as

11   follows:

12                             **PLAINTIFF(S)**

13   Elaine T. Byszewski
HAGENS BERMAN SOBOL SHAPIRO LLP
14   700 South Flower Street, Suite 2940
15   Los Angeles, CA 90017-4101
Tel: (213) 330-7150
16   Elaine@hbsslaw.com

17   Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
18   1301 Fifth Avenue, Suite 2900
19   Seattle, WA 98101
Tel: (206) 623-7292
20   Steve@hbsslaw.com

21   Thomas M. Sobol
HAGENS BERMAN SOBOL SHAPIRO LLP
22   One Main Street, 4th Floor
23   Cambridge, MA 02142
Tel: (617) 482-3700
24   Tom@hbsslaw.com

25   ///

26   ///

27

28

1

**DEFENDANT(S)**

2

Peter I. Ostroff

3   Mark E. Haddad
Alycia A. Degen

4   Sidley Austin Brown & Wood LLP
555 West Fifth Street, Suite 4000

5   Los Angeles, CA 90013-1010
Tel: 213-896-6000

6   Fax: 213-896-6600
postroff@Sidley.com

7   mhaddad@Sidley.com

8   adegen@Sidley.com

9              I declare under penalty of perjury under the laws of the State of California that the

10  above is true and correct.

11              Executed on November 1, 2005, at Los Angeles, California.

12

13

14                                                    Masa Brown

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LA1 713860v.1                              -2-

1  Peter I. Ostroff (SBN 045718)
   Mark E. Haddad (SBN 205945)
2  Alycia A. Degen (SBN 211350)
   Joshua E. Anderson (SBN 211320)
3  SIDLEY AUSTIN BROWN & WOOD LLP
   555 West Fifth Street, Suite 4000
4  Los Angeles, California 90013-1010
   Telephone: (213) 896-6000
5  Facsimile:  (213) 896-6600

6  Attorneys For Defendant
   Zeneca Inc.

7

8                  SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                      FOR THE COUNTY OF LOS ANGELES

10

11 KATHLEEN LEDWICK, individually and on    )  Case No. BC 324518
   behalf of all others similarly situated,  )
12                                           )  **CLASS ACTION**
                Plaintiff,                    )
13                                           )  Assigned to: Honorable Victoria G. Chaney
       vs.                                    )  Department 324
14                                           )
   ASTRAZENECA PHARMACEUTICALS LP;  )  Complaint Filed: October 18, 2004
15 and ZENECA, INC.,                          )
                                             )  **DEFENDANT ZENECA INC.'S FIRST SET**
16              Defendants.                   )  **OF REQUESTS FOR PRODUCTION OF**
                                             )  **DOCUMENTS TO PLAINTIFF**
17                                           )  **KATHLEEN LEDWICK (NOS. 1-8)**
                                             )
18 _____       )

19

20 **PROPOUNDING PARTY:**      Defendant ZENECA INC.

21 **RESPONDING PARTY:**       Plaintiff KATHLEEN LEDWICK

22 **SET NUMBER:**             One (1)

23

24     Pursuant to California Code of Civil Procedure section 2031.010, Defendant Zeneca Inc.

25 hereby requests that Plaintiff Kathleen Ledwick (1) serve a written response to this First Set of

26 Requests for Production (Nos. 1-8) as required by section 2031.210 and (2) produce for inspection

27 and copying the documents requested below that are within his possession, custody, or control, on

28 December 1, 2005, at 10:00 a.m., at the offices of Sidley Austin Brown & Wood LLP, 555 West

---

**DEFENDANT ZENECA INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO
PLAINTIFF KATHLEEN LEDWICK (NOS. 1-8)**

1  Fifth Street, Suite 4000, Los Angeles, California 90013, or at such other time and place as may be

2  agreed upon by counsel.

3                                   **Definitions**

4         Notwithstanding any definition set forth below, each word, term, or phrase used in these

5  requests is intended to have the broadest meaning permitted under the California Rules of Civil

6  Procedure. As used in these requests, the following terms are to be interpreted in accordance with

7  these definitions:

8         1.      "And," "Or," "Any," "Each," and "All" shall be construed in their broadest form.

9         2.      "ASTRAZENECA" shall mean AstraZeneca Pharmaceuticals LP and Zeneca Inc.

10        3.      "COMMUNICATION" shall mean the transmission or transfer of information of any

11 kind, orally, in writing, or in any other manner, at any time or place, and under any circumstances

12 whatsoever, including without limitation telephone conversations, letters, memoranda,

13 advertisements, electronic mail, notes, notes of meetings, summaries, photographs, motion pictures,

14 audio tapes, video tapes, computer telecommunications, electronic or magnetic media, or other

15 materials or memorials or communication, meetings or any occasions of joint or mutual presence, as

16 well as the transfer of any document from one PERSON to another.

17        4.      "DOCUMENT(S)" shall include anything falling within the definition of "writing"

18 under Evidence Code section 250, and includes, without limitation, the original and all copies of all

19 written, printed, typed, electronic, computer, or otherwise recorded matter, however produced or

20 reproduced, of every kind and description, in whatever form (e.g., final or draft versions), including,

21 but not limited to, all writings, contracts, policy statements, manuals, telephone messages, checks,

22 correspondence, letters, electronic mail or email messages, telegrams, notes, mailgrams, minutes of

23 any meetings, agendas, memoranda, interoffice communications, reports, studies, forecasts, project

24 analyses, working papers, charts, expense account reports, ledgers, journals, financial statements,

25 statements of accounts, calendars, appointment books, diaries, drawings, graphs, photographs, sound

26 recordings, materials stored on electronic media such as computer discs or hard drives, or any other

27 tangible things. "DOCUMENT(S)" shall also mean originals and copies of all of the above upon

28 which notations in writing, print, or otherwise have been made which do not appear on the originals.

-2-

1      5.     DOCUMENTS that "refer or relate to" a specified topic or topics shall include all

2 DOCUMENTS that mention, describe, discuss, memorialize, concern, constitute, contain, evidence,

3 reflect, depict, or refer in any way, whether or not on the face of the DOCUMENT, directly or

4 indirectly, to the specified topic or topics.

5      6.     "HEALTHCARE PROVIDER" shall mean any doctor, nurse practitioner, hospital,

6 clinic, pharmacy, or any other PERSON who has provided healthcare services or consultation to

7 YOU.

8      7.     "NEXIUM" shall mean NEXIUM® (esomeprazole magnesium).

9      8.     "OTHER PPI" shall mean ACIPHEX® (rabeprazole sodium), PREVACID®

10 (lansoprazole), PROTONIX® (pantoprazole sodium), and generic omeprazole.

11      9.     "PERSON(S)" shall mean natural persons, proprietorships, corporations,

12 partnerships, trusts, joint ventures, groups, associations, and organizations, and any other entity,

13 whether real or fictitious, included within the meaning of "person" set forth in California Evidence

14 Code § 175.

15      10.    "PRILOSEC" shall mean PRILOSEC® (omeprazole).

16      11.    "PRILOSEC OTC" shall mean Prilosec OTC™ (omeprazole magnesium).

17      12.    "YOU" or "YOUR" shall mean Kathleen Ledwick.

18                    **Instructions**

19      1.     If, in responding to these requests, YOU encounter any ambiguities when construing

20 a request, definition, or instruction, the response shall set forth the matter deemed ambiguous and the

21 construction used in responding.

22      2.     If production of any requested DOCUMENT(S) or thing(s) is objected to on the

23 grounds that production is unduly burdensome, describe the burden or expense of the proposed

24 discovery.

25      3.     Each Request seeks production of a DOCUMENT or thing in its entirety, without

26 abbreviation or expurgation, including all attachments, or other matters affixed thereto.

27      4.     All DOCUMENTS and things produced by YOU in response to this Request shall

28 include a production number.

**DEFENDANT ZENECA INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO
PLAINTIFF KATHLEEN LEDWICK (NOS. 1-8)**

1         5.     Pursuant to Civil Procedure section 2031.280, YOU are obligated to produce or make

2    available for inspection all DOCUMENTS responsive to this Request, as those DOCUMENTS are

3    kept in the usual course of business or shall organize and label those DOCUMENTS to correspond

4    with the categories in this Request.

5         6.     These Requests apply to all DOCUMENTS and things in YOUR possession, custody

6    or control, or otherwise known or available to YOU, regardless of their location and regardless of

7    whether such DOCUMENTS are held, known by or available to any of YOUR agents, employees,

8    representatives, attorneys, or any other PERSON.

9         7.     The singular shall be construed to include the plural, and the plural shall be construed

10   to include the singular, as necessary to bring within the scope of these Requests any DOCUMENTS

11   that might otherwise be construed to fall outside the scope of these Requests.

12        8.     The present tense shall be construed to include the past tense, and the past tense shall

13   be construed to include the present tense, as necessary to bring within the scope of these Requests

14   any DOCUMENTS that might otherwise be construed to be outside the scope of these Requests.

15        9.     More than one Request herein may ask for the same DOCUMENT. Such duplication

16   is not to be interpreted to narrow or limit the normal interpretation placed upon each individual

17   Request.

18        10.     In accordance with Code of Civil Procedure section 2031.240, where a claim of

19   privilege is asserted in objecting to any Request or part thereof, and any DOCUMENT is not

20   provided on the basis of such assertion:

21                  (1) in asserting the privilege, YOU shall, in the objection to the

22                  Request, or part thereof, identify with specificity the nature of the

23                  privilege (including work product) that is being claimed; and

24
25                  (2) identify that DOCUMENT, supplying the following information:

               (a) the name of the author, writer, sender, or initiator of each copy of

26                  the DOCUMENT; (b) the name of each recipient, addressee, or party

27                  who obtained a copy of the DOCUMENT; (c) the date of each copy of

28

-4-

1    the DOCUMENT or, if no date appears on the DOCUMENT, an

2    estimate thereof, indicated as an estimate; (d) a description of the

3    DOCUMENT, including but not limited to the subject matter, title and

4    number of pages of the DOCUMENT; (e) a statement of the basis of

5    the claim of privilege; (f) the particular Request herein to which the

6    DOCUMENT is responsive; (g) the PERSON(S) in whose custody

7    each copy of the DOCUMENT is presently located; (h) where not

8    apparent, the relationship of the author, writer, sender, initiator,

9    addressee, custodian, and any other recipient to each other; and (i)

10    whether any matter that is not privileged or not work product is

11    discussed or mentioned in the DOCUMENT.

12

13    11.    In accordance with Code of Civil Procedure section 2031.240, if only a portion of any

14    DOCUMENT requested herein is subject to a privilege or work product protection, produce each

15    and every portion of such DOCUMENT for which privilege or work product protection is not

16    claimed.  Similarly, in the event an objection is made to any Request or part thereof, produce all

17    DOCUMENTS in the category requested to the full extent that such production would not be subject

18    to the objection.

19    12.    In responding to these Requests, produce all DOCUMENTS within YOUR

20    possession, custody or control at the time of production, including but not limited to DOCUMENTS

21    in the possession, custody or control of YOUR attorneys.

22    13.    To the extent that YOU believe that DOCUMENTS sought by these Requests raise

23    privacy concerns, ASTRAZENECA is willing to enter into a mutually agreeable confidentiality

24    order that complies with the Health Insurance Portability and Accountability Act of 1996.

25                                         **Requests**

26    **REQUEST FOR PRODUCTION NO. 1:**

27    All DOCUMENTS that refer or relate to each fact called for by each interrogatory in Zeneca

28    Inc.'s concurrently-served First Set of Interrogatories to Plaintiff Kathleen Ledwick.

-5-

1  **REQUEST FOR PRODUCTION NO. 2:**

2      All DOCUMENTS that support YOUR contention that YOU purchased, paid for, or

3  otherwise obtained NEXIUM.

4  **REQUEST FOR PRODUCTION NO. 3:**

5      All DOCUMENTS that refer or relate to any prescription that YOU received for NEXIUM,

6  PRILOSEC, PRILOSEC OTC, or any OTHER PPI.

7  **REQUEST FOR PRODUCTION NO. 4:**

8      All DOCUMENTS that refer or relate to any advertisement for NEXIUM.

9  **REQUEST FOR PRODUCTION NO. 5:**

10      All DOCUMENTS that refer or relate to YOUR health insurance coverage for NEXIUM,

11  PRILOSEC, PRILOSEC OTC, or any OTHER PPI between the January 1, 2000 and the present

12  date, including, but not limited to, DOCUMENTS that refer or relate to any co-payment or

13  deductible under YOUR health insurance plan for NEXIUM, PRILOSEC, PRILOSEC OTC, or any

14  OTHER PPI.

15  **REQUEST FOR PRODUCTION NO. 6:**

16      All DOCUMENTS that refer or relate to any COMMUNICATION between YOU and

17  ASTRAZENECA.

18  **REQUEST FOR PRODUCTION NO. 7:**

19      All DOCUMENTS that refer or relate to any COMMUNICATION between YOU and

20  YOUR HEALTHCARE PROVIDER regarding NEXIUM, PRILOSEC, PRILOSEC OTC or any

21  OTHER PPI.

22  **REQUEST FOR PRODUCTION NO. 8:**

23      All DOCUMENTS that refer or relate to any medical treatment that you received between

24  January 1, 2000 and the present date.

25

26

27

28

**DEFENDANT ZENECA INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF KATHLEEN LEDWICK (NOS. 1-8)**

1

2   Dated:  November 1, 2005             SIDLEY AUSTIN BROWN & WOOD LLP

3

4                               By: _____

                                    Mark E. Haddad

5                                    Attorneys For Defendant Zeneca Inc.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-7-

1                                    <u>PROOF OF SERVICE</u>

2    STATE OF CALIFORNIA            )
                                    )  ss
3    COUNTY OF LOS ANGELES          )

4

5            I am employed in the County of Los Angeles, State of California. I am over the age

6    of 18 and not a party to the within action.   My business address is Sidley Austin Brown & Wood

7    LLP, 555 West Fifth Street, Suite 4000, Los Angeles, California 90013-1010.

8            On November 1, 2005, I served the foregoing document described as **DEFENDANT**

9    **ZENECA INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO**

10   **PLAINTIFF KATHLEEN LEDWICK (NOS. 1-8)** by E-MAIL on all interested parties in this

11   action as follows:

12                                   **PLAINTIFF(S)**

13   Elaine T. Byszewski
14   HAGENS BERMAN SOBOL SHAPIRO LLP
     700 South Flower Street, Suite 2940
15   Los Angeles, CA 90017-4101
     Tel: (213) 330-7150
16   Elaine@hbsslaw.com

17   Steve W. Berman
18   HAGENS BERMAN SOBOL SHAPIRO LLP
     1301 Fifth Avenue, Suite 2900
19   Seattle, WA 98101
     Tel: (206) 623-7292
20   Steve@hbsslaw.com

21   Thomas M. Sobol
22   HAGENS BERMAN SOBOL SHAPIRO LLP
     One Main Street, 4th Floor
23   Cambridge, MA 02142
     Tel:  (617) 482-3700
24   Tom@hbsslaw.com

25   ///

26   ///

27

28

1

**DEFENDANT(S)**

2

3

4

5

6

7

8

Peter I. Ostroff
Mark E. Haddad
Alycia A. Degen
Sidley Austin Brown & Wood LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013-1010
Tel:  213-896-6000
Fax: 213-896-6600
postroff@Sidley.com
mhaddad@Sidley.com
adegen@Sidley.com

9

10

        I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

11

        Executed on November 1, 2005, at Los Angeles, California.

12

13

14

                                                    _____
                                                                Masa Brown

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF SERVICE VIA E-MAIL

I, the undersigned, declare:

That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of Los Angeles, over the age of 18 years, and not a party to or interested in the within action; that declarant's business address is 700 South Flower Street, Suite 2940, Los Angeles, California 90017-4101.

On April 28, 2006, I served the foregoing document(s) described as **JOINT DISCOVERY STATEMENT** by E-MAIL on all interested parties in this action set forth in the attached **Service List**.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 28th day of April, 2006, at Los Angeles, California.

MICHAEL KEMPLE

# SERVICE LIST

**AFL-CIO ET AL. V. ASTRAZENECA PHARMACEUTICALS LP, ET AL.**
BC323107
Dept 324

**LEDWICK V. ASTRAZENECA PHARMACEUTICALS LP, ET AL.**
BC324518
Dept 324

Central Civil West

## PLAINTIFF(S)

Elaine T. Byszewski
**Hagens Berman Sobol Shapiro LLP**
700 South Flower Street
Suite 2940
Los Angeles, CA 90017
Elaine@hbsslaw.com
(Via email)

Thomas M. Sobol
**Hagens Berman Sobol Shapiro LLP**
One Main Street, 4th Floor
Cambridge, MA 02142
Tom@hbsslaw.com
(Via email)

Ronald S. Goldser
**Zimmerman Reed, PLLP**
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
rsg@zimmreed.com
(Via email)

Steve W. Berman
Craig R. Spiegel
**Hagens Berman Sobol Shapiro LLP**
1301 Fifth Avenue
Suite 2900
Seattle, WA 98101
Steve@hbsslaw.com
(Via email)

Jason J. Thompson
**Charfoos & Christensen, P.C.**
5510 Woodward Avenue
Detroit, MI 48202
jthompson@c2law.com
(Via email)

## DEFENDANT(S)

Peter I. Ostroff
Mark E. Haddad
Catherine Valerio Barrad
Alycia A. Degan
Anne Mayer Turk
**Sidley Austin LLP**
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013-1010
Telephone: 213.896.6000
Facsimile: 213.896.6600
postroff@Sidley.com
cbarrad@Sidley.com
Mhaddad@sidley.com
Adegen@sidley.com
Aturk@Sidley.com
(Via email)

# Exhibit I

1  ELAINE T. BYSZEWSKI (SBN 222304)
   HAGENS BERMAN SOBOL SHAPIRO LLP
2  700 South Flower Street, Suite 2940
   Los Angeles, CA 90017-4101
3  Telephone: (213) 330-7150
   Facsimile: (213) 330-7152
4       -and-
   STEVE W. BERMAN
5  CRAIG R. SPIEGEL (SBN 122000)
   HAGENS BERMAN SOBOL SHAPIRO LLP
6  1301 Fifth Avenue, Suite 2900
   Seattle, WA 98101
7  Telephone: (206) 623-7292

8  Attorneys for Plaintiffs

9  [Additional Counsel Listed on Signature Page]

10              SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                 FOR THE COUNTY OF LOS ANGELES

12                  CENTRAL CIVIL WEST COURTHOUSE

13

| | |
|---|---|
| 14  JAMES WEISS, individually and on behalf of all)<br>others similarly situated,<br><br>15                               Plaintiff,<br><br>16       v.<br><br>17  ASTRAZENECA PHARMACEUTICALS LP;<br>and ZENECA INC.,<br><br>18                               Defendants.<br>19 | Case No. BC 323107<br><br>CLASS ACTION<br><br>**NOTICE AND REPORT FROM STATUS<br>CONFERENCE**<br><br>***Next Status Conference:***<br>Date: July 17, 2006<br>Time: 8:30 a.m.<br>Dep't: 324 [Hon. Victoria G. Chaney]<br><br>Complaint filed: October 18, 2004 |
| 20  KATHLEEN LEDWICK, individually and on<br>21  behalf of all others similarly situated,<br><br>22                               Plaintiff,<br><br>23       v.<br><br>24  ASTRAZENECA PHARMACEUTICALS LP;<br>and ZENECA INC.,<br><br>25                               Defendants.<br>26<br>27 | Case No. BC 324518<br><br>CLASS ACTION<br><br>**NOTICE AND REPORT FROM STATUS<br>CONFERENCE**<br><br>***Next Status Conference:***<br>Date: July 17, 2006<br>Time: 8:30 a.m.<br>Dep't: 324 [Hon. Victoria G. Chaney]<br><br>Complaint filed: November 15, 2004 |

28

On May 8, 2006 at 10:30 a.m., this complex case came on for a status conference before the Honorable Victoria G. Chaney in Department 324 of the above-referenced Court. Mr. Spiegel and Ms. Byszewski of Hagens Berman Sobol Shapiro LLP appeared for Plaintiffs James Weiss and Kathleen Ledwick. Mr. Ostroff of Sidley Austin LLP appeared on behalf of Defendants AstraZeneca Pharmaceuticals LP and Zeneca Inc. ("AstraZeneca").

During the Status Conference, the Court made the following rulings and set the following dates regarding issues presented in the Joint Discovery Statement, attached hereto as *Exhibit A*:

1. The Court approved the approach to additional productions by AstraZeneca to Plaintiffs' First Request for the Production of Documents agreed to by the parties in the Joint Discovery Statement;

2. The Court ruled that, with respect to Plaintiffs' Request for Production No. 6, the "documents relating to marketing objectives and themes" to be produced shall be limited, at this time, to include only the following documents, including communications regarding such documents: creative briefs, advertisements, marketing plans, and media plans;

3. The Court ruled that Defendants shall make further inquiry to confirm the existence or nonexistence of a "Shark Fin Project" pertaining to Nexium or Prilosec with the aim of providing a declaration confirming its nonexistence (if that is the case) to Plaintiffs;

4. The Court ruled that with respect to Plaintiffs' Request for Production No. 5 Defendants shall produce only copies of standard communications provided to third party payors not previously produced, if any;

5. The parties agreed and the Court ruled that Plaintiffs' CCP § 2025.230 depositions may go forward with respect to topics (a), (b), (g), (h), (i), and (j);

- 1 -

NOTICE AND REPORT FROM STATUS CONFERENCE

6.  The Court ruled that Plaintiffs' CCP § 2025.230 depositions may not go forward with respect to topic (f) at this time;

7.  The Court ruled that Plaintiffs' CCP § 2025.230 depositions may go forward as to doctors and consumers with respect to topics (c) and (e) but not as to "wholesalers," "purchasing groups" or "third party payors;" the parties shall meet and confer respecting the definitions of "managed care companies" and "pharmacy benefit managers" for the purpose of resolving AstraZeneca's relevance and burden objections;

8.  With respect to PMK deposition topic (d), the Court ruled that Defendants shall make further inquiry to confirm the existence or nonexistence of an AstraZeneca "Shark Fin Project" pertaining to Nexium or Prilosec with the aim of providing a declaration confirming its nonexistence (if that is the case) to Plaintiffs;

9.  The parties agreed and the Court ruled that Plaintiffs shall execute authorizations for the release of insurance records and authorizations for the release of medical records as set forth in the Joint Discovery Statement; and

10. The parties are to appear for a further status conference on July 17, 2006, at 8:30 a.m.

Respectfully submitted,

DATED: May 11, 2006

HAGENS BERMAN SOBOL SHAPIRO LLP

By _____
ELAINE T. BYSZEWSKI
700 South Flower St., Suite 2940
Los Angeles, CA 90017-4101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152

- 2 -

STEVE W. BERMAN
CRAIG R. SPIEGEL
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292

THOMAS W. SOBOL
HAGENS BERMAN SOBOL SHAPIRO LLP
One Main Street, 4th Floor
Cambridge, MA 02142

RONALD S. GOLDSER
ZIMMERMAN REED, PLLP
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402

JASON J. THOMPSON
CHARFOOS & CHRISTENSEN, P.C.
5510 Woodward Avenue
Detroit, MI 48202

*Attorneys for Plaintiffs in Both Actions*

- 3 -

NOTICE AND REPORT FROM STATUS CONFERENCE

# EXHIBIT A

1  CRAIG R. SPIEGEL (SBN 122000)
   ELAINE T. BYSZEWSKI (SBN 222304)
2  HAGENS BERMAN SOBOL SHAPIRO LLP
   700 South Flower Street, Suite 2940
3  Los Angeles, CA 90017-4101
   Telephone: (213) 330-7150
4  Facsimile: (213) 330-7152

5  Attorneys for Plaintiffs in Both Actions

6  [Additional Counsel Listed on Signature Page]

7  PETER I. OSTROFF (SBN 45718)
   ALYCIA A. DEGEN (SBN 211350)
8  SIDLEY AUSTIN LLP
   555 West Fifth Street, Suite 4000
9  Los Angeles, CA 90013-1010
   Telephone: (213) 896-6000
10 Facsimile: (213) 896-6600

11 Attorneys For Defendants In Both Actions

12

13               **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

14                    **FOR THE COUNTY OF LOS ANGELES**

15                    **CENTRAL CIVIL WEST COURTHOUSE**

16 JAMES WEISS, individually and on behalf of all )    Case No. BC 323107
   others similarly situated,                       )
17                              Plaintiff,           )    CLASS ACTION
                                                     )
18            v.                                      )    **JOINT DISCOVERY STATEMENT**
                                                     )
19 ASTRAZENECA PHARMACEUTICALS LP;                   )
   and ZENECA, INC.                                  )    Date: May 8, 2006
20                              Defendants.           )    Time: 10:30 a.m.
                                                     )    Dep't: 324 [Hon. Victoria G. Chaney]
21                                                    )
                                                     )
22 KATHLEEN LEDWICK, individually and on            )    Case No. BC 324518
   behalf of all others similarly situated,         )
23                                                    )    CLASS ACTION
                                Plaintiff,           )
24            v.                                      )    **JOINT DISCOVERY STATEMENT**
                                                     )
25 ASTRAZENECA PHARMACEUTICALS LP;                   )    Date: May 8, 2006
   and ZENECA, INC.                                  )    Time: 10:30 a.m.
26                              Defendants.           )    Dep't: 324 [Hon. Victoria G. Chaney]
                                                     )
27 ─────────────────────────────────── )

28

─────────────────────────────────────────────────────────────

1         Plaintiffs James Weiss and Kathleen Ledwick ("Plaintiffs") and Defendants AstraZeneca

2    Pharmaceuticals LP and Zeneca Inc. ("Defendants" or "AstraZeneca"), by counsel, hereby file their

3    Joint Discovery Statement, in advance of the further status conference scheduled for May 8, 2006,

4    at 10:30 a.m. as follows:

5    **I.    PLAINTIFFS' DOCUMENT REQUESTS**

6         Plaintiffs served their First Request for Production ("First RFP") on September 26, 2005. A

7    copy of those requests is attached hereto as ***Exhibit A***. AstraZeneca objected to Plaintiffs requests

8    on numerous grounds but had produced documents nonetheless. A copy of AstraZeneca's

9    Response is attached hereto as ***Exhibit B.*** The parties continued to disagree on various issues

10   regarding whether Plaintiffs were entitled to further production. Accordingly, the parties have

11   discussed a general approach whereby AstraZeneca will produce responsive documents pursuant to

12   a method intended to reduce unnecessary burden, expense, and duplication. This joint discovery

13   statement sets forth the general approach to which the parties have agreed and then discusses

14   particular issues, setting forth any remaining disputes between the parties.

15       **A.    General Approach**

16        Rather than require AstraZeneca to search every custodial file that could conceivably

17   contain responsive documents, the parties have discussed a general approach whereby they will

18   mutually endeavor to identify approximately ten individuals who had the most relevant

19   responsibility between 1999 and 2004 and are most likely to have relevant and non-duplicative

20   documents in their custodial files for each outstanding area of discovery. Plaintiffs acknowledge

21   that discovery is continuing and AstraZeneca is not currently in the position to definitively

22   determine those with the "most" relevant responsibility or "most" likely to have responsive

23   documents in their custodial file. AstraZeneca's willingness to attempt to identify such individuals

24   at this juncture does not imply a continuing obligation to reassess such identification. AstraZeneca

25   will provide Plaintiffs with the names, job titles, functions, departments, and time periods of the

26   identified individuals. Plaintiffs will supplement this information with knowledge gained from the

27   30(b)(6) deposition taken in the related Massachusetts litigation and cross-noticed in this litigation,

28   which cross-notice Plaintiffs have previously objected to. The parties will discuss these individuals

1    and then identify the appropriate custodial files to be searched for documents responsive to

2    Plaintiffs' requests.  AstraZeneca agrees to review additional custodial files upon reasonable

3    request from Plaintiffs, after Plaintiffs' review of the materials from the files of the individuals

4    referenced above and after the parties have met and conferred to determine the reasonableness of

5    Plaintiffs' request, in accordance with the spirit of the general approach set forth above.

6         Plaintiffs have agreed to receive responsive documents pursuant to the general approach

7    described above based on AstraZeneca's representation that discovery would otherwise be unduly

8    burdensome, expensive, time consuming and duplicative.  By agreeing to this approach, however,

9    Plaintiffs do not concede that AstraZeneca's position is correct and reserve the right to seek further

10    discovery.  Moreover, to the extent that AstraZeneca engages in review of documents in places

11    other than the custodial files selected pursuant to the general approach described herein *and* for the

12    purpose of locating documents that would be responsive to Plaintiffs' First RFP, it agrees to

13    provide Plaintiffs with any responsive document located by such review.

14         The following sections B, C, and D discuss application of this general approach of

15    identification and review of custodial files for each of the outstanding areas of discovery.

16    **B.    Documents Re Marketing Objectives And Themes**

17         Plaintiffs' First RFP No. 6 seeks documents regarding marketing objectives and themes.

18    AstraZeneca is willing to produce responsive documents subject to the general approach discussed

19    above.  AstraZeneca's marketing objectives and themes were directed at consumers, healthcare

20    professionals, and managed care organizations.  To locate sufficient documents responsive to

21    Plaintiffs' requests, it will be necessary, at a minimum, to search the custodial files of at least ten

22    individuals for each of those three areas.

23         In order to review the selected custodial files, AstraZeneca requested Plaintiffs to provide

24    specificity as to the meaning of "documents relating to marketing objectives and themes," but did

25    not agree with Plaintiffs' stated specificity.  Therefore, the following paragraphs set forth the

26    parties' contentions on how that phrase should be interpreted.

27    ***Plaintiffs' Contention***:  Plaintiffs contend that "documents relating to marketing objectives

28    and themes" means those documents that constitute or relate to, including communications

- 2 -

1    regarding, market research, marketing concepts, creative briefs, advertisements, approval thereof,

2    media plans, marketing plans, and any other internal strategy plan regarding the marketing of

3    Nexium.

4        ***AstraZeneca's Contention***:  AstraZeneca contends that "documents relating to marketing

5    objectives and themes"should be limited to the following documents, including communications

6    regarding such documents:  marketing plans, media plans, advertisements and creative briefs.

7        Additionally, Plaintiffs specifically requested AstraZeneca to provide documents regarding

8    the "Shark Fin Project."  The following paragraphs set forth the parties' contentions regarding

9    production of such documents.

10        ***Plaintiffs' Contention***:  The "Shark Fin Project" was the genesis of AstraZeneca's

11    marketing strategy for Nexium.  Counsel for AstraZeneca assert that no documents exist that refer

12    to such a project by name but admit that they have not made inquiry as to whether anyone at

13    AstraZeneca acknowledges participation in the "Shark Fin Project."  Plaintiffs contend that inquiry

14    should be made as to who was involved in the "Shark Fin Project" so that their custodial files can

15    be reviewed for responsive documents consistent with the general approach.

16        ***AstraZeneca's Contention***:  AstraZeneca agrees to make an inquiry as to whether anyone

17    at AstraZeneca acknowledges participation in anything referred to as the "Shark Fin Project."

18        **C.    Communications With Sales Employees**

19        Plaintiffs' First RFP No. 10 seeks communications with sales employees.  AstraZeneca is

20    willing to produce responsive documents subject to the general approach discussed above.

21    AstraZeneca has generally described for Plaintiffs the current structure of the healthcare provider

22    sales force to Plaintiffs with the understanding that a similar structure has been in place since the

23    launch of Nexium:  today the state of California contains nine sales districts (managed by District

24    Sales Managers ("DSMs")), each of which is part of the same Region (managed by Regional Sales

25    Directors ("RSDs")).  Consistent with the general approach outlined above, AstraZeneca will work

26    with Plaintiffs to identify the custodian files to be reviewed for responsive documents.   The

27    custodians identified may, subject to Plaintiffs' selection, include individuals who managed the

28    sales specialists.

---

- 3 -

1       Additionally, AstraZeneca will produce to Plaintiffs the "Nexium Learning System," and

2   the sales training materials indexed in eSTaR, which will include materials from the Hawaii launch

3   training.  However, AstraZeneca has explained that materials from the Hawaii launch training will

4   not be identified as such in eSTaR.  Accordingly, AstraZeneca will work with Plaintiffs to identify

5   individuals whose custodial files will provide information as to which sales training materials

6   constitute those used at the Hawaii launch training.

7       **D.    Communications To And From Doctors**

8       Plaintiffs' First RFP No. 2 seeks communications to and from doctors.  AstraZeneca is

9   willing to produce responsive documents subject to the general approach discussed above.

10      Also, AstraZeneca has produced the 182 standard responses to the Professional Information

11  Requests ("PIRs") to Plaintiffs.  AstraZeneca has informed Plaintiffs that it has the capability to

12  identify which PIR responses were sent to California doctors.  Plaintiffs have requested and

13  AstraZeneca has agreed to identify which PIR responses were sent to Plaintiffs' doctors.

14  Thereafter, Plaintiffs will assess whether they need AstraZeneca to identify which PIR responses

15  were sent to all other California doctors.

16      Additionally, AstraZeneca has confirmed that it has a database that collects the call notes of

17  the sales representatives who call on healthcare providers which permits identification of the call

18  notes entered by the sales representatives responsible for promoting Nexium to healthcare

19  professionals in California.  Plaintiffs have requested and AstraZeneca has agreed to produce all

20  such call notes for calls made on Plaintiffs' healthcare professionals.  The parties will also discuss

21  how Plaintiffs might receive a representative slice of the database with respect to California sales

22  call notes without Plaintiffs now requesting all such California call notes, in accordance with the

23  spirit of the general approach (as the parties are dealing with a database rather than custodial files).

24  Thereafter, Plaintiffs will assess whether they need AstraZeneca to produce all call notes for calls

25  made on healthcare professionals in California to promote Nexium.

26  ///

27  ///

28  ///

- 4 -

1       **E.    Communications With Third-party Payors ("TPPs")**

2           Plaintiffs' First RFP No. 5 seeks communications with TPPs such as insurance companies

3       and health maintenance organizations. AstraZeneca disputes whether documents responsive to this

4       request are relevant to class certification or at all.

5           *__Plaintiffs' Contention__*: Plaintiffs contend that discovery of communications with TPPs is

6       necessary because (1) to the extent that the messages communicated to consumers/physicians and

7       TPPs were the same there will be sufficient predominance of common questions for class

8       certification to include the latter and (2) such discovery is necessary even if the proposed class did

9       not include TPPs, in order to show that AstraZeneca engaged in a common course of conduct to

10      cause consumers to purchase Nexium rather than Prilosec. AstraZeneca urged TPPs to place

11      Nexium on their formularies in order to increase sales of Nexium, as well as to convince TPPs to

12      pay for Nexium instead of Prilosec. AstraZeneca's communications with TPPs regarding Nexium

13      were part and parcel of its communications with doctors, TPPs and consumers to increase the sales

14      of Nexium. Thus, this information is relevant even if TPPs were not alleged to be class members.

15      Moreover, any concerns regarding the adequacy and typicality of the current class representatives

16      should be raised at the class certification stage of proceeding.

17          *__AstraZeneca's Contention__*:    AstraZeneca has produced to Plaintiffs its NEXIUM®

18      Formulary Submission Dossier, which is information that AstraZeneca supplies to TPPs and other

19      managed care organizations in order to provide information about Nexium to them, for the purpose

20      of being included on their formulary lists. AstraZeneca has also produced its standard contracts

21      relating to Nexium between AstraZeneca and TPP or other managed care organizations.

22      AstraZeneca contends that any further discovery regarding communications with TPPs is

23      inappropriate because TPPs are not properly part of this case. With the exception of Plaintiffs'

24      class definitions, there are no allegations relating to TPPs in Plaintiffs' Complaints. *See,* e.g.,

25      *Advanced Modular Sputtering, Inc. v. Superior Court*, 132 Cal.App.4th 826, 835 (2005) ("the

26      allegations of a complaint limit discovery in. . . civil actions"). Furthermore, as consumers,

27      Plaintiffs Weiss and Ledwick cannot be adequate or typical class representatives for TPPs.

28      Apparently, the Plaintiffs claim that AstraZeneca falsely advertised Nexium, that the false

-5-

1    advertising caused them to purchase Nexium and that they were injured as a result of their purchase

2    of Nexium.  Proof of these facts would not establish a claim on behalf of any TPP.  Given the

3    burden and expense that Plaintiffs' RFP No. 5 would impose on AstraZeneca, this discovery which

4    does not relate to the issues in this case should not be conducted.

5         **F.    Communications To TPPs, Doctors, Or Consumers Re Superiority Of Nexium**

6         Plaintiffs' First RFP Nos. 8 and 9 seek communications to TPPs, doctors, or consumers

7    regarding the alleged superiority of Nexium.  The parties have agreed that the responses to RFP

8    Nos. 8 and 9 with respect to TPPs and doctors are subsumed within the responses to RFP Nos. 2

9    and 5, set forth in Sections D and E above.  As to consumers, additional custodians will have to be

10   identified in accordance with the general approach.

11        Also, as part of the meet and confer process, Plaintiffs have requested that AstraZeneca

12   inform them of any database that record inquiries made by consumers and AstraZeneca has agreed

13   to do so.

14   **II.    PLAINTIFFS' PMK DEPOSITIONS**

15        On April 6, 2006, Plaintiffs noticed the deposition of the person most knowledgeable at

16   AstraZeneca regarding ten marketing-related topics, designated (a)-(j).  A copy of that notice is

17   attached hereto as ***Exhibit C***.  The parties have met and conferred regarding three issues raised by

18   AstraZeneca.  The following paragraphs discuss the parties' contentions regarding those three

19   issues:

20        ***AstraZeneca's Contention***:  First, topics (c), (e), and (f) seek discovery related to not only

21   TPPs, but also other entities, including "wholesalers, purchasing groups, and pharmacy benefit

22   managers."  The reasons articulated by AstraZeneca in Section I(E) above with respect to the

23   inappropriateness of extensive discovery regarding TPPs apply with even greater force with respect

24   to wholesalers, purchasing groups, and pharmacy benefit managers because neither the Plaintiffs

25   nor any of the named plaintiffs in any related action is a wholesaler, purchasing group, or

26   pharmacy benefit manager, and Plaintiffs' complaints contain no allegations concerning those

27   types of entities.  Plaintiffs cannot be adequate or typical representatives for such entities.

28

1    Second, with respect to topic (d), AstraZeneca cannot produce a witness respecting the so

2    called, undefined, and unexplained "Shark Fin Project."

3    Third, AstraZeneca's refinement of the terms "plan and themes" discussed in Section I(B)

4    above should apply to topics (e)-(i).

5    ***Plaintiffs' Contention***:  First, as discussed in Section I(E) above, Plaintiffs contend that

6    discovery of communications with TPPs is necessary because (1) to the extent that the messages

7    communicated to consumers/physicians and TPPs were the same there will be sufficient

8    predominance of common questions for class certification to include the latter and (2) such

9    discovery is necessary even if the proposed class did not include TPPs, in order to show that

10    AstraZeneca engaged in a common course of conduct to cause consumers to purchase Nexium

11    rather than Prilosec.

12    Second, Plaintiffs contend that the genesis of AstraZeneca's strategy and marketing

13    message for Nexium was with the Shark Fin Project, which is an important aspect of the common

14    course of conduct alleged by Plaintiffs.

15    Third, Plaintiffs' refinement of the phrase "plan and themes" discussed in Section I(B)

16    above should apply to topics (e)-(i).

17    The parties agree that the PMK depositions should commence, subject to the availability of

18    appropriate witnesses and after the production of the documents referenced above, on mutually

19    convenient dates and place(s) in May 2006, if possible.

20    **III.    DEFENDANTS' DOCUMENT REQUESTS**

21    **A.    Insurance Records**

22    AstraZeneca has requested that Plaintiffs execute authorizations for the release of their

23    insurance records.  A copy of Defendant Zeneca Inc.'s First Set of Requests for Production is

24    attached as ***Exhibit D.***  For Plaintiff Ledwick, AstraZeneca intends to subpoena insurance records

25    from Blue Cross Blue Shield of Illinois.  For Plaintiff Weiss, AstraZeneca intends to subpoena

26    insurance records Advantek Benefit Administrators and Aetna Health of California, Inc.  Plaintiffs

27    do not object to the execution of authorizations for the release of insurance records, so AstraZeneca

28    may discover the terms of the named plaintiffs' prescription drug coverage.   Any subpoena

1    directed at an insurance company for which a named plaintiff has provided an authorization will be

2    limited to requesting the terms of such prescription drug coverage, unless the parties subsequently

3    agree to a broader scope of permissible discovery.  However, AstraZeneca may also seek medical

4    records from these insurance companies, to the extent they have them, consistent with language

5    discussed below.

6        The parties agree that all plaintiff-specific documents obtained from their insurance

7    companies will be deemed designated as "Confidential" within the meaning of the Agreed

8    Protective Order Regarding Confidential Information entered in the actions, notwithstanding

9    paragraph 8 of said Protective Order.

10        **B.    Medical Records**

11        AstraZeneca has requested that Plaintiffs execute authorizations for the release of their

12    medical records.  For Plaintiff Ledwick, AstraZeneca intends to subpoena medical records from Dr.

13    Robert L. Andrews, Dr. J. Michael Gospe, Dr. Paul W. Hornberger, Dr. L. Wayne Keiser, Dr.

14    Michael A. Lustberg, Dr. Bruce N. Tucker, and Dr. Harvey Young.  For Plaintiff Weiss,

15    AstraZeneca intends to subpoena medical records from Dr. Ajit Arora, Dr. Terril A. Efrid, Dr.

16    Michel Gen, Dr. Phil Lugo, Dr. John R. Nelson, Dr. Brenda J. Regier, and Dr. Mary A. Sadlek.

17        Plaintiffs have objected to such third-party discovery on relevancy and privacy grounds.

18    Notwithstanding those objections, as part of the meet and confer process, Plaintiffs have agreed to

19    execute such authorizations for the release of medical records.    Any subpoena directed at

20    healthcare provider for which a named plaintiff has provided an authorization will be limited to

21    requesting "any medical treatment or consultation with healthcare providers between January 1,

22    2000 and the present date regarding any of the following conditions: dyspepsia, heartburn,

23    gastroesophageal reflux disease, acid reflux, esophagitis, erosive esophagitis, gastric or duodenal

24    ulcers, h. pylori infection, epigastric pain, stomach pain, esophageal pain, and stomach or

25    esophageal complaints or disorders of any kind and any symptoms related thereto," unless the

26    parties subsequently agree to a broader scope of discovery.

27        The parties agree that any plaintiff-specific documents obtained from healthcare providers

28    will be deemed designated as "Confidential" within the meaning of the Agreed Protective Order

- 8 -

1  Regarding Confidential Information entered in the actions, notwithstanding paragraph 8 of said

2  Protective Order.

3          DATED:  April 28, 2006

                                        HAGENS BERMAN SOBOL SHAPIRO LLP
4

5

          By
6          ELAINE T. BYSZEWSKI
           700 South Flower Street, Suite 2940
7          Los Angeles, CA  90017-4101
           Telephone:  (213) 330-7150
8
           STEVE W. BERMAN
9          CRAIG R. SPIEGEL
           HAGENS BERMAN SOBOL SHAPIRO LLP
10         1301 Fifth Avenue, Suite 2900
           Seattle, WA  98101
11         Telephone:  (206) 623-7292

12         THOMAS M. SOBOL
           HAGENS BERMAN SOBOL SHAPIRO LLP
13         One Main Street, 4th Floor
           Cambridge, MA  02142
14
           RONALD S. GOLDSER
15         ZIMMERMAN REED, PLLP
           651 Nicollet Mall, Suite 501
16         Minneapolis, MN 55402

17         JASON J. THOMPSON
           CHARFOOS & CHRISTENSEN, P.C.
18         5510 Woodward Avenue
           Detroit, MI  48202
19
           *Attorneys for Plaintiffs in Both Actions*
20
21         DATED:  April 28, 2006

                                        SIDLEY AUSTIN LLP
21

22

23         By
           PETER I. OSTROFF
24         MARK E. HADDAD
           ALYCIA A. DEGEN
25         ANNE MAYER TURK
           555 West Fifth Street, Suite 4000
26         Los Angeles, CA 90013-1010
           Telephone:  (213) 896-6000
27
           *Attorneys for Defendants in Both Actions*
28

                              - 9 -

                    JOINT DISCOVERY STATEMENT

1 | Regarding Confidential Information entered in the actions, notwithstanding paragraph 8 of said

2 | Protective Order.

3 |      DATED: April 28, 2006

HAGENS BERMAN SOBOL SHAPIRO LLP

4

5

6 | By_____
ELAINE T. BYSZEWSKI
700 South Flower Street, Suite 2940

7 | Los Angeles, CA 90017-4101
Telephone: (213) 330-7150

8

9 | STEVE W. BERMAN
CRAIG R. SPIEGEL
HAGENS BERMAN SOBOL SHAPIRO LLP

10 | 1301 Fifth Avenue, Suite 2900
Seattle, WA 98101

11 | Telephone: (206) 623-7292

12 | THOMAS M. SOBOL
HAGENS BERMAN SOBOL SHAPIRO LLP

13 | One Main Street, 4th Floor
Cambridge, MA 02142

14

15 | RONALD S. GOLDSER
ZIMMERMAN REED, PLLP
651 Nicollet Mall, Suite 501

16 | Minneapolis, MN 55402

17 | JASON J. THOMPSON
CHARFOOS & CHRISTENSEN, P.C.

18 | 5510 Woodward Avenue
Detroit, MI 48202

19

*Attorneys for Plaintiffs in Both Actions*

20 |      DATED: April 28, 2006

21 | SIDLEY AUSTIN LLP

22

23 | By _____
PETER I. OSTROFF

24 | MARK E. HADDAD
ALYCIA A. DEGEN

25 | ANNE MAYER TURK
555 West Fifth Street, Suite 4000

26 | Los Angeles, CA 90013-1010
Telephone: (213) 896-6000

27

*Attorneys for Defendants in Both Actions*

28

- 9 -

JOINT DISCOVERY STATEMENT

1

**DECLARATION OF SERVICE**

2        I, the undersigned, declare:

3        That declarant is and was, at all times herein mentioned, a citizen of the United States and a

4   resident of the County of Los Angeles, over the age of 18 years, and not a party to or interested in

5   the within action; that declarant's business address is 700 South Flower Street, Suite 2940, Los

6   Angeles, California 90017-4101.

7        On May 11, 2006, I served the foregoing document(s) described as **NOTICE AND REPORT**

8   **FROM STATUS CONFERENCE** on all interested parties in this action.

9   [X]    **BY EMAIL**

10        I caused the above listed documents to be served by E-MAIL from Kalyn Baker to the

11        email addresses set forth on the attached service list.

12        I declare under penalty of perjury that the foregoing is true and correct. Executed this 11th

13   day of May, 2006, at Los Angeles, California.

14

15

16                                         KALYN BAKER

17

18

19

20

21

22

23

24

25

26

27

28

# SERVICE LIST

AFL-CIO ET AL. V. ASTRAZENECA PHARMACEUTICALS LP, ET AL.
BC323107
Dept 324

LEDWICK V. ASTRAZENECA PHARMACEUTICALS LP, ET AL.
BC324518
Dept 324

Central Civil West

## PLAINTIFF(S)

Elaine T. Byszewski
**Hagens Berman Sobol Shapiro LLP**
700 South Flower Street
Suite 2940
Los Angeles, CA 90017
Elaine@hbsslaw.com
(Via email)

Thomas M. Sobol
**Hagens Berman Sobol Shapiro LLP**
One Main Street, 4th Floor
Cambridge, MA 02142
Tom@hbsslaw.com
(Via email)

Ronald S. Goldser
**Zimmerman Reed, PLLP**
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
rsg@zimmreed.com
(Via email)

Steve W. Berman
Craig R. Spiegel
**Hagens Berman Sobol Shapiro LLP**
1301 Fifth Avenue
Suite 2900
Seattle, WA 98101
Steve@hbsslaw.com
(Via email)

Jason J. Thompson
**Charfoos & Christensen, P.C.**
5510 Woodward Avenue
Detroit, MI 48202
jthompson@c2law.com
(Via email)

## DEFENDANT(S)

Peter I. Ostroff
Mark E. Haddad
Catherine Valerio Barrad
Alycia A. Degan
Anne Mayer Turk
**Sidley Austin LLP**
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013-1010
Telephone: 213.896.6000
Facsimile: 213.896.6600
postroff@Sidley.com
cbarrad@Sidley.com
Mhaddad@sidley.com
Adegen@sidley.com
Aturk@Sidley.com
(Via email)

# <u>Exhibit J</u>

LAW OFFICES
## ODOM & DES ROCHES, LLP
A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

SUITE 2020, POYDRAS CENTER
650 POYDRAS STREET
NEW ORLEANS, LA 70130
TELEPHONE (504) 522-0077
FAX (504) 522-0078

217 WEST MAIN STREET
P.O. BOX 523
HAHIRA, GA 31632
TELEPHONE (229) 794-3412
FAX (229) 794-3544

April 18, 2007

John W. Treece, Esq.                                    *Via Facsimile and U.S. Mail*
*Sidley Austin LLP*
One South Dearborn
Chicago, IL 60603

Re:    ***Louisiana Wholesale Drug Co., Inc. v. AstraZeneca
       Pharmaceuticals, L.P., et al.*; United States District
       Court, District of Columbia; Civil Case No. 06-cv-02157**

Dear Mr. Treece:

I represent Louisiana Wholesale Drug Co., Inc. ("LWD"), and the putative class of direct purchasers, in the above-captioned matter. It is my understanding that your client, AstraZeneca, produced documents relating to Nexium® in the matter captioned *James Weiss, et al. v. AstraZeneca Pharmaceuticals LP, et al.*, currently proceeding in Los Angeles, California, Case No. BC 323107 (the "California matter"). From our review of the document requests and responses in the California matter, we believe those documents are relevant to the instant matter. Also, according to the terms of the protective order in the California matter, the documents produced by AstraZeneca were clearly produced with the understanding that they could also be produced in cases such as the one brought by LWD. For example, paragraph 3.a. of the Agreed Protective Order Regarding Confidential Information states, in pertinent part:

> The parties agree that Discovery Material will be used only for the litigation of [the California matter], including any appeal of this Litigation, and for any other action brought by or on behalf of a [sic] an individual or organization that has used, purchased or reimbursed for Nexium alleging injuries or other damages from the marketing, sale, use or purchase of Nexium, so long as all parties have agreed to be governed by the terms of this Order.

In light of the above, and in order to alleviate any burden on AstraZeneca, we are willing to attempt to obtain, at our cost, copies of the documents produced by AstraZeneca in the California matter from plaintiffs' counsel in that matter. We will also agree to abide by the Agreed Protective Order Regarding Confidential Information from the California matter, until a substantively identical protective order is entered in this matter.

LAW OFFICES
ODOM & DES ROCHES, LLP

 

 

Please let me know within five days if you will consent to the production of these documents.  Please feel free to contact me should you wish to discuss this matter further.  With kind regards, I am

Sincerely Yours,

*Stuart E. Des Roches*
by aa

Stuart E. Des Roches

cc:  Barry Taus
     Joseph T. Lukens
     Scott Perwin
     Lauren Ravkind
     Linda P. Nussbaum

# Exhibit K



| | |
|---|---|
| SIDLEY AUSTIN LLP | BEIJING    GENEVA    SAN FRANCISCO |
| 555 WEST FIFTH STREET | BRUSSELS    HONG KONG    SHANGHAI |
| LOS ANGELES, CA 90013 | CHICAGO    LONDON    SINGAPORE |
| (213) 896 6000 | DALLAS    LOS ANGELES    TOKYO |
| (213) 896 6500 FAX | FRANKFURT    NEW YORK    WASHINGTON, D.C. |

jtreece@sidley.com
(312) 853-2937

FOUNDED 1866

April 23, 2007

Stuart E. Des Roches
Odom & Des Roches, LLP
Suite 2020, Poydras Center
650 Poydras Street
New Orleans, LA 70130

Re:   *Louisiana Wholesale Drug Co., Inc. v. AstraZeneca*
      *Pharmaceuticals, L.P., et al.*; United States District
      Court, District of Columbia; Civil Case No. 06-cv-02157

Dear Stuart:

Thank you for your April 18 letter. I apologize for any delay in responding, but as your partner Greg Odom will tell you, I was at the ABA Antitrust Section meeting when it was received by my office.

We think that the issue of discovery should be addressed only if necessary after Judge Roberts rules on the pending motions to dismiss. Further, we point out that under the Agreed Protective Order entered in the California state case, plaintiff's counsel in that case may not provide documents or information produced therein to Louisiana Wholesale Drug Co., Inc. or its counsel. Doing so would be an act in contempt of that protective order and subject to sanction. Accordingly, neither Louisiana Wholesale Drug nor its counsel should attempt to obtain copies of documents produced in the California case.

Sincerely,

John W. Treece

JWT:ll

cc:   Barry Taus            Linda P. Nussbaum
      Joseph T. Lukens      Mark E. Haddad
      Scott Perwin          Alycia A. Degen
      Lauren Ravkind        Joshua E. Anderson

Sidley Austin LLP is a limited liability partnership practicing in affiliation with other Sidley Austin partnerships

# Exhibit L

1  Peter I. Ostroff (SBN 045718)
   Mark E. Haddad (SBN 205945)
2  Alycia A. Degen (SBN 211350)
3  SIDLEY AUSTIN BROWN & WOOD LLP
   555 West Fifth Street, Suite 4000
4  Los Angeles, California 90013-1010
   Telephone: (213) 896-6000
5  Facsimile: (213) 896-6600
6  Attorneys For Defendants
   AstraZeneca Pharmaceuticals LP; Zeneca Inc.
7

RECEIVED  **ORIGINAL FILED**

NOV 2 2 2005        NOV 2 8 2005

Dept. 324    LOS ANGELES
             SUPERIOR COURT

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                  FOR THE COUNTY OF LOS ANGELES

10  JAMES WEISS, individually, and on behalf of )   Case No. BC 323107
11  all others similarly situated,            )
                                              )   **CLASS ACTION**
.12          Plaintiffs,                       )
             vs.                              )   Assigned to:  Hon. Victoria Chaney
13  ASTRAZENECA PHARMACEUTICALS LP; )                Department 324
    and ZENECA INC.                           )
14                                            )   Complaint Filed: November 15, 2004
             Defendants.                       )
15                                            )   **AGREED PROTECTIVE ORDER**
                                              )   **REGARDING CONFIDENTIAL**
16                                            )   **INFORMATION**
17                                            )
    _____ )
18  KATHLEEN LEDWICK, individually and on )
    behalf of all others similarly situated,  )   Case No. BC 324518
19                                            )
20          Plaintiff,                        )   **CLASS ACTION**
             vs.                              )
21  ASTRAZENECA PHARMACEUTICALS LP; )        Assigned to:  Hon. Victoria Chaney
    and ZENECA INC.                           )                Department 324
22                                            )
             Defendants.                       )   Complaint Filed: November 15, 2004
23                                            )
                                              )   **AGREED PROTECTIVE ORDER**
24                                            )   **REGARDING CONFIDENTIAL**
                                              )   **INFORMATION**
25                                            )
26
27
28

1         WHEREAS, Sections 2025(i) and 2031(f) of the California Code of Civil

2 Procedure provide for the issuance of protective orders limiting the disclosure of discovered

3 information in appropriate circumstances, and Rule 243.1 and 243.2 of the California Rules of

4 Court provide for the lodging and filing under seal of appropriate discovered information,

5 NOW, THEREFORE, THIS _____ DAY OF _____ IT IS HEREBY ORDERED THAT:

6        1.   <u>Discovery Material</u>:   This Order applies to all products of discovery and

7 all information derived from it, including, but not limited to, all documents and deposition

8 testimony and any copies, excerpts or summaries of them, obtained by any party pursuant to the

9 requirements of any court order, requests for production of documents, requests for admissions,

10 interrogatories or subpoena.

11        2.   <u>Confidential Discovery Material</u>:   Discovery Material containing trade

12 secrets, or other confidential or proprietary research, development, manufacturing or commercial

13 or business information may be designated as "Confidential." Without prejudice to the right of a

14 party to object to the production of the following information or of a party to seek production,

15 the information subject to such designation shall include the producing party's:

16             a.   Customer names;

17             b.   Proprietary licensing, distribution, marketing, design,

18 development, research and manufacturing information regarding products and medicines,

19 whether previously or currently marketed or under development;

20             c.   Clinical studies;

21             d.   Information concerning competitors;

22             e.   Production information;

23             f.   Personnel records and information;

24             g.   Financial information not publicly filed with any federal or state

25 regulatory authorities;

26             h.   Confidential patient information; and

27             i.   Information submitted to any governmental or regulatory agency,

28 which information is exempt from public disclosure.

1      3.   a.    The parties agree that Discovery Material will be used only for the

2   litigation of actions under *Weiss, et al. v. AstraZeneca Pharmaceuticals LP, et al.*, Los Angeles

3   Superior Court Case No. BC 323107; and *Ledwick v. AstraZeneca Pharmaceuticals LP, et al.,*

4   *Los Angeles Superior Court,* Case No. BC 324518 ("Litigation"), including any appeals of this

5   Litigation, and for any other action brought by or on behalf of a an individual or organization

6   that has used, purchased or reimbursed for Nexium alleging injuries or other damages from the

7   marketing, sale, use or purchase of Nexium, so long as all parties have agreed to be governed by

8   the terms of this Order.   Confidential Discovery Material will not be disclosed except in

9   accordance with paragraphs 3.b. and 6, without prior written approval from the Court or the prior

10   written consent of the producing person or party.

11         b.    Prior to being given access to Confidential Discovery Material, any

12   person falling within subparagraphs 6.a.v., 6.a.vii. or 6.a.viii. shall be provided with a copy of

13   this Order and shall execute a copy of the Endorsement of Agreed Protective Order, attached as

14   Exhibit A. Counsel providing such access to Confidential Discovery Material shall retain copies

15   of the Endorsement(s) of Agreed Protective Order and shall provide them to counsel producing

16   Confidential Discovery Material as provided below.  For testifying Experts, a copy of the

17   Endorsement of Agreed Protective Order executed by the testifying Expert shall be furnished to

18   counsel for the party who produced the Confidential Discovery Material to which the Expert has

19   access, either at the time the Confidential Discovery Material is provided to the testifying Expert,

20   or at the time the expert's designation is served, whichever is later.

21      4.    Confidential Discovery Material, if a writing, shall have the following

22   wording stamped on the face of the writing, or shall otherwise have such wording clearly

23   marked:

24                      **CONFIDENTIAL**

25                **SUBJECT TO PROTECTIVE ORDER**

26   //

27   //

28   //

3

1  Such stamping or marking will take place prior to production by the producing person, or
2  subsequent to selection by the receiving party for copying but prior to the actual copying if done
3  expeditiously. The stamp shall be affixed in such manner as not to obliterate or obscure any
4  written matter. In the case of deposition testimony, confidentiality designations shall be made
5  within thirty (30) days after the transcript has been received by counsel making the designation,
6  and shall specify the testimony being designated confidential by page and line number(s). Until
7  the expiration of such 30 (thirty) day period, the entire text of the deposition, including exhibits,
8  shall be treated as confidential under this Order. In the event that the producing person or party
9  inadvertently fails to designate Discovery Material as Confidential in this or any other litigation,
10  it may make such a designation subsequently by notifying all parties to whom such Discovery
11  Material was produced, in writing as soon as practicable. After receipt of such notification, the
12  parties to whom production has been made shall treat the designated Discovery Material as
13  Confidential, subject to their right to dispute such designation in accordance with paragraph 7.

14       5.    All persons receiving or given access to Confidential Discovery Material
15  in accordance with the terms of this Order consent to the continuing jurisdiction of the Court for
16  the purposes of enforcing this Order and remedying any violations of it.

17       6.   a.    Confidential Discovery Material shall not be disclosed to anyone
18  other than the following categories of persons:

19            i.    The Court (and any appellate court), including court
20  personnel, jurors, and alternate jurors only in the manner provided in paragraph 9 below.

21            ii.    If produced by Plaintiffs, Defendants' in-house counsel, in-
22  house paralegals, legal assistants, management team, and outside counsel, including any
23  attorneys employed by or retained by Defendants' outside counsel who are assisting in
24  connection with this Litigation, and the paralegal, legal assistants, clerical, secretarial, and other
25  staff employed or retained by such outside counsel or retained by the attorneys employed by or
26  retained by Defendants' outside counsel.

27            iii.    If produced by Defendants, Plaintiffs' in-house counsel, in-
28  house paralegals, legal assistants, management team, and outside counsel, including any

1   attorneys employed by or retained by Plaintiffs' outside counsel who are assisting in connection

2   with this Litigation, and the paralegal, clerical, secretarial, and other staff employed or retained

3   by such counsel, as well as Plaintiffs' attorneys in other filed litigation alleging injuries or

4   damages resulting from the use or purchase of Nexium, including their paralegal, legal assistants,

5   clerical, secretarial and other staff employed or retained by such counsel, provided that such

6   counsel have agreed to be governed by the terms of this Order or another Protective Order that is

7   the substantial equivalent of this Order.  (In connection with disclosure to an attorney not bound

8   by this Order, the producing party shall be given ten (10) days notice by e-mail, facsimile or

9   FedEx of the proposed disclosure in order to determine whether the party to whom disclosure is

10   contemplated is governed by a "substantially equivalent" order.  If the producing party does not

11   object within that ten (10) day period, then disclosure may be made.  If the producing party

12   objects, then no disclosure shall be made until the matter is resolved by the Court.)

13                      iv.     Court reporters (including persons operating video

14   recording equipment at depositions) and persons preparing transcripts of testimony to the extent

15   necessary to prepare such transcripts.

16                      v.     Retained experts, advisors and consultants, including

17   persons directly employed by such experts, advisors and consultants, (collectively "Experts") but

18   only to the extent necessary to perform their work in connection with this Litigation.

19                      aa.     Prior to a Plaintiff or his/her/their counsel

20   disclosing any Confidential Discovery Material to an Expert who is a current or former

21   employee, officer, director, agent, contractor, subcontractor or consultant of any entity that is or

22   potentially may engage in the research, development, manufacture or sale of any product for the

23   treatment of erosive esophagitis, acid reflux disease, or GERD, or in any other way is or may be

24   a potential competitor of any Defendant, such Plaintiff(s) or his/her/their counsel shall promptly

25   notify (by email, facsimile or FedEx) the producing or designating person or party's counsel,

26   including with such notification a copy of the Expert's curriculum vitae. Within ten (10) business

27   days of receiving such notification and curriculum vitae, the producing or designating person or

28   party's counsel shall notify Plaintiff's counsel whether the producing or designating person or

1  party objects to the disclosure of Confidential Discovery Material to the proposed Expert. Any

2  such objection shall be made in good faith and on reasonable grounds. If an objection is made

3  and not resolved by the parties, the party objecting to disclosure shall file a motion (or letter to

4  the Court) in support of that objection within ten (10) business days of the failure to reach

5  resolution. Under no circumstances shall Confidential Discovery Material be disclosed to an

6  Expert who is a current or former employee, officer, director, agent, contractor, subcontractor or

7  consultant of any entity that is or potentially may be engaged in the research, development,

8  manufacture or sale of any product for the treatment of erosive esophagitis, acid reflux disease,

9  or GERD, or in any other way is or may be a potential competitor of any Defendant; unless and

10  until the parties resolve the matter, the objection is withdrawn, the Court permits disclosure, or

11  the producing or designating person or party fails to object to such disclosure or file a motion in

12  support of their objection within the tines specified in this section (or other schedule agreed

13  among the parties).

14             vi.       The persons who authored the Confidential Discovery

15  Material or who received such Confidential Discovery Material in the ordinary course of

16  business.

17             vii.      Witnesses and deponents.

18             vii.      Such persons as the undersigned counsel shall consent to in

19  writing before the proposed disclosure.

20        b.       All parties and their respective counsel, paralegals, legal assistants,

21  and the employees and assistants of all counsel receiving Discovery Material shall take all steps

22  reasonably necessary to prevent the disclosure of Confidential Discovery Material other than in

23  accordance with the terms of this Order.

24        c.       Disclosure of Confidential Discovery Material other than in

25  accordance with the terms of this Protective Order may subject the disclosing person to such

26  sanctions and remedies as the Court may deem appropriate, including without limitation,

27  contempt, injunctive relief and damages.

28  //

6

1         7.    a.    If at any time a party wishes for any reason to dispute a

2    designation of Discovery Material as confidential, such party shall notify the designating party

3    of such dispute in writing, specifying by exact document numbers the Discovery Material in

4    dispute and the precise nature of the dispute with regard to each such document or other

5    Discovery Material. If the parties are unable amicably to resolve the dispute, the proponent of

6    confidentiality may apply by motion to the Court for a ruling as to whether the designated

7    Discovery Material may, in accordance with Section 2031(f) of the California Code of Civil

8    Procdure and this Order, properly be treated as confidential, provided such motion is made

9    within thirty (30) days from the date on which the parties, after good faith attempt, cannot

10    resolve the dispute or such other time period as the parties may agree. Any failure to identify

11    each disputed document by bates number, and/or to specify the precise nature of the dispute with

12    respect to each such identified document, shall be presumptively inadequate to support such a

13    motion, and will provide a sufficient basis upon which any Court may deny such a motion. The

14    designating party shall have the burden of proof on such motion to establish the propriety of its

15    confidentiality designation.

16            b.    All Discovery Material designated as confidential under this Order,

17    whether or not such designation is in dispute pursuant to subparagraph 7.a. above, shall retain

18    that designation and be treated as confidential in accordance with the terms of this Order unless

19    and until:

20            i.    The time period for filing a Motion for Protective Order set

21    in Paragraph 10(a) has expired without the filing of any such Motion;

22            ii.    The producing party agrees in writing that the material is

23    no longer confidential and subject to the terms of this Order; or

24            iii.    Ten days after the expiration of the appeal period of an

25    Order of this Court that the matter shall not be entitled to confidential status (or such longer time

26    as ordered by this Court) if the Order on appeal is not subject to a stay.

27            c.    The parties shall meet and confer in good faith before filing any

28    motion relating to this Order.

7

1        8.     Any non-party who is producing Discovery Materials in this Litigation

2  may subscribe to and obtain the benefits of the term and protections of this Order by designating

3  as "Confidential" the Discovery Materials that the non-party is producing as set forth in

4  paragraphs 2 and 4. Should any such non-party fail to designate the produced documents as

5  "Confidential," then those documents shall not be considered confidential and/or subject to the

6  terms of this Order.

7        9.     In the event that any Confidential Discovery Material is used in any Court

8  proceeding, the information shall not lose its confidential status through such use, and the party

9  using such information shall take all reasonable steps to maintain its confidentiality during such

10  use. All documents, transcripts, pleadings, motions and other materials filed or lodged with the

11  Court comprising, containing or reflecting Confidential Material shall be filed or lodged pursuant

12  to California Rules of Court 243.1 and 243.2. In the event a party in receipt of Confidential

13  Discovery Material (hereafter, "Receiving Party") seeks to use such Confidential Discovery

14  Material in any Court proceeding, the Receiving Party shall notify the producing party of its

15  intent to use such materials at least ten (10) days prior to their use. In the event the Receiving

16  Party seeks to use the materials in an *ex parte* application and cannot give the producing party

17  ten (10) days notice of its intent to use the materials, the Receiving Party shall notify the

18  producing party of its intent to use the materials as soon as possible. In either event, the burden

19  shall be on the Producing party to file a motion to seal the materials pursuant to Rule 243.2 of the

20  California Rules of Court, and the Receiving Party shall file the materials conditionally under

21  seal, pending hearing on the motion to seal. Failure of the producing party to file such motion to

22  seal shall not excuse the Receiving Party's obligation to comply with this Order in all other

23  respects with regard to any document filed or lodged with the Court.

24        When filing or lodging with the Court Confidential Discovery Material, the

25  parties shall deliver such Confidential Discovery Material under seal to the Clerk of the Court.

26  Envelopes used to seal Confidential Discovery Material shall carry the notation:

27  "CONDITIONALLY UNDER SEAL: Confidential. This document is subject to a

28  Confidentiality Agreement and Protective Order issued by the Court and may not be examined or

1  copied except in compliance with that Order." Material found by the Court to meet the

2  requirements of California Rules of Court 243.1 - 243.2 shall be maintained under seal and shall

3  not be made available for public review.

4          10.   a.    Except as otherwise provided for, nothing in this Order shall

5  prevent or restrict counsel for any party in any way from inspecting, reviewing, using, or

6  disclosing any Discovery Material produced or provided by that party, including Discovery

7  Material designated as "Confidential."

8               b.    Nothing shall prevent disclosure beyond that required under this

9  Order if the producing party consents in writing to such disclosure, or if the Court, after notice to

10  all affected parties, orders such disclosure and that Order is not subject to an appellate stay

11  within twenty (20) days after it is issued.

12               c.    No disclosure pursuant to this paragraph 10 shall waive any rights

13  or privileges of any party granted by this Order.

14          11.    This Order shall not enlarge or affect the proper scope of discovery in this

15  or any other litigation, nor shall this Order imply that Confidential Discovery Material is

16  properly discoverable, relevant or admissible in this or any of the litigation. Each party reserves

17  the right to object to any disclosure of information or production of any documents that the

18  producing party designates as Confidential Discovery Material on any other ground it may deem

19  appropriate.

20          12.    The entry of this Order shall be without prejudice to the rights of the

21  parties, or any one of them, or of any non-party, to assert or apply for additional or different

22  protection.

23          13.    All parties and counsel for such parties in this Litigation shall make a

24  good faith effort to ensure that their Experts, employees and agents comply with this Order.  In

25  the event of a change in counsel, retiring counsel shall fully instruct new counsel of their

26  responsibilities under this Order.

27          14.    The terms of this Order shall survive and remain in effect after the

28  termination of this Litigation. The parties shall take such measures as are necessary and

1  appropriate to prevent the public disclosure of Confidential Discovery Material, through

2  inadvertence or otherwise, after the conclusion of this Litigation.

3         15.    Within thirty (30) days of the termination of this Litigation (including any

4  appeals) or such other time as the producing party may agree in writing, the parties shall return

5  the Confidential Discovery Material to counsel for the producing party, or certify to counsel for

6  the producing party that such Discovery Material has been destroyed, at the option of the

7  producing party.  Outside counsel, however, shall not be required to return or destroy any pretrial

8  or trial records as are regularly maintained by that counsel in the ordinary course of business,

9  which records will continue to be maintained confidential in conformity with this Order.

10         16.    If a receiving party or its counsel or expert is served with a subpoena or

11  other process by any court, administrative or legislative body, or any other person or

12  organization which calls for production of any Confidential Discovery Material produced by

13  another party, then the party to whom the subpoena or other process is directed shall not, to the

14  extent permitted by applicable law, provide or otherwise disclose such documents or information

15  until ten (10) business days after notifying counsel for the producing party (by email, facsimile

16  or FedEx) in writing of all of the following: (1) the information and documentation which is

17  requested for production in the subpoena; (2) the date on which compliance with the subpoena is

18  requested; (3) the location at which compliance with the subpoena is requested; (4) the identity

19  of the party serving the subpoena; and (5) the case name, jurisdiction and index, docket,

20  complaint, charge, civil action or other identification number or other designation identifying the

21  litigation, administrative proceeding or other proceeding in which the subpoena has been issued.

22  The party, counsel or expert receiving the subpoena or other process shall cooperate with the

23  producing party in any proceeding relating to it.

24         17.    Inadvertent production of documents subject to work-product immunity,

25  the attorney-client privilege or other legal privilege protecting information from discovery shall

26  not constitute a waiver of the immunity or privilege, provided that the producing party shall

27  promptly notify the receiving party in writing of such inadvertent production. If reasonably

28  prompt notification is made, then such inadvertently produced documents and all copies of it

1  (whether electronic or paper), as well as all notes or other work product reflecting the contents of

2  such materials, shall be returned to the producing party or destroyed, upon request, and such

3  returned or destroyed material shall be deleted from any litigation-support or other electronic or

4  paper database.   No use shall be made of such documents during depositions or at trial, nor shall

5  they be disclosed to anyone who was not given access to them prior to the request to return or

6  destroy them. The fact or circumstances of the inadvertent production may not be used by the

7  returning party to support a motion to compel the returned documents.

8  18.    This Order does not restrict or limit the use of Confidential Discovery

9  Material at any hearing or trial, which is expected to be the subject of a further protective order

10  and/or appropriate court orders in addition to any obtained under Paragraph 9 herein in

11  connection with the lodging and filing under seal of Confidential Discovery Material.

12  Nonetheless, this Order shall remain in full force and effect until modified, superseded, or

13  terminated on the record by agreement of the parties, or by order of the court(s) in which the

14  Litigation is pending. Nothing in this Order, however, shall prevent any party from seeking an

15  appropriate protective order to govern such use of Confidential Discovery Material at a hearing

16  or trial.

17  19.    This Order shall not prevent any persons bound by it from making use of

18  information or documents without the restrictions of this Order if the information or documents

19  are lawfully in their possession and/or lawfully obtained through discovery in this Litigation or

20  in any other litigation alleging injuries or damages resulting from the use or purchase of Nexium

21  in which such information was not designated as "Confidential" or subject to a protective order

22  or court as "Confidential" or subject to confidential treatment, or where there has been a

23  final judgment (including any appeal ) declaring that such information or documents are not

24  confidential.

25  //

26  //

27  //

28  //

11

1         20.     Nothing in this Order shall limit or circumscribe in any manner any rights

2 the parties may have under common law or pursuant to any statute, regulation or ethical canon.

3

4 Dated: November 22, 2005            HAGENS BERMAN SOBOL SHAPIRO

5

6                               By: _____

7                                 Elaine T. Byszewski
                                 700 South Flower St., Suite 2940
                                 Los Angeles, CA 90017-4101

8                                  Telephone: (213) 330-7150

9                                  STEVE W. BERMAN
                                 HAGENS BERMAN SOBOL SHAPIRO LLP

10                                  1301 Fifth Avenue, Suite 2900
                                 Seattle, WA 98101

11                                  Telephone: (206) 623-7292

12                                  THOMAS W. SOBOL
                                 HAGENS BERMAN SOBOL SHAPIRO LLP

13                                  One Main Street, 4th Floor
                                 Cambridge, MA 02142

14                                  Telephone: (617) 482-3700

15                                  Attorneys for Plaintiffs

16 Dated: November ___, 2005           SIDLEY AUSTIN BROWN & WOOD LLP

17

18                                 By: _____

19                                  Alycia A. Degen
                                 Attorneys For Defendants

20                                  ASTRAZENECA PHARMACEUTICALS
                                 LP and ZENECA INC.

21

22         IT IS SO ORDERED:

23

24 DATED: _____, 2005

25                                  _____
                                   Victoria G. Chaney
                                      Judge

26

27

28

1       20.    Nothing in this Order shall limit or circumscribe in any manner any rights

2    the parties may have under common law or pursuant to any statute, regulation or ethical canon.

3

4    Dated: November ___, 2005                    HAGENS BERMAN SOBOL SHAPIRO

5

6                                                  By: _____
                                                      Elaine T. Byszewski
7                                                     700 South Flower St., Suite 2940
                                                      Los Angeles, CA 90017-4101
8                                                     Telephone: (213) 330-7150

9                                                     STEVE W. BERMAN
                                                      HAGENS BERMAN SOBOL SHAPIRO LLP
10                                                    1301 Fifth Avenue, Suite 2900
                                                      Seattle, WA 98101
11                                                    Telephone: (206) 623-7292

12                                                    THOMAS W. SOBOL
                                                      HAGENS BERMAN SOBOL SHAPIRO LLP
13                                                    One Main Street, 4th Floor
                                                      Cambridge, MA 02142
14                                                    Telephone: (617) 482-3700

15                                                    Attorneys for Plaintiffs

16   Dated: November 22, 2005                     SIDLEY AUSTIN BROWN & WOOD LLP

17

18                                                By: _____
                                                      Alycia A. Degen
19                                                    Attorneys For Defendants
                                                      ASTRAZENECA PHARMACEUTICALS
20                                                    LP and ZENECA INC.

21

22                IT IS SO ORDERED:

23

24   DATED: 11-28, 2005                           _____
                                                      Victoria G. Gerrard Chaney
25                                                    Victoria G. Chaney
                                                      Judge
26

27

28

                                              12

1

**EXHIBIT A**

2

3

4

5

6

7

8          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                 **FOR THE COUNTY OF LOS ANGELES**

| | |
|---|---|
| 10   JAMES WEISS, individually, and on behalf of<br>11   all others similarly situated, | Case No. BC 323107 |
| 12            Plaintiffs,<br>        vs. | **CLASS ACTION**<br><br>Assigned to:   Hon. Victoria Chaney |
| 13   ASTRAZENECA PHARMACEUTICALS LP;<br>   and ZENECA INC. |               Department 324 |
| 14 | Complaint Filed: November 15, 2004 |
| 15            Defendants. | **ENDORSEMENT OF AGREED**<br>**PROTECTIVE ORDER** |
| 16 | |
| 17 | |
| 18   KATHLEEN LEDWICK, individually and on<br>   behalf of all others similarly situated, | Case No. BC 324518 |
| 19 | |
| 20            Plaintiff,<br>        vs. | **CLASS ACTION**<br><br>Assigned to:   Hon. Victoria Chaney |
| 21   ASTRAZENECA PHARMACEUTICALS LP;<br>   and ZENECA INC. |               Department 324 |
| 22            Defendants. | Complaint Filed: November 15, 2004 |
| 23 | **ENDORSEMENT OF AGREED**<br>**PROTECTIVE ORDER** |
| 24 | |
| 25 | |

26

27

28

13

## ENDORSEMENT OF AGREED PROTECTIVE ORDER

I, _____, state that:

1.     My address is _____

_____.

2.     My present employer is and the address of my present employer is _____

_____.

3.     My present occupation or job description is _____

_____.

4.     I have received a copy of the Protective Order in *American Federal of Labor and Congress of Industrial Organizations, et al. v. AstraZeneca Pharmaceuticals LP, et al.*, Los Angeles Superior Court Case No. BC 323107; and *Ledwick v. AstraZeneca Pharmaceuticals LP, et al., Los Angeles Superior Court,* Case No. BC 324518 ("Litigation") and I have carefully read and understand the provisions of the Protective Order.  Counsel for _____ has explained to me my obligations under the Protective Order.

5.     I will comply with all of the provisions of the Protective Order.

6.     I will hold in confidence, will not disclose to anyone not qualified under the Protective Order, and will use only for purposes of the Litigation, any Confidential Material (as defined by the Protective Order) disclosed to me.

7.     I will advise any necessary assistant of mine of the nature of any Confidential Material which I disclose to such assistant and will be responsible for assuring that such assistant complies with the same obligations or confidentiality to which I am hereby agreeing.

8.     I will return all Confidential Material which comes into my possession, and all notes, documents or things which I prepare relating thereto, to counsel for the party by whom I am employed or retained.

9.     I hereby submit to the jurisdiction of this Court for the purpose of enforcement of this Endorsement pursuant to the Protective Order.

14

1        10.    I declare that all statements made herein are true and accurate and understand that

2    any willful false statement is punishable as perjury.

3

4    Date: _____        _____

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LA1 685622v.3                                    15

1                              PROOF OF SERVICE

2   STATE OF CALIFORNIA         )

                               )  ss

3   COUNTY OF LOS ANGELES   )

4

5         I am employed in the County of Los Angeles, State of California. I am over the age

6   of 18 and not a party to the within action.  My business address is Sidley Austin Brown & Wood

7   LLP, 555 West Fifth Street, Suite 4000, Los Angeles, California 90013-1010.

8         On November 22, 2005, I served the foregoing document described as **AGREED**

9   **PROTECTIVE ORDER REGARDING CONFIDENTIAL INFORMATION** by E-MAIL on all

10   interested parties in this action as follows:

11                             **PLAINTIFF(S)**

12   Elaine T. Byszewski

13   HAGENS BERMAN SOBOL SHAPIRO LLP

     700 South Flower Street, Suite 2940

14   Los Angeles, CA 90017-4101

     Tel: (213) 330-7150

15   Elaine@hbsslaw.com

16   Steve W. Berman

17   HAGENS BERMAN SOBOL SHAPIRO LLP

     1301 Fifth Avenue, Suite 2900

18   Seattle, WA 98101

     Tel: (206) 623-7292

19   Steve@hbsslaw.com

20   Thomas M. Sobol

21   HAGENS BERMAN SOBOL SHAPIRO LLP

     One Main Street, 4th Floor

22   Cambridge, MA 02142

     Tel: (617) 482-3700

23   Tom@hbsslaw.com

24   ///

25   ///

26   ///

27

28

1

**DEFENDANT(S)**

2

3    Peter I. Ostroff
     Mark E. Haddad
     Alycia A. Degen
4    Sidley Austin Brown & Wood LLP
     555 West Fifth Street, Suite 4000
5    Los Angeles, CA 90013-1010
     Tel: 213-896-6000
6    Fax: 213-896-6600
     postroff@Sidley.com
7    mhaddad@Sidley.com
8    adegen@Sidley.com

9        I declare under penalty of perjury under the laws of the State of California that the

10   above is true and correct.

11       Executed on November 22, 2005, at Los Angeles, California.

12

13

14                                                    Lynn Levinson

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1                       <u>PROOF OF SERVICE</u>

2   STATE OF CALIFORNIA        )

                             )  ss

3   COUNTY OF LOS ANGELES    )

4

5          I am employed in the County of Los Angeles, State of California. I am over the age

6   of 18 and not a party to the within action. My business address is Sidley Austin Brown & Wood

7   LLP, 555 West Fifth Street, Suite 4000, Los Angeles, California 90013-1010.

8          On December 8, 2005, I served the foregoing document described as **NOTICE OF**

9   **ENTRY OF ORDER** by E-MAIL on all interested parties in this action as follows:

10                       **PLAINTIFF(S)**

11   Elaine T. Byszewski

12   HAGENS BERMAN SOBOL SHAPIRO LLP

     700 South Flower Street, Suite 2940

13   Los Angeles, CA 90017-4101

     Tel: (213) 330-7150

14   Elaine@hbsslaw.com

15   Steve W. Berman

16   HAGENS BERMAN SOBOL SHAPIRO LLP

     1301 Fifth Avenue, Suite 2900

17   Seattle, WA 98101

     Tel: (206) 623-7292

18   Steve@hbsslaw.com

19   Thomas M. Sobol

20   HAGENS BERMAN SOBOL SHAPIRO LLP

     One Main Street, 4th Floor

21   Cambridge, MA 02142

     Tel: (617) 482-3700

22   Tom@hbsslaw.com

23   ///

24   ///

25

    ///

26

27                     **DEFENDANT(S)**

28

1  Peter I. Ostroff
   Mark E. Haddad
2  Alycia A. Degen
3  Sidley Austin Brown & Wood LLP
   555 West Fifth Street, Suite 4000
4  Los Angeles, CA 90013-1010
   Tel:  213-896-6000
5  Fax: 213-896-6600
6  postroff@Sidley.com
   mhaddad@Sidley.com
7  adegen@Sidley.com

8          I declare under penalty of perjury under the laws of the State of California that the

9  above is true and correct.

10         Executed on December 8, 2005, at Los Angeles, California.

11

12

13                                              Lynn Levinson

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LA1 722121v.1                        -2-